SIDLEY AUSTIN LLP
Thomas R. Califano (10369867)
Charles M. Persons (24060413)
Maegan Quejada (24105999)
Jeri Leigh Miller (24102176)
Juliana L. Hoffman (24106103)
2021 McKinney Ave
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

*Counsel for the Debtors and
Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| GVS TEXAS HOLDINGS I, LLC, *et al.* [1] | Case No. 21-31121-MVL |
| Debtors. | **(Jointly Administered)** |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER
## (I) APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE
## SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (II) APPROVING
## PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY
## CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: GVS Texas Holdings I, LLC (7458); GVS Texas Holdings II, LLC (1225); GVS Portfolio I, LLC (6441); GVS Portfolio I B, LLC (7171); GVS Portfolio I C, LLC (3093); WC Mississippi Storage Portfolio I, LLC (0423); GVS Nevada Holdings I, LLC (4849); GVS Ohio Holdings I, LLC (6449); GVS Missouri Holdings I, LLC (5452); GVS New York Holdings I, LLC (5858); GVS Indiana Holdings I, LLC (3929); GVS Tennessee Holdings I, LLC (5909); GVS Ohio Holdings II, LLC (2376); GVS Illinois Holdings I, LLC (9944); and GVS Colorado Holdings I, LLC (0408). The location of the Debtors' service address is: 814 Lavaca Street, Austin, Texas 78701.

GVS Texas Holdings I, LLC and its affiliated debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors") submit this motion (this "Motion") pursuant to sections 105(a), 363, 365, and/or 503 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of an order (the "Order"), substantially in the form attached hereto as **Exhibit A**, (i) authorizing and approving the bidding procedures attached hereto as **Exhibit 1** to the Order (the "Bidding Procedures"); (ii) scheduling a bid deadline, auction date, and sale hearing; (iii) approving the assumption and assignment notice, including the procedures and deadlines set forth therein, attached as **Exhibit 2** to the Order (the "Assumption and Assignment Notice"); and (iii) granting related relief. In support of this Motion, the Debtors respectfully state as follows:

## Preliminary Statement

1.      This Motion and the accompanying Bidding Procedures are submitted in connection with the Debtors' Plan of Reorganization filed on October 4, 2021. The Plan contains a "sale toggle" feature, i.e., the Debtors will market their equity and assets pursuant to the Bidding Procedures, however, if at any time prior to the date which is ten (10) days prior to the scheduled auction (the "Sale Trigger Date"), the Debtors' existing equity interests produces the financing necessary to confirm the Plan, the marketing process will be terminated. This toggle feature provides certainty that this case will be resolved while at the same time preserving equity's option to retain control of the Debtors' Assets.

## Status of the Cases and Jurisdiction

2.      On June 17, 2021, (the "Subsidiaries Petition Date") the debtors and debtors in possession, with the exception of GVS Portfolio I C, LLC, filed voluntary petitions for relief under

2

chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas (the "Court"). On June 23, 2021 (the "Parent Petition Date," and, together with the Subsidiaries Petition Date, the "Petition Date") GVS Portfolio I C, LLC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Court. The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.     On September 29, 2021, RREF III Storage LLC moved for the appointment of a chapter 11 trustee in these cases (the "Trustee Motion"). A briefing schedule on the Trustee Motion has been set by the Court, with the next status conference on the Trustee Motion to occur on October 13, 2021 at 9:30 a.m. (CT). No party has requested the appointment of an examiner in these cases, and no statutory committee has been appointed.

4.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the District Court's Miscellaneous Order No. 33, Order of Reference of Bankruptcy Cases and Proceedings *Nunc Pro Tunc* dated August 3, 1984. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.     The statutory and other bases for the relief requested in this Motion are Bankruptcy Code sections 105(a), 363, and 365, Bankruptcy Rules 2002, 6004, and 6006.

## Background

### A.     General Background

7.     Debtors are limited liability companies with the principal business of owning and leasing a wide array of properties functioning principally as self-storage and parking facilities. The properties are managed by a non-Debtor operating affiliate—Great Value Storage, LLC—that

maintains and manages the facilities. The Debtors have 64 storage locations in Texas, Colorado, Illinois, Indiana, Mississippi, Missouri, Nevada, New York, Ohio, and Tennessee. Six of the properties are in the Dallas-Fort Worth Metroplex, with an additional 28 located elsewhere in the State of Texas. Since their formation, the Debtors and their non-Debtor operating affiliate have generated revenue and marketed their services as "Great Value Storage,"[2] and maintain approximately 30,811 units, totaling 4,103,764 square feet. The storage units offer secure storage with 24-hour security systems, both climate controlled and non-climate controlled, RV, car, and boat parking, moving and storage supplies and moving truck rentals. In addition to conventional storage units, the GVS Portfolio includes 1,380 covered and uncovered vehicle parking units; thirteen office, warehouse and retail commercial spaces; four campsites; seven billboards; and, two cell tower leases.

8. On the petition date, the Debtors' board consisted of Robert D. Albergotti, an independent director, Natin Paul, principal shareholder of the Debtors' ultimate corporate parent, Richard Arthur, an independent director, and Colleen De Vries, an independent director. Each of the Debtors are directly or indirectly owned by GVS Portfolio I, LLC, GVS Portfolio I B, LLC, and GVS Portfolio I C, LLC.

