Office of the United States Trustee
1100 Commerce Street, Room 976
Dallas, Texas 75242
(214) 767-8967

Asher Bublick
for the United States Trustee
asher.bublick@usdoj.gov

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | | |
|---|---|---|---|
| In re: | § | CASE NO. | 21-31121-MVL-11 |
| | § | | |
| **GVS TEXAS HOLDINGS I, LLC, et al.**[1] | § | **(Jointly Administered)** | |
| | § | | |
| *Debtors.* | § | | |

### UNITED STATES TRUSTEE'S OBJECTION TO
### AMENDED DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF
### GVS TEXAS HOLDINGS I, LLC AND ITS DEBTOR AFFILIATES [ECF No. 343]

William T. Neary, the United States Trustee for Region 6 ("United States Trustee"), files

this Objection (the "Objection") to Amended Disclosure Statement for the Joint Administration of

GVS Texas Holdings I, LLC and its Debtor Affiliates [ECF No. 343] (the "Disclosure Statement").

In support of the relief requested, the United States Trustee would show:

### SUMMARY

The Court should decline to approve the Disclosure Statement for the following reasons:

i.  The Disclosure Statement omits material information including, among other things:

  a.  the Debtors' available assets and their value as well as the estimated return to
    creditors under a Chapter 7 liquidation;

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: GVS Texas Holdings I, LLC (7458); GVS Texas Holdings II, LLC (1225); GVS Portfolio I, LLC (6441); GVS Portfolio I B, LLC (7171); GVS Portfolio I C, LLC (3093); WC Mississippi Storage Portfolio I, LLC (0423); GVS Nevada Holdings I, LLC (4849); GVS Ohio Holdings I, LLC (6449); GVS Missouri Holdings I, LLC (5452); GVS New York Holdings I, LLC (5858); GVS Indiana Holdings I, LLC (3929); GVS Tennessee Holdings I, LLC (5909); GVS Ohio Holdings II, LLC (2376); GVS Illinois Holdings I, LLC (9944); and GVS Colorado Holdings I, LLC (0408). The location of the Debtors' service address is: 814 Lavaca Street, Austin, Texas 78701.

b. The status of insurance claims and the receipt of insurance claim payments connected with (i) the arson or fire at Debtors' storage facility located at 16530 W Hardy Rd Houston, Texas 77060 and (b) the looting of Debtors' storage facility located at 632 Timken Rd Tomball, Texas 77375. While the form tenant agreement specifies tenants should obtain their own insurance and releases the Debtor from liability, the tenants –who have not received bankruptcy notice -- may have other legal theories. Also, the lender is entitled to know the status.

ii. The Amended Joint Chapter 11 Plan of GVS Texas Holdings I, LLC and its Debtor Affiliates [ECF No. 342] (the "Plan") is patently unconfirmable for the following reasons:

a. The Debtor has failed to provide notice of the bankruptcy to storage tenants who may have claims. Some tenants deposits are with the Debtor; the status of others is unclear to the United States Trustee. The form tenant agreement refers generically to "Greater Value Storage," without delineating the entity.

b. The Disclosure Statement and the Plan contain impermissible release and exculpation provisions in contravention of *Bank of N.Y. Trust Co. v. Off'l Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009).

c. The release provisions are "opt-out" releases and, therefore, nonconsensual for those parties who are not solicited or who otherwise do not vote on the Plan or return an opt out form because there is no meeting of the minds with regard to the releases.

d. No party should be released from any causes of action or proceedings brought by any governmental agencies in accordance with their regulatory functions.

Amending the Disclosure Statement and Plan prevents the cost and delay of materiality objections and, possibly, re-solicitation.

## FACTUAL ALLEGATIONS

### *Insurance Claims and Tenant Notice:*

1. On August 12, 2021, during the continued meeting of creditors, Debtor's representative Barbara Lee testified that the Debtors' storage facility at 16530 W Hardy Rd Houston, Texas 77060 experienced a fire that was deemed arson, that there had been an arrest, and

that an insurance claim had been filed. Ms. Lee further testified that half of the facility was damaged, and that the Debtors anticipated that the loss would be fully covered by insurance.

2. On September 1, 2021, Debtors' counsel stated to the Court that arson and looting occurred at two of Debtors' properties.

3. On December 6, 2021, the United States Trustee confirmed with Debtors' counsel that the property at 632 Timken Rd Tomball, Texas 77375 was looted while the property at 16530 W Hardy Rd Houston Texas 77060 had a fire.

4. When the United States Trustee requested a copy of the police reports and insurance claims, Debtors' counsel did not have a copy available.

5. On December 8, 2021, Debtors' counsel responded to the United States Trustee's question from two days prior whether Debtors' tenants received notice of the bankruptcy proceedings: with the exception of those tenants listed on the Debtors' Schedules because they were owed a deposit, none of the tenants who had contracted with Greater Value Storage were listed on the creditor matrix or otherwise provided notice of the bankruptcy proceedings.

6. According to the sample rental agreement produced by Debtors' counsel to the United States Trustee for Debtors' tenants in Texas, a rental agreement is between "GREAT VALUE STORAGE" and the "Occupant." Debtors' property management company, Great Value Storage, LLC, is not mentioned anywhere in the agreement.

GREAT VALUE STORAGE (hereinafter collectively Owner), rents to Occupant the storage space indicated above pursuant to the following terms and conditions:

### *Releases, Injunction, and Exculpation*

7. Article VIII.D of the Disclosure Statement discusses release provisions (including releases of third-parties by third-parties), Article VIII.E discusses exculpation provisions, and Article VIII.F discusses injunction provisions.

8.      Article VIII.C of the Plan sets forth the following releases by the Debtors:

**C.      Releases by the Debtors**

**Except as provided for in this Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors and their Estates (and any Entity seeking to exercise rights of the Estates) from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the reorganization contemplated by this Plan, the Sale, the Purchase and Sale Agreement, if applicable, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, this Plan, the pursuit of Confirmation, the pursuit of Consummation, or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection thereto, including the issuance or distribution of securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above**

**do not release obligations of any party or Entity under this Plan, or any document, instrument, or agreement executed to implement this Plan.**

**Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release set forth in this Section VIII.C, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the restructuring and implementation of this Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, or the Debtors' Estates (and any Entity seeking to exercise rights of the Estates) asserting any Claim or Cause of Action released pursuant to the Debtor Release.**

Plan at 41-42.

9.      Article VIII.D of the Plan describes releases of holders of claims or interests (the

"Third-Party Release") as follows:

---

### D. Consensual Releases by the Releasing Parties

Except as provided for in this Plan or the Confirmation Order, as of the Effective Date, for good and valuable consideration, including the obligations of the Debtor under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Person or Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the reorganization contemplated by this Plan, the Sale, the Purchase and Sale Agreement, if applicable, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement or this Plan, the pursuit of Confirmation, the pursuit of Consummation, or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection thereto, including the issuance or distribution of securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release obligations of any Person or Entity under this Plan, or any document, instrument, or agreement executed to implement this Plan.

Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release set forth in this Section VIII.D, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Court's finding that the Third Party Release is: (1) consensual; (2) essential to the confirmation of this Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise

of the Claims released by the Third Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third Party Release.

Plan at 42-43.

10. Article VIII.E of the Plan sets forth the following exculpation provision:

E. **Exculpation**

**Except as provided for in this Plan or the Confirmation Order, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, these Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, this Plan, or any restructuring transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or this Plan, the Filing of these Chapter 11 Cases, the pursuit of Confirmation, or the administration and implementation of this Plan, including the issuance of securities pursuant to this Plan or the distribution of property under this Plan, or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, gross negligence or willful misconduct, but in all respects such Persons or Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan.**

**The Exculpated Parties and parties covered by section 1125(e) of the Bankruptcy Code have, and upon Consummation of this Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan. Each of the Exculpated Parties and parties covered by section 1125(e) of the Bankruptcy Code shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code.**

Plan at 43.

11. Article VIII.F of the Plan contains the following injunction:

F. **Injunction**

**Except as otherwise expressly provided in this Plan, the Confirmation Order, or for obligations issued or required to be paid pursuant to this Plan or the Confirmation Order, all Persons or Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, settled or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Persons or Entities or the property or the estates of such Persons or Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of**

setoff, subrogation, or recoupment, or other similar legal or equitable right of any kind against any obligation due from such Persons or Entities or against the property of such Persons or Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, discharged, or settled pursuant to this Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of this Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, Plan Distributions or Reinstatement of such Claim or Interest, as applicable, pursuant to this Plan, shall be deemed to have consented to the injunction provisions set forth in this Section VIII.F.

Plan at 43-44.

12.     The term "Released Parties" is defined by the Plan in Article I.A as follows:

100.    "Released Parties" means, collectively, and in each case in its capacity as such: (a) the Debtor Released Parties; (b) the Professionals; and (c) with respect to each of the foregoing Entities, such Entity's current and former Affiliates and subsidiaries, and such Entities and their

current and former Affiliates' and subsidiaries' current and former directors, managers, officers, principals, members, employees, agents, advisors, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals and other representatives, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, and successors and assigns, each in its capacity as such.

Plan at 14-15.

13.     The term "Releasing Parties" is defined by the Plan in Article I.A as follows:

101. "Releasing Parties" means, collectively, and in each case in its capacity as such: (a) the Debtor Released Parties; (b) the Professionals; (c) each Holder of a Claim and/or Interest that (i) votes to accept the Plan, (ii) is deemed to accept the Plan, or (iii) does not return the opt-out election on the applicable ballot or form pursuant to the instructions set forth therein; and (d) with respect to each of the foregoing Entities in clauses (a) through (c), such Entity's current and former Affiliates and subsidiaries, and such Entities and their current and former Affiliates' and subsidiaries' current and former directors, managers, officers, principals, members, employees, agents, advisors, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals and other representatives, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, and successors and assigns, each in its capacity as such.

Plan at 15.

14. The term "Debtor Released Parties" is defined by the Plan in Article I.A as follows:

38. "Debtor Released Parties" means, collectively, (a) the Debtors; (b) Robert D. Albergotti; (c) each of the Debtors' Professionals; and (d) the Purchaser.

Plan at 10.

15. The term "Exculpated Parties" is defined by the Plan in Article I.A as follows:

51. "Exculpated Parties" means collectively, in each case, solely in its capacity as such: (a) the Debtor Released Parties; (b) each of the respective current professionals, advisors, accountants, attorneys, investment bankers, consultants, employees, agents, and other representatives of each of the Debtor Released Parties; and (c) the Professionals.

Plan at 11.

16. The term "Holder" is defined by the Plan in Article I.A as follows:

62. "Holder(s)" means an Entity holding a Claim or Interest, as applicable.

Plan at 12.

17. The term "Interest" is defined by the Plan in Article I.A as follows:

68. "Interest(s)" means (a) any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor that existed immediately prior to the Petition Date, including all units, shares, common stock, preferred stock, membership interests, and other instruments evidencing any fixed or contingent ownership in any Debtor or any rights to purchase or demand the issuance of any of the foregoing (including options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, or convertible, exercisable, or exchangeable securities); or (b) any other agreement, arrangement, or commitment of any character relating to, or whose value is related to, any of the foregoing.

Plan at 12.

18. The term "Professional" is defined by the Plan in Article I.A as follows:

92. "Professional" means an Entity either (a) employed pursuant to a Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code to be compensated for services rendered prior to or on the Effective Date in accordance with sections 327, 328, 329, 330 331, or 363 of the Bankruptcy Code, as applicable; or (b) awarded compensation and reimbursement by the Court pursuant to section 503(b)(4) of the Bankruptcy Code.

Plan at 14.

19. The term "Purchaser" is defined by the Plan in Article I.A as follows:

98. "Purchaser" means the purchaser or purchasers under the Purchase and Sale Agreement, together with their successors and permitted assigns.

Plan at 14.

20. Article VI.B of the Disclosure Statement lists the classes of claims, whether those classes are impaired or unimpaired, and whether those classes are deemed to accept or deemed to reject the Plan as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Senior Lender Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | PropCo Debtor Administrative Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 5 | PropCo Debtor Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 6 | PropCo Debtor General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

| Class 7 | Senior Mezz Lender Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 8 | Senior Mezz Debtor Administrative Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 9 | Senior Mezz Debtor Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 10 | Senior Mezz Debtor General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 11 | Junior Mezz Lender Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 12 | Junior Mezz Debtor General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 13 | Junior Mezz Debtor Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

Disclosure Statement at 45-46.

21.     All of the Classes (1-13) are designated as not entitled to vote and deemed to have

accepted the Plan.

22.     Article XII.L of the Plan provides that the Plan shall be construed and enforced in

accordance with the laws of the State of Texas.

23.     Although the Disclosure Statement provides that those who are entitled to vote to approve the plan will receive a ballot along with notice of the Disclosure Statement [Disclosure Statement at 2], a sample ballot is not included in Debtors' Disclosure Statement, thus a review of the opt-in/opt-out language on the ballot is not possible.

## ARGUMENT AND AUTHORITY

### I.     The Disclosure Statement fails to provide adequate information.

24.     In *In re Metrocraft Pub. Serv., Inc.*, 39 B.R. 567 (Bankr. N.D. Ga. 1984), the court listed the following nineteen factors relevant to an analysis of the adequacy of a disclosure statement: (1) the events which led to the filing of a bankruptcy petition; (2) a description of the available assets and their value; (3) the anticipated future of the company; (4) the source of information stated in the disclosure statement; (5) a disclaimer; (6) the present condition of the debtor while in chapter 11; (7) the scheduled claims; (8) the estimated return to creditors under a chapter 7 liquidation; (9) the accounting method utilized to produce financial information and the name of the accountants responsible for such information; (10) the future management of the debtor; (11) the chapter 11 plan or a summary thereof; (12) the estimated administrative expenses, including attorneys' and accountants' fees; (13) the collectability of accounts receivable; (14) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the chapter 11 plan; (15) information relevant to risks posed to creditors under the Plan; (16) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; (17) litigation likely to arise in a nonbankruptcy context; (18) tax attributes of the debtor; and (19) the relationship of the debtor with affiliates.  Adequate information also includes a description of the plan and the risks posed to creditor recovery under the plan. *In re U.S. Brass Corp.*, 194 B.R. 420, 425-25 (Bankr. E.D. Tex. 1996).

### A. *Omitted Areas of Discussion in Disclosure Statement.*

25.     The Disclosure Statement does not adequately disclose:

    a.  the available assets and their value;

    b.  the source of information stated in the disclosure statement;

    c.  the present condition of the Debtors while in Chapter 11;

    d.  the estimated return to creditors under a Chapter 7 liquidation. *See* ECF No. 343-3 (noting that liquidation Analysis is "To Come");

    e.  the accounting method utilized to produce financial information and the name of the accountants responsible for such information;

    f.  the estimated administrative expenses, including attorneys' and accountants' fees. *See* ECF No. 343 at 17 (noting that projected amount of administrative expense claims ins "Undetermined");

    g.  the collectability of accounts receivable;

    h.  financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan; and

    i.  the actual or projected realizable value from recovery of preferential or otherwise voidable transfers.

### B. *The Debtors should disclose how its insurance claims will be distributed.*

26.     In addition to the omission of the preceding general *Metrocraft* areas, the Debtors omitted any discussion of the specific events surrounding the two damaged facilities and the pending insurance claims. They should modify their Disclosure Statement and the Plan to address the status of insurance claims relating to the arson at Debtors' storage facility located at 16530 W Hardy Rd Houston, Texas 77060 and the looting of Debtors' storage facility located at 632 Timken Rd Tomball, Texas 77375.

27.     Furthermore, the Debtors should disclose the proposed distribution of the insurance proceeds.

28.     While Debtors' may argue that they have no relationship with tenants as their Texas

rental agreements are between its property management company—Great Value Storage, LLC—and tenants, the agreement is at ambiguous as it merely refers to "GREAT VALUE STORAGE" and Great Value Storage, LLC is not mentioned anywhere in the agreement. The Court should construe the document against Debtors to reflect that Debtors are the party referred to as "GREAT VALUE STORAGE" in the agreement. *See In re Hence*, 358 B.R. 294, 307 (Bankr. S.D. Tex. 2006) ("Texas law provides: 'It is well-established law that where an ambiguity exists in a contract, the contract language will be construed strictly against the party who drafted it since the drafter is responsible for the language used.'") (citation omitted).

### C. *The Debtors should clarify that claims of governmental agencies are not released.*

29.     The Debtors should modify the Disclosure Statement and the Plan to clarify that no party shall be released from any causes of action or proceedings brought by any governmental agencies in accordance with their regulatory functions, including but not limited to criminal and environmental matters. The United States Trustee requests that the Debtors include the following language in the Disclosure Statement and Plan:

> Nothing in the Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person, nor shall anything in the Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or person for any liability of such persons whatever, including without limitation any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against such persons, nor shall anything in the Confirmation Order or the Plan exculpate any party or person from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the

environmental laws or any criminal laws of the United States or any state and local authority against any party or person.

## II. **The Court should decline to approve the Disclosure Statement because the plan is patently unconfirmable because the proposed releases are impermissible under 11 U.S.C. § 524(e) and Fifth Circuit authority.**

30.     If there is a defect that makes a plan patently or inherently unconfirmable, the Court may consider and resolve that issue at the disclosure statement stage before requiring parties to proceed with solicitation of the plan and a contested confirmation hearing. *In re American Capital Equipment, LLC*, 688 F.3d 145, 153-54 (3d Cir. 2012). *See also, In re United States Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996).

31.     The Court's equitable powers under 11 U.S.C. § 105 permit the Court to control its own docket and, therefore, to decline to approve a disclosure statement when the plan it supports may not be confirmable. *In re American Capital Equipment, LLC*, 688 F.3d at 154. A plan is patently unconfirmable when confirmation defects cannot be overcome by creditor voting and the confirmation defects relate to matters upon which the material facts are not in dispute or have been fully developed at the disclosure statement hearing. *Id*. at 154-55. The Plan is patently unconfirmable because it contains impermissible release and exculpation provisions, which should be excised prior to solicitation of the Plan. *See* Decision and Order on Appeal, ECF No. 279 at 73, *In re Perdue Pharma, L.P.,* Case No. 7:21-cv-07532-CM (Bankr. S.D.N.Y. Dec. 12, 2021) (concluding that a bankruptcy court does not have statutory authority to approve non-debtor releases and that "[t]he Bankruptcy Code does not authorize a bankruptcy court to order the nonconsensual release of third-party claims against non-debtors in connection with the confirmation of a chapter 11 plan.")

### A. *Procedural Due Process Requires Notice to the Storage Tenants.*

32.     Federal Rule of Bankruptcy Procedure 2002 contemplates notice of important

events to parties who might be impacted by a bankruptcy. Some tenant deposits allegedly are with the Debtor, but we do not know the status of other deposits. While the form tenant agreement insulates the Debtor or other contracting party from liability for the unknown items stored in rented space, the tenants should be afforded notice of the bankruptcy, especially given the damage at two facilities.

### B. The Plan's non-debtor releases violate the Due Process Clause.

33.    Due process principles generally command that a litigant should have a choice as to whether to settle his or her own monetary damages claims. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845-48 (1999); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 597-98 (1997). In *Ortiz*, the Supreme Court recognized that a narrow exception to this principle exists "in certain limited circumstances" such as "where a special remedial scheme exists expressly foreclosing successive litigation by nonlitigants, as for example in bankruptcy or probate," and for limited-fund class actions under Rule 23(b)(1)(B). *Ortiz*, 527 US at 841, 846.

34.    The "special remedial scheme" of bankruptcy does not exempt non-debtor releases from the requirements of due process. The Court's reference to a "special remedial scheme" in *Ortiz* arose in the context of discussing the principle that normally one is not bound by an *in personam* judgment in a litigation in which he is not designated as a party or made a party by service of process. *Ortiz*, 527 U.S. at 846; *Martin*, 490 U.S. at 761. Bankruptcy differs because the court exercises *in rem jurisdiction* over the debtor's estate; thus, neither service of process nor personal notice is necessary for a bankruptcy court to discharge a debtor's debts. *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 192 (1902). "A bankruptcy court is able to provide the debtor a fresh start . . . despite the lack of participation of all of his creditors, because the court's jurisdiction is premised on the debtor and his estate, and not on the creditors." *Tennessee Student Assistance*

*Corp. v. Hood*, 541 U.S. 440, 447 (2004) (emphasis added).

35.    "The 'special remedial scheme' contemplated by the Bankruptcy Code addresses the rights of persons who have claims against a debtor in bankruptcy – not claims against other non-debtors." Decision and Order on Appeal, ECF No. 279 at 135, *In re Perdue Pharma, L.P.,* Case No. 7:21-cv-07532-CM (Bankr. S.D.N.Y. Dec. 12, 2021). "The 'special remedial scheme' due process exception relating to *in rem* bankruptcy proceedings simply does not give a bankruptcy court subject matter jurisdiction to release *in personam* third-party claims against a non-debtor." *Id.* at 136 (citing *In re Johns-Manville Corp.*, 600 F. 3d 135, 158 (2d Cir. 2010).

### C.  *The proposed releases grant releases of third-party claims against non-debtor third-parties.*

36.    The Third-Party Release extends to myriad non-debtors including members of the board of directors, purchasers of the Debtors' real and personal property assets, and the Debtors' professionals.

37.    The Fifth Circuit struck down all non-debtor releases except those releasing the unsecured creditors' committee and its members because "its members are the only disinterested volunteers" to be released. *Bank of N.Y. Trust Co. v. Off'l Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229, 253 (5th Cir. 2009) ("*Pacific Lumber*"); *see also United Artists Theatre Co. v. Walton (In re United Artists Theatre Co.)*, 315 F.3d 217, 227 (3d Cir. 2003) (holding that plan release provisions did not render moot United States Trustee's appeal of indemnity provisions of financial advisor's employment agreement).  The Fifth Circuit reasoned that the release of the debtors' officers, directors, and professionals should be disallowed because there was no evidence that they "were jointly liable for any . . . pre-petition debt.  They are not guarantors or sureties, nor are they insurers." *Pacific Lumber*, 584 F.3d at 252.  The Fifth Circuit held that 11 U.S.C. § 524(e) was never intended to protect non-debtor parties from "any negligent conduct

that occurred during the course of the bankruptcy." *Id*; *see also Dropbox, Inc. v. Thru, Inc., et al. (In re Thru, Inc.)*, 2018 WL 5113124, *23 (N.D. Tex. 2018).

### D. The proposed releases grant releases of third-party claims against non-debtor third-parties.

38.     In the Plan, the Debtors couch the Third-Party Release in terms of a Rule 9019 settlement.  The Debtors may not settle third-party claims against third-parties.

39.     This Court should decline to approve the Disclosure Statement unless and until the release, exculpation, and injunction provisions in the Plan are excised or modified so that they comply with Fifth Circuit authority.  *In re Zale Corp.*, 62 F.3d 746, 759-60 (5th Cir. 1995) (overturning the bankruptcy court's injunction against pursuing claims against non-debtor third-parties as effectively discharging a non-debtor) ("*Zale*").

40.     The Fifth Circuit has reaffirmed this principal in the context of an SEC receivership. *SEC v. Stanford Int'l Bank, Ltd.*, 927 F.3d 830, 841 (5th Cir. 2019) ("*Stanford*").  "[T]he court may not exercise unbridled authority over assets belonging to third parties to which the receivership estate has no claim."  *Id*.  Analogizing the SEC receivership in *Stanford* to bankruptcy cases, the Fifth Circuit highlighted *Zale* and other Fifth Circuit opinions that prohibit settling unrelated, third-party claims against non-debtor third-parties.  "The prohibition on enjoining unrelated, third-party claims without the third parties' consent does not depend on the Bankruptcy Code, but is a maxim of law not abrogated by the district court's equity power to fashion ancillary relief measures."  *Id*. at 842.

41.     Accordingly, the Debtors cannot use Rule 9019 to obtain this Court's approval of an otherwise nonconsensual third-party release.

### E. The proposed exculpation provision violates Fifth Circuit law.

42.     The exculpation provision included in the Plan should be modified to clarify that it

complies with 11 U.S.C. § 524(e), which was never intended to protect non-debtor parties from "any negligent conduct that occurred during the course of the bankruptcy." *Pacific Lumber*, 584 F.3d at 252. In *Pacific Lumber,* the Fifth Circuit disallowed the release of the debtors' officers, directors, and professionals because there was no evidence that they "were jointly liable for any . . . pre-petition debt. They are not guarantors or sureties, nor are they insurers." *Id.*

43. The Fifth Circuit struck down all non-debtor releases except those releasing the unsecured creditors' committee and its members because "its members are the only disinterested volunteers" seeking release. *Id.* at 253; *see also United Artists Theatre Co. v. Walton (In re United Artists Theatre Co.)*, 315 F.3d 217, 227 (3d Cir. 2003) (holding that plan release provisions did not render moot United States Trustee's appeal of indemnity provisions of financial advisor's employment agreement); *In re Thru, Inc.*, 2018 WL 5113124, *23. Bankruptcy Courts within the Northern District of Texas have resolved objections to exculpation provisions by replacing such provisions with channeling injunctions. *See e.g., In re Pilgrim's Pride Corp.*, No. 08-45664-DML-11, 2010 WL 200000 (Bankr. N.D. Tex. Jan. 14, 2010); Fourth Amended Joint Chapter 11 Plan of CHC Group Ltd. and its Affiliated Debtors (Section 10.8), ECF No. 1701, *In re CHC Group, Ltd.*, Case No. 16-31854-BJH-11 (Bankr. N.D. Tex. Feb. 16, 2017).

### F. *Release and exculpation provisions of professionals violate professional ethical obligations.*

40. Attorneys practicing in federal courts in this circuit are subject both to federal and state ethics canons. The Fifth Circuit has held that federal law applies to attorney conduct in federal court. *In re Dresser Industries, Inc.*, 972 F.2d 540, 543 (5th Cir. 1992). In *Dresser Industries,* the Fifth Circuit applied the ABA Model Rules of Professional Conduct, the ABA Model Code of Professional Responsibility, and the American Law Institute's *Restatement of the Law Governing Lawyers. Id.* at 544-45. In *Dresser,* the Fifth Circuit held, after examining relevant

federal ethics canons, that an attorney may not sue a client he represents in another matter. *Id.* at 544.

41. ABA Model Rule of Professional Conduct 1.8(h)(1) prohibits lawyers from making "an agreement prospectively limiting the lawyer's liability to a client for malpractice unless the client is independently represented in making the agreement." Similarly, Texas Disciplinary Rule 1.08(g) of Professional Conduct provides:

> (g) A lawyer shall not make an agreement prospectively limiting the lawyer's liability to a client for malpractice unless permitted by law and the client is independently represented in making the agreement, or settle a claim for such liability with an unrepresented client or former client without first advising that person in writing that independent representation is appropriate in connection therewith.

42. The Released Entities in the Plan include advisors, attorneys, accountants, investment bankers, and consultants. The proposed releases therefore prospectively limit various counsels' liability to the Releasing Parties, and as such are not permissible. *In re Thru, Inc.*, 2018 WL 5113124 at *22 (finding that plan's exculpatory provisions releasing professionals and other third parties from liability incurred in connection with, among other actions, formulating or implementing plan, were improper).

43. Furthermore, Debtors cannot unilaterally release Debtors' counsel from prospective liability given that counsel owes a duty not only to the Debtors but also to the bankruptcy estate. While the Bankruptcy Code does not specifically impose a fiduciary requirement on counsel for debtors-in-possession, "[i]t is undisputed that counsel of a debtor-in-possession owes certain fiduciary duties to both the client debtor-in-possession and the bankruptcy court." *ICM Notes, Ltd. V. Andrews & Kurth, LLP,* 278 B.R. 117, 124 (S.D. Tex. 2002), *aff'd.* 324 F.3d 768 (5th Cir. 2003). Thus while "counsel to a debtor in possession may not owe a duty

directly to creditors, counsel does have an obligation to ensure the debtor properly maintains the estate." *In re Texasoil Enterprises, Inc.*, 296 B.R. 431, 435 (Bankr. N.D. Tex. 2003). *See, e.g., Pacific Lumber*, 584 F.3d at 252 (striking third-party releases of attorneys in conjunction with confirmation of plan of reorganization).

44.     Finally, professionals are protected by fee review under section 330 of the Bankruptcy Code, under which the Court evaluates the reasonableness of a professional's services, including whether those services were necessary to the administration of the estate or beneficial at the time the services were rendered. *See In re Frazin*, 732 F.3d 313, 319-21 (5th Cir. 2013) (citing *Osherow v. Ernst & Young, L.L.P.*, 200 F.3d 382 (5th Cir. 2000)).

45.     Accordingly, the Court should not approve the Disclosure Statement until the release and exculpation provisions of professionals are stricken from the Plan.

### G.     *The opt-out releases are not consensual.*

46.     In the Fifth Circuit, releases must be consensual. *See Pacific Lumber*, 584 F.3d at 252 (observing that prior Fifth Circuit authority "seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions").

47.     Contract principals govern whether a release is consensual. *In re SunEdison, Inc.*, 576 B.R. 453, 458 (S.D.N.Y. Bankr. 2017) ("*SunEdison*").

48.     The *SunEdison* court, in applying New York state contract principles to opt-out releases, found that an opt-out provision in a ballot was not sufficient "consent" to the release to convert the failure to opt-out into affirmative consent to give the release. *Id.*

49.     "Courts generally agree that an affirmative vote to accept a plan that contains a third-party release constitutes an express consent to the release." *SunEdison*, 576 B.R. at 458 *Id.*

"Consent through silence or inaction – 'deemed consent' – raises a more difficult question. Absent a duty to speak, silence does not constitute consent." *Id.*

50.     The *SunEdison* court observed that, under New York state contract law, an offeror cannot transform an offeree's silence into acceptance when the offeree does not intend to accept the offer. *Id.* The only exceptions to this rule are (a) when the silence is misleading, (b) when silence as consent is supported by the parties' ongoing course of conduct, or (c) when the offeree accepts the benefits of the offer despite reasonable opportunity to reject and understand that the offeror expects compensation. *Id.* at 458-59.

51.     The Plan provides that the construction and enforcement of the Plan is governed by the laws of the State of Texas. The laws of the State of Texas, like New York, hold that silence does not equal consent except under limited circumstances not applicable in this case.

52.     "A contract implied in fact is one in which, under the circumstances, the acts of the parties are such as to indicate according to the ordinary course of dealing and the common understanding of men a mutual intention to contract, as where one accepts the tendered service of another under circumstances justifying the inference that such other expected to be paid for such services. Of course, in implied contracts as well as express contracts there must be shown the element of mutual agreement. But the only difference is that such agreement is expressly stated, in the one instance, and is inferred from the circumstances, in the other. A contract implied from the facts and circumstances in evidence is as binding as would be an expressed one." *Marr-Piper Co. v. Bullis*, 1 S.W.2d 572, 575 (Tex. Comm. App. 1928, judgment adopted).

53.     Silence and inaction, however, will generally not be deemed assent to an offer because, with silence, there is generally no meeting of the minds. *Texas Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty.*, 52 S.W.3d 128, 132-33 (Tex. 2000) (quoting 2 Williston on

Contracts § 6:49 (4th ed. 1991)). "[A]s a matter of law, when a party is unilaterally informed of [a contract term], 'mere failure to object within a reasonable time . . ., without more, could not establish an agreement between the parties.'" *In re Couture Hotel Corporation*, 554 B.R. 369, 381 (Bankr. N.D. Tex. 2016) (quoting *Triton Oil and Gas Corp. v. Marine Contractors and Supply, Inc.*, 665 S.W. 2d 443, 445 (Tex. 1982)). "'[A] meeting of the minds is an essential element of an implied in fact contract.'" *Id*. (quoting *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 49 (Tex. 2008)).

54. Conspicuous warnings of the effect of silence in the disclosure statement, on the plan ballots, or on an opt out form are not enough to convert a creditor's silence into consent to the release. In *SunEdison*, the debtors argued that the warning in the disclosure statement and on the ballots regarding the potential effect of silence gave rise to a duty to speak, and the nonvoting creditors' failure to object to the plan or to reject the plan should be deemed their consent to the release. *SunEdison*, 576 B.R. at 460. The court rejected this argument because the debtors failed to show that the nonvoting creditors' silence was misleading or that the nonvoting creditors silence signified their intention to consent to the release (finding that silence could easily be attributable to other causes). *Id*. The debtors did not contend that an ongoing course of conduct between themselves and the nonvoting creditors gave rise to a duty to speak. *Id*.

55. "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." *In re Chassix Holdings, Inc.*, 533 B.R. 64, 88 (Bankr. S.D.N.Y. 2015).

56. This is particularly true with regard to the classes of creditors and claimants who are presumed to reject the Plan and, therefore, will never be solicited such that they might opt-out.

These classes of creditors and claimants will never be given the chance to opt-out of the release and, thus, will have it imposed on them without being given the opportunity to consent or not consent (even by way of the opt-out provision). Thus, the pretext of "consent" by failure to opt-out falls away.

57.     Moreover, the court in *SunEdison* observed that parties who are solicited, but do not vote, may have failed to vote for reasons other than an intention to assent to the releases. *SunEdison*, 576 B.R. at 461.

58.     On June 4, 2019, this Court, Judge Mullin sitting in Fort Worth, adopted the reasoning of the *SunEdison* court in considering similar opt-out third-party releases in *In re Mac Churchill, Inc.*, Case No. 18-41988-MXM-11 ("*Mac Churchill*"). Like in *SunEdison*, Judge Mullin found that inaction in connection with an opt-out provision set forth on a plan ballot is not sufficient an affirmative action on the part of the non-voting creditor to constitute consent. "The courts generally do agree that you have to have an affirmative opt-out and that silence really shouldn't be deemed consent." *See* Transcript of Confirmation Hearing, *Mac Churchill*, June 4, 2019, p. 14, ln. 1 to 3. Judge Mullin adopted the reasoning in the *SunEdison* opinion and sustained the United States Trustee's objection to confirmation. *Id.* at ln. 4 to 8.

59.     Judge Hale also adopted the reasoning of Judge Mullin in *Mac Churchill* and Judge Bernstein in *SunEdison* in sustaining the United States trustee's objection to confirmation, striking any third party release by "a party who does not vote on the plan one way or another" because such non-voting party "has not expressed his consent" to the third party release and "this Court does not have the ability to force the release of an non-debtor against another non-debtor." *See* Transcript of Confirmation Hearing on Amended Chapter 11 Plan, *In re PHI, Inc., et al.*, Case No. 19-30923-HDH-11, July 30, 2019, p. 161-62, ln. 22 to 4.

60. In a colloquy with debtor's counsel in *Mac Churchill*, Judge Mullin observed than an opt-in release would be acceptable "because that's clearly an affirmative action taken on behalf of the creditor" and that, under his reading, the opt-out release would not pass muster as a consensual release under *Pacific Lumber*. *Mac Churchill* Transcript, p. 16, ln. 9-24.[2]

61. Finally, as set forth above, the Fifth Circuit, has also reaffirmed the proposition that enjoining unrelated, third-party claims without the third parties' consent is improper. *Stanford*, 927 F.3d at 842. "No matter the euphemism, a permanent bar order is a death knell intended to extinguish the [third-party] claims, which are a property interest." *Id.* at 848. Construing a creditor's failure to opt out of a release as affirmative consent to the release is every bit as euphemistic as the injunction in *Stanford*.

62. Accordingly, the Court should decline to approve a Disclosure Statement that contains release provisions that would extinguish third parties' (creditors) property rights – potential claims against non-debtor third parties – without the creditors' consent by way of the opt-out releases. Rather, the Court should require the Debtors to amend the Plan and Disclosure Statement to provide for truly consensual releases or to excise the releases in their entirety.

### H. *The opt out releases are not analogous to class action opt outs.*

63. The exception for class actions is based on the unique character of class actions – on of the most important of which is the fact that the interests of the absent class members are

---

[2] Judge Mullin also distinguished *dicta* from a recent opinion from the Southern District of Texas, *Cole v. Nabors Corp. Serv., Inc. (In re CJ Holding Co.)*, 597 B.R. 597 (S.D. Tex. 2019) ("*CJ Holdings*") that seems to approve of nondebtor third party releases. *Mac Churchill* Transcript, p. 15, ln. 5 to 10. The Fifth Circuit in *Pacific Lumber* similarly distinguished *Republic Supply Company v. Shoaf*, 815 F.2d 1046 (5th Cir. 1987) ("*Shoaf*") from other Fifth Circuit authority prohibiting, non-consensual third-party releases. *See Pacific Lumber*, 584 F.3d at 252 n. 27. Like in *Shoaf*, *CJ Holdings* essentially involved a question of *res judicata* of a confirmation order, rather than an appeal of the confirmation order in the first instance. In a collateral attack to the confirmation order, the creditor in *CJ Holdings* challenged an order enforcing the confirmation order long past the time to appeal the confirmation order, rather than appealing the order confirming a plan in the first place. *CJ Holdings*, 597 B.R. at 602-05.

adequately protected by court-certified class representatives who hold similar claims, who have incentives to pursue them, and who can be trustiest to litigate or settle the class of claims in a way that will fully protect the absent parties' interests." *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 724 (Bankr. S.D.N.Y. 2019).

64.     In the present bankruptcy, when third party releases are proposed, "no such similar protections exist." *Id.* There is no court-certified representative who held similar claims against these third parties of a kind that would be released and who has acted on behalf of other parties holding similar claims. There is no proposed resolution of claims that has been negotiated by people who hold such claims. Instead, the proposed opt out release, which will extinguish third party claims against non-debtor third parties, was made not by parties similarly situated to the proposed releasers, but made primarily at the behest of the people who would be the beneficiaries of the releases.

## **PRAYER**

Wherefore, the United States Trustee requests that the Court deny approval of the Disclosure Statement and grant to the United States Trustee such other and further relief as is just and proper.

Dated: December 20, 2021

Respectfully submitted,

WILLIAM T. NEARY
UNITED STATES TRUSTEE

*/s/ Asher M. Bublick*
Asher M. Bublick
Texas State Bar No. 24113629
Office of the United States Trustee
1100 Commerce Street, Room 976
Dallas, Texas 75242
(214) 767-8967
asher.bublick@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on December 20, 2021, that I sent a copy of the forgoing document via ECF.

*/s/ Asher M. Bublick*
Asher M. Bublick