SIDLEY AUSTIN LLP
Thomas R. Califano (10369867)
Charles M. Persons (24060413)
Maegan Quejada (24105999)
Jeri Leigh Miller (24102176)
Juliana L. Hoffman (24106103)
2021 McKinney Ave
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

*Counsel for the Debtors and
Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| GVS TEXAS HOLDINGS I, LLC, *et al.* [1] | Case No. 21-31121-MVL |
| Debtors. | **(Jointly Administered)** |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) DESIGNATING THE STALKING HORSE BIDDER; (II) APPROVING
REVISED BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (III) APPROVING REVISED PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (VI) GRANTING RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: GVS Texas Holdings I, LLC (7458); GVS Texas Holdings II, LLC (1225); GVS Portfolio I, LLC (6441); GVS Portfolio I B, LLC (7171); GVS Portfolio I C, LLC (3093); WC Mississippi Storage Portfolio I, LLC (0423); GVS Nevada Holdings I, LLC (4849); GVS Ohio Holdings I, LLC (6449); GVS Missouri Holdings I, LLC (5452); GVS New York Holdings I, LLC (5858); GVS Indiana Holdings I, LLC (3929); GVS Tennessee Holdings I, LLC (5909); GVS Ohio Holdings II, LLC (2376); GVS Illinois Holdings I, LLC (9944); and GVS Colorado Holdings I, LLC (0408).  The location of the Debtors' service address is: 814 Lavaca Street, Austin, Texas 78701.

GVS Texas Holdings I, LLC and its affiliated debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors") submit this motion (this "Motion") pursuant to sections 105(a), 363, 365, 503, and/or 507 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") and Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of an order (the "Revised Bidding Procedures Order"), substantially in the form attached hereto as **Exhibit A**; (i) authorizing the Debtors to enter into the asset purchase agreement (the "Stalking Horse APA"), substantially in the same form as attached to the Revised Bidding Procedures Order as **Exhibit 1**; (ii) amending the Original Bidding Procedures,[2] (the "Revised Bidding Procedures") in substantially in the same form as attached to the Revised Bidding Procedures Order as **Exhibit 2**; (iii) approving revised procedures for the assumption and assignment of executory contracts, attached as **Exhibit 3** to the Revised Bidding Procedures Order (the "Revised Assumption and Assignment Notice"); and (vi) granting related relief. In support of this Motion, the Debtors respectfully state as follows:

**Status of the Cases and Jurisdiction**

1. On June 17, 2021, (the "Subsidiaries Petition Date") the debtors and debtors in possession, with the exception of GVS Portfolio I C, LLC, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas (the "Court"). On June 23, 2021 (the "Parent Petition Date," and, together with the Subsidiaries Petition Date, the "Petition Date"), GVS Portfolio I C, LLC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Court. The Debtors continue to operate

---

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the *Order (I) Approving Bidding Procedures in Connection with the Sale of Substantially all of the Debtors' Assets; (II) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Lease; and (III) Granting Related Relief* [Docket No. 318] (the "Original Bidding Procedures Order").

their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2. On September 29, 2021, RREF III Storage LLC ("RREF" or the "Junior Mezz Lender") filed a motion for appointment of a chapter 11 trustee. On October 12, 2021, the Office of the United States Trustee, Region 6 ("U.S. Trustee") filed a motion for the appointment of a chapter 11 trustee. On October 13, 2021, the Junior Mezz Lender voluntarily withdrew its trustee motion without prejudice to refile. On November 5, 2021, the Court denied the U.S. Trustee's motion for appointment of a chapter 11 trustee. No trustee or examiner has been appointed in these chapter 11 cases.

3. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the District Court's Miscellaneous Order No. 33, Order of Reference of Bankruptcy Cases and Proceedings *Nunc Pro Tunc* dated August 3, 1984. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

4. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The statutory and other bases for the relief requested in this Motion are Bankruptcy Code sections 105(a), 363, 365, 503, and/or 507, Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014.

**Background**

**A. General Background**

6. The Debtors are limited liability companies with the principal business of owning and leasing a wide array of properties functioning principally as self-storage and parking facilities. Each of the Debtors are directly or indirectly owned by GVS Portfolio I, LLC, GVS Portfolio I B, LLC, and GVS Portfolio I C, LLC. The properties are managed by a non-Debtor operating

3

affiliate, Great Value Storage, LLC (the "Property Manager") and have 64 storage locations in Texas, Colorado, Illinois, Indiana, Mississippi, Missouri, Nevada, New York, Ohio, and Tennessee. Six of the properties are in the Dallas-Fort Worth Metroplex, with an additional 28 located elsewhere in the State of Texas. The Property Manager enters into contracts with persons and entities, including consumers (the "Customers"), to provide self-storage units located on the real property of the PropCo Debtors.

### B.     The Original Bidding Procedures

7.     On October 6, 2021, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures in Connection with the Sale of Substantially all of the Debtors' Assets; (II) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Lease; and (III) Granting Related Relief* [Docket No. 213] seeking Bankruptcy Court approval of the Original Bidding Procedures, which the submission and consideration of competing plan sponsorship or asset purchase proposals for the sale or sales (the "Sale(s)" (including pursuant to section 363 of the Bankruptcy Code or a chapter 11 plan of reorganization)) of some or all of the assets or equity interests of one or more of the Debtors (such assets and equity interests, collectively, the "Assets"). The Original Bidding Procedures were ultimately approved on November 5, 2021.[3]

8.     Pursuant to the Original Bidding Procedures Order, the Debtors are required to seek Court approval of the Stalking Horse Bidder and any bid protections sought in connection therewith.[4] In addition, the Original Bidding Procedures provide certain conditions to be considered a "Qualified Bidder" including entering into a nondisclosure agreement ("NDA(s)"), a

---

[3] *See* Original Bidding Procedures Order.

[4] *See* Original Bidding Procedures Order ¶ 13; Original Bidding Procedures ¶ A.f.

letter of intent ("LOI(s)"), and statements of their commitment to close,[5] and establish various deadlines for key events in connection with the Sale, including a February 11, 2022 deadline to submit qualified bids (the "Bid Deadline"), and a February 21, 2022 auction ("Auction") date.[6]

      **C.**      **The Plan and Sale Process**

      9.      In furtherance of the Sale, the Debtors filed the *Amended Joint Chapter 11 Plan of GVS Texas Holdings I, LLC and its Debtor Affiliates* [Docket No. 342] (as may be further amended, modified, altered, revised or supplemented from time to time, the "Plan")[7] and the *Amended Disclosure Statement for the Joint Chapter 11 Plan of GVS Texas Holdings I, LLC and its Debtor Affiliates* [Docket No. 343]. The Plan implements the terms of the Sale and provides for the distribution of the Sale proceeds among the Debtors' stakeholders in the order of their priority under the Bankruptcy Code.

      10.      The Debtors, with the assistance of their investment banker, Houlihan Lokey Capital, Inc. ("Houlihan") have engaged in a comprehensive Sale process that was designed to maximize the value realized from the Debtors' assets. To date, the Debtors have made substantial progress and have, in accordance with the Original Bidding Procedures:

    a. established a virtual data room to allow interested purchasers to promptly conduct due diligence;

    b. distributed over 225 "teasers" to investors and potential bidders in the space;

    c. entered into approximately 61 NDAs with potential purchasers and provided these NDA counterparties access to the Debtors' virtual data room; and

    d. drafted and provided potential bidders a form asset purchase agreement.

---

[5] Original Bidding Procedures ¶ A.

[6] *Id.* ¶ ¶ A, C.

[7] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

11. Additionally, the Debtors and their advisers engaged in negotiations with several parties interested in serving as the stalking horse bidder. The Debtors determined that the bid (the "Stalking Horse Bid") from CBRE WWG Storage Partners JV III, LLC, a Delaware limited liability company (the "Stalking Horse Bidder") best served the purpose of promoting a competitive sale process and entered into an Asset Purchase Agreement (the "APA") with the Stalking Horse Bidder. The Stalking Horse Bid, which the Debtors negotiated at arms'-length with the assistance of Houlihan and the Debtors' other professionals, will serve as a baseline from which all prospective bidders will negotiate.

### i. The Stalking Horse Bid and Stalking Horse APA

12. The total estimated cash consideration for the Stalking Horse Bid is $450 million, subject to higher or otherwise better offers and certain adjustments, as well as limited conditions to closing (including approval by the Court) and rights of termination. The material terms of the APA are as follows:

a. Purchaser: CBRE WWG Storage Partners JV III, LLC;

b. Purchase Price: $450,000,000 (the "Base Amount");

c. Holdbacks/Contingency Reserve/Transition Services Amount: $20,000,000;

d. Indemnity Escrow: $4,500,000

e. Bid Protections: Break-Up Fee in an amount equal to 1.5% of the Base Amount, *plus*, Purchaser Expense Reimbursement capped at $1,500,000, each of which shall be allowed as an administrative expense claim pursuant to sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code;

f. Deposit: 10% of Base Amount;

g. Overbid: Overbids must be equal to or in excess of the sum of (i) the Base Amount, *plus* (ii) the Breakup Fee, *plus* (iii) the Purchaser Expense Reimbursement, *plus* (iv) an amount equal to 1% of the Base Amount (a "Topping Bid");

h. Outside Closing Date: May 15, 2022;

i. <u>Other Material Terms</u>: (i) Transition Services Holdback Amount, which shall be paid the transition services amount in the event all of the Transition Milestones are successfully completed on or prior to the Transition Services Expiration Date; (ii) limited termination rights for the Purchaser; (iii) no due diligence contingency; (iv) limited conditions precedent to Purchaser's obligations to close, but requirement that there not be total Events of Loss between signing and Closing to one or more Facilities of 5% of the Base Amount (approximately $22 million) or more (each as defined more fully in the Stocking Horse APA).

### ii. The Revised Bidding Procedures

13. In connection with the Stalking Horse Bid, the Debtors seek to revise the Original Bidding Procedures. The Revised Bidding Procedures remain substantially the same as the Original Bidding Procedures but have been amended to reflect the selection of the Stalking Horse Bidder and related Bid Protections (as defined herein) and otherwise facilitate a value-maximizing Auction and Sale process.

14. The material changes set forth in the Revised Bidding Procedures include:

   a. <u>Submission of Asset Purchase Agreement</u>. Bidders shall submit an asset purchase agreement in lieu of an LOI, and redline against the Stalking Horse APA, which shall (i) identify the Assets the bidder seeks to purchase; (ii) contain the form and total consideration to be paid by such bidder, including the amount of cash consideration and the liabilities to be assumed, (iii) be subject to all of the terms, conditions, and contingencies in the Stalking Horse APA; and (iv) include cash consideration equal to or greater than the Topping Bid;

   b. <u>Bid Protections</u>. Stalking Horse Bidder, but no other bidders, shall be immediately entitled to a termination fee in an amount equal to 1.5% of the Base Amount (the "<u>Break-Up Fee</u>") *plus* the sum of the aggregate amount of the Stalking Horse Bidder's actual reasonable documented out-of-pocket costs and expenses incurred by the Stalking Horse Bidder in connection with or related to the Transactions prior to the date of termination of the Stalking Horse APA (i) pursuant to Section 9.1(c), Section 9.1(d) or Section 9.1(e) of the Stalking Horse APA or (ii) by the Sellers in accordance with Section 9.1(b) or Section 9.1(h) of the Stalking Horse APA, up to a maximum amount of $1,500,000, (the "<u>Purchaser Expense Reimbursement</u>" (and together with the Breakup Fee, the "<u>Bid Protections</u>"). The Bid Protections shall constitute administrative expense claims under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code pursuant to the terms of the Stalking Horse APA;

   c. <u>Topping Bid</u>. Bidders shall be required to submit a bid equal to or in excess of the sum of (i) the Base Amount, plus (ii) the Breakup Fee, plus (iii) the Purchaser Expense Reimbursement, plus (iv) an amount equal to 1% of the Base Amount;

    d. <u>Auction</u>. The Auction will be conducted live on **February 21, 2022**. Access to the Auction will also made available by Zoom or similar video conference platform; <u>provided</u>, that each Qualified Bidder is required to have at least one (1) representative present physically at the Auction;

    e. <u>Sale Hearing</u>. The hearing to approve the Successful Bid (the "<u>Sale Hearing</u>") shall be conducted on or before **March 15, 2022**.

15. The Revised Bidding Procedures Order is attached hereto as **<u>Exhibit A</u>**, with the Stalking Horse APA attached thereto as **<u>Exhibit 1</u>**, and the Revised Bidding Procedures attached thereto as **<u>Exhibit 2</u>**. A redline reflecting changes between the Original Bidding Procedures and the Revised Bidding Procedures is attached hereto as **<u>Exhibit B</u>**. Separately, the Debtors will file a motion seeking authority to execute the Sale of the Debtors' Assets (the "<u>Sale Motion</u>").

16. Given the Debtors' need to maximize value for creditors through a timely and efficient marketing and Sale process, the ability to designate a Stalking Horse Bidder and offer such bidder Bid Protections pursuant to the Revised Bidding Procedures as set forth herein is justified, appropriate, and essential.

**Relief Requested**

17. By this Motion, the Debtors respectfully request approval of (i) the designation of the Stalking horse Bidder and Stalking Horse Bid on the terms provided in the Stalking Horse APA, (ii) customary Stalking Horse Bid Protections, in particular, the payment of the Break-Up Fee and Purchaser Expense Reimbursement; and (iii) entry of the proposed Revised Bidding Procedures Order in the form attached hereto as **<u>Exhibit A</u>**, approving the Revised Bidding Procedures for the Sale of the Debtors' Assets and the Revised Assumption and Assignment Notice reflecting appropriate changes consistent with the Revised Bidding Procedures.

**Basis for Relief Requested**

**A. Designation of the Stalking Horse Bidder and Related Bid Protections is a Valid Exercise of the Debtors' Business Judgment**

18. Based on the extensive marketing process that the Debtors and their advisors have conducted thus far, the Debtors have determined that the Stalking Horse Bid provides the best terms to serve as the Debtors' Stalking Horse Bidder. The Debtors believe that the presence of the Stalking Horse Bidder will set a floor for the value of the Assets and attract other potential buyers to bid for such Assets, thereby maximizing the realizable value of the Assets for the benefit of the Debtors' estates,

19. Pursuant to the Stalking Horse APA, the Debtors have agreed, subject to Court approval, to pay the Stalking Horse Bidder a Break-Up Fee in an amount equal to 1.5% of the Base Amount, under certain conditions outlined in the Stalking Horse APA, and the Purchaser Expense Reimbursement up to $1,500,000. Such amounts are only payable if the conditions set forth in the Stalking Horse APA are satisfied. The Debtors submit that the Bid Protections are necessary for the Stalking Horse Bidder to enter into the Stalking Horse APA, as the Stalking Horse Bidder would not have entered into the Stalking Horse APA without the Bid Protections.

20. Indeed, the Bid Protections were used by the Debtors to induce the Stalking Horse Bidder to convert the Debtors' value to a dollar figure on which other bidders could rely.[8] The Bid Protections are necessary to incentivize the Stalking Horse Bidder to assume this important role in the Sale process and drive up the value of the Assets at Auction for the benefit of the Debtors, their creditors, and interest holders. Such customary protections will therefore compensate the Stalking Horse Bidder for the benefit it provides to the Debtors' estates in the

---

[8] *See, e.g., Integrated*, 147 B.R. 650; *In re 995 Fifth Ave. Assocs. L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

event the Stalking Horse Bid and corresponding Revised Bidding Procedures elicits one or more additional qualified bids. The benefit to the estates from this maximization of value will outweigh the cost of any Bid Protections.

21. Bidding incentives such as the proposed Bid Protections have become a recognized practice in chapter 11 cases because they enable a debtor to ensure a sale to a contractually committed buyer at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process.

22. To warrant approval of break-up fees and expenses, the Fifth Circuit required in *Asarco* a showing that the requested fees and expenses are supported by a sound business justification.[9]

23. Generally speaking, courts within this Circuit find break-up fees to be reasonable and approve the same ranging up to approximately five percent (5%) of the total consideration received.[10] Here, the Breakup Fee amounts to 1.5% of the Base Amount. This is well within – and in fact, below – the range of reasonableness found within the Fifth Circuit and supported by the sound business justification of maximizing the value of the assets by providing a baseline bid, which may be topped or increased at Auction.

---

[9] *See Asarco, Inc. v. Elliot Mgmt. (In re Asarco, L.L.C.)*, 650 F.3d 593, 597–98, 602–03 n.9 (5th Cir. 2011) (concluding on the facts of the case that the business judgment standard rather than the administrative expense standard was the proper standard to determine whether the expense reimbursement bid protection was permissible).

[10] *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 662, 659 (S.D.N.Y. 1992) (noting expert testimony that 3.3% is industry average for break-up fees); *see also, e.g.*, *In re Fresh Acquisitions, LLC*, No. 21-30721 (SGJ) (Bankr. N.D. Tex. Sept. 21, 2021) (approving breakup fee of $150,000, which constituted less than 5% of the cash component of the stalking horse bid); *In re Lockwood Holdings, Inc.*, (approving 3% break-up fee); *In re Stone Energy Corp.*, No. 16-26390 (MI) (approving 3% break-up fee); *In re UGHS Senior Living, Inc.*, No. 15-80399 (DRJ) (Bankr. S.D. Tex. Nov. 24, 2015) (approving 3% break up fee and 1% expense reimbursement); *In re TransCom USA Mgmt. Co., L.P.*, No. 01-35158 (KKB) (Bankr. S.D. Tex., Feb. 12, 2002) (approving break-up fee of more than 3.6%).

      **B.**      **Administrative Expense Claim Status for the Bid Protections is Necessary in Light of the Benefits that Will Inure to the Estates**

24.      In addition, although bidding incentives in favor of a stalking horse are measured against a business judgment standard, to receive administrative expense priority pursuant to section 503(b) of the Bankruptcy Code, the bidding incentive must provide some post-petition benefit to the estate.[11] The *O'Brien* court identified two instances in which such a benefit to the estate may be found. The first instance is where the incentive promoted a more competitive bidding process, "such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."[12] The second instance is where bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as the floor bid on which other bidders can rely.[13]

25.      As explained herein, the selection of the Stalking Horse Bidder and Bid Protections are the product of extensive, good faith, arm's-length negotiations between the Debtors and the Stalking Horse Bidder and will facilitate a more competitive bidding process. The Bid Protections will permit the Debtors to insist that a competing bid be materially higher or otherwise better than the Stalking Horse Bid. The Debtors believe that the presence of the Stalking Horse Bidder and Bid Protections will increase the likelihood that they will receive the greatest possible consideration as part of the Sale, which will inure to the benefit of the estates.

---

[11] *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 533 (3d Cir. 1999).

[12] *Id.* at 537.

[13] *Id.* at 535 ("We . . . conclude that the determination whether break-up fees or expenses are allowable under §503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate. Therefore, we conclude that the business judgment rule should not be applied as such in the bankruptcy context. Nonetheless, the considerations that underlie the debtor's judgment may be relevant to the Bankruptcy Court's determination on a request for break-up fees and expenses.").

26. For these reasons, the Debtors submit that the Bid Protections are reasonable, appropriate, and necessary to preserve and enhance the value of the Assets for the benefit of the Debtors' estates and creditors, and therefore should be approved.

### C. The Revised Bidding Procedures Are Reasonable, Appropriate and Will Maximize Value for the Debtors and All Parties in Interest

27. The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate. Procedures used to enhance competitive bidding support this objective and, therefore, are appropriate in the context of bankruptcy sales.

28. The Debtors have revised the Original Bidding Procedures to enhance the bidding process and maximize value for the Debtors' estates and creditors under the unique circumstances of these cases. The Revised Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the highest or best possible consideration for the applicable Assets.

29. As provided in the Original Bidding Procedures, the Debtors and their estates, in consultation with the Consultation Parties, reserved the right to modify these Bidding Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth herein, waive terms and conditions set forth herein with respect to any or all Potential Bidders (including, without limitation, the Bid Requirements), and designate a stalking horse bidder.

30. As set forth herein, after consideration and evaluation of favorable stalking horse bids, the Debtors, in consultation with their professionals, determined the Stalking Horse Bid represents the best bid to serve as the stalking horse bidder.

31. Finally, the Revised Assumption and Assignment Notice is equally as reasonable and necessary to reflect a Sale timeline consistent with the Revised Bidding Procedures.

32. For these reasons, the Debtors submit that the Revised Bidding Procedures and Revised Assumption and Assignment Notice are fair and transparent and will derive the highest or best bids for the Assets. Accordingly, the Debtors request that the Court approve the Revised Bidding Procedures, including, without limitation, the dates established therein for the Auction and the Sale Hearing.

## Reservation of Rights

33. Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any party in interest's rights to dispute any claim, (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law, or (iv) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to dispute such claim subsequently.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

34. To successfully implement the Sale, the Debtors request that the Court enter the Order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

35. Notice of this Motion has been provided by email, facsimile, or overnight courier to: (a) the Office of the U.S. Trustee for the Northern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) Wells Fargo Bank, National Association, or counsel thereto; (d) Wilmington Trust, National Association, or counsel

thereto; (e) ESS-GVS Holdings LLC, or counsel thereto; (f) RREF III Storage LLC, or counsel thereto; (g) Midland Loan Services, a division of PNC Bank, National Association, or counsel thereto; (h) the United States Attorney's Office for the Northern District of Texas; (i) the Internal Revenue Service; (j) the state attorneys general for states in which the Debtors conduct business; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank*]

| | |
|---|---|
| Dated: January 18, 2022<br>Dallas, Texas | Respectfully submitted,<br><br>SIDLEY AUSTIN LLP<br>/s/ *Thomas R. Califano*<br>Thomas R. Califano (10369867)<br>Charles M. Persons (24060413)<br>Maegan Quejada (24105999)<br>Jeri Leigh Miller (24102176)<br>Juliana L. Hoffman (24106103)<br>2021 McKinney Ave<br>Suite 2000<br>Dallas, Texas 75201<br>Telephone: (214) 981-3300<br>Facsimile: (214) 981-3400<br><br>*Counsel for the Debtors and Debtors in Possession* |