### B. Debtors' Marketing Process

9. On October 4, 2021, the Debtors' filed their *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization for GVS Texas Holdings I, LLC and its Debtor Affiliates* [Docket No. 208] (the "Disclosure Statement") and their *Joint Chapter 11 Plan of Reorganization for GVS Texas Holdings I, LLC and its Debtor Affiliates* [Docket No. 207] (the "Plan"). As set forth in the Disclosure Statement and Plan, the Plan contains a toggle feature whereby the Debtors

---

[2] www.greatvaluestorage.com

will market their assets ("Assets") for a sale ("Sale") while at the same time pursuing exit financing.

10.     The Debtors retained Houlihan Lokey Capital, Inc. ("Houlihan") as its investment banker and financial advisor in June 2021. Houlihan will assist the Debtors in marketing the Assets and establishing a sale process designed to generate maximum value for all creditors and other parties in interest.[3]

11.     Houlihan is actively engaged with the Debtors to assemble and finalize various marketing materials, including a teaser and confidential information memorandum, create an initial outreach plan, and put together a comprehensive data room that would streamline potential purchaser diligence requests (collectively, the "Marketing Process"). Houlihan contemplates the Marketing Process will commence following the filing of this Motion, with initial indications of interest due from potential investors by January 24, 2022. Qualified Bids (as such term is defined in the Bidding Procedures), along with the documents necessary for such transactions will be due by March 4, 2022, with an auction to occur on March 28, 2022 (the "Auction"). Following the Auction, the Debtors would file notice of the winning bidder and seek this Court's approval of the Sale.

12.     A more detailed timeline setting forth the key milestone dates for the Marketing Process is below:

| Date | Event |
|---|---|
| October 6 | Filing of Bid Procedures Motion |
| Oct. 7–March 3 | Debtors conduct Marketing Process, which includes targeted outreach to potential investors, responding to various diligence |

---

[3] *See* Debtors' application to retain and employ Houlihan as their investment banker and financial advisor [Docket No. 86] (the "Houlihan Retention Application") and the order approving the Houlihan Retention Application [Docket No. 178].

| | requests, and negotiation and finalization of bid proposals and documentation for the Sale |
| --- | --- |
| January 24 | Initial indications of interest due from potential bidders |
| March 4 | Bid Deadline |
| March 18 | Sale Trigger Date |
| March 18 | Debtors' Board of Directors determine (i) which proposals constitute Qualified Bids (as such term is defined in the Bidding Procedures); and (ii) enter into a stalking horse agreement with leading bidder in advance of the Auction. |
| March 21 | Notice to Qualified Bidders (as such term is defined in the Bidding Procedures) of Auction date and Stalking Horse Bid (as defined below). |
| March 28 | Auction |
| March 29 | Deadline to File Notice of Auction Results |
| (7 Days Prior to Sale Hearing) | Deadline to object to approval of Sale, including objections to the assumption and assignment of executory contracts or unexpired leases. |
| (To Be Set by the Court) | Hearing for approval the Sale |

13.      The sale timeline set forth above is reasonable and sufficient to determine the best available bids in advance of the Bid Deadline while limiting administrative costs and burdens on the estate associated with a lengthy chapter 11 process.  Accordingly, the Debtors ask that the timeline be approved as set forth above.

**Bidding Procedures and Sale**

**A.      Bidding Procedures Overview**

14.      The Debtors have developed and propose the bidding procedures summarized below and attached as **Exhibit 1** to the proposed Order in an effort to promote a transparent, competitive, and expedient sale process that will allow the Debtors to solicit, receive, and evaluate bids in a fair and accessible manner.  The Debtors designed these Bidding Procedures to encourage all parties submit their highest and best bids for the Assets and to maximize the value of the Sale

for the benefit of all parties in interest. These Bidding Procedures establish, among other things, the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the process by which the Debtors will select a stalking horse bidder, the form and manner in which the Auction will be conducted, and how the ultimate selection of a successful bidder will be determined.

15. In sum, the proposed Bidding Procedures provide as follows:[4]

a. Qualified Bid Requirements: To participate in the Auction, a party (upon approval, each a "Qualified Bidder") interested in submitting a qualified bid (a "Qualified Bid") must, on or before **March 4, 2022 at 5:00 p.m. (prevailing Central Time)** (the "Bid Deadline"), deliver (unless previously delivered) the following documents, statements, or acknowledgements (the "Bid Documents") by the Bid Deadline:

1. Confidentiality Agreement: a confidentiality agreement on terms reasonably acceptable to the Debtors and their advisors (the "Confidentiality Agreement"), which will provide that all non-public information about the Debtors and their Assets received by a potential bidder will be kept strictly confidential in accordance therewith and used only in connection with the Sale;

2. Written Submission of Asset Purchase Agreement: a binding written proposal in the form of an executed asset purchase agreement, together with all exhibits and schedules thereto, that identifies the Assets, or portion of the Assets, sought to be acquired and that specifies the amount of cash and other consideration (the "Purchase Price") to be offered; provided that in determining the value of a bid, the Debtors will not be limited to evaluating the dollar amount of a bid but may also consider other factors affecting the speed, certainty, and value of the proposed transactions;

3. Identity of Purchaser: full disclosure of the identity of the entity bidding or otherwise financing the bid, including a statement of the representatives who are authorized to appear and act on behalf of the bidder at the Auction;

---

[4] This summary is qualified in its entirety by reference to the provisions of the Bidding Procedures themselves. In the event of any inconsistencies between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern. Unless otherwise defined, capitalized terms shall have the meanings ascribed to them in the Bidding Procedures.

4. <u>Commitment to Close or Serve as Back-Up Bidder</u>: a written statement that (i) the bidder is willing to consummate and fund the sale of the Assets pursuant to the asset purchase agreement within three (3) business days after satisfaction of any conditions to closing; and (ii) the bidder is alternatively willing to serve as the Back-Up Bidder;

5. <u>Irrevocable</u>: a statement that the bid is irrevocable until (i) if the bid is designated as the Successful Bid, the closing of the sale of the Assets to such bidder; and (ii) if such bid is designated as the Back-Up Bid, the earlier to occur of (A) five (5) days after the closing of the transaction by which all of the Assets that were subject to the Back-Up Bid have been transferred to one or more Qualified Bidders at the closing of the sale of the Assets to such bidder(s), or (B) twenty-one days after the Sale Hearing;

6. <u>Bid Protections</u>: a statement that, unless such bid is designated as the Stalking Horse Bid (as defined below) by the Debtors in advance of the auction, that such bid is not subject to any break-up fee, transaction fee, termination fee, expense reimbursement, or any similar type of payment or reimbursement obligation (collectively, the "<u>Bid Protections</u>"); <u>provided</u> that if designated as the Stalking Horse Bid (as defined below), such Bid Protections, in the aggregate, shall not exceed a maximum of three percent (3%) of the cash portion of the Purchase Price;

7. <u>Contingencies</u>: a statement that the bid is not conditioned on any due diligence, internal approval, financing, regulatory, or other third-party approval contingencies of any kind (other than regulatory contingencies required by law);

8. "<u>As-Is, Where-Is</u>": an acknowledgement and representation that the bidder (i) has had the opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in makings its bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or with the Auction;

9. <u>Executory Contracts and Unexpired Lease to Be Assumed</u>: identification with reasonable particularity of the executory contracts and unexpired leases of the Debtors that the bidder seeks to have assumed and assigned pursuant to the asset purchase agreement;

10. <u>Adequate Assurance</u>: evidencing the potential bidder's ability to comply with section 365 of the Bankruptcy Code, including providing

adequate assurance of such bidder's ability to perform in the future the contracts and leases proposed in its bid to be assumed by the Debtors and assigned to such bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases;

11. Proof of Ability to Close: proof by the bidder of its financial capacity to close the proposed Bid, including payment of any cure amount with respect to any contract that may be assigned, which may include current unaudited financial statements of, or verified financial commitments obtained by, the bidder, the adequacy of which the Debtors and their advisors will determine in their sole discretion;

12. Corporate Authority: evidencing authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission of the bid and the consummation of the transactions contemplated in such bidder's asset purchase agreement;

13. Good Faith Deposit: a deposit paid by wire transfer of immediately available funds or such other form acceptable to the Debtors payable to the order of the Debtors (the "Good Faith Deposit") in the amount of not less than ten percent (10%) of the stated Purchase Price to be held in an account designed by the Debtors to be applied or returned, as applicable, pursuant to the terms of these Bidding Procedures;

14. Access to Books and Records: a statement that the bidder will allow the Debtors reasonable access to the Debtors' books and records for the administration of these chapter 11 cases if the bid provides for the purchase of such books and records; and

15. Good Faith of Bidder: a statement that the bid constitutes a good faith, *bona fide* offer to effectuate the proposed transaction.

b. Submission of Bid Documents: The bid documents shall be submitted by email to the following parties:

1. counsel for the Debtors, Sidley Austin LLP: Thomas R. Califano (tom.califano@sidley.com), Charles Persons (cpersons@sidley.com), Jeri Leigh Miller (jeri.miller@sidley.com), Juliana Hoffman (jhoffman@sidley.com), and Maegan Quejada (mquejada@sidley.com);

2. the Debtors' investment banker, Houlihan: Matthew Niemann (mniemann@hl.com), Brad Jordan (bjordan@hl.com), and Ross Rosenstein (rrosenstein@hl.com); and

3. the Debtors' Board of Directors: Nate Paul (npaul@world-class.com) and Robert Albergotti (albergottib@gmail.com).

c.      Selection of Qualified Bidder / Qualified Bid:  Promptly after the Bid Deadline, the Debtors shall determine, in consultation with their advisors, whether each bidder has submitted an acceptable bid document that is deemed to be a "Qualified Bid" (and such bidder, a Qualified Bidder).  All potential bidders, whether deemed Qualified Bidders or not, consent to the jurisdiction of the Court to determine matters concerning the Sale and their bids, the Auction, or the Marketing Process generally, and waive any right to any other venue.

d.      Designation of Stalking Horse Bidder:  Following the Bid Deadline and in advance of the Auction, the Debtors, in consultation with their advisors, shall determine whether to designate the leading Qualified Bidder as the "Stalking Horse Bidder" and the leading Qualified Bid as the "Stalking Horse Bid."  To the extent such designation is made, notice of the Stalking Horse Bid, including any Bid Protections included therein, shall be filed with the Court and served on all parties in interest.

e.      Access to Due Diligence:  Only a bidder who has signed a Confidentiality Agreement, submitted a non-binding indication of interest, and provided preliminary proof of its financial capacity to close a proposed transaction, the adequacy of which the Debtors and their advisors will determine, shall be eligible to receive additional due diligence and access to additional non-public information.  Potential bidders interested in conducting due diligence should contact the Debtors' investment banker, Houlihan, at Matthew Niemann (mniemann@hl.com), Brad Jordan (bjordan@hl.com), or Ross Rosenstein (rrosenstein@hl.com).

Any potential bidder meeting the requirements above shall be granted access to all relevant information regarding the Bidding Procedures and the business of the Debtors reasonably necessary to enable a potential bidder to evaluate the Assets and submit a bid proposal.  The Debtors shall make such document access available to potential bidders through an electronic data room as soon as reasonably practicable following execution of the Confidentiality Agreement. The Debtors reserve the right to provide information in stages (*e.g.*, after a bidder has demonstrated wherewithal and indicative valuation or interest in a transaction).  All due diligence must be completed before the Bid Deadline.  No condition(s) allowing or regarding further due diligence will be accepted after the Bid Deadline unless otherwise determined by the Debtors and their advisors.

Notwithstanding the foregoing, Houlihan is not required to provide confidential, business-sensitive or proprietary information to any potential bidder if the Debtors reasonably believe that (i) such disclosure would be detrimental to the interests of the Debtors' estates, or (ii) such potential bidder does not intend in good faith, or the capacity, to consummate its bid. To the greatest extent possible, Houlihan and the Debtors shall ensure that

any material due diligence provided to any bidder will be made available to all other bidders who satisfy the requirements herein.

Each potential bidder will comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such potential bidder and its contemplated transaction. If the Debtors determine at any time in their reasonable discretion that a potential bidder is not reasonably likely to become a Qualified Bidder (as defined below), then the Debtors may terminate the distribution of due diligence information to such potential bidder and all information provided by the Debtors prior to such time will be returned to the Debtors in accordance with the terms of the applicable Confidentiality Agreement.

Each potential bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making any such bids; that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the assets in making its bid; and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures. Neither the Debtors nor any of their employees, officers, directors, affiliates, subsidiaries, representatives, agents, advisors or professionals are responsible for, and shall bear no liability with respect to, any information obtained by bidders in connection with the Sale of the Assets at the Auction.

f.  <u>Auction</u>:  If one or more Qualified Bids has been submitted in accordance with these Bidding Procedures, the Debtors will conduct an auction (the "<u>Auction</u>") commencing on **March 28, 2022 at 10:00 a.m. (prevailing Central Time)** or such later time as the Debtors shall timely notify the Qualified Bidders.  The auction shall be organized and conducted by the Debtors at the offices of its counsel, Sidley Austin LLP, 2021 McKinney Avenue, Suite 2000, or such other location as may be announced prior to the Auction to the Qualified Bidders.  The Auction will be recorded by stenographic means by an authorized court reporter.  The Auction will be conducted in accordance with the following procedures (the "<u>Auction Procedures</u>"):

1.  only the Qualified Bidders shall be entitled to bid at the Auction;

2.  only the authorized representatives of each of the Qualified Bidders, the Debtors and their advisors will be permitted to attend the Auction;

3.  to the extent a Stalking Horse Bid is not selected, the Debtors will announce the starting bid at or before the commencement of the Auction;

4. the Debtors will announce what the bidding increments and minimum overbid are at the Auction, which may be modified as necessary to the extent the Debtors deem appropriate;

5. each Qualified Bidder will be required to confirm on the record of the Auction that it has not engaged in any collusion with respect to the bidding or the Sale;

6. absent irregularities in the conduct of the Auction, the Court will not consider Bids made after the Auction is closed; and

7. the Auction shall be governed by any other Auction Procedures as may be determined by and announced by the Debtors, from time to time, on the record at the Auction.

g.   Selection of the Successful Bid:  Upon the conclusion of the Auction, the Debtors, in the exercise of their reasonable, good-faith business judgment, shall identify the highest or otherwise best Qualified Bid(s) that, in the exercise of their fiduciary duties, the Debtors in good faith believe is in the best interests of the Debtors' estates and stakeholders, which will be determined by considering, among other things:

1. the total expected consideration to be received by the Debtors;

2. the likelihood of the bidder's ability to close a transaction and the timing thereof;

3. whether any proposed modification of the Plan require re-solicitation of ballots;

4. the ability of the bidder to satisfy necessary regulatory approvals and the timing for obtaining such; and

5. the expected net benefit to the estates, including enhanced treatment of Creditors.

The Qualified Bidder(s) having submitted the successful bid (the "Successful Bid") will be deemed the "Successful Bidder." The Debtors may also designate the Back-Up Bid (as defined below). The Successful Bidder and the Debtors shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments or other documents evidencing and containing the terms upon which such Successful Bid was made.

The Debtors will present the results of the Auction to the Court at the Sale Hearing (as defined below), at which certain findings will be sought from the Court regarding the Auction, including, among other things, that (i) the Auction was conducted, and the Successful Bidder was selected, in

accordance with these Bidding Procedures, (ii) the Auction was fair in substance and procedure, (iii) the Successful Bid is a Qualified Bid as defined in these Bidding Procedures and (iv) consummation of the Successful Bid will provide the highest or otherwise best value for the Debtors' assets and is in the best interests of the Debtors' estates. The Debtors reserve the right to modify these procedures at any time if they believe it will promote a competitive process or is otherwise in the interests of the estates.

h.      <u>Sale Hearing</u>: A hearing to consider approval of the Successful Bid (the "<u>Sale Hearing</u>"), will be held by the Court at a time to be decided by the Court at the time of the entry of the proposed Order approving the Bidding Procedures. Such Sale Hearing may be continued by the Debtors by the filing of a notice with the Court.

i.      <u>Designation of Back-Up Bid</u>: If for any reason the Successful Bidder fails to consummate the Successful Bid, then the Qualified Bidder with the second highest or otherwise best Bid (the "<u>Back-Up Bidder</u>"), as determined by the Debtors, at the conclusion of the Auction and announced at that time to all the Qualified Bidders participating therein, will automatically be deemed to have submitted the highest or otherwise best Bid (the "<u>Back-Up Bid</u>"). The Debtors will be authorized to consummate the transaction pursuant to the Back-Up Bid as soon as is commercially reasonable without further order of the Court upon at least twenty-four (24) hours advance notice, which notice will be filed with the Court. Upon designation of the Back-Up Bidder at the Auction, the Back-Up Bid shall remain open until 21 days after the Sale Hearing.

j.      <u>Return of Good Faith Deposit</u>: The Good Faith Deposit of the Successful Bidder shall, upon consummation of the Successful Bid, be credited to the purchase price paid. If the Successful Bidder fails to consummate the Successful Bid, then the Good Faith Deposit shall be forfeited to, and retained irrevocably by, the Debtors, in accordance with the applicable transaction agreement. The Good Faith Deposit(s) of any unsuccessful Qualified Bidders will be returned within five (5) business days after the Auction unless such Bidder is named the Back-Up Bidder, in which case such Good Faith Deposit shall be returned within five (5) business days after the consummation of the Successful Bid.

k.      <u>Reservation of Rights</u>: Notwithstanding anything herein to the contrary, the Debtors reserve their rights to modify these Bidding Procedures in any manner that they believe will best promote the goals of the bidding process or impose, at or prior to the Auction, additional customary terms and conditions on the Sale.

**B.** **Assumption and Assignment Overview**

16. The Debtors also request approval of the Assumption and Assignment Notice in substantially the form attached as **Exhibit 2** to the Order. As soon as reasonably practicable after entry of the Order, the Debtors shall file and serve by email, mail, or facsimile the Assumption and Assignment Notice on all non-Debtor parties to an executory contract or unexpired lease listed therein (and any counsel appearing on their behalf in these chapter 11 cases). The Assumption and Assignment Notice shall identify the agreements to be potentially assumed and assigned and provide the cure amounts that the Debtors believe must be paid to cure all prepetition defaults under such agreements (each a "Cure Amount" and collectively, the "Cure Amounts").

17. An executory contract or unexpired lease's inclusion on the Assumption and Assignment Notice shall not constitute or be deemed a designation or admission by the Debtors that such contract or lease is in fact an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code, and all rights of the Debtors with respect thereto are reserved. Moreover, the inclusion of any executory contract or unexpired lease on the Assumption and Assignment Notice shall not be a guarantee that such contract or lease will ultimately be assumed and assigned in the Sale.

18. The successful Bidder shall provide adequate assurance information to the Debtors consistent with the information required in the Bidding Procedures, and the Debtors shall serve it on all of the counterparties to the contracts or leases listed on the Assumption and Assignment Notice as soon as reasonably practicable after determination of the Successful Bidder is made and a notice of Successful Bidder is filed with the Court.

19. Any objection to the Cure Amount or to the assumption and assignment of an executory contract and/or unexpired lease, including with respect to adequate assurance of future performance (collectively, a "Contract Objection"), must be filed with the Court on or before 5:00

14

p.m. (prevailing Central Time) on the date that is at least seven days prior to the Sale Hearing (as may be extended by the Debtors in their sole discretion, the "Contract Objection Deadline"), and served, so as to be actually received on the same day the Contract Objection is filed, to (a) the Debtors; (b) counsel to the Debtors; (c) the Office of the U.S. Trustee for the Northern District of Texas; and (d) counsel to the Successful Bidder at the address provided in the asset purchase agreement.

20.     Any Contract Objection must state the basis for such objection and state with specificity what Cure Amount the party to the assigned contract believes is required (in all cases with appropriate documentation in support thereof).  If no Contract Objection is timely received, the Cure Amount set forth in the Assumption and Assignment Notice shall be controlling, notwithstanding anything to the contrary in the assumed agreement or other documents as of the date of the Assumption and Assignment Notice.   The Assumption and Assignment Notice shall also provide that the Contract Objection to any Cure Amount or assumption and assignment will be heard at the Sale Hearing or at a later hearing to be set by the Court, as determined by the Debtors and the Successful Bidder.

21.     Prior to the closing of any Sale, the Debtors may amend the Assumption and Assignment Notice, including without limitation amendment of any Cure Amount, and may make a determination not to assume certain contracts or unexpired leases.  In the event the Debtors file an amended Assumption and Assignment Notice adding an assignable contract and/or lease or decreasing any proposed Cure Amount on or after the Contract Objection Deadline, the non-Debtor counterparty must file and serve a Contract Objection in accordance with the procedures described above within seven (7) days after the filing of any such amendment.  In the event the Debtors amend the Assumption and Assignment Notice to decrease the Cure Amount of

an assignable contract previously included, any such Contract Objection shall be limited to the Cure Amount only.

22.     Unless a non-Debtor party to any assumed agreement files an objection to the Cure Amount by the applicable Contract Objection Deadline, then such counterparty shall be (i) forever barred from objection to the Cure Amount; (ii) forever barred and estopped from asserting or claiming any Cure Amount, other than the Cure Amount on the schedule of the Assumption and Assignment Notice, against the Debtors, the Successful Bidder or Back-Up Bidder, as applicable, or any other assignee of the relevant contract, lease or other agreement; (iii) deemed to have consented to the assumption and assignment of the executory contract or unexpired lease to the Successful Bidder or Back-Up Bidder, as applicable; and (iv) forever barred and estopped from objecting to the assumption and assignment of its contract or lease on any basis.

23.     Entry of an order approving a Sale (any such order, a "Sale Order") shall have the effect of liquidating on a final basis all Cure Amounts that were not objected to and all Cure Amounts previously disputed that were consensually resolved prior to the Sale Hearing, and each counterparty whose Cure Amount is so liquidated shall be barred from asserting any additional cure or other amounts against the Debtors or their estates with respect to its executory contract or unexpired lease, for the time period ending on the date of the filing of the Assumption and Assignment Notice.

24.     In the event the Debtors seek to close a Sale to the Back-Up Bidder, the Debtors shall provide prompt written notice to all potentially affected counterparties, who shall then have three (3) days to object, solely on the basis of any changed circumstances regarding the proposed Cure Amount or adequate assurance since the date of the Sale Hearing.

25. The Debtors submit that compliance with the foregoing notice provisions constitutes sufficient notice of the potential assumption, assignment, and Cure Amount for the assumed executory contracts and unexpired leases. As such, except as set forth in the Sale Order, no other or further notice of the potential assumption, assignment, and Cure Amount for the assumed executory contracts and unexpired leases shall be required to be provided by the Debtors. If such notice procedures are approved, upon entry of a Sale Order, any counterparty that fails to file a Contract Objection in accordance with those procedures shall be barred from objecting to the Cure Amount and from asserting or claiming any Cure Amount, other than the Cure Amount in the Assumption and Assignment Notice, against the Debtors, the Successful Bidder or Back-Up Bidder, as applicable, or any other assignee of the relevant contract, lease, or other agreement.

## Relief Requested

26. By this Motion, the Debtors respectfully request entry of the proposed Order attached hereto as **Exhibit A**, approving the Bidding Procedures for the sale of the Debtors' assets, including the deadlines set forth therein, authorizing the Debtors to conduct an Auction, scheduling the Sale Hearing, and approving the Assumption and Assignment Notice.

## Basis for Relief Requested

**A. The Bidding Procedures Are Appropriate and Ensure the Bidding Process is Fair, Reasonable, and Will Generate Maximum Value for the Debtors and All Parties in Interest**

27. Pursuant to section 105(a) of the Bankruptcy Code, a "[c]ourt may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."[5] Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may

---

[5] 11 U.S.C. § 105(a).

use, sell, or lease, other than in the ordinary course of business, property of the estate."[6] Although

section 363(b) does not specify a standard for determining when it is appropriate for a court to

authorize the use, sale or lease of property of the estate, courts within the Fifth Circuit and

elsewhere have required that such use, sale or lease be based upon the sound business judgment of

the debtor.[7]

28.     The demonstration of a valid business justification by the debtor leads to a strong

presumption "that in making [the] business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best interests

of the company."[8]  Deference should be given by the court to the business judgment of the debtor

in making this determination.[9]  Accordingly, any party objecting to a debtor's proposed asset sale

must make a showing of "bad faith, self-interest, or gross negligence" to succeed.[10]

29.     Given that the principal purpose of any sale of proposed property of the debtor's

estate is to maximize proceeds received by the estate for the benefit of creditors and all parties in

---

[6] 11 U.S.C. § 363(b).

[7] *See Inst. Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re San Jacinto Glass Indus., Inc.*, 93 B.R. 934, 944 (Bankr. S.D. Tex. 1988); *see also, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *In re Lionel Corp.*).

[8] *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

[9] *In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in ordinary course of business, but the movant must articulate some business justification for the sale (other than the appeasement of major creditors) before the Bankruptcy Judge enters a § 363(b) sale); *see also In re Rodriguez*, 353 B.R. 144, 149 (Bankr. N.D. Tex. 2006) (stating in a chapter 7 case that the court "gives great deference to the decisions of trustees in selling property" when proper notice is provided).

[10] *In re Integrated Res., Inc.*, 147 B.R. at 656.  *Cf. In re STAK Design, Inc.*, 612 B.R. 872, 875–76 (Bankr. N.D. Tex. 2020) (determining debtor exercised its reasonable business judgment in holding private sale of assets rather than public auction where better offer unlikely given the circumstances of the case).

interest, a court may appropriately approve bidding procedures that maximize the value of a debtor's assets.[11]

30.     Here, the Debtors' selection of an offer and determination of a Successful Bid will represent a reasonable exercise of the Debtors' business judgment and, accordingly, such a sale should be approved under sections 105(a) and 363(b) of the Bankruptcy Code.  The Debtors are conducting an extensive process to market the Assets through their advisors.  The open and fair sale process contemplated by the Bidding Procedures will ensure that the Debtors' estates receive the highest or otherwise best value available for the Assets by allowing the market to determine the value of such Assets.  Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid any Successful Bidder or Backup Bidder, and establish that the Debtors and such bidder have proceeded in good faith.

31.     With respect to the Bidding Procedures, these procedures will set the parameters by which the value of the Debtors' assets and the overall transaction value may be established and tested.  As drafted, the Bidding Procedures create a competitive and fair bidding process and increase the likelihood of the maximization of the value of the Debtors' assets for the benefit of its estate and all parties in interest.

32.     Depending on the results of the Auction, a Sale conducted in accordance with the Bidding Procedures may represent the best path forward for maximizing recoveries to the Debtors' estates, the Debtors' creditors, and all parties in interest, given both the open nature of the proposed process and the Debtors' need to move forward with a transaction and conclude these chapter 11

---

[11] *See Cadle Co. v. Moore (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010) (stating a debtor in possession has a duty to "maximize the value of the estate"); *In re TM Village, Ltd.*, No. 18-32770-BJH, 2019 WL 1004571, at *10 (Bankr. N.D. Tex. Feb. 28, 2019) ("As long as [the sale] appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision to [sell] should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.") (quoting *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985).

cases as soon as possible. The Debtors submit that ample business justification exists for conducting the Auction in accordance with the Bidding Procedures and, therefore, request that the Court grant the requested relief herein.

**B.      To the Extent a Stalking Horse Bid Is Designated, the Bid Protections Are Reasonable and Necessary to Ensure Maximum Value for the Debtors' Estates**

33.      The presence of a stalking horse bidder has been shown over the years to maximize sale value by setting a floor for the auction and encouraging the submission of overbids from other qualified bidders, driving up the price of the assets and increasing recovery for creditors and a debtor's estate. Often, however, bidders are unwilling to engage in the time or expense of acting as the stalking horse bidder without the promise of certain bid protections meant to offset the risk of entering into an agreement that is subject to higher and better offers and exposing its bid to public scrutiny, all without any assurances that the transaction will be consummated.

34.      Break-up fees, expense reimbursements and other bid protections are a normal, customary, and sometimes necessary component of sales outside of the ordinary course.[12] Specifically, such bid protections are often required by a bidder to offset the cost of serving as a stalking horse bid.[13] To warrant approval of break-up fees and expenses, the Fifth Circuit required

---

[12] *See In re Integrated Res., Inc.*, 147 B.R. at 659–60 ("[B]ecause the directors of a corporation have a duty to encourage bidding, break-up fees can be *necessary* to discharge the directors' duties to maximize value.") (emphasis in original); *see also In re GGI Holdings, LLC*, No. 20-31318 (HDH) (Bankr. N.D. Tex. June 11, 2020) (approving break-up fee of 3% for an insider purchaser under short timeline); *In re Lockwood Holdings, Inc.*, No. 18-30197 (DRJ) (Bankr. S.D. Tex. July 17, 2018) (approving break-up fee of 3% for a potential stalking horse bidder to be named later); *In re Stone Energy Corp.*, No. 16-26390 (MI) (Bankr. S.D. Tex. Jan. 18, 2017) (approving break-up fee of 3% of the purchase price).

[13] *In re Integrated Res., Inc.*, 147 B.R. at 660–61 (recognizing that bid protections can prompt bidders to commence negotiations and ensure that a bidder does not retract its bid); *see also In re Hupp Int'l Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's due diligence.").

in *Asarco* a showing that the requested fees and expenses are supported by a sound business justification.[14]

35.     Generally speaking, courts within this Circuit find break-up fees to be reasonable and approve the same ranging up to approximately five percent (5%) of the total consideration received.[15]   Here, the Bid Protections offered, if any, will not exceed in the aggregate a maximum of three percent (3%) of the cash portion of the Purchase Price.   This is well within the range of reasonableness found within the Fifth Circuit and supported by the sound business justification of maximizing the value of the assets by providing a baseline bid, which may be topped or increased at Auction.   If designated, the Stalking Horse Bidder will expend significant time and resources developing its bid and offering such bid up publicly for testing at the Auction.   Such resources will be expended despite the risk to the Stalking Horse Bidder that it will not be deemed a Successful Bidder at the conclusion of this process.   The Bid Protections are necessary to incentivize the Stalking Horse Bidder to assume this important role in the Sale process and drive up the value of the Assets at Auction for the benefit of the Debtors, their estates, and their creditors.   The benefit to the estates from this maximization of value will outweigh the cost of any Bid Protections.   As such, the Bid Protection, to the extent applicable, should be approved.

---

[14] *See Asarco, Inc. v. Elliot Mgmt. (In re Asarco, L.L.C.)*, 650 F.3d 593, 597–98, 602–03 n.9 (5th Cir. 2011) (concluding on the facts of the case that the business judgment standard rather than the administrative expense standard was the proper standard to determine whether the expense reimbursement bid protection was permissible).

[15] *See In re Integrated Res., Inc.*, 147 B.R. at 662 (noting expert testimony that 3.3% is industry average for break-up fees); *see also, e.g.*, *In re Fresh Acquisitions, LLC*, No. 21-30721 (SGJ) (Bankr. N.D. Tex. Sept. 21, 2021) (approving breakup fee of $150,000, which constituted less than 5% of the cash component of the stalking horse bid); *In re Lockwood Holdings, Inc.*, (approving 3% break-up fee); *In re Stone Energy Corp.*, No. 16-26390 (MI) (approving 3% break-up fee); *In re UGHS Senior Living, Inc.*, No. 15-80399 (DRJ) (Bankr. S.D. Tex. Nov. 24, 2015) (approving 3% break up fee and 1% expense reimbursement); *In re TransCom USA Mgmt. Co., L.P.*, No. 01-35158 (KKB) (Bankr. S.D. Tex., Feb. 12, 2002) (approving break-up fee of more than 3.6%).

**C.   The Sale Should be Approved Free and Clear of all Liens, Claims, Interests, and Encumbrances**

36.   A debtor in possession may sell property free and clear of all liens, claims, interests, and encumbrances in such property under section 363(f) of the Bankruptcy Code if, among other things:

(1) applicable nonbankruptcy law permits the sale of such property free and clear of such interests;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding to accept a money satisfaction of its interest.[16]

As section 363(f) is stated in the disjunctive, satisfaction of any of its five requirements is sufficient for approval of the proposed sale.[17]

37.   To the extent the Debtors to sell any Assets on which an entity has a lien, such party will receive a copy of the notice of Successful Bidder and will have the opportunity to object.  If the Debtors continue to proceed with the sale over such objection, the Debtors will present appropriate evidence at the Sale Hearing to support approval of the Sale under one or more subdivisions of section 363(f).  Moreover, any lien, claim, interest, or encumbrance will be adequately protected by attachment to the net proceeds of the Sale in the same order of priority as existed prior to the Petition Date.  Therefore, the Debtors request that the Sale to the Successful

---

[16] 11 U.S.C. § 363(f).

[17] *See, e.g.*, *In re Partners Oil Co.*, 216 B.R. 399, 401 (Bankr. S.D. Tex. 1998) (approval sale free and clear where just one of the subsections of section 363(f) were met); *In re Collins*, 180 B.R. 447, 449–50 (Bankr. E.D. Va. 1995) ("Section 363(f) is phrased in the disjunctive, such that only one of the enumerated conditions must be met in order for the Court to approve the proposed sale").

Bidder be free and clear of all liens, claims, interests, and encumbrances, with such liens, claims, interests, and encumbrances, to the extent they remain, attaching to the proceeds therefrom.

### D. The Successful Bidder or Back-Up Bidder, as applicable, Is a Good Faith Purchaser Under Section 363(m) of the Bankruptcy Code

38.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

39.     Although the Bankruptcy Code does not define "good faith," the Fifth Circuit has determined that a good faith purchaser is one who "purchases the assets for value, in good faith, and without notice of adverse claims."[18]  The good faith status of a purchaser will only be destroyed with evidence of fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take unfair advantage of the other bidders.[19]

40.     The Debtors intend to present evidence at the Sale Hearing that the Sale is an arms'-length transaction in which the Successful Bidder or Back-Up Bidder, as applicable, and the Debtors at all times acted in good faith and without collusion.  Accordingly, the Debtors request that the Court find that the Successful Bidder or Back-Up Bidder, as applicable, is a good faith purchase entitled to the protections of section 363(m) of the Bankruptcy Code.

---

[18] *Hardage v. Herring Nat'l Bank*, 837 F.2d 1319, 1323 (5th Cir. 1988) (internal citations omitted).

[19] *TMT procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 521 (5th Cir. 2014).

**E.** **The Assumption and Assignment Notice is Appropriate and Should be Approved**

41. Section 365(f)(2) of the Bankruptcy Code provides that a trustee "may assign an executory contract or unexpired lease of the debtors only if (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.[20]

42. Section 365(a) of the Bankruptcy Code allows a debtor in possession, subject to court approval, to assume or reject any executory contract or unexpired lease of the debtor.[21] A court should approve such assumption or rejection if the decision is within the debtor's reasonable business judgment.[22] The debtor may then assign the assumed executory contract or unexpired lease provided any default thereunder has been cured or will be promptly cured and adequate assurance of future performance under such contract or lease is provided.[23]

43. Here, the Assumption and Assignment Notice reflects the business judgment of the Debtors to assume certain executory contracts or unexpired leases that are essential components to the proposed Sale. For example, it is likely that if the Debtor chose to reject such contracts or leases that the Successful Bidder would be unable to operate the business or unwilling to purchase the Assets. Additionally, the Debtors will satisfy the requirements for assumption and assignment of any executory contracts and unexpired leases in connection with the Sale Hearing, and all counterparties to the assumed contracts will be provided notice of the proposed assumption and

---

[20] 11 U.S.C. § 365(f)(2).

[21] 11 U.S.C. § 365(a).

[22] *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Tex. Health Enters. Inc. v. Lytle Nursing Home (In re Tex. Health Enters. Inc.)*, 72 F. App'x 122, 127 (5th Cir. 2003).

[23] 11 U.S.C. § 363(b)(1).

assignment and Cure Amounts, along with an opportunity to object, in advance of the Sale Hearing. Thus, the decision to assume and assign falls within the Debtor's business judgment and should be approved.

## Reservation of Rights

44. Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any party in interest's rights to dispute any claim, (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law, or (iv) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to dispute such claim subsequently.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

45. To successfully implement the Sale, the Debtors request that the Court enter the Order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

46. Notice of this Motion has been provided by email, facsimile, or overnight courier to: (a) the Office of the U.S. Trustee for the Northern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) Wells Fargo Bank, National Association, or counsel thereto; (d) Wilmington Trust, National Association, or counsel thereto; (e) ESS-GVS Holdings LLC, or counsel thereto; (f) RREF III Storage LLC, or counsel

thereto; (g) Midland Loan Services, a division of PNC Bank, National Association, or counsel thereto; (h) the United States Attorney's Office for the Northern District of Texas; (i) the Internal Revenue Service; (j) the state attorneys general for states in which the Debtors conduct business; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

47.     No prior request for the relief sought in this Motion has been made by the Debtors to this or any other court.

*[Remainder of page intentionally left blank]*

Dated: October 6, 2021
      Dallas, Texas

Respectfully submitted,

SIDLEY AUSTIN LLP
/s/ *Thomas R. Califano*

Thomas R. Califano (10369867)
Charles M. Persons (24060413)
Maegan Quejada (24105999)
Jeri Leigh Miller (24102176)
Juliana L. Hoffman (24106103)
2021 McKinney Ave
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

*Counsel for the Debtors and
Debtors in Possession*