<u>**EXHIBIT 1**</u>

**STALKING HORSE APA**

**ASSET PURCHASE AGREEMENT**

**by and among**

**CBRE WWG STORAGE PARTNERS JV III, LLC, as Purchaser,**

**and**

**GVS PORTFOLIO I C, LLC, as Parent**

**and**

**each of the entities listed on <u>Exhibit A</u> signatory hereto, collectively with Parent, as Sellers**

**Dated as of January 18, 2022**

## Table of Contents

Page

ARTICLE 1 DEFINED TERMS ........................................................................... 2

    1.1   **Defined Terms** .................................................................. 2

    1.2   **Other Definitional and Interpretive Matters** ........................ 14

ARTICLE 2 THE PURCHASE AND SALE; CLOSING ...................................... 17

    2.1   **Purchase and Sale** ............................................................ 17

    2.2   **Excluded Assets** ............................................................... 19

    2.3   **Assumption of Liabilities** ................................................. 20

    2.4   **Excluded Liabilities** .......................................................... 21

    2.5   **Excluded Contracts** .......................................................... 21

    2.6   **Nontransferable Assets and Liabilities** ............................... 21

    2.7   **Closing** ........................................................................... 22

    2.8   **Closing Deliveries of the Parties** ....................................... 22

    2.9   **Purchase Price; Assumed Liabilities; Deposits** ................... 23

    2.10   **Transition Services Holdback Amount** ............................... 25

    2.11   **Transfer Taxes** ................................................................. 26

    2.12   **Allocation of Purchase Price** ............................................ 26

    2.13   **Escrow Accounts** ............................................................. 27

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF THE SELLERS ...... 27

    3.1   **Organization, Good Standing and Other Matters; Subsidiaries** .... 27

    3.2   **Authority and Enforceability** ............................................. 28

    3.3   **No Conflict; Required Filings and Consents** ...................... 28

    3.4   **Compliance With Laws; Permits** ....................................... 28

    3.5   **Litigation** ......................................................................... 29

    3.6   **Real Property; Personal Property** ...................................... 29

    3.7   **Assignable Contracts** ........................................................ 30

    3.8   **Taxes** .............................................................................. 30

    3.9   **Employees; Employee Benefits** ......................................... 30

3.10 **Brokers and Finders** ..................................................................30

3.11 **No Other Representations or Warranties**..............................31

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF PURCHASER
........................................................................................................31

4.1 **Organization, Good Standing and Other Matters**.................31

4.2 **Authority and Enforceability**......................................................31

4.3 **No Conflict; Required Filings and Consents**...........................32

4.4 **Financing**..........................................................................................32

4.5 **Solvency**............................................................................................32

4.6 **Litigation**..........................................................................................32

4.7 **Brokers and Finders**......................................................................33

4.8 **Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other Representations and Warranties**.........33

4.9 **No Other Representations or Warranties**.................................34

ARTICLE 5 BANKRUPTCY COURT MATTERS
........................................................................................................34

5.1 **Competing Transaction**................................................................34

5.2 **Bankruptcy Court Filings**............................................................34

5.3 **Assumption of Assigned Contracts**............................................35

ARTICLE 6 PRE-CLOSING COVENANTS
........................................................................................................36

6.1 **Conduct of Business**......................................................................36

6.2 **Access to Information; Confidentiality**......................................37

6.3 **Efforts to Consummate**.................................................................39

6.4 **Notices and Consents**....................................................................39

6.5 **Regulatory Matters and Approvals**............................................39

6.6 **Public Announcements**..................................................................41

6.7 **Update of Schedules; Knowledge of Breach**............................41

6.8 **Notification of Certain Matters**..................................................42

6.9 **Revised Bidding Procedures**.......................................................42

6.10 **Title Insurance and Surveys**........................................................42

6.11 **Encumbrances**................................................................................42

ARTICLE 7 POST-CLOSING COVENANTS

.................................................................................................42

7.1    Access to Information; Books and Records ..................42

7.2    Post-Closing Receipt and Possession of Assets ..................43

7.3    Tax Matters ..................43

7.4    Use of Seller Marks ..................45

7.5    Seller Confidentiality ..................46

ARTICLE 8 CONDITIONS PRECEDENT

.................................................................................................46

8.1    Conditions to Each Party's Obligation ..................46

8.2    Conditions to Obligation of Purchaser ..................47

8.3    Conditions to Obligations of the Seller ..................48

8.4    Waiver of Condition; Frustration of Conditions ..................48

ARTICLE 9 TERMINATION

.................................................................................................48

9.1    Events of Termination ..................48

9.2    Effect of Termination ..................50

9.3    Breakup Fee; Purchaser Expense Reimbursement ..................50

ARTICLE 10 SURVIVAL; INDEMNIFICATION

.................................................................................................51

10.1    Survival of Representations, Warranties and Covenants ..................51

10.2    Indemnification by the Seller ..................51

10.3    Indemnification by Purchaser ..................52

10.4    Indemnification Procedures ..................53

10.5    Certain Limits on Indemnification ..................55

10.6    Calculation of Losses ..................56

10.7    Tax Treatment of Indemnity Payments ..................56

10.8    Release of Escrow Funds ..................56

10.9    Exclusive Remedy ..................57

ARTICLE 11 GENERAL PROVISIONS

.................................................................................................58

11.1    Entire Agreement ..................58

11.2    Amendment; No Waiver ..................58

11.3    Severability; Specific Versus General Provisions ..................59

11.4    **Expenses and Obligations** .................................................................59

11.5    **Notices** .........................................................................................59

11.6    **Counterparts** ................................................................................61

11.7    **Governing Law** ............................................................................61

11.8    **Submission to Jurisdiction; Consent to Service of Process** ..............61

11.9    **Waiver of Jury Trial** .....................................................................61

11.10   **Rights Cumulative** .......................................................................62

11.11   **Assignment** ...................................................................................62

11.12   **Specific Enforcement; Remedies** ..................................................62

11.13   **Third-Party Beneficiaries** ............................................................63

11.14   **No Personal Liability of Directors, Officers and Owners** ...............63

11.15   **General Release** ............................................................................63

11.16   **Legal Representation** ....................................................................64

11.17   **Parent** ...........................................................................................65

## SCHEDULES

Schedule A              Subsidiaries
Schedule B              Facilities

## EXHIBITS

Exhibit A               Form of Escrow Agreement
Exhibit B               Form of Bill of Sale and Assignment and Assumption
                        Agreement
Exhibit C               Form of Special Warranty Deed
Exhibit D               Form of Revised Bidding Procedures Order
Exhibit E               Form of Transition Services Agreement

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of January 18, 2022 is entered into by and among CBRE WWG Storage Partners JV III, LLC, a Delaware limited liability company ("**Purchaser**"), GVS Portfolio I C, LLC, a Delaware limited liability company (the **"Parent"**), and each of the entities listed on Schedule A and signatory hereto (the "**Subsidiaries**" and, collectively with Parent, the "**Seller Group**" or the "**Sellers**").

## RECITALS

**WHEREAS**, the Parent owns, directly or indirectly, 100% of the limited liability company interests of each of the Subsidiaries;

**WHEREAS**, on June 17, 2021, (the "**Subsidiaries Petition Date**") the Subsidiaries filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**"), and on June 23, 2021 (the "**Parent Petition Date**," and, together with the Subsidiaries Petition Date, the "**Petition Date**"), the Parent filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (collectively, the "**Bankruptcy Cases**");

**WHEREAS**, the members of the Seller Group are debtors-in-possession under the Bankruptcy Code and manage their properties and assets pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, the Parent, through itself and the Subsidiaries, is engaged in the Business and owns, directly or indirectly, all of the Transferred Assets;

**WHEREAS**, the Sellers desire to sell (or cause to be sold) to Purchaser, and Purchaser desires to purchase from the Sellers, all of the Transferred Assets Free and Clear, and the Sellers desire Purchaser to assume, and Purchaser desires to assume from the Sellers, all of the Assumed Liabilities, in each case upon the terms and subject to the conditions hereof, pursuant to a Sale Order and Sections 101(a), 363 and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure;

**WHEREAS**, the Transactions contemplated by this Agreement are subject to approval by the Bankruptcy Court and will only be consummated pursuant, among other things, to the Sale Order to be entered in the Bankruptcy Cases; and

**WHEREAS**, prior to the filing of a motion with the Bankruptcy Court seeking approval of Purchaser as the stalking horse bidder, Purchaser shall deposit (or cause to be deposited) an aggregate amount equal to the Deposit Escrow Amount into an escrow account (the "**Deposit Escrow Account**") to be established and maintained by Escrow Agent pursuant to the Escrow Agreement.

**NOW**, **THEREFORE**, in consideration of the premises and the mutual representations, warranties, covenants, agreements and conditions set forth herein, and for other good and valuable

consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE 1
## DEFINED TERMS

1.1 **Defined Terms**. The following terms shall have the following meanings in this Agreement:

"**Action**" means any action, suit, proceeding, arbitration, mediation, investigation, inquiry, hearing, inspection, demand, charge, allegation, proceeding, claim (including any counterclaim) or litigation (whether civil, criminal or administrative) commenced, brought, conducted or heard by or before any Governmental Authority, arbitrator or mediator.

"**Affiliate**" of any particular Person means any other Person, directly or indirectly, controlling, controlled by, or under common control with, such particular Person. For the purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Allocation Principles**" has the meaning set forth in Section 2.12(a).

"**Allocation Schedule**" has the meaning set forth in Section 2.12(a).

"**Alternate Transaction**" means (a) any sale consummated pursuant to the Revised Bidding Procedures, (b) any plan of reorganization or plan of liquidation confirmed in the Sellers' Bankruptcy Cases, or (c) any other sale or disposition of all or substantially all of Sellers' assets by any means.

"**Antitrust Laws**" has the meaning set forth in Section 6.5(b)

"**Asset Tax Return**" means a Tax Return relating to an obligation to pay Asset Taxes.

"**Asset Taxes**" means any Taxes with respect to the ownership or operation of the Transferred Assets other than (a) Taxes based on net or gross income, and (b) Transfer Taxes.

"**Assigned Contracts**" has the meaning set forth in Section 5.3b).

"**Assignable Contracts**" means all Contracts to which a member of the Seller Group is a party and which relate to the Business (including all Customer Contracts, Protection Plans and all Contracts relating to any Facility Revenue Rights).

"**Assumed Liabilities**" has the meaning set forth in Section 2.3.

"**Assumption Notice**" has the meaning set forth in Section 5.3a).

"**Attorney-Client Information**" has the meaning set forth in Section 11.16.

"**Auction**" has the meaning set forth in Section 5.2b).

"**Avoidance Actions**" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Sellers or their respective estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including, but not limited to, actions or remedies under Sections 502, 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

"**Back-Up Bid**" means the second highest or otherwise best bid if the successful bidder fails to consummate its bid in accordance with the Bidding Procedures or Revised Bidding Procedures, as applicable.

"**Back-up Termination Date**" means the first to occur of (a) 60 days after the entry of the Sale Order, (b) consummation of the Transactions with the winning bidder at the Auction, (c) Purchaser's receipt of notice from the Sellers of the release by the Sellers of Purchaser's obligations under Section 5.2b) and (d) May 31, 2022.

"**Bankruptcy Cases**" has the meaning set forth in the Recitals.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Base Amount**" equals $450,000,000.

"**Bidding Procedures**" means those certain bidding procedures set forth as Exhibit 1 to the Bidding Procedures Order, as such procedures may be amended from time to time thereafter in accordance with the Bidding Procedures Order.

"**Bidding Procedures Order**" means the *Order (I) Approving Bidding Procedures in Connection with the Sale of Substantially all of the Debtors' Assets; (II) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Lease; and (III) Granting Related Relief* [Docket No. 318] entered on November 10, 2021.

"**Bid Protections**" shall have the meaning set forth in Section 9.3.

"**Bill of Sale and Assignment and Assumption Agreement**" means the bill of sale and assignment and assumption agreement, dated as of the Closing Date, by and among the Sellers and Purchaser, substantially in the form attached hereto as Exhibit B.

"**Breakup Fee**" has the meaning set forth in Section 9.3.

"**Business**" means the business of owning and operating the Facilities, including the revenue streams associated with the real property on which the Facilities are located from self-storage and related services, tenant Protection Plans, billboards, cell towers or antennae, or solar power systems giving rise to Facility Revenue Rights, and the sale of retail products.

"**Business Day**" means any day other than (a) a Saturday, Sunday or federal holiday or (b) a day on which commercial banks in Dallas, Texas are authorized or required to be closed.

"**Cap**" has the meaning set forth in <u>Section 10.5(a)</u>.

"**Closing**" has the meaning set forth in <u>Section 2.7</u>.

"**Closing Date**" has the meaning set forth in <u>Section 2.7</u>.

"**Code**" means the Internal Revenue Code of 1986, as amended, or any successor law, and regulations issued by the IRS pursuant thereto.

"**Competing Bid**" has the meaning set forth in <u>Section 5.1</u>.

"**Confidentiality Agreement**" means that certain Confidentiality Agreement, dated as of November 23, 2021, by and between the Parent and The William Warren Group, Inc.

"**Consent**" means any consent, approval, authorization, waiver or license.

"**Contract**" means any written agreement, mortgage, indenture, lease (whether for real or personal property), contract or subcontract.

"**Contracting Parties**" has the meaning set forth in <u>Section 11.14</u>.

"**Cure Costs**" means any and all costs, expenses or actions that Purchaser is required to pay or perform to assume any of the Assignable Contracts pursuant to section 365(f) of the Bankruptcy Code.

"**Customer Contract(s)**" means those certain rental agreements entered into by or on behalf of the Subsidiaries with customers of the Business to, among other things, lease self-storage units located at the Facilities to customers in furtherance of the Business.

"**Customer Data**" means all data (including Personal Information) that is in the possession or under the control of the Seller Group, or to which any member of the Seller Group has a contractual right pursuant to a Property Management Agreement (such member of the Seller Group to use its commercially reasonable efforts to exercise its rights under such Property Management Agreement to access such data), to the extent relating to the customers of the Business and collected in the context of such Persons acting in their capacity as customers of the Business, including customer lists, customer information and all installation, repair or other servicing history. The parties hereto acknowledge that the customers of the Business may also be customers of the retained businesses of any member of the Seller Group and, thus, the same or similar information may be contained in Customer Data (to the extent collected in the context of such Persons acting in their capacity as customers of the Business) and the data retained by any member of the Seller Group (to the extent collected in the context of such Persons acting in their capacity as customers of any member of the Seller Group's retained businesses), in which case, the applicable member of the Seller Group shall be permitted to retain such duplicative information.

"**Data Room**" means that certain virtual data room folder titled "GVS" hosted on behalf of the Sellers by datasite.com in connection with the Transactions.

"**De Minimis Claim**" has the meaning set forth in Section 10.5(a).

"**Deductible**" has the meaning set forth in Section 10.5(a).

"**Deposit Escrow Account**" has the meaning set forth in the Recitals.

"**Deposit Escrow Amount**" means $45,000,000.

"**Designation Deadline**" has the meaning set forth in Section 5.3b).

"**Determined Cure Costs**" means, in the aggregate, all Cure Costs payable in respect of the Assigned Contracts as determined pursuant to the Sale Order.

"**Direct Claim**" has the meaning set forth in Section 10.4(a).

"**DOJ**" has the meaning set forth in Section 6.5a).

"**Employee Plan**" means any material "employee benefit plans," as defined in § 3(3) of the Employee Retirement Income Security Act of 1974, as amended, any fringe benefit plans as defined in § 6039D of the Code, and any other bonus, incentive compensation, deferred compensation, profit sharing, stock or other equity option, stock or other equity appreciation rights, stock or other equity ownership rights, stock or other equity purchase rights, savings, severance, supplemental unemployment, layoff, salary continuation, retirement, pension, health, life insurance, disability, group insurance, vacation, holiday, sick leave, fringe benefit or other welfare plans, all employment, consulting, change in control, independent contractor, professional services, confidentiality, or non-competition agreements and all other similar plans, programs, policies, procedures, practices, agreements and understandings (whether oral or written, qualified or nonqualified) and all trust, escrow or other funding arrangements related thereto.

"**Enforceability Exceptions**" means applicable bankruptcy, insolvency, reorganization, moratorium, receivership and similar Laws affecting the enforcement of creditors' rights generally and general equitable principles.

"**ERISA Affiliate**" means (i) any related company or trade or business that is required to be aggregated with the Sellers under Code Sections 414(b), (c), (m) or (o); (ii) any other company, entity or trade or business that has adopted or has ever participated in any Employee Plan; and (iii) any predecessor or successor company or trade or business of the Sellers or any entity described in clauses (i) and (ii) of this definition.

"**Escrow Agent**" means Fidelity Title Insurance Company.

"**Escrow Agreement**" means the escrow agreement, dated as of the date hereof, by and among Purchaser, the Parent and the Escrow Agent in substantially the form attached hereto as Exhibit A.

"**Event of Loss**" means (i) damage or loss to any Facility or the improvements located thereon due to fire, flood, riot, war, terrorism, theft, vandalism, neglect, act of God or other casualty, or by reason of condemnation or (ii) delivery to any member of the Seller Group of notice from a Governmental Authority that a Facility is to be acquired by the power of eminent domain.

"**Excluded Assets**" has the meaning set forth in Section 2.2.

"**Excluded Books and Records**" means the following books and records, documents, data and information (in whatever form maintained and whether originals or copies) of the Seller Group and the Business: (i) all corporate minute books (and other similar corporate records) and stock records of the Seller Group, (ii) any books and records relating exclusively to the Excluded Assets or (iii) any books, records or other materials that any member of the Seller Group (x) is required by Law to retain (copies of which, to the extent permitted by Law, will be made available to Purchaser upon Purchaser's reasonable request), (y) reasonably believes is necessary to enable it to prepare and/or file Tax Returns (copies of which will be made available to Purchaser upon Purchaser's reasonable request) or (z) is prohibited by Law from delivering to Purchaser.

"**Excluded Contracts**" has the meaning set forth in Section 2.5.

"**Excluded Liabilities**" has the meaning set forth in Section 2.4.

"**Expense Dispute**" has the meaning set forth in Section 10.8(b).

"**Expense Notice**" has the meaning set forth in Section 10.8(b).

"**Facilities**" means the self-storage facilities listed at the locations set forth on Schedule B.

"**Facility Revenue Rights**" has the meaning set forth in Section 2.1(m).

"**Facility Worker**" means each individual who, as of the date of this Agreement or prior to the Closing of the Transactions, is employed or engaged as an independent contractor by any Person, including the Manager, to provide services in connection with the operation or management of any of the Facilities.

"**Final Order**" means an Order, judgment or other decree of the Bankruptcy Court or any other Governmental Authority of competent jurisdiction that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect; provided, that such Order shall be considered a Final Order only after the time period for third parties seeking appeal has expired without the filing of any appeal or motion for reconsideration.

"**Final Cash Collateral Order**" means that *Final Order Authorizing the Use of Cash Collateral and Granting Related Relief* [Docket No. 132] entered by the Bankruptcy Court in the Bankruptcy Cases.

"**Fraud**" means an actual and intentional misrepresentation with respect to the making of the representations and warranties made in this Agreement (in each case, as qualified by any Schedules); provided, that such actual and intentional misrepresentation shall only be deemed to exist if (a) the party hereto making the statement had actual knowledge (as opposed to imputed or

constructive knowledge) that the representations and warranties made in this Agreement by such party, were actually false when made, (b) such party made the misrepresentation with the intention that the other party rely thereon to such other party's detriment, and (c) such misrepresentation was in fact relied on by the other party to its detriment.

"**Free and Clear**" means free and clear of all Liens (other than the Permitted Liens) to the maximum extent permitted by Section 363(f) of the Bankruptcy Code.

"**FTC**" has the meaning set forth in Section 6.5a).

"**Funding Agreement**" has the meaning set forth in Section 4.4(b).

"**GAAP**" means generally accepted accounting principles in the United States as of the date hereof.

"**Governmental Authority**" means any domestic or foreign national, provincial, state, multi-state or municipal or other local government, any subdivision, agency, commission, instrumentality or authority thereof, any court (including the Bankruptcy Court), arbitrator (public or private) or tribunal or any quasi-governmental or private body exercising any regulatory or taxing authority thereunder (including the IRS).

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**HSR Filing**" has the meaning set forth in Section 6.5a).

"**Indemnified Party**" has the meaning set forth in Section 10.4(a).

"**Indemnifying Party**" has the meaning set forth in Section 10.4(a).

"**Indemnity Escrow Account**" means the account or subaccount set up with the Escrow Agent in which the Indemnity Escrow Amount is deposited.

"**Indemnity Escrow Amount**" means an amount equal to one percent (1%) of the Base Amount.

"**Indemnity Escrow Funds**" means the amounts held in the Indemnity Escrow Account, including any dividends, interest, distributions and other income received in respect thereof, less any losses on investments thereof and less distributions thereof in accordance with this Agreement and the Escrow Agreement.

"**Intellectual Property**" means any and all intellectual property rights arising from the following: (i) patents and patent applications; (ii) Trademarks; (iii) copyrights and all registrations and applications for registration thereof; (iv) trade secrets and know-how; and (v) internet domain name registrations.

"**IRS**" means the United States Internal Revenue Service.

"**Knowledge**" means with regard to the Sellers, the actual knowledge, without any implication of verification or investigation concerning such knowledge, of Robert Albergotti, in each case as of

the date of this Agreement (or, with respect to a certificate delivered pursuant to this Agreement, as of the date of delivery of such certificate).

"**Law**" means any federal, provincial, state, local law, ordinance, principle of common law, code, regulation or statute.

"**Law Firm**" means Sidley Austin LLP and its successors.

"**Liabilities**" shall mean debts, liabilities, duties, obligations or commitments of any nature whatsoever, whether direct or indirect, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise, whenever or however arising (including whether arising out of any Assignable Contract or in a tort claim based on negligence or strict liability).

"**Lien**" means all forms of lien (including but not limited to mechanic's, contractor's or other similar liens arising under or relating to the provision of goods or services on or to any Transferred Assets, and liens issued pursuant to Section 361, 363 or 364 of the Bankruptcy Code), encumbrance, defect or irregularity in title, pledge, mortgage, deed of trust, deed to secure debt, security interest, charge, claim, restriction (whether on voting, sale, transfer or disposition) or similar agreement or encumbrance of any type or description, including any dedication under any purchase, sale or similar agreements, or any other rights granted or consensual as or against any Transferred Assets including but not limited to easements, encroachments, rights of first refusal, options, licenses, sublicenses or any other interest or right in property that constitutes a lien or interest within the definition or adjudication of such terms under the Bankruptcy Code, in each case, whether imposed by Law or Contract.

"**Losses**" means, with respect to any Person, any actual losses, Liabilities, claims, demands, judgments, damages, fines, suits, actions, out-of-pocket costs and expenses (including reasonable attorneys' fees) against or affecting such Person; provided, however, the parties hereto agree that "Losses" shall not include: (a) any consequential, indirect or punitive damages or (b) damages which are not the natural, probable and reasonably foreseeable result of the event giving rise to the claim of Loss.

"**Manager**" means Great Value Storage, LLC, a Texas limited liability company.

"**Material Adverse Effect**" means a material adverse effect on the business, financial condition or results of operations of the Business (including the Transferred Assets and Assumed Liabilities) taken as a whole; provided, however, that none of the following shall be deemed (either alone or in combination) to constitute, and none of the following shall be taken into account in determining whether there has been or may be, a Material Adverse Effect: (a) any change in, or effects arising from or relating to, general business or economic conditions affecting any industry in which the Business operates; (b) any change in, or effects arising from or relating to, the United States or foreign economies, or securities, banking or financial markets in general, or other general business, banking, financial or economic conditions (including (i) any disruption in any of the foregoing markets, (ii) debt defaults or other restructuring events of any country with respect to which bondholders take a discount to the debt of any country or any increases in the interest rates for any country's debt, (iii) any change in currency exchange rates, (iv) any decline or rise in the price of

any security, commodity, contract or index and (v) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (c) any change from, or effects arising from or relating to, the occurrence, escalation or material worsening of any act of God or other calamity, natural disaster, pandemic or disease, outbreak, hostility, act of war, sabotage, cyber-attack or terrorism or military action; (d) any action taken by Purchaser or its Affiliates with respect to the Transactions or with respect to the Business; (e) any action taken, or failed to be taken, by the Sellers at the request of or with the prior written consent of Purchaser or otherwise as expressly required by the terms of this Agreement or any change from, or effects arising from or relating to, Purchaser's failure to consent to any action restricted by Section 6.1; (f) any change in, or effects arising from or relating to changes in, Laws or accounting rules (including GAAP) or any interpretation thereof; (g) the failure of the Business to meet any of its projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or representatives), it being understood that the underlying causes of such failure may, if they are not otherwise excluded from the definition of Material Adverse Effect by another exception in clauses (a) through (n), be taken into account in determining whether a Material Adverse Effect has occurred); (h) national or international political, labor or social conditions; (i) any matter described in the Seller Schedules delivered as of the date of this Agreement and not giving effect to any updates to the Seller Schedules provided by the Sellers following the date of this Agreement; (j) the public announcement of, or entry into, this Agreement and the Transactions or the identity of the parties to this Agreement; (k) the sale of any assets other than the Transferred Assets to any third parties by a member of the Seller Group or any of their Affiliates; (l) any effect arising or resulting from or related to the filing of the Bankruptcy Cases; (m) any action required to be taken under any Law or Order or any existing Contract by which any member of the Seller Group's (or any of their properties) are bound; or (n) any epidemic, pandemic, outbreak of disease or other public health emergency (including COVID-19) or any escalation or worsening of any such conditions; which, in the case of any of the foregoing clauses (a)-(c) and (f)-(h) does not disproportionately affect the Facilities relative to other self-storage facilities in the markets similar to the Facilities.

"**Non-Transferred Asset**" has the meaning set forth in Section 2.6a).

"**Nonparty Affiliates**" has the meaning set forth in Section 11.14.

"**Order**" means any award, decision, injunction, judgment, ruling or verdict entered, issued, made or rendered by any Governmental Authority.

"**Organizational Documents**" means (a) the articles or certificates of incorporation and the by-laws of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and the certificate of formation of a limited liability company, (e) any charter, joint venture agreement or similar document adopted or filed in connection with the creation, formation or organization of a Person not described in clauses (a) through (d), and (f) any amendment to or equivalent of any of the foregoing.

"**Outside Date**" has the meaning set forth in Section 9.1h).

"**Outstanding Claims**" has the meaning set forth in Section 10.8(a).

"**Owned Real Property**" has the meaning set forth in Section 3.6a).

"**Parent**" has the meaning set forth in the preamble.

"**Parent Petition Date**" has the meaning set forth in the Recitals.

"**Permit**" means all permits, authorizations, certificates, franchises, consents and other approvals from any Governmental Authority.

"**Permitted Liens**" means (a) Liens for Asset Taxes, assessments or other governmental charges not yet due and payable; (b) statutory Liens of landlords (and landlords' lien rights set forth in any leases of real property), mechanics', carriers', workers', repairer's and other similar Liens arising or incurred in the ordinary course of business for obligations that are not overdue and are Assumed Liabilities as set forth in Section 2.3; (c) zoning, entitlement and building regulations and land use restrictions; (d) covenants, conditions, restrictions, easements and other similar matters affecting title to Owned Real Property which (x) do not materially interfere with the present use of the property they affect, and (y) are not violated in any material respect by the present use of, or buildings or improvements at, the property they affect; (e) matters that would be disclosed by an inspection or accurate survey of each parcel of Owned Real Property which (x) do not materially interfere with the present use of the property they affect, and (y) are not violated in any material respect by the present use of, or buildings or improvements at, the property they affect; (f) Schedule B (TDI) and Schedule B, Part II (ALTA) title exception items disclosed on the Title Commitments; (g) deposits to secure the performance of Assigned Contracts (other than for borrowed money); (h) leases included in the Assigned Contracts; and (i) Liens arising under or created by this Agreement or any of the Related Documents.

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization, labor union or any other entity or Governmental Authority.

"**Personal Information**" means any information in the possession or control of the Seller Group (solely as related to the Business) about an identifiable individual other than the name, title or business address, business email address or telephone number of any employee of the Seller Group.

"**Petition Date**" has the meaning set forth in the Recitals.

"**Pre-Closing Tax Period**" has the meaning set forth in Section 7.3(a).

"**Property Management Agreement**" means each Property Management Agreement by and between a member of the Seller Group and Manager relating to the management of any Facility.

"**Protection Plan**" has the meaning set forth in Section 2.1(l).

"**Provision**" has the meaning set forth in Section 11.3.

"**Public Health Measures**" means any closures, "shelter-in-place," "stay at home," workforce reduction, social distancing, shut down, closure, curfew or other restrictions or any other Laws, Orders, directives, guidelines or recommendations issued by any Governmental Authority, the Centers for Disease Control and Prevention, the World Health Organization, or any industry group in connection with COVID-19 or any other epidemic, pandemic, or outbreak of disease, or in connection with or in response to any other public health conditions.

"**Purchase Price**" has the meaning set forth in Section 2.9(a).

"**Purchaser**" has the meaning set forth in the preamble.

"**Purchaser Expense Reimbursement**" means the sum of the aggregate amount of Purchaser's actual reasonable documented out-of-pocket costs and expenses (including without limitation expenses of outside counsel, accountants and financial advisors, which shall be based on summary invoices, redacted to preserve privileged or confidential information, filing fees which relate to any governmental filing or notification, including filing fees under the HSR Act, fees and expenses of consultants, expenses incurred in the course of Purchaser's due diligence, including research services and travel costs, and entity formation costs for the formation of Purchaser) incurred by the Purchaser in connection with or related to the Transactions prior to the date of termination of this Agreement (i) pursuant to Section 9.1(c), Section 9.1(d) or Section 9.1(e) or (ii) by the Sellers in accordance with Section 9.1(b) or Section 9.1(h), up to a maximum amount of $1,500,000, with such cap subject to approval by the Bankruptcy Court.

"**Purchaser Group Members**" has the meaning set forth in Section 11.16.

"**Purchaser Indemnified Parties**" has the meaning set forth in Section 10.2(a).

"**Purchaser Releasing Party**" has the meaning set forth in Section 11.15.

"**Purchaser Schedules**" has the meaning set forth in Article 4.

"**Related Claims**" means all claims or causes of action (whether in contract or tort, in law or in equity, or granted by statute or otherwise) that may be based upon, arise out of or relate to this Agreement, the Related Documents and any other document or instrument delivered pursuant to this Agreement or the Related Documents, or the negotiation, execution, termination, validity, interpretation, construction, enforcement, performance or nonperformance of this Agreement or the Related Documents or otherwise arising from the Transactions or the relationship between the parties (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with, or as an inducement to enter into, this Agreement or the Related Documents).

"**Related Documents**" means the Escrow Agreement, Bill of Sale and Assignment and Assumption Agreement, Special Warranty Deeds, and any other document, agreement, certificate or instrument entered into in connection with this Agreement; provided, however, that the Escrow Agreement, Bill of Sale and Assignment and Assumption Agreement and Special Warranty Deeds, shall not be a Related Document solely for purposes of applying the provisions in Article 11 to the extent, and only to the extent, that any such document expressly conflicts with Article 11; provided,

<u>further</u>, that for the avoidance of doubt, neither the Confidentiality Agreement nor the Transition Services Agreement shall be deemed a "Related Document" hereunder.

"**Release Date**" has the meaning set forth in <u>Section 10.8(a)</u>.

"**Revised Bidding Procedures**" means those certain bidding procedures set forth as Exhibit 1 to the Revised Bidding Procedures Order, which amend the Bidding Procedures, as such procedures may be amended from time to time thereafter in accordance with the Revised Bidding Procedures Order.

"**Revised Bidding Procedures Order**" means an Order of the Bankruptcy Court approving the Revised Bidding Procedures substantially in the form attached hereto as <u>Exhibit D</u>; <u>provided</u>, <u>however</u>, that there shall be no modifications to the Bid Protections in the Revised Bidding Procedures Order after the date hereof without the consent of Purchaser.

"**Sale Motion**" means the motion of the Sellers seeking entry of the Sale Order approving the terms herein, to be filed on or about January 20, 2022 in the Bankruptcy Cases.

"**Sale Order**" means an Order of the Bankruptcy Court issued pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code in form and substance acceptable to Purchaser and the Sellers, in each party's reasonable discretion, approving this Agreement and all of the terms and conditions hereof and approving and authorizing the Sellers to consummate the Transactions contemplated hereby Free and Clear and containing a finding that Purchaser has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code.

"**Seller Access Contact**" has the meaning set forth in <u>Section 6.2(a)</u>.

"**Sellers**" or "**Seller Group**" has the meaning set forth in the preamble.

"**Seller Group Members**" has the meaning set forth in <u>Section 11.16</u>.

"**Seller Indemnified Parties**" has the meaning set forth in <u>Section 10.3(a)</u>.

"**Seller Permits**" has the meaning set forth in <u>Section 3.4b)</u>.

"**Seller Schedules**" has the meaning set forth in <u>Article 3</u>.

"**Seller Taxes**" has the meaning set forth in <u>Section 7.3(e)</u>.

"**Seller Tax Claim**" has the meaning set forth in <u>Section 7.3(e)</u>.

"**Senior Lender**" means Wells Fargo Bank, National Association, as Trustee, for the benefit of the Registered Holders of UBS Commercial Mortgage Trust 2019-C16 Commercial Mortgage Pass-Through Certificates, Series 2019-C16 in its capacity as A-2-1 Noteholder and Lead Securitization Noteholder (each as defined in that certain loan agreement, dated November 30, 2018, by and between the Senior Lender and certain of the Sellers) on behalf of the related companion noteholders; Wells Fargo Bank, National Association, as Trustee, for the benefit of the Registered Holders of UBS Commercial Mortgage Trust 2018-C15; and Wilmington Trust,

National Association, as Trustee, for the benefit of Wells Fargo Commercial Mortgage Trust 2019-C50 Commercial Mortgage Pass-Through Certificates, Series 2019-C50, by and through Midland Loan Services, a division of PNC Bank, N.A. as special servicer for the Lead Securitization Noteholder.

"**Solvent**" when used with respect to any Person, means that, as of any date of determination, (a) the fair salable value (determined on a going concern basis) of its assets and property will, as of such date, exceed the amounts required to pay its debts as they become absolute and mature, as of such date, (b) such Person will have adequate capital to carry on its business and (c) such Person will be able to pay its debts as they become absolute and mature, in the ordinary course of business, taking into account the timing of and amounts of cash to be received by it and the timing of and amounts of cash to be payable on or in respect of its indebtedness.

"**Special Warranty Deed**" has the meaning set forth in Section 2.8(d)(iv).

"**Specific Provision**" has the meaning set forth in Section 11.3.

"**Straddle Period**" has the meaning set forth in Section 7.3(b).

"**Subsidiaries Petition Date**" has the meaning set forth in the Recitals.

"**Subsidiary**" has the meaning set forth in the preamble.

"**Surveys**" means the surveys of the Owned Real Property that were provided to Purchaser or its representatives or otherwise made available in the Data Room.

"**Survival Period**" has the meaning set forth in Section 10.1.

"**Tangible Personal Property**" has the meaning set forth in Section 2.1(g).

"**Tax**" means any tax (including any income tax, franchise tax, branch profits tax, capital gains tax, value-added tax, sales tax, use tax, property tax, transfer tax, payroll tax, social security tax or withholding tax), and any related fine, penalty, interest, or addition to tax with respect thereto, imposed, assessed or collected by or under the authority of any Governmental Authority.

"**Tax Return**" means any return (including any information return), report, statement, schedule, notice, form, or other document or information (whether in tangible, electronic or other form), including any amendments, schedules attachments, supplements, appendices and exhibits thereto, filed with or submitted to, or required to be filed with or submitted to, any Governmental Authority in connection with the determination, assessment, collection, or payment, of any Tax.

"**Third-Party Claim**" has the meaning set forth in Section 10.4(b).

"**Title Commitments**" means the title commitments for the Owned Real Property prepared by the Title Insurance Company that were provided to Purchaser or its representatives or otherwise made available in the Data Room.

"**Title Insurance Company**" means Fidelity Title Insurance Company.

"**Title Insurance Policy**" means one or more owner's policies of title insurance (on a Texas Department of Insurance T-1 or American Land Title Association (ALTA) form) in a reasonable aggregate amount mutually agreed upon by the Purchaser and Sellers prior to the Closing Date, in which the Title Insurance Company shall have agreed to insure in Purchaser fee simple title to the Owned Real Property, subject only to the Permitted Liens.

"**Trademarks**" means trademarks, service marks, trade dress, service names, trade names, brand names, logos, business names, corporate names and other source or business identifiers, all registrations and applications for registration thereof, and, in each case, together with all of the goodwill associated therewith.

"**Transaction Tax Benefit**" means an amount by which the Tax liability of a party (or the consolidated, combined, unitary or similar Tax group including the party) or, if the party is a pass-through entity for Tax purposes, the members of the party, is reduced or is reasonably expected to be reduced (including by deduction, reduction of income by virtue of increased Tax basis or otherwise, entitlement to refund, credit or otherwise) plus any related interest received from the relevant Governmental Authority responsible for the administration of any Tax.

"**Transactions**" means the transactions contemplated by this Agreement and the Related Documents.

"**Transfer Taxes**" has the meaning set forth in Section 2.11.

"**Transferred Assets**" has the meaning set forth in Section 2.1.

"**Transition Milestones**" has the meaning set forth in Section 2.10.

"**Transition Period**" has the meaning set forth in Section 7.4.

"**Transition Services Agreement**" has the meaning set forth in Section 2.10.

"**Transition Services Holdback Account**" means the account or subaccount set up with the Escrow Agent in which the Transition Services Holdback Amount is deposited.

"**Transition Services Holdback Amount**" equals $20,000,000.

"**Treasury Regulations**" means the regulations promulgated by the U.S. Department of the Treasury under the Code, including proposed and temporary regulations.

"**Vehicles**" has the meaning set forth in Section 2.1(h).

    1.2    **Other Definitional and Interpretive Matters**.

        (a)    Unless otherwise expressly provided, for purposes of this Agreement and the Related Documents, the following rules of interpretation shall apply:

        (i)    Calculation of Time Period. All references to a day or days shall be deemed to refer to a calendar day or days, as applicable, unless otherwise specifically

provided. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)     Dollars. Any reference to $ shall mean U.S. dollars, which is the currency used for all purposes in this Agreement and the Related Documents. The specification of any dollar amount in the representations and warranties or otherwise in this Agreement, the Related Documents, the Purchaser Schedules or the Seller Schedules is not intended and shall not be deemed to be an admission or acknowledgement of the materiality of such amounts or items, nor shall the same be used in any dispute or controversy between the parties hereto to determine whether any obligation, item or matter (whether or not described herein or included in any schedule) is or is not material for purposes of this Agreement, the Related Documents, the Purchaser Schedules or the Seller Schedules.

(iii)     Exhibits/Schedules. The Exhibits and Schedules to this Agreement are an integral part of this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent such exception to such other representation or warranty is readily apparent on its face. Disclosure of any item on any Schedule shall not constitute an admission or indication that any such item is required to be disclosed, or that such item or matter is material or has resulted in or will result in a Material Adverse Effect or that the included items or actions are not in the ordinary course of business. No disclosure on a Schedule relating to a possible breach or violation of any Contract, Law or Order shall be construed as an admission or indication that a breach or violation exists or has actually occurred. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)     Gender and Number. Any reference to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)     Headings. The provision of a table of contents, the division of this Agreement or Related Documents into articles, sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement or any Related Document, as applicable. Unless otherwise specified, all references in this Agreement to any "Section" or other subdivision are to the corresponding section or subdivision of this Agreement, and all references in a Related Document to any "Section" or other subdivision are to the corresponding section or subdivision of such Related Document.

(vi)     Herein. The words such as "herein," "hereinafter," "hereof" and "hereunder" that are used in this Agreement refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. Uses of such words in the Related Documents shall refer to such Related Document as a

whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii) <u>Or</u>. The word "or" shall be construed in the inclusive sense of "and/or" unless otherwise specified.

(viii) <u>Including</u>. The word "including" or any variation thereof means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(ix) <u>Successors</u>. A reference to any party to this Agreement, any Related Document or any other agreement or document shall include such party's successors and permitted assigns.

(x) <u>Legislation</u>. A reference to any legislation or to any provision of any legislation shall include any amendment thereto, and any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(xi) <u>Reflected On or Set Forth In</u>. An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statement, to the extent any such phrase appears in such representation or warranty, if (a) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statement that relates to the subject matter of such representation, (b) such item is otherwise specifically set forth on the balance sheet or financial statement or (c) such item is set forth in the notes to the balance sheet or financial statement.

(xii) <u>Made Available</u>. Any reference in this Agreement to "made available" means a document or other item of information that was provided to Purchaser or its representatives or uploaded to the Data Room as of the date that is no fewer than one (1) Business Day prior to the date of this Agreement.

(xiii) <u>Commercially Reasonable Efforts</u>. As used herein, "commercially reasonable efforts" as it relates to the efforts of the Sellers, includes taking all actions as may be necessary or appropriate, including (i) at Purchaser's request, filing and prosecuting motions or adversary proceedings in the Bankruptcy Court to compel compliance with Bankruptcy Court Orders or Assignable Contracts, and (ii) exercising any rights or remedies the Sellers may have under applicable Law, any Contract, or any Order of the Bankruptcy Court; <u>provided, however</u>, that no representation, warranty, covenant or agreement of the Sellers shall be breached or deemed breached, and no condition shall be deemed not satisfied, as a result of the failure of any Person (other than the Sellers) to comply with the actions taken pursuant to <u>clauses (i)</u> and <u>(ii)</u>.

(b) All representations and warranties set forth in this Agreement or the Related Documents are contractual in nature only and subject to the sole and exclusive remedies set forth herein. Without limiting Purchaser's rights under <u>Article 10</u> (including without limitation <u>Sections</u>

10.2 and 10.5(a)), no Person is asserting the truth of any representation and warranty set forth in this Agreement or the Related Documents; rather, the parties have agreed that should any representations and warranties of any party prove untrue, the other parties shall have the specific rights and remedies herein specified as the exclusive remedy therefor, but that no other rights, remedies or causes of action (whether in law or in equity or whether in contract or in tort or otherwise) are permitted to any party hereto as a result of the untruth of any such representation and warranty. The phrase "to Seller's Knowledge" and phrases of similar import or effect are used herein to qualify and limit the scope of any representation or warranty in which they appear and are not affirmations of any Person's "superior knowledge" that the representation or warranty in which they are used is true.

(c)     The parties hereto have participated jointly in the negotiation and drafting of this Agreement and the Related Documents and, in the event an ambiguity or question of intent or interpretation arises, this Agreement and the Related Documents shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement and the Related Documents. The parties hereto agree that changes from earlier drafts to the final version of this Agreement do not necessarily imply that the party agreeing to such change is agreeing to a change in meaning (as the party agreeing to such change may believe the change is stylistic and non-substantive); consequently, no presumption should exist by virtue of a change from a prior draft.

## ARTICLE 2
## THE PURCHASE AND SALE; CLOSING

2.1     **Purchase and Sale**. Upon the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, in exchange for an aggregate payment from Purchaser to the Sellers equal to the Purchase Price, Purchaser shall purchase, assume and accept from the Sellers, and the Sellers shall sell, transfer, assign, convey and deliver (or shall cause the sale, transfer, assignment, conveyance and delivery) to Purchaser, Free and Clear, all of the rights, title and interests in, to and under the following properties, assets, rights and interests exclusively used in connection with the Business as the same shall exist on the Closing Date, but excluding the Excluded Assets (defined below) (collectively, the "**Transferred Assets**"), whether or not such Transferred Assets are physically located at any Facility:

(a)     all supplies and other inventories (including retail merchandise) exclusively used in the Business;

(b)     all Customer Data;

(c)     to the extent transferable, the Seller Permits (including any applications that are in process) exclusively used in the Business;

(d)     all Assigned Contracts that Purchaser elects to assume pursuant to Section 5.3b);

(e)      all original books and records, documents, data and information of the Seller Group exclusively related to the Business, other than the Excluded Books and Records; provided, however, that the Seller Group shall be entitled to retain copies of any such materials;

(f)      the Owned Real Property, including, in each case, all of the right, title and interest of the Seller Group to all buildings, structures or improvements thereon, and all easements and other rights and interests appurtenant thereto and any associated rights to off-site parking;

(g)      all equipment, and other tangible personal property, including without limitation, carts, dollies, office furniture and fixtures, computers, security systems, telephone and internet equipment and maintenance equipment and supplies, exclusively used in the Business and owned by the Seller Group, a listing of which Sellers will use commercially reasonable efforts to cause to be delivered to Purchaser prior to the Closing (the "**Tangible Personal Property**");

(h)      to the extent transferable, all vehicles exclusively used in the Business and owned by the Seller Group, which are listed on Schedule 2.1(h) (the "**Vehicles**");

(i)      all of the Seller Group's rights, claims or causes of action against third parties relating to the assets, properties, business or operations of the Seller Group with respect to the Business, the Transferred Assets and the Assumed Liabilities (including all guaranties, warranties, indemnities and similar rights in favor of the Seller Group or any their Affiliates to the extent related to the Transferred Assets or the Assumed Liabilities), in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date, except for such rights, claims and causes of related to the Excluded Assets or Excluded Liabilities;

(j)      all prepaid expenses, claims, deposits (including any utility and security deposits and escrows under the Owned Real Property), prepayments, refunds, causes of action, demands, actions, suits, choses in action, rights of recovery, rights under guarantees, warranties, indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent exclusively used in or held for use for the Transferred Assets listed in clauses (a) through (i) above or the Assumed Liabilities;

(k)      all accounts receivable of any member of the Seller Group relating to the Business;

(l)      all revenues generated after the Closing to which the Business is entitled pursuant to any tenant protection plan issued under such tenant's respective rental agreement in respect of a Facility (each, a "**Protection Plan**") and all data and information associated with any such Protection Plan;

(m)      all revenue generated after the Closing from any billboard, cell tower, cell antenna or solar panel installation located at any Facility or otherwise relating to the Business (collectively, "**Facility Revenue Rights**"); and

(n)      all third-party property and casualty insurance proceeds, and all rights to third-party property and casualty insurance proceeds of any member of the Seller Group, in each case, but other than to the extent the subject matter of the claim exclusively constitutes an Excluded

Asset or the associated liability relating thereto exclusively constitutes an Excluded Liability. For
the avoidance of doubt, the insurance proceeds included in the Transferred Assets shall include all
insurance proceeds and other amounts received from third parties in respect of an Event of Loss
as to any Facility, whether such Event of Loss arises prior to or following the date of this
Agreement.

   2.2 **Excluded Assets**. Notwithstanding the provisions of <u>Section 2.1</u> or anything to the
contrary herein, Purchaser shall not acquire any right, title or interest in and to the assets, rights,
interests and properties of any member of the Seller Group other than as specifically identified in
<u>Section 2.1</u> as Transferred Assets in connection with the Transactions, including the following
(collectively, the "**Excluded Assets**") which shall be retained by the Seller Group, and Purchaser
and its designees shall acquire no right, title or interest in the Excluded Assets in connection with
the Transaction:

    (a) all (i) cash and cash equivalents, wherever located, including bank balances
and bank accounts or safe deposit boxes, monies in the possession of any banks, savings and loans
or trust companies and similar cash items, (ii) all escrow monies and deposits in the possession of
landlords and utility companies; and (iii) investment securities and other short- and medium-term
investments;

    (b) all of the Seller Group's right, title and interest in the Intellectual Property,
including as set forth on <u>Schedule 2.2(b)</u> (collectively, the "**Excluded IP**");

    (c) any interest of the Seller Group under this Agreement or the Related
Documents, including, without limitation, the right to receive the Purchase Price and to enforce
the Sellers' rights and remedies thereunder;

    (d) all Excluded Contracts and Contracts, other than the Assigned Contracts, to
which any member of the Seller Group or any of their respective Affiliates is a party;

    (e) any (i) Attorney-Client Information arising from communications prior to
the Closing Date between a member of the Seller Group (including any one or more officers,
directors or stockholders of such Seller Group member), on the one hand, and its counsel, on the
other hand, and (i) claims under any director and officer, errors and omissions, fiduciary and
commercial crime insurance policies;

    (f) except for the Owned Real Property constituting Transferred Assets, all of
the Seller Group's right, title and interest in owned and leased real property and other interests in
real property including all such right, title and interest under each real property lease pursuant to
which any of the leases, subleases (as sub-tenant) or otherwise occupies any such leased real
property, including all improvements, fixtures and appurtenances thereto and rights in respect
thereof;

    (g) subject to <u>Section 7.3(h)</u>, any rights of the Seller Group to Tax refunds or
credits for overpayment of Taxes in lieu of a refund attributable to any taxable period (or portion
thereof) ending on or before the Closing Date;

(h)     all Permits (including applications therefor and any trade or import/export Permits) that (i) are not related solely to the Business or (ii) are not transferable to Purchaser under applicable Law;

(i)     the Excluded Books and Records;

(j)     any assets from time to time designated in writing by the parties hereto as Excluded Assets;

(k)     the Avoidance Actions listed on Schedule 2.2(k);

(l)     all of the Seller Group's rights, claims or causes of action against third parties relating to any of the Excluded Assets or Excluded Liabilities, as listed on Schedule 2.2(l); and

(m)     all prepaid expenses, claims, deposits, prepayments, refunds, causes of action, demands, actions, suits, rights of recovery, rights under guarantees, warranties, indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent exclusively related to or exclusively used in or held for use for the Excluded Assets listed in clauses a through (l) above.

Notwithstanding anything to the contrary contained in this Agreement or any of the other Related Documents, Purchaser acknowledges and agrees that all of the following are also Excluded Assets, and all right, title and interest in and to all Excluded Assets shall be retained by the Seller Group and shall remain the property of the Seller Group (and shall expressly be excluded from the sale, transfer, assignment and conveyance to Purchaser hereunder), and neither Purchaser nor any of its Affiliates shall have any interest therein: (x) all records and reports prepared or received by the Seller Group or any of their Affiliates in connection with the sale of the Business and the Transactions, including all analyses relating to the Business or Purchaser so prepared or received; and (y) all confidentiality agreements with prospective purchasers of the Business or any portion thereof and all bids and expressions of interest received from third parties with respect thereto.

2.3     **Assumption of Liabilities**. On the terms and subject to the conditions set forth in this Agreement, Purchaser shall, effective as of the Closing, assume and agree to pay, discharge and perform in accordance with their terms only the following Liabilities of the Seller Group arising from or related to the Business or the Transferred Assets (collectively, the "**Assumed Liabilities**"):

(a)     Liabilities arising out of or relating to the Transferred Assets or the operation of the Business, in each case, solely to the extent arising at or after the Closing;

(b)     all Taxes for which Purchaser is expressly liable pursuant to this Agreement in the amounts enumerated in this Agreement;

(c)     all accounts payable of the Seller Group to the extent related to the Business, arising out of or related to the purchase of goods, materials or services in the ordinary course of business prior to the Closing by or on behalf of the Seller Group in an aggregate amount no greater than $550,000;

(d)     all Determined Cure Costs; and

(e)     obligations arising from the operation of the Business after the Closing, including post-Closing obligations under the Assigned Contracts, in each case solely to the extent arising exclusively out of events and circumstances first occurring after the Closing.

2.4     **Excluded Liabilities**. Purchaser is assuming only the Assumed Liabilities of the Seller Group and will not assume or be obligated to pay, perform, discharge or in any other manner be liable or responsible for any Liabilities of any member of the Seller Group or the Business that are not Assumed Liabilities as expressly set forth in Section 2.3, whether existing on the Closing Date or arising thereafter (collectively, the "**Excluded Liabilities**"), and the Seller Group shall retain and shall be responsible for, all Liabilities of any member of the Seller Group or the Business that are not Assumed Liabilities.

2.5     **Excluded Contracts**. Pursuant to Section 5.3(b), Purchaser shall be entitled, in its sole discretion, by written notice to the Sellers up to three Business Days prior to the Closing Date, to elect not to purchase or assume one or more Assignable Contracts, in which case, notwithstanding anything in this Agreement or any Related Document to the contrary, any such Assignable Contract shall be considered an excluded contract ("**Excluded Contract**") (and shall constitute an Excluded Asset and not be included in the Transferred Assets) for all purposes of this Agreement and Purchaser shall not have any obligation to satisfy or pay any Cure Costs or other Liabilities with respect to such Excluded Contract. Only those Assignable Contracts that Purchaser elects in writing to assume from the list of Assignable Contracts pursuant to Section 5.3(b) shall be deemed an Assigned Contract.

2.6     **Nontransferable Assets and Liabilities**.

(a)     Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Transferred Asset or any claim, right or benefit arising thereunder or resulting therefrom if an attempted assignment or transfer thereof, without the Consent of a third party (including any Governmental Authority) (after giving effect to the Sale Order or any other applicable order of the Bankruptcy Court that effects such transfer without any required Consents), would constitute a breach or other contravention thereof or a violation of Law (each, a "**Non-Transferred Asset**").

(b)     If, on the Closing Date, any third-party Consent is not obtained for a Non-Transferred Asset, or if an attempted transfer or assignment thereof would be ineffective or a violation of Law, then, until any requisite consent is obtained therefor and the same is transferred and assigned to Purchaser or its designee, each such Non-Transferred Asset shall be held by the applicable member of the Seller Group as agent for the Purchaser, and the Sellers shall, to the extent permitted by Law, provide to Purchaser the benefits and Purchaser shall assume the obligations and bear the economic burdens associated with such Non-Transferred Asset. The Sellers and Purchaser shall use commercially reasonable efforts to enter into agreements (including subcontracting, sublicensing or subleasing, if permitted) by which (i) the Sellers shall, at Purchaser's sole expense, without interruption of the Business, provide Purchaser with the economic and operational equivalent of obtaining the requisite third-party Consent and assigning the applicable Non-Transferred Asset to Purchaser (including, with the prior written consent of

Purchaser, enforcing for the benefit of Purchaser, and at Purchaser's sole expense, all claims or rights arising thereunder) and (ii) Purchaser shall perform, at its sole expense, the obligations and assume the economic burdens of the applicable member of the Seller Group or its Affiliates to be performed after the Closing with respect to such Non-Transferred Asset. Purchaser shall promptly, upon receipt of a written request therefor from the Sellers, reimburse the Sellers for all monies paid by the Sellers on Purchaser's behalf in connection with any Assumed Liability not assigned or transferred to Purchaser pursuant to this Section 2.6.

2.7     **Closing**. The closing of the Transactions (the "**Closing**") will take place remotely by electronic exchange of documents on the date (the "**Closing Date**") that is the fifth (5th) Business Day after the date on which all of the conditions set forth in Article 8 (excluding conditions that, by their terms, are to be satisfied at the Closing, but subject to the satisfaction or waiver of all such conditions at the Closing), have been satisfied or waived by the party hereto entitled the benefit of the same, unless another time or date is agreed to in writing by the parties hereto. Except as otherwise set forth herein, all proceedings to be taken and all documents to be executed and delivered by all parties hereto at the Closing will be deemed to have been taken and executed simultaneously and no proceedings will be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

2.8     **Closing Deliveries of the Parties**. At or prior to the Closing:

(a)     Purchaser and the members of the Seller Group shall execute and deliver the Bill of Sale and Assignment and Assumption Agreement;

(b)     Escrow Agent, Purchaser and the Parent, on behalf of itself and the members of the Seller Group, shall execute and deliver the Escrow Agreement;

(c)     Purchaser shall deliver, or cause to be delivered, to the Parent or the applicable Person each of the following:

(i)     a certificate, dated as of the Closing Date, executed by or on behalf of Purchaser as to the satisfaction of the conditions set forth in Section 8.3a) and Section 8.3b); and

(ii)     payment of the closing payments set forth in Section 2.9.

(d)     the applicable member of the Seller Group shall deliver, or cause to be delivered, to Purchaser or the applicable Person each of the following:

(i)     a certificate, dated as of the Closing Date, executed by or on behalf of the Sellers as to the satisfaction of the conditions set forth in Section 8.2a), Section 8.2(b) and Section 8.2(c);

(ii)     certificates, dated as of the Closing Date, of each member of the Seller Group's non-foreign status, in accordance with Treasury Regulation § 1.1445-2(b);

(iii)     (x) certifications, dated as of the Closing Date, stating that each applicable member of the Seller Group that owns any Owned Real Property is not, and has

not been, a U.S. real property holding corporation, in form and substance required under Treasury Regulation §§1.897-2(h) and 1.1445-2(c)(3) and (y) the notification to the IRS described in Treasury Regulation Section 1.897-2(h)(2) regarding delivery of the statement referred to in the preceding clause (x);

(iv)    special warranty deeds, dated as of the Closing Date, in recordable form substantially similar to the form attached hereto as Exhibit C, executed by the applicable member of the Seller Group and notarized by a notary public, for each Owned Real Property (each, a "**Special Warranty Deed**");

(v)    such commercially reasonable owner's affidavits, gap undertakings and similar documents and instruments (in customary form) duly executed and delivered by the applicable member of the Seller Group which are necessary to cause the Title Insurance Company to issue at Closing a Title Insurance Policy with respect to all Owned Real Property;

(vi)    a copy of the resolutions of the board of directors of the Parent approving the Sellers' entry into this Agreement, the Related Documents to which any Seller is a party and the consummation of the Transactions by the Sellers; and

(vii)    evidence of the issuance to Purchaser, or the Title Insurance Company's irrevocable and unconditional commitment to issue to Purchaser, the Title Insurance Policy, effective as of the Closing Date (subject to any affidavits, authority documents, and other deliveries required of Purchaser by the Title Insurance Company, the payment of all premiums and fees of the Title Insurance Company by Purchaser, and all other actions required of Purchaser by the a Title Insurance Company, the failure of which shall not be a reason for which Purchaser may assert that the closing condition under this Subsection (vi) is not satisfied).

To the extent not delivered to Purchaser at Closing, promptly following the Closing, the Sellers will use all commercially reasonable efforts (as such term is defined in Section 1.2(a)(xiii)) as may be necessary or appropriate to put Purchaser in actual physical possession and operating control of the Transferred Assets.

2.9    **Purchase Price; Assumed Liabilities; Deposits**.

(a)    At the Closing, upon the terms and subject to the conditions set forth herein, in full consideration for the sale, transfer, conveyance, assignment and delivery of the Transferred Assets to Purchaser Free and Clear, Purchaser shall (i) pay to the Parent (for the benefit of the members of the Seller Group) an aggregate purchase price equal to (1) the Base Amount, (2) *minus* the Determined Cure Costs, (3) *minus* the Indemnity Escrow Amount, which shall be released by the Escrow Agent pursuant to Section 10.8, (4) *minus* the Transition Services Holdback Amount, which shall be released by the Escrow Agent pursuant to Section 2.10, and (5) *minus* the Deposit Escrow Amount, which shall be released by the Escrow Agent pursuant to Section 2.9(d), (the "**Purchase Price**") by irrevocable wire transfer of immediately available funds in accordance with payment instructions delivered by the Parent to Purchaser prior to the Closing; and (ii) assume the Assumed Liabilities.

(b) At the Closing, on the terms and subject to the conditions set forth in this Agreement, Purchaser will assume and become responsible for the Assumed Liabilities. Purchaser agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in accordance with the terms thereof, including paying or causing to be paid, at the Closing, all Determined Cure Costs.

(c) At the Closing, Purchaser shall deposit (or cause to be deposited) an amount equal to (i) the Indemnity Escrow Amount into the Indemnity Escrow Account (which shall be the sole source of recovery funds to make the applicable payment (if any) to Purchaser in accordance with Section 10.8) and (ii) Transition Services Holdback Amount into the Transition Services Holdback Account, in each case, by wire transfer of immediately available funds in accordance with the terms of the Escrow Agreement.

(d) Prior to the filing of a motion with the Bankruptcy Court seeking approval of Purchaser as the stalking horse bidder, Purchaser shall deposit (or cause to be deposited) an aggregate amount equal to the Deposit Escrow Amount into the Deposit Escrow Account to be established and maintained by Escrow Agent pursuant to the Escrow Agreement. The Deposit Escrow Amount shall be distributed as follows:

(i) if the Closing shall occur, (A) the Parent, on behalf of itself and the other members of the Seller Group, and Purchaser shall deliver a joint written instruction to the Escrow Agent in accordance with the Escrow Agreement instructing the Escrow Agent to release from the Deposit Escrow Account the entire Deposit Escrow Amount (together with any dividends, interest, distributions and other income received in respect thereof) to the Parent (for the benefit of the members of the Seller Group), by irrevocable wire transfer of immediately available funds, to an account(s) designated by the Parent to the Escrow Agent, and (B) the Deposit Escrow Amount (together with any dividends, interest, distributions and other income received in respect thereof) shall be delivered to the Parent at Closing and credited against the amount required to be paid by Purchaser to the Parent at Closing in accordance with Section 2.9a);

(ii) if this Agreement is terminated by the Sellers pursuant to Section 9.1f), (A) the Parent, on behalf of itself and the other members of the Seller Group, and Purchaser shall deliver a joint written instruction to the Escrow Agent in accordance with the Escrow Agreement instructing the Escrow Agent to release from the Deposit Escrow Account the entire Deposit Escrow Amount (together with any dividends, interest, distributions and other income received in respect thereof) to the Parent (for the benefit of the members of the Seller Group), by irrevocable wire transfer of immediately available funds, to an account designated by the Parent to the Escrow Agent and (B) the Deposit Escrow Amount (together with any dividends, interest, distributions and other income received in respect thereof), which shall constitute liquidated damages (and not a penalty), shall be delivered to the Sellers within two Business Days following delivery of such joint written instruction; or

(iii) if this Agreement is validly terminated for any reason in accordance with the terms of this Agreement other than by the Sellers pursuant to Section 9.1f), (A) the Parent, on behalf of itself and the other members of the Seller Group, and Purchaser shall deliver a joint written instruction to the Escrow Agent in accordance with the Escrow Agreement instructing the Escrow Agent to release from the Deposit Escrow Account the entire Deposit Escrow Amount

(together with any dividends, interest, distributions and other income received in respect thereof) to Purchaser, by irrevocable wire transfer of immediately available funds, to an account designated by Purchaser to the Escrow Agent, and (B) the Deposit Escrow Amount (together with any dividends, interest, distributions and other income received in respect thereof) shall be delivered to Purchaser within two Business Days following delivery of such joint written instruction.

(iv) Any issue regarding the entitlement to the Deposit Escrow Amount shall be determined by the Bankruptcy Court, and Purchaser consents to the jurisdiction of the Bankruptcy Court for any issue related to the Escrow Agreement.

2.10 **Transition Services Holdback Amount**.

(a) The Sellers shall use their commercially reasonable efforts to cause the Manager to enter into a transition services agreement with Purchaser, in substantially the form attached hereto as Exhibit E (the "**Transition Services Agreement**"), on or prior to the Closing Date pursuant to which the Manager and/or its Affiliates shall take certain actions and provide certain services to Purchaser as identified in the Transition Services Agreement. The Parent (for the benefit of the members of the Seller Group) shall be entitled to receive payment of the Transition Services Holdback Amount in accordance with this Section 2.10 upon the successful completion of all of the following milestones on or prior to the Transition Services Expiration Date: (i) the Manager shall have executed and delivered the Transition Services Agreement in form and substance reasonably satisfactory to Purchaser on or prior to the date that is five (5) days following the date on which the Sale Order is entered, (ii) the Closing of the Transactions shall have occurred in accordance with Section 2.7 of this Agreement, (iii) the Manager and/or its Affiliates shall have satisfied all obligations of the Manager set forth in the Transition Services Agreement in accordance with the terms thereof on or prior to the expiration of the term set forth in the Transition Services Agreement, (iv) the Manager shall not have committed any breach of the Transition Services Agreement (other than breaches which are cured by the Manager within the time period permitted therein or otherwise waived by Purchaser in accordance with the terms therein), and (v) neither the Manager nor any of its Affiliates shall have objected to the entry of the Sale Order or otherwise obstructed entry of the Sale Order or consummation of the Closing (collectively, the "**Transition Milestones**"). The Transition Services Holdback Amount shall be distributed as follows:

(i) If the Sellers and Manager, as applicable, successfully complete all of the Transition Milestones by the fifth Business Day following the Closing Date ("**Transition Services Expiration Date**") (or such earlier date as expressly indicated in the definition of Transition Milestones), (A) the Parent, on behalf of itself and the other members of the Seller Group, and Purchaser shall deliver a joint written instruction to the Escrow Agent in accordance with the Escrow Agreement instructing the Escrow Agent to release from the Transition Services Holdback Account the entire Transition Services Holdback Amount (together with any dividends, interest, distributions and other income received in respect thereof) to the Parent (for the benefit of the members of the Seller Group), by irrevocable wire transfer of immediately available funds, to an account(s) designated by the Parent to the Escrow Agent and (B) the Transition Services Holdback Amount (together with any dividends, interest, distributions and other income received in

respect thereof) shall be delivered to the Parent (for the benefit of the members of the Seller Group) within two Business Days following delivery of such joint written instruction.

(ii)    If any one or more of the Transition Milestones is not successfully completed by the Transition Services Expiration Date (or such earlier date as expressly indicated in the definition of Transition Milestones), (A) the Parent, on behalf of itself and the other members of the Seller Group, and Purchaser shall deliver a joint written instruction to the Escrow Agent in accordance with the Escrow Agreement instructing the Escrow Agent to release from the Transition Services Holdback Account the entire Transition Services Holdback Amount (together with any dividends, interest, distributions and other income received in respect thereof) to Purchaser, by irrevocable wire transfer of immediately available funds, to an account designated by Purchaser to the Escrow Agent, and (B) the Transition Services Holdback Amount (together with any dividends, interest, distributions and other income received in respect thereof) shall be delivered to Purchaser within two Business Days following delivery of such joint written instruction.

(b)    Any issue regarding the entitlement to the Transition Services Holdback Amount shall be determined by the Bankruptcy Court, and Purchaser and the Sellers consent to the jurisdiction of the Bankruptcy Court for any issue related to the Escrow Agreement.

2.11    **Transfer Taxes**. It is the intention of the Purchaser and the Sellers that the Transactions be exempt from all transfer, documentary, sales, use, excise, stock transfer, value-added, stamp, recording, registration and other similar taxes, levies and fees (including any penalties, fines and interest), together with any conveyance fees, recording charges and other similar fees and charges, incurred in connection with this Agreement and the Transactions (collectively, "**Transfer Taxes**") pursuant to Bankruptcy Code Section 1146(a). Purchaser and the Sellers shall cooperate in good faith to minimize, to the extent permissible under applicable Law, the amount of any Transfer Taxes due with respect to the Transactions. In the event any Transfer Taxes are required to be paid with respect to the Transactions, the Sellers shall be solely responsible for such Transfer Taxes and shall indemnify, defend and hold harmless Purchaser against any such Transfer Taxes.

2.12    **Allocation of Purchase Price**.

(a)    The Purchase Price (as finally determined hereunder and including all other amounts treated as consideration for U.S. federal income tax purposes) and Assumed Liabilities shall be allocated among the Transferred Assets in accordance with Section 1060 of the Code and the Treasury Regulations thereunder (the "**Allocation Principles**"). Within 120 days following the final determination of the Purchase Price, Purchaser shall deliver to the Parent (on behalf of Sellers) a schedule allocating the Purchase Price (and all other amounts treated as consideration for U.S. federal income tax purposes) and Assumed Liabilities among the Transferred Assets (the "**Allocation Schedule**"). The Allocation Schedule shall be reasonable and shall be prepared in accordance with the Allocation Principles, and Purchaser and the Parent (on behalf of Sellers) shall negotiate in good faith to resolve disputed items, if any, in the Allocation Schedule as promptly as practicable. If Purchaser and the Parent (on behalf of Sellers) are unable to reach agreement with respect to the Allocation Schedule within 30 days after the delivery of the Allocation Schedule by

Purchaser to the Parent, the parties shall be entitled to use their own Purchase Price allocations for Tax reporting purposes.

(b)     To the extent Purchaser and the Parent agree on the Allocation Schedule pursuant to Section 2.12(a), Purchaser and the Sellers shall (i) timely file all Tax Returns required to be filed in connection with the Allocation Schedule, and (ii) prepare and file all Tax Returns and determine all Taxes in a manner consistent with the Allocation Schedule, except as may be required by applicable Law and except as may be necessary to reflect adjustments to the Allocation Schedule resulting from post-Closing payments or events. Purchaser, on the one hand, and the Sellers, on the other hand, shall notify the other if they receive notice that any Governmental Authority proposes any allocation different from Allocation Schedule.

2.13     **Escrow Accounts**. At the Closing, the Deposit Escrow Amount shall be used to satisfy a portion of the payment obligations of Purchaser pursuant to Section 2.9(a), otherwise the Deposit Escrow Amount (together with any dividends, interest, distributions and other income received in respect thereof) shall be released to Purchaser or the Sellers pursuant to Section 2.9(d). The Indemnity Escrow Funds shall be used to satisfy any portion of the payment obligations (if any) of the Sellers pursuant to Article 10 and shall be released pursuant to Section 10.8 as the sole source of recovery. The Transition Services Holdback Amount shall be used to satisfy the payment obligations (if any) pursuant to Section 2.10 and shall be released to Purchaser or Parent pursuant to Section 2.10. Upon the final release of all of the Deposit Escrow Amount, the Indemnity Escrow Funds and the Transition Services Holdback Amount (in each case, together with any dividends, interest, distributions and other income received in respect thereof) pursuant to the terms of this Agreement and the Escrow Agreement, the Escrow Agreement shall automatically terminate. Any fees owed to the Escrow Agent and obligations under the Escrow Agreement shall be borne equally by Purchaser, on the one hand, and the Sellers, on the other hand. The Deposit Escrow Amount shall be held in trust for the benefit of the Sellers and shall not be subject to any encumbrance, attachment, trustee process or any other judicial process of any creditor of any party hereto, and shall be held and disbursed solely for the purposes of and in accordance with the terms of this Agreement and the Escrow Agreement.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except as disclosed in a document herewith delivered by the Sellers to Purchaser (the "**Seller Schedules**") , each member of the Seller Group hereby makes, jointly and severally, the representations and warranties contained in this Article 3 to Purchaser.

3.1     **Organization, Good Standing and Other Matters; Subsidiaries**. Such member of the Seller Group is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization and has, subject to the necessary authority of the Bankruptcy Court, the requisite limited liability company power and authority to operate the Business and necessary to own, lease or operate the properties and assets owned, leased or operated by it to carry on the Business as now being conducted, except where the failure to be so duly organized, validly existing and in good standing, or to have such power and authority, would not, individually or in the aggregate, have a Material Adverse Effect. Such member of the Seller Group is duly qualified to do business as a foreign limited liability company in each jurisdiction in which the nature of the

Business as currently conducted by it or the property owned or leased by it makes such qualification necessary, except where the failure to be so qualified would not, individually or in the aggregate, have a Material Adverse Effect.

3.2 **Authority and Enforceability**. Subject to Bankruptcy Court approval, such member of the Seller Group has all requisite power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance of this Agreement and each of the Related Documents to which such member of the Seller Group is (or at Closing, will be) a party, and the consummation by it of the Transactions, has been duly authorized and approved by all necessary limited liability company action on the part of the Parent and the other members of the Seller Group and are subject to the approval of the Bankruptcy Court. This Agreement has been, and each Related Document will be, at or prior to the Closing, duly executed and delivered by the applicable member of the Seller Group and, assuming the due execution and delivery by the other parties hereto or thereto, and subject to entry of the Sale Order, constitutes a valid and binding obligation of such member of the Seller Group, enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

3.3 **No Conflict; Required Filings and Consents**. Except (a) as required by the HSR Act and any other Antitrust Laws that require the consent, waiver, approval, Order or Permit of, or declaration or filing with, or notification to, any Person or Governmental Authority, (b) such filings as may be required in connection with the Transfer Taxes described in Section 2.11 and (c) as otherwise set forth on Schedule 3.3, the execution and delivery of this Agreement by such member of the Seller Group does not and the execution and delivery of the Related Documents by it will not, and the consummation of the Transactions hereby and thereby will not (i) violate the provisions of the Organizational Documents of any member of the Seller Group, (ii) subject to the entry of the Sale Order, violate any Law or Order to which any member of the Seller Group is subject or by which its properties or assets are bound, (iii) require any member of the Seller Group to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority on or prior to the Closing Date (except as required by the Bankruptcy Code or the Sale Order), (iv) subject to the entry of the Sale Order, to the Seller's Knowledge, result in a breach of or constitute a default (with or without due notice or lapse of time or both), give rise to any right of termination, cancellation or acceleration under, or require the Consent of any third party to, any Assigned Contract or (v) subject to the entry of the Sale Order, result in the imposition or creation of any Lien upon or with respect to any of the assets or properties of the Seller Group; excluding from the foregoing clauses (ii) through (v) any Consents, approvals, notices and filings the absence of which, and violations, breaches, defaults, rights of acceleration, cancellation or termination, and Liens, the existence of which would not, individually or in the aggregate, have a Material Adverse Effect.

3.4 **Compliance With Laws; Permits**.

(a) Except as set forth on Schedule 3.4(a), (i) the Seller Group is conducting, and has conducted since the Petition Date, the Business in compliance in all material respects with all Laws applicable to the Business and (ii) no member of the Seller Group has received any written

notice since the Petition Date of any material violations of any Law applicable to their conduct of the Business.

(b)     Except as set forth on Schedule 3.4(b), (i) all material Permits required for the operation of the Business as currently conducted (the "**Seller Permits**") are in full force and effect in accordance with their terms and (ii) no member of the Seller Group has received as of the date hereof any written notice of any cancellation, suspension, revocation, invalidation or non-renewal of any Permit since the Petition Date.

(c)     The Sellers have made available to Purchaser complete and accurate copies of all environmental site assessments, surveys, reports, summaries or audits, prepared either internally or by third parties that are in the possession of any member of the Seller Group with respect to the Owned Real Properties.

3.5     **Litigation**. There is no Action pending or formally threatened in writing, against or by any member of the Seller Group before any Governmental Authority and no Order pending or outstanding, in each case, that would reasonably be expected to materially affect the Transferred Assets or the Business or that seeks to restrain or prohibit or otherwise challenge the consummation, legality or validity of the Transactions.

3.6     **Real Property; Personal Property**.

(a)     Schedule 3.6(a) lists the address and owner for each parcel of real property owned by one or more members of the Seller Group or a subsidiary that is used for, held for use in or otherwise related to the Business (the "**Owned Real Property**"). One or more members of the Seller Group has good and marketable title to such Owned Real Property, and shall deliver fee simple title to the Owned Real Property at Closing, Free and Clear. The Seller Group is in possession of the Owned Real Property.

(b)     The Tangible Personal Property included in the Transferred Assets to be delivered to Purchaser at the Closing constitutes all of the tangible assets and other personal property owned by any member of the Seller Group and exclusively used in the Business. Each member of the Seller Group has good and valid title to the Tangible Personal Property, Free and Clear, other than Liens that will be released prior to Closing. All such material tangible assets and other personal property are (i) in good condition and repair, normal wear and tear excepted, (ii) adequate for use in the ordinary and regular course of Business without the need for material repair or replacement, (iii) conform to all applicable Laws, ordinances, codes, rules and regulations applicable thereto, including Laws imposed by the Department of Transportation, similar state transportation authorities and similar laws, and (iv) as of the Closing Date will be physically located at one of the Facilities.

(c)     The Seller Group has good, valid, and marketable title to, or a valid leasehold interest in, all of the assets and properties included in the Transferred Assets, subject to the entry of the Sale Order, free and clear of any Liens, contractual restriction or covenant, option or other adverse claim (whether arising by contract or by operation of law) other than Permitted Liens and Liens that will be released prior to or contemporaneous with Closing. Subject to the entry of the Sale Order, at the Closing, the Parent or the applicable member of the Seller Group,

as applicable, shall transfer all right, title and ownership to, or a valid leasehold interest in, the Transferred Assets, Free and Clear, all to the extent provided in the Sale Order and to the extent the Sale Order becomes a final non-appealable order, such that Purchaser will own, or have the unrestricted right to use, the Transferred Assets immediately after the Closing.

3.7 **Assignable Contracts**. With respect to the Assignable Contracts, (i) except as a result of, or arising in connection with, the filing of the Bankruptcy Cases, since the Petition Date, no member of the Seller Group has received any written notice of any default or event that (with due notice or lapse of time or both) would constitute a default by the applicable member of the Seller Group under any Assignable Contract, other than defaults that have been cured or waived in writing or would not reasonably be expected to have a Material Adverse Effect, (ii) to the Sellers' Knowledge, each Assignable Contract is a legal, valid and binding obligation of the applicable member of the Seller Group and is in full force and effect (except to the extent subject to, and limited by, the Enforceability Exceptions) and (iii) since the Petition Date, to the Sellers' Knowledge, no other party to any Assignable Contract is (with or without the lapse of time or the giving of notice, or both) in material breach of or in material default under any Assignable Contract. Except for the Cure Costs, to the Sellers' Knowledge, there are no other outstanding obligations arising out of or in connection with the Assignable Contracts as of the Petition Date other than obligations to perform under such Assignable Contracts after the Petition Date. The Seller Group has true, correct and complete copies of each of the Assignable Contracts to be included in the Assumption Notice, together with all amendments thereto.

3.8 **Taxes**. Except as set forth on Schedule 3.8, there are no Liens for Taxes upon the Transferred Assets or the Business except Liens for current Taxes not yet due.

3.9 **Employees; Employee Benefits.**

(a) No member of the Seller Group has and has ever had any employees, whether on a full-time, part-time or other basis. Other than the Manager and the other payees reflected in the schedules of accounts payable of the Business made available to Purchaser, since the Petition Date, no member of the Seller Group has had any independent contractors.

(b) No member of the Seller Group and no ERISA Affiliate of any such Person is, or within the seven-year period immediately preceding the date of this Agreement, has sponsored, maintained or contributed to, or has otherwise been liable for contributions to or benefits under, an Employee Plan.

(c) No member of the Seller Group, nor any of their respective Affiliates has made any commitments or representations to any Person regarding (i) potential employment, engagement or other similar arrangement by Purchaser or any Affiliates of Purchaser at the Facilities after the Closing Date, or (ii) any terms and conditions of such potential employment, engagement or other similar arrangement by Purchaser or any Affiliate thereof following the Closing Date.

3.10 **Brokers and Finders**. Except as set forth on Schedule 3.10, no member of the Seller Group has, directly or indirectly, entered into any agreement with any Person that would

obligate the Parent or any other member of the Seller Group to pay any commission, brokerage fee or "finder's fee" in connection with the Transactions.

3.11 **No Other Representations or Warranties**. Except for the representations and warranties contained in this Article 3 and the Related Documents, the Sellers do not, nor do any other Persons on behalf of the Sellers, make any other express or implied representation or warranty with respect to the Sellers, the Business, the Transferred Assets or the Assumed Liabilities, or with respect to any other information provided to Purchaser or its representatives, and the Sellers disclaim any other representations or warranties, whether made by or on behalf of the Sellers or any other Person. The Sellers will not, and no other Persons will, have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser, or Purchaser's use of, any such information, including any information, documents, projections, forecasts or other material made available to Purchaser or its representatives in the Data Room management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever (electronic or otherwise) or otherwise in expectation of the Transactions.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as disclosed in a document herewith delivered by Purchaser to the Sellers (the "**Purchaser Schedules**"), Purchaser hereby makes the representations and warranties contained in this Article 4 to the Sellers.

4.1 **Organization, Good Standing and Other Matters**. Purchaser is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization and has all requisite corporate power or other entity power and authority to own its properties and to carry on its business as now being conducted. Purchaser is duly qualified or licensed to conduct its business as currently conducted and is in good standing in each jurisdiction in which the location of the property owned, leased or operated by it or the nature of its business makes such qualification necessary, except where the failure to be so qualified or licensed would not, individually or in the aggregate, materially impair or delay Purchaser's ability to consummate the Transactions.

4.2 **Authority and Enforceability**. Purchaser has all requisite corporate power or other entity power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance of this Agreement and each of the Related Documents to which Purchaser is (or at Closing, will be) a party, and the consummation of the Transactions, have been duly authorized and approved by its board of directors (or equivalent governing body) and no other action on the part of Purchaser or its members is necessary to authorize the execution, delivery and performance of this Agreement and the Related Documents by Purchaser and the consummation of the Transactions. This Agreement has been, and each Related Document will be at or prior to Closing, duly executed and delivered by Purchaser and, assuming the due execution and delivery by the other parties hereto or thereto, constitutes a valid and binding obligation of Purchaser enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

4.3 **No Conflict; Required Filings and Consents**. Except (a) as required by the HSR Act and any other Antitrust Laws that require the consent, waiver, approval, Order or Permit of, or declaration or filing with, or notification to, any Person or Governmental Authority, (b) such filings as may be required in connection with the Transfer Taxes described in Section 2.11 and (c) as set forth on Schedule 4.3, the execution and delivery of this Agreement and of the Related Documents and the consummation of the Transactions by Purchaser will not (i) violate the provisions of its Organizational Documents, (ii) violate any Law or Order to which it is subject or by which any of its properties or assets are bound, (iii) require it to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority on or prior to the Closing Date, (iv) result in a material breach of or constitute a default (with or without due notice or lapse of time or both), give rise to any right of termination, cancellation or acceleration under, or require the Consent of any third party to, any material Contract to which it is a party or (v) result in the imposition or creation of any Lien upon or with respect to any of its assets or properties; excluding from the foregoing clauses (ii) through (v) Consents, approvals, notices and filings the absence of which, and violations, breaches, defaults, rights of acceleration, cancellation or termination, and Liens, the existence of which would not, individually or in the aggregate, (A) have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or (B) otherwise prevent, hinder or delay the consummation of the Transactions.

4.4 **Financing**.

(a) Purchaser has, and at the Closing will have, (a) sufficient internal funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) available to pay the Purchase Price in accordance with the terms hereof and any other payments required hereunder and any expenses incurred or required to be paid by Purchaser in connection with the Transactions, and (b) the resources and capabilities (financial or otherwise) to perform its obligations hereunder and under the Related Documents. Purchaser has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

(b) Concurrently with the execution of this Agreement, Purchaser has delivered (or caused to be delivered) to the Sellers a copy of the duly executed funding agreement (the "**Funding Agreement**") pursuant to which, an Affiliate of Purchaser has guaranteed to fund to Purchaser an amount sufficient to satisfy the full Purchase Price and all other payment obligations of Purchaser contemplated hereunder. The Parent is listed as at third party beneficiary under the Funding Agreement.

4.5 **Solvency**. Purchaser is not entering into this Agreement with the intent to hinder, delay or defraud either present or future creditors. Immediately after giving effect to all of the Transactions, including the making of the payments contemplated by Section 2.9, and assuming satisfaction of the conditions to Purchaser's obligation to consummate the Transactions as set forth herein, the accuracy of the respective representations and warranties of Purchaser and the Sellers set forth herein and the performance by Purchaser and the Sellers of their respective obligations hereunder in all material respects, Purchaser will be Solvent.

4.6 **Litigation**. Except as set forth on Schedule 4.6, there is no Action pending or formally threatened in writing against Purchaser or involving any of its properties or assets that

would be reasonably be expected to (a) have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or (b) otherwise prevent, hinder or delay the consummation of the Transactions.

4.7 **Brokers and Finders**. Except as set forth on Schedule 4.7, neither Purchaser nor its Affiliates have, directly or indirectly, entered into any agreement with any Person that would obligate the Sellers to pay any commission, brokerage fee, or "finder's fee" in connection with the Transactions.

4.8 **Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other Representations and Warranties**.

(a) Purchaser acknowledges that it and its representatives have received such access to such books and records, facilities, equipment, contracts and other assets of the Business which it and its representatives have considered sufficient in order to enter into this Agreement and to consummate the Transactions. Purchaser acknowledges and agrees that it has made its own inquiry and investigation into, and, based thereon, has formed an independent judgment concerning the Seller Group, the Business, the Transferred Assets and the Assumed Liabilities.

(b) Except for the specific representations and warranties expressly made by the Sellers in Article 3 and in the Related Documents, Purchaser acknowledges and agrees that the Sellers are not making and have not made any representation or warranty, expressed or implied, at law or in equity, in respect of the Business, the Transferred Assets, the Assumed Liabilities, or any of its operations, prospects or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any Liabilities, the prospects of the Business, the effectiveness or the success of any operations, or the accuracy or completeness of any confidential information memoranda, documents, projections, material or other information (financial or otherwise) regarding the Business furnished to Purchaser or its representatives or made available to Purchaser and its representatives in the Data Room, management presentations, or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever, and (ii) no officer, director, manager, stockholder, agent, Affiliate, advisor, representative or employee of the Seller Group has any authority, express or implied, to make any representations, warranties or agreements not specifically set forth in Article 3 and in the Related Documents and subject to the limited remedies herein provided.

(c) Other than the specific representations and warranties expressly set forth in Article 3 and the Related Documents, Purchaser specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that the Sellers and the Sellers' Affiliates have specifically disclaimed and do hereby specifically disclaim, and shall not have or be subject to any Liability for reliance on any such other representation or warranty made by any Person.

(d) Purchaser is acquiring the Transferred Assets and assuming the Assumed Liabilities subject only to the specific representations and warranties expressly set forth in Article 3 and the Related Documents.

4.9 **No Other Representations or Warranties.** Except for the representations and warranties contained in this Article 4 and the Related Documents, neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to the Sellers or their representatives, and Purchaser disclaims any other representations or warranties, whether made by Purchaser or any of its Affiliates, officers, directors, employees, agents or representatives.

## ARTICLE 5
## BANKRUPTCY COURT MATTERS

5.1 **Competing Transaction.** This Agreement is subject to approval by the Bankruptcy Court and the consideration by the Sellers of higher or better competing bids in respect of all or any part of the Transferred Assets (whether in combination with other assets of the Seller Group or otherwise) in accordance with the terms of the Revised Bidding Procedures Order (each, a "**Competing Bid**"). From the date hereof (and any prior time) and until the Closing, the Sellers are permitted to, and to cause their representatives to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates and representatives) in connection with any sale or other disposition of the Transferred Assets. In addition, the Sellers shall have the authority to respond to any inquiries or offers to purchase all or any part of the Transferred Assets (whether in combination with other assets of the Seller Group or otherwise) and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Sale Order or other applicable Law, including supplying information relating to the Business and the assets of the Seller Group to prospective purchasers.

5.2 **Bankruptcy Court Filings.**

(a) Subject to its right to pursue a Competing Bid in accordance with the Revised Bidding Procedures Order, the Sellers shall diligently pursue the entry by the Bankruptcy Court of the Sale Order, which Sale Order shall provide for the transfer of the Transferred Assets and the Assumed Liabilities to Purchaser free from all successor or transferee Liability to the fullest extent permitted by Section 363 of the Bankruptcy Code. The Sellers shall comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the Bankruptcy Court in obtaining the entry of the Sale Order. The Sellers further covenant and agree that, after entry by the Bankruptcy Court of the Sale Order, and provided, that the Sale Order becomes final and non-appealable, the terms of any other proposed order submitted by the Sellers to the Bankruptcy Court shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the Transactions. Purchaser agrees that it will promptly take such actions as are reasonably requested by the Sellers to assist in obtaining entry of the Sale Order, including a finding of adequate assurance of future performance by Purchaser, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event the entry of the Sale Order shall be appealed, each of the Sellers and Purchaser shall use its respective commercially reasonable efforts to defend such appeal.

(b)    The Sellers and Purchaser agree that, in the event that Purchaser is not the winning bidder at the auction undertaken pursuant to the Revised Bidding Procedures Order (the "**Auction**"), if and only if (i) Purchaser submits the Back-Up Bid at the Auction or the terms of this Agreement constitute the Back-Up Bid, and (ii) the Parent, on behalf of itself and the other members of the Seller Group, gives written notice to Purchaser on or before the Back-up Termination Date, stating that the Sellers (A) failed to consummate the sale of the Transferred Assets with the winning bidder, and (B) terminated the purchase agreement with the winning bidder, Purchaser shall promptly consummate the Transactions upon the terms and conditions as set forth herein, including the payment of Purchase Price, as the same may be increased by Purchaser at the Auction.

(c)    The Sellers covenant that, without Purchaser's prior written consent, neither the Sellers nor any of their appointees, representatives (including legal counsel), agents, trustees, or other similar Person shall take any action designed to (i) dismiss the Bankruptcy Cases (including making any request to the Bankruptcy Court in relation to any such dismissal), or (ii) convert the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code (including making any request to the Bankruptcy Court in relation to any such conversion), in the case of either (i) or (ii), at any time prior to the Outside Date.

5.3    **Assumption of Assigned Contracts**.

(a)    On or before the date that is five Business Days following the date on which the Sale Order is entered by the Bankruptcy Court, the Sellers shall file (or cause to be filed) a notice of assumption (the "**Assumption Notice**") with the Bankruptcy Court and serve such notice on each counterparty to an Assignable Contract listed thereon. The Assumption Notice shall identify all Assignable Contracts that the Sellers and Purchaser believe may be assumed and assigned in connection with the sale of the Transferred Assets and set forth a good faith estimate of the amount of Cure Costs applicable to each such Assignable Contract (and if no Cure Cost is estimated to be applicable with respect to any particular Assignable Contract, the amount of such Cure Cost designated for such Assignable Contract shall be "$0.00"). In accordance with the Bidding Procedures Order or the Revised Bidding Procedures Order, as applicable, the Sellers reserve the right to supplement such list of Assignable Contracts and provide additional notice of assumption, and to remove an Assignable Contract from the list of Assignable Contracts, up to five Business Days prior to the hearing by the Bankruptcy Court with respect to the Sale Motion.

(b)    On or before the date that is five Business Days before the Closing Date (the "**Designation Deadline**"), Purchaser shall provide to the Sellers a list of those Assignable Contracts that it elects to have assumed and assigned to Purchaser on the Closing Date (the "**Assigned Contracts**"). Purchaser shall be entitled to remove certain Assignable Contracts from the list of Assigned Contracts at any time prior to the Designation Deadline by providing the Sellers written notice of such removal. In the event that Purchaser removes any of such Assignable Contracts from such list, the Sellers will provide the relevant counterparty written notice that the applicable Assignable Contract is no longer identified as an Assigned Contract. For the avoidance of doubt, only those executory Assignable Contracts that remain identified as Assigned Contracts as of the Closing Date will constitute Assigned Contracts and will be assumed by the Sellers and assigned to Purchaser pursuant to the Sale Order. The Sellers shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Assignable Contracts and to determine

the amount of the Cure Costs; provided, that nothing herein shall preclude the Sellers from filing one or more motion to reject any Contracts that are not Assignable Contracts.

(c)     Subject to the terms of <u>Section 2.5</u>, <u>Section 2.8</u>, <u>Section 2.9(a)</u>, <u>Section 5.3(a)</u> and <u>Section 5.3(b)</u>, Purchaser shall make provision for the payment of the Determined Cure Costs in cash at Closing in accordance with the Sale Order.

(d)     On or prior to the date that is five Business Days prior to the Closing Date, the Sellers shall have used commercially reasonable efforts to provide Purchaser with access to true and complete copies of the Assignable Contracts or, where written pursuant to a form of Contract, the forms thereof.

(e)     Notwithstanding any provision in this Agreement to the contrary, from and after the date hereof through the Closing Date, the Sellers will not reject or take any action (or fail to take any action that would result in rejection by operation of Law) to reject, withdraw, repudiate or disclaim any Assignable Contract unless (i) Purchaser has provided its prior written consent or (ii) Purchaser has removed such Assignable Contract from the list of Assigned Contracts. The Sellers will not reject or take any action (or fail to take any action that would result in rejection by operation of Law) to reject, withdraw, repudiate or disclaim any Property Management Agreement without the prior written consent of Purchaser.

## ARTICLE 6
## PRE-CLOSING COVENANTS

6.1     **Conduct of Business**. Except (i) as may be approved by Purchaser (which approval will not be unreasonably withheld, delayed or conditioned; provided, however, that the consent of Purchaser shall be deemed to have been given if Purchaser does not object within 48 hours after a written request for such consent is provided by the Sellers to Purchaser), (ii) for actions taken or omitted to be taken by any member of the Seller Group in response to any Public Health Measure, or (iii) as is otherwise permitted, contemplated or required by this Agreement, any Assignable Contract, by applicable Laws or by order of the Bankruptcy Court, from the date hereof through the earlier of the Closing Date or the termination of this Agreement in accordance with its terms:

(a)     The Seller Group shall use their commercially reasonable efforts to carry on the Business in all material respects in the ordinary course of business as it has been conducted since the Petition Date; and

(b)     No member of the Seller Group shall:

(i)     sell, license, abandon or otherwise dispose of any material asset or property constituting Transferred Assets other than, in each case, in the ordinary course of business or for the purpose of disposing of obsolete or worthless assets;

(ii)     except in the ordinary course of business, acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of any business or any corporation, partnership or other business organization or otherwise acquire any assets (except inventory), that as of the Closing would constitute Transferred Assets, except for the acquisition of assets in the ordinary course of business;

(iii) change its present accounting methods or principles in any material respect, except as required by GAAP or applicable Law;

(iv) enter into any commitment for capital expenditures in respect of the Business in excess of 125% of the aggregate amount set forth in the capital expenditure plan of the Sellers in respect of the Business for the applicable fiscal year;

(v) make or change any Tax election, change an annual accounting period, adopt or change any Tax accounting method, file any amended Tax Return, enter into any closing agreement, settle any material Tax claim or assessment or surrender any right to claim a refund of Taxes, other than in the ordinary course of business or as required by the Code or applicable Law, and in each case that could have a material effect on the amount of Taxes due from the Business or due as a result of the Transferred Assets for a taxable period (or portion thereof) beginning after the Closing Date; or

(vi) other than in the ordinary course of business, amend, modify or terminate any Assignable Contract.

(c) Notwithstanding anything to the contrary, nothing contained in this Agreement shall give Purchaser or any of its Affiliates, directly or indirectly, any right to control or direct the Business, assets and operations prior to the Closing. Prior to the Closing, the Sellers shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its Business, assets and operations.

6.2 **Access to Information; Confidentiality**.

(a) From the date hereof until the earlier of the Closing Date or the termination of this Agreement, the Sellers shall grant Purchaser and its representatives (at Purchaser's sole cost and expense) reasonable access, during normal business hours and upon reasonable notice (and in the event of a Facility visit request, at least 48 hours prior notice), and subject to any limitations resulting from any Public Health Measures, to the personnel, Facilities, book and records of the Seller Group related to the Business or the Transferred Assets that are in the possession or under the control of the Seller Group; provided, however, that (i) all requests for access shall be directed to Ross Rosenstein (rrosenstein@hl.com) or such other person(s) as the Parent, on behalf of itself and the other members of the Seller Group, may designate in writing from time to time (the "**Seller Access Contact**"), (ii) such activities do not unreasonably interfere with the ongoing business or operations of the Seller Group, (iii) the Sellers shall have the right to have one or more of its representatives present at all times during any visits, examinations, discussions or contacts contemplated by this Section 6.2a), (iv) Purchaser shall have no right to perform invasive or subsurface investigations or conduct any sampling or analysis of environmental media of the nature commonly referred to as a "Phase II Environmental Investigation," such as any soil or groundwater testing, (v) such access or related activities would not cause a violation of any agreement to which any Seller is a party, (vi) no Personal Information shall be disclosed or used other than in compliance with applicable privacy law, (vii) to the extent such access request requires a member of the Seller Group to exercise its rights under the express terms of any Property Management Agreement (including any request to access each of the Facilities for the purpose of preparing for and conducting employee interviews with any Facility Workers), such member of

the Seller Group shall use commercially reasonable efforts to provide the requested access and (viii) nothing herein shall require any member of the Seller Group or their representatives to furnish to Purchaser or provide Purchaser with access to information that (A) is subject to an attorney-client or an attorney work-product privilege, (B) legal counsel for the Seller Group reasonably concludes may give rise to antitrust or competition law issues or violate a protective order or otherwise may not be disclosed pursuant to applicable Law (including any Public Health Measure) or (C) would cause significant competitive harm to the Seller Group if the Transactions are not consummated. In connection with the rights of Purchaser under this Section 6.2, the Sellers hereby covenant and agree to diligently pursue all rights and remedies available to any member of the Seller Group pursuant to applicable Law (including without limitation, the Bankruptcy Code), Contract (including without limitation, the Property Management Agreements), or Order of the Bankruptcy Court, including without limitation, using its commercially reasonable efforts to promptly obtain Manager's signature to any estoppel, acknowledgement, agreement to cooperate or other agreement that Purchaser may reasonably request in connection with the Transaction.

(b)     Notwithstanding anything to the contrary contained in this Agreement, from the date of this Agreement until the Closing Date, Purchaser shall not, and shall cause its representatives not to, have any contact or discussions concerning any member of the Seller Group, the Business, the Transactions or any other matters with any lender, borrower, creditor, guarantor, business partner, bank, landlord, tenant, supplier, customer, employee, manager, franchisee, distributer, noteholder, independent contractor, consultant or other material business relation of any Seller, in each case, without the prior written consent of the Seller Access Contact (which consent may be withheld in the Sellers' sole discretion and, if given, may be conditioned on the Seller Access Contact or his or her designee having the right to participate in any meeting or discussion); provided, however, that (subject to the rights of the Seller Access Contact or his or her designee to participate in any such meeting or discussion as set forth in this Section 6.2(b) and subject to applicable restrictions under Antitrust Laws) the Sellers shall use their commercially reasonable efforts to facilitate, or to request the Manager to facilitate, as applicable, meetings between Purchaser and any suppliers or vendors of the Business as may be reasonably requested by Purchaser to facilitate the transition of the Transferred Assets to Purchaser at the Closing.

(c)     Any information provided to or obtained by Purchaser or its representatives, including pursuant to this Section 6.2 is confidential information and subject to the terms of, and the restrictions contained in, the Confidentiality Agreement. Purchaser agrees to be bound by and comply with the provisions set forth in the Confidentiality Agreement as if Purchaser were a party to the Confidentiality Agreement as a "Recipient" and the provisions were set forth herein, and such provisions are hereby incorporated herein by reference. Effective upon (and only upon) the Closing, the Confidentiality Agreement shall automatically terminate and none of the parties thereto shall have any further Liability or obligation thereunder except with respect to any confidential information provided to or obtained by Purchaser or its representatives concerning the Seller Group that is unrelated to the Business, the Transferred Assets or the Assumed Liabilities, which information shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date. If this Agreement is terminated prior to Closing for any reason, the duration of the confidentiality of the Confidentiality Agreement shall be deemed extended, without any further action by the parties, for a period of time equal to the period of time elapsed between the date such Confidentiality Agreement was initially signed and the date of termination of this Agreement.

6.3      **Efforts to Consummate.** Except as otherwise provided in this Agreement, each of the parties hereto agrees to use its commercially reasonable efforts to cause the Closing to occur as soon as possible after the date hereof, including satisfying the conditions precedent set forth in Article 8 applicable to such party including (a) defending against any Actions, judicial or administrative, challenging this Agreement or the consummation of the Transactions, (b) seeking to have any preliminary injunction, temporary restraining order, stay or other legal restraint or prohibition entered or imposed by any court or other Governmental Authority that is not yet final and nonappealable vacated or reversed, and (c) and executing any additional instruments reasonably requested by another party hereto (without cost or expense to the executing party) necessary to carry out the Transactions and to fully carry out the purposes of this Agreement; provided, however, that, solely for purposes of the "commercially reasonable efforts" standard as required by this Section 6.3 or Section 6.4 neither the Sellers, the Purchaser nor their respective Affiliates or representatives shall be required to offer or grant any material accommodation or material concession (financial or otherwise) to any third party (in each case that is not required by the express terms of any obligation of such party or its Affiliates to such third party) or to otherwise expend any material amounts of money or suffer any material detriment, to commence any Action, to waive or surrender any material right, to modify in any material respect any agreement (including any Assigned Contract) except as otherwise explicitly required by this Agreement, and neither the Sellers nor their Affiliates shall be required to provide financing to Purchaser for the consummation of the Transactions.

6.4      **Notices and Consents**. Reasonably promptly following the execution of this Agreement, the Sellers will give, or cause to be given, applicable notices to third parties and thereafter will use commercially reasonable efforts (as limited by Section 6.3) to obtain the third-party consents set forth on Schedule 6.4; provided, however, that no representation, warranty, covenant or agreement of the Sellers shall be breached or deemed breached, and no condition shall be deemed not satisfied, as a result of (a) the failure to obtain any such third-party consent, (b) any termination of a Contract as a result of the failure to obtain such third-party consent or (c) any Action commenced or threatened by or on behalf of any Person arising out of or relating to the failure to obtain any such consent or any such termination.

6.5      **Regulatory Matters and Approvals**.

(a)      Each of Purchaser and the Sellers will provide any notices to and make any filings with any Governmental Authority that are necessary to consummate the Transactions. Without limiting the generality of the foregoing, the Sellers and Purchaser shall, no later than 10 Business Days after the date hereof, prepare and file with the United States Federal Trade Commission (the "**FTC**") and the United States Department of Justice (the "**DOJ**") the notification and report form required under the HSR Act for the Transactions and seek to obtain early termination of the waiting period thereunder (the "**HSR Filing**"). Each of Purchaser and the Sellers shall submit as soon as practicable and advisable any supplemental or additional information which may reasonably be requested by the FTC and the DOJ or by any other Governmental Authority in connection with such filings and shall comply in all material respects with all applicable Laws relating thereto.

(b)      Without limiting the generality of the foregoing: (i) each of Purchaser and the Sellers shall use its commercially reasonable efforts to avoid, eliminate or resolve each and

every impediment and obtain all clearances, consents, approvals and waivers under the HSR Act, the Sherman Antitrust Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and any other United States federal or state or foreign statutes, rules, regulations, Orders, decrees, administrative or judicial doctrines or other Laws designed to prohibit, restrict or regulate actions for the purpose or effect of monopolization or restraint of trade (collectively "**Antitrust Laws**") that may be required by any Governmental Authority, so as to enable the parties to cause the Closing to occur as soon as practicable and in any event prior to the Outside Date; provided, however, that for purposes of the "commercially reasonable efforts" standard as required by this Section 6.5, neither Purchaser nor any of its Affiliates shall be required to (and the Sellers shall not without the prior written consent of Purchaser) (A) propose, negotiate, offer to commit and effect (and if such offer is accepted, commit to and effect), by Order, consent decree, hold separate order, trust, or otherwise, the sale, divestiture, license, disposition or holding separate of such assets or businesses of Purchaser or the Sellers or their respective subsidiaries, or otherwise offer to take or offer to commit to take any action that limits its freedom of action, ownership or control with respect to, or its ability to retain or hold, any of the businesses, assets, product lines, properties or services of Purchaser or the Sellers or their respective subsidiaries (or, in the case of Purchaser, its Affiliates)); (B) terminate, relinquish, modify or waive existing relationships, ventures, contractual rights, obligations or other arrangements of Purchaser or the Sellers or their respective subsidiaries (or, in the case of Purchaser, its Affiliates) or (C) enter or offer to enter into agreements and stipulate to the entry of an Order or decree or filing appropriate applications with any Governmental Authority in connection with any of the actions contemplated by the foregoing clauses (A) and (B) ; and (ii) if any objections are asserted with respect to the Transactions under any applicable Antitrust Law or if any Action, whether judicial or administrative, is instituted by any Governmental Authority or any private party challenging the Transactions as violating any applicable Antitrust Law, each of Purchaser and the Sellers shall cooperate with one another and use its commercially reasonable efforts to avoid the filing of, or to resist or resolve, any such Action, objection or challenge.

(c)    Each of Purchaser and the Sellers will promptly notify the other parties hereto of any substantive written communication made to or received by either Purchaser and/or the Sellers, as the case may be, from any Governmental Authority regarding the Transactions, and, subject to applicable Law, if practicable, (i) permit the other parties hereto to review in advance any proposed substantive written communication to any such Governmental Authority and incorporate the other parties' reasonable comments, (ii) not agree to participate in any substantive meeting or discussion with any such Governmental Authority in respect of any filing, investigation or inquiry concerning this Agreement or the Transactions unless, to the extent reasonably practicable, it consults with the other parties hereto in advance and to the extent permitted by such Governmental Authority, gives the other parties hereto the opportunity to attend, and (iii) furnish the other parties with copies of all material correspondence, filings and written communications between them and their Affiliates and their respective representatives on one hand and any such Governmental Authority or its staff on the other hand, with respect to this Agreement and the Transactions; provided, however, that this Agreement shall not obligate any party to disclose to any other party such portions of any proposed or final correspondence, filing or other written communication with a Governmental Authority or its staff as the party to such correspondence, filing or communication may reasonably deem competitively-sensitive, privileged or confidential vis-à-vis the other party or with respect to the HSR Filing, information not customarily shared between parties, except that it shall disclose matters to the external counsel of the other party to

the extent reasonably necessary in order to enable the party to fulfill its cooperation obligations in this Section 6.5(c).

(d) Purchaser shall not, and shall not permit any of its Affiliates to, acquire or agree to acquire by way of arrangement, amalgamation, merger or consolidation with, or by purchasing a substantial portion of the assets of or equity in, or by any other manner, any Person or portion thereof, or otherwise acquire or agree to acquire any assets, if the entering into a definitive agreement relating to or the consummation of such acquisition, arrangement, amalgamation, merger or consolidation would reasonably be expected to (i) impose any delay in the obtaining of, or significantly increase the risk of not obtaining, any authorizations, consents, orders, declarations or approvals of any Governmental Authority necessary to consummate the Transactions or the expiration or termination of any applicable waiting period, (ii) significantly increase the risk of any Governmental Authority entering an order prohibiting the consummation of the Transactions or (iii) delay the consummation of the Transactions.

(e) Purchaser and the Sellers shall not extend or consent to any extension of any applicable waiting or review period or enter into any agreement with a Governmental Authority to not consummate the Transactions, except upon the prior written consent of the other party, such consent not to be unreasonably withheld, conditioned or delayed.

6.6     **Public Announcements**. Between the date of this Agreement and the Closing Date, except to the extent required by any applicable Law or Action (including the Bankruptcy Cases), neither Purchaser nor the Sellers shall, and Purchaser and the Sellers shall cause their respective Affiliates and representatives not to, directly or indirectly, issue any press release or public announcement of any kind without the prior written consent of Purchaser and the Sellers; provided, however, that the Sellers and their Affiliates may make announcements from time to time to their respective employees, customers suppliers and other business relations and otherwise as the Sellers may reasonably determine is necessary to comply with applicable Law or the requirements of this Agreement or any other agreement to which any Seller or any such Affiliate is a party. Purchaser and the Sellers shall cooperate in good faith to prepare a joint press release to be issued on the Closing Date, the terms of which shall be mutually agreed upon by the parties.

6.7     **Update of Schedules; Knowledge of Breach**. From time to time prior to the Closing, the Sellers may supplement or amend the Seller Schedules with respect to any matter (a) hereafter arising or discovered which if existing or known by the Sellers at the date of this Agreement would have been required to be set forth or described in the Seller Schedules or (b) which comes into the possession of the Seller Group after the date hereof which if in the possession of the Sellers at the date of this Agreement would have been required to be set forth or described in the Seller Schedules. Any such supplemental or amended disclosure shall not be deemed to have cured any such breach of representation or warranty, including for purposes of determining whether or not the conditions set forth in Section 8.2(a) have been satisfied and for purposes of determining any remedy available to Purchaser under Section 10.2. From and after the Closing, references to the Seller Schedules shall be references to the Schedules as supplemented, modified and/or updated. Nothing in this Agreement, including this Section 6.7, shall imply that the Sellers are making any representation or warranty as of any date other than date of this Agreement and the Closing Date (other than representations and warranties that are expressly made as of an earlier date).

6.8     **Notification of Certain Matters**. Until the Closing, each party hereto shall promptly notify the other parties in writing of any fact, change, condition, circumstance or occurrence or nonoccurrence of any event of which it is aware that will or is reasonably likely to result in any of the conditions set forth in Article 8 becoming incapable of being satisfied.

6.9     **Revised Bidding Procedures** . The Sellers shall file (or cause to be filed) a motion with the Bankruptcy Court seeking approval of the Revised Bidding Procedures promptly following the date of this Agreement, but in no event more than three Business Days following the date hereof (the "**Revised Bidding Procedures Filing Deadline**"). Subject to Section 8.1(d), the Sellers shall diligently pursue the entry by the Bankruptcy Court of the Revised Bidding Procedures Order on or prior to February 1, 2022 (the "**Revised Bidding Procedures Order Deadline**").

6.10    **Title Insurance and Surveys**. Purchaser shall rely on the Title Commitments and Surveys for the purposes of obtaining any title insurance policies for the Owned Real Property and shall not order any title insurance policies for the Owned Real Property from any Person other than the Title Insurance Company.

6.11    **Encumbrances**. The Sellers shall not place, or allow to be placed, any Lien (other than a Permitted Lien) of any nature against or relating to the Owned Real Property between the date hereof and the Closing.

## ARTICLE 7
## POST-CLOSING COVENANTS

7.1     **Access to Information; Books and Records**. From and after the Closing, and without prejudice to the obligations of Purchaser pursuant to Section 7.3g), Purchaser and its Affiliates shall (i) afford the Seller Group and their respective representatives reasonable access, during normal business hours, upon reasonable advance notice and under reasonable circumstances, to the books and records of Purchaser and the Business shall permit the Seller Group and their respective representatives to examine and copy such books and records to the extent reasonably requested by such party and (ii) cause their representatives to furnish all information reasonably requested by any member of the Seller Group or their representatives in connection with financial or regulatory reporting, audit, third party litigation, preparing or filing of any Tax Return or the defense of any Tax claim or assessment or any other business purpose; provided, however, that nothing in this Section 7.1 shall require Purchaser or its Affiliates to furnish to the Seller Group or their respective representatives any material that is subject to an attorney-client or solicitor-client privilege or an attorney or solicitor work-product privilege or which may not be disclosed pursuant to applicable Law. For a period of six (6) years following the Closing Date, or such longer period as may be required by applicable Law or necessitated by applicable statutes of limitations, Purchaser shall, and shall cause its Affiliates to, maintain all such books and records in the jurisdiction in which such books and records were located prior to the Closing Date and shall not destroy, alter or otherwise dispose of any such books and records. On and after the end of such period, Purchaser shall, and shall cause its Affiliates to, provide the Sellers with at least 10 Business Days prior written notice before destroying, altering or otherwise disposing any such books and records, during which period the Sellers may elect to take possession, at their own expense, of such books and records.

7.2    **Post-Closing Receipt and Possession of Assets**.

(a)    After the Closing Date, the Sellers shall transfer promptly to Purchaser from time to time (but in any event on a monthly basis) any payments constituting Transferred Assets (whether such payments were received prior to, on, or following the Closing Date) including any accounts receivable constituting Transferred Assets, received by any Seller. After the Closing Date, Purchaser shall transfer promptly to the applicable member of the Seller Group, from time to time (but in any event on a monthly basis), any payments constituting Excluded Assets received by Purchaser after the Closing.

(b)    In the event that, after the Closing Date, Purchaser receives or otherwise is in possession of any other Excluded Asset, Purchaser shall promptly notify the Sellers of its receipt or possession of such other Excluded Asset and transfer, at the Sellers' expense, such Excluded Asset to the applicable member of the Seller Group. In the event that, after the Closing Date, any Seller receives or otherwise is in possession of any other Transferred Asset, the applicable Seller shall promptly notify Purchaser of its receipt or possession of such other Transferred Asset and transfer, at Purchaser's expense (unless the Seller was required to transfer such Transferred Asset to Purchaser at Closing, in which case, and without limitation of any other remedies available to Purchaser, such transfer will be at the Sellers' expense), such Transferred Asset to Purchaser.

7.3    **Tax Matters**.

(a)    The Sellers shall be responsible for preparing or causing to be prepared all Asset Tax Returns for itself for taxable periods ending on or before the Closing Date (each, a "**Pre-Closing Tax Period**") that are required to be filed after the Closing. After the Closing, Purchaser will assist and cooperate with the Sellers in preparing such Asset Tax Returns. The Sellers shall provide Purchaser with completed drafts of such Asset Tax Returns for Purchaser's review and reasonable comment at least 15 days prior to the due date for the filing thereof, taking into account extensions (or, if such due date is within 30 days following the Closing Date, as promptly as practicable following the Closing Date) and shall make such revisions to such Asset Tax Returns as are reasonably requested by Purchaser; provided, that Purchaser's requests are consistent with the prior practice of the Sellers (to the extent relevant) and comply with applicable Law. Purchaser shall cause all such Asset Tax Returns received from the Sellers to be duly executed (as may be required) and timely filed (taking into account all extensions properly obtained).

(b)    Purchaser shall prepare and timely file or cause to be prepared and timely filed (taking into account all extensions properly obtained) all Asset Tax Returns that are required to be filed for any taxable period that begins on or before the Closing Date and ends after the Closing Date (a "**Straddle Period**") and shall timely pay (subject to Purchaser's right to reimbursement of Seller Taxes), or cause to be timely paid, the amount of any Taxes shown as due thereon. Purchaser shall prepare such Asset Tax Returns in a manner consistent with past practice to the extent relevant and consistent with applicable Law and shall provide the Sellers with completed drafts of such Asset Tax Returns for the Sellers' review and reasonable comment at least 15 days prior to the due date for filing thereof, taking into account extensions (or, if such due date is within 30 days following the Closing Date, as promptly as practicable following the Closing Date) and shall make such revisions to such Asset Tax Returns as are reasonably requested by the

Sellers, provided such requests are consistent with the prior practice of the Sellers (to the extent relevant) and comply with applicable Law.

(c) The Sellers shall be liable for, and shall indemnify and hold Purchaser harmless against, any Asset Taxes with respect to a Pre-Closing Tax Period and the portion of any Straddle Period ending on the Closing Date and any other Taxes of the Sellers ("**Seller Taxes**"). The Sale Order shall require Sellers to pay all Seller Taxes (unless such Seller Taxes are paid by Purchaser) on or prior to the due date for any such Seller Taxes and to promptly reimburse Purchaser for any Seller Taxes paid by Purchaser and any plan of reorganization of Sellers shall include means for implementation of Seller's payment obligation pursuant to this Section 7.3(c). Purchaser shall be liable for, and shall indemnify and hold the Sellers harmless against, all Asset Taxes with respect to the portion of any Straddle Period beginning the day after the Closing Date. For purposes of this Agreement, in the case of any Straddle Period, (a) the amount of any Asset Taxes based on or measured by income or receipts, sales or use, employment, or withholding allocated to the portion of such Straddle Period ending on the Closing Date shall be determined based on an interim closing of the books as of the end of the day on the Closing Date and (b) any other Asset Taxes shall be allocated to the portion of such Straddle Period ending on the Closing Date by prorating the amount of such Tax for the entire premium or taxable period per diem.

(d) Purchaser and its Affiliates shall not make or change any Tax election, amend, refile or otherwise modify (or grant an extension of any statute of limitation with respect to) any Tax Return, or take any other action that could cause or result in an increase in any Liability for Taxes or reduce any Transaction Tax Benefit in respect of any Pre-Closing Tax Period or Straddle Period relating to the Seller Group or the Business without the prior written consent of the Parent, on behalf of itself and the other members of the Seller Group.

(e) Purchaser shall promptly notify the Sellers in writing upon receipt by Purchaser or any of its Affiliates of notice of any pending or threatened federal, state, local or foreign Tax audits, proceedings or assessments relating to the Pre-Closing Tax Period, Straddle Period or otherwise relating to a Tax for which the Sellers may be liable (a "**Seller Tax Claim**").

(f) The Sellers shall have the sole right to control the defense or resolution of any Seller Tax Claim, and to employ counsel of its choice at the Seller's expense; provided, however, that Purchaser and its representatives shall be permitted, at their expense, to observe and participate in any defense or resolution of such Seller Tax Claim. Neither Purchaser nor any of its Affiliates shall be entitled to settle, either administratively or after the commencement of litigation, any Seller Tax Claim without the prior written consent of the Parent, on behalf of itself and the other members of the Seller Group, which shall not be unreasonably conditioned, denied or delayed. Notwithstanding anything to the contrary contained herein, without the prior written consent of Purchaser, which shall not be unreasonably conditioned, denied or delayed, the Sellers shall not agree or consent to compromise or settle, either administratively or after the commencement of litigation, any issue or claim in a Tax audit or administrative or court proceeding it controls hereunder to the extent that any such compromise, settlement, consent or agreement may affect the Liability of Purchaser or any of its Affiliates for Taxes for which the Sellers are not responsible hereunder. The provisions of this Section 7.3(f) shall control over any contrary provisions of Article 11.

(g)     After the Closing, each of the Sellers and Purchaser shall (and shall cause their respective Affiliates to):

(i)     timely sign and deliver such certificates or forms as may be necessary or appropriate to establish an exemption from (or otherwise reduce), or file Tax Returns or other reports with respect to, Transfer Taxes;

(ii)     cooperate fully in preparing for and defending any audits or proceedings of or disputes with Governmental Authorities regarding any Tax Returns required to be filed by, or Taxes related to the Transferred Assets due from, the Sellers for any Pre-Closing Tax Period or Straddle Period;

(iii)     maintain and preserve until the expiration of the applicable statutes of limitations, and make available to the other parties as reasonably requested and to any Governmental Authority as reasonably required, all information, records and documents relating to Taxes related to the Transferred Assets for any Pre-Closing Tax Period or Straddle Period, and make employees available to the other parties as reasonably requested during business hours to supplement or explain such information, records and documents; and

(iv)     furnish the other parties with copies of all correspondence received from any Governmental Authority in connection with any Tax audit, proceeding, assessment or information request relating to Taxes related to the Transferred Assets for a Pre-Closing Tax Period or Straddle Period, and furnish the other parties with copies of all records and documents relating to Taxes related to the Transferred Assets for a Pre-Closing Tax Period or Straddle Period that are proposed to be destroyed (and not otherwise in the possession of such other party).

(h)     Purchaser shall pay, or cause to be paid, to the Sellers the amount of any refunds of Taxes from a Pre-Closing Tax Period or the portion of a Straddle Period ending on the Closing Date, other than any refunds that are attributable to a carryback of net operating losses or other Tax attributes (unrelated to Transaction Tax Benefits) attributable to a taxable period or portion thereof beginning after the Closing Date. Purchaser shall make payment of any such refunds described in this Section 7.3(h), net of any reasonable costs incurred by Purchaser and its Affiliates in obtaining such refunds, to the Sellers within five days of receipt of the refund. If, in lieu of receiving any such refund, Purchaser or any of its Affiliates reduces a Liability for Taxes with respect to a taxable period or portion thereof beginning after the Closing Date or increases a Tax asset that can be utilized for such a taxable period or portion thereof, Purchaser shall promptly pay or cause to be paid to the Sellers the amount of such reduction in Liability for Taxes or the amount of any benefit resulting from such increase in Tax asset, as the case may be.

7.4     **Use of Seller Marks**. Subject to the terms of this Section 7.4, the Sellers hereby grant to Purchaser a non-exclusive, non-transferrable license to use the Trademarks included in the Excluded IP (the "**Seller Marks**") solely during the period beginning on the Closing Date and ending on the nine-month anniversary of the Closing Date (the "**Transition Period**") that have been, prior to the Closing Date, used by the Seller Group with, affixed to or otherwise associated with the Facilities and Transferred Assets, in each case solely for purposes of transitioning

ownership of the Facilities and Transferred Assets and in a manner that is not intended to or reasonably likely to harm or disparage any member of the Seller Group or their respective businesses, reputation or goodwill. In connection with such limited use of the Seller Marks as permitted by this Section 7.4, the Purchaser acknowledges that use thereof shall inure to the Sellers' benefit and shall not create in the Purchaser's favor any right, title or interest in or to the Seller Marks. Purchaser shall use the Seller Mark in compliance with all applicable Law and shall not (i) use the Seller Marks in combination with any other Trademark in a manner that creates a combination mark, (ii) contest Sellers' (or their Affiliates') ownership of the Seller Marks, (iii) take any action that a reasonable person would believe would diminish or dilute the distinctiveness or validity of the Seller Marks, or (iv) attempt to register any of the Seller Marks or any mark confusingly similar thereto, alone or in combination with other words or designs, as a trademark, service mark or trade name. Upon the expiration of the Transition Period, Purchaser shall promptly cease and discontinue all use of the Seller Marks. Purchaser shall re-label, destroy, delete or exhaust all materials in its possession bearing any of the Seller Marks, including signage, advertising, promotional materials, packaging, inventory, electronic materials, collateral goods, stationery, business cards, websites and other materials. For the avoidance of doubt, this paragraph will not require Purchaser to alter any historical or archival materials owned or held by Purchaser as part of the Transferred Assets acquired by Purchaser in the Transactions which include the Seller Marks.

7.5 **Seller Confidentiality**. From and after the Closing Date, the Sellers shall, and shall cause their Affiliates or subsidiaries to hold in confidence and not disclose any confidential information, whether written or oral, concerning the Business, the Facilities, or the Transferred Assets, except to the extent such information is generally available to and known by the public through no fault of the Sellers or any of their Affiliates or subsidiaries. If the Sellers or any of their Affiliates or subsidiaries are compelled to disclose any information by judicial or administrative process or by other requirements of Law, the Sellers shall promptly notify Purchaser in writing and shall cause the disclosing Person to disclose only that portion of such information which such Person is advised by its counsel is legally required to be disclosed, provided that such Person shall (and the Sellers shall cause such Person to) use commercially reasonable efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

## ARTICLE 8
## CONDITIONS PRECEDENT

8.1 **Conditions to Each Party's Obligation**. The respective obligations of the parties hereto to effect the Transactions are subject to the satisfaction (or, to the extent permitted by applicable Law, waiver by the Sellers and Purchaser), at or prior to the Closing, of the following conditions:

(a) HSR Act. Any applicable waiting periods, together with any extensions thereof, under the HSR Act shall have expired or been terminated.

(b) No Injunctions or Restraints. No Order or Law restraining, enjoining or otherwise prohibiting the consummation of the Transactions shall be in effect, and no Action shall

have been made against the Sellers or Purchaser seeking to restrain or prohibit, or to obtain substantial damages with respect to, the consummation of the Transactions.

(c)     Sale Order. The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall be a Final Order.

(d)     Bid Protections.     The Bankruptcy Court shall have entered an Order approving the Bid Protections set forth in the Revised Bidding Procedures.

8.2     **Conditions to Obligation of Purchaser**. The obligations of Purchaser to effect the Transactions is subject to the satisfaction (or, to the extent permitted by applicable Law, waiver by Purchaser), at or prior to the Closing, of the following conditions:

(a)     Representations and Warranties. Each of the representations and warranties of the Sellers contained in (A) Section 3.1 (*Organization, Good Standing and Other Matters; Subsidiaries*), (B) Section 3.2 (*Authority and Enforceability*), (C) Section 3.3 (*No Conflict; Required Filings and Consents*), (D) Section 3.6(c) (*Title to Transferred Assets*) and (E) Section 3.10 (*Brokers and Finders*) shall be true and correct in all respects, except for *de minimis* inaccuracies, as of the date hereof and as of the Closing Date as though made as of the Closing Date, except to the extent such representations and warranties are made as of a specific date or time (which need only be true and correct as of such date or time). Each of the representations and warranties of the Sellers set forth in Article 3 (other than the representations and warranties set forth in preceding sentence of this Section 8.2(a)) shall be true and correct in all respects (without giving effect to any qualifications or limitations as to "materiality", "Material Adverse Effect" or words of similar import set forth therein) as of the date hereof and as of the Closing Date as though made as of the Closing Date, except to the extent such representations and warranties are made as of a specific date or time (which need only be true and correct as of such date or time), except where the failure of such representations and warranties to be so true and correct would not have, individually or in the aggregate, a Material Adverse Effect.

(b)     Performance of Covenants and Obligations. The Sellers shall have performed or complied in all material respects with all obligations, covenants and agreements required to have been performed or complied with by them under this Agreement at or prior to the Closing.

(c)     Condition of Facilities. At any time prior to the Closing (including during the period preceding the date of this Agreement), there shall not have occurred one or more Events of Loss in respect of any one or more Facilities that would result in an aggregate amount of Losses in respect of such Facilities equal to or greater than an amount equal to five percent (5%) of the Base Amount.

(d)     Closing Deliverables. The Sellers shall have delivered to Purchaser the closing deliveries required to be delivered by the Sellers pursuant to Section 2.8(a), Section 2.8(b) and Section 2.8(d). The Escrow Agent shall have delivered its duly executed signature page of the Escrow Agreement to Purchaser pursuant to Section 2.8(b).

8.3 **Conditions to Obligations of the Seller**. The obligation of the Sellers to effect the Transactions is subject to the satisfaction (or, to the extent permitted by applicable Law, waiver by the Sellers), at or prior to the Closing, of the following conditions:

(a) Representations and Warranties. Each of the representations and warranties of Purchaser set forth in Article 4 shall be true and correct in all respects (without giving effect to any qualifications or limitations as to "materiality" or words of similar import set forth therein) as of the Closing as though made at and as of such time (other than such representations and warranties as are made as of an earlier date, which shall be so true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, (i) have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or (ii) otherwise prevent, hinder or delay the consummation of the Transactions.

(b) Performance of Covenants and Obligations of Purchaser. Purchaser shall have performed or complied in all material respects with all obligations, covenants and agreements required to have been performed or complied with by it under this Agreement at or prior to the Closing.

(c) Closing Deliverables. Purchaser shall have delivered to the Sellers the closing deliveries required to be delivered by Purchaser pursuant to Section 2.8(a), Section 2.8(b) and Section 2.8(c). The Escrow Agent shall have delivered its duly executed signature page of the Escrow Agreement to the Sellers pursuant to Section 2.8(b).

8.4 **Waiver of Condition; Frustration of Conditions**. All conditions to the Closing shall be deemed to have been satisfied or waived from and after the Closing. Neither Purchaser nor the Sellers may rely on the failure of any condition set forth in this Article 8, as applicable, to be satisfied if such failure was caused by such party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the Transactions.

## ARTICLE 9
## TERMINATION

9.1 **Events of Termination**. Notwithstanding anything to the contrary, this Agreement may be terminated and the Transactions may be abandoned at any time prior to the Closing:

(a) by mutual written consent of Purchaser and the Parent;

(b) by Purchaser or the Parent by written notice to Purchaser or the Parent, on behalf of itself and the other members of the Seller Group, from the other, (i) if the Bankruptcy Court denies the motion for the Sale Order or (ii) if the Sale Order has not been entered by the Bankruptcy Court on or before March 18, 2022;

(c) by Purchaser or the Parent, by written notice to Purchaser or the Parent, on behalf of itself and the other members of the Seller Group, from the other, if (i) the Bankruptcy Court shall enter an order approving an Alternate Transaction and (ii) (A) Purchaser does not submit the Back-Up Bid or (B) Purchaser submits the Back-Up Bid and such Alternate Transaction is consummated;

48

(d) by Purchaser by written notice to the Parent, on behalf of itself and the other members of the Seller Group, if (i) any Seller withdraws, or publicly announces its intention to withdraw, the motion for the Sale Order; (ii) the Bankruptcy Cases are dismissed or if any Seller files a motion to voluntarily dismiss the Bankruptcy Cases; (iii) the Bankruptcy Cases are converted to Chapter 7 of the Bankruptcy Code or if any Seller moves for such conversion; (iv) an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code or a trustee in the Bankruptcy Cases is appointed or if the Sellers move for such appointment; (v) the Sellers have not filed (or caused to be filed) a motion with the Bankruptcy Court seeking approval of the Revised Bidding Procedures by the Revised Bidding Procedures Filing Deadline; (vi) the Bankruptcy Court has not entered the Revised Bidding Procedures Order by the Revised Bidding Procedures Order Deadline; or (vii) any Seller or any of their representatives, agents or similar Persons (excluding Manager, any equityholder of a Seller or any of their respective Affiliates) files or prosecutes, or the Bankruptcy Court otherwise approves, any plan of reorganization in respect of all or a portion of the members of the Seller Group that does not contemplate consummation of the Transactions or is inconsistent in any way with the terms of this Agreement or the Sale Order;

(e) by Purchaser, by written notice from Purchaser to the Parent, on behalf of itself and the other members of the Seller Group, (i) if there has been a breach or inaccuracy of a covenant, representation or warranty made by the Sellers in this Agreement, such that the conditions in Section 8.1 or Section 8.2 are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by the Sellers prior to the earlier of (i) 20 Business Days after receipt of written notice from Purchaser requesting such breach be cured or (ii) the Outside Date; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(e) shall not be available to Purchaser if the failure of Purchaser to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if the conditions in Section 8.1 or Section 8.3 are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement;

(f) by the Sellers, by written notice from the Parent, on behalf of itself and the other members of the Seller Group, to Purchaser, if there has been a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement, such that the conditions in Section 8.1 or Section 8.3 are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by Purchaser prior to the earlier of (i) 20 Business Days after receipt of written notice from the Parent, on behalf of itself and the other members of the Seller Group, requesting such breach be cured or (ii) the Outside Date; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(f) shall not be available to the Parent if the failure of the Parent or a Seller to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if the conditions in Section 8.1 or Section 8.3 are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by the Sellers in this Agreement;

(g) by Purchaser or the Parent, by written notice from Purchaser or the Parent, on behalf of itself and the other members of the Seller Group, to the other, if any Governmental Authority of competent jurisdiction shall have issued an Order, enacted any Law or taken any other action restraining, enjoining or otherwise prohibiting the consummation of the Transactions and,

in the case of Orders and other actions, such Orders or other actions shall have become Final Orders; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(g) shall not be available to the party seeking to terminate if any action of such party or any failure of such party to act has contributed to such Order or other action and such action or failure constitutes a breach of this Agreement; or

(h)     by Purchaser or the Parent, by written notice from Purchaser or the Parent, on behalf of itself and the other members of the Seller Group, to the other, if the Closing has not occurred on or prior to May 15, 2022 (the "**Outside Date**"); provided, however, that the party exercising the right to terminate this Agreement pursuant to this Section 9.1(h) shall not have been responsible for such failure of the Closing to occur through a breach or inaccuracy of a covenant, representation or warranty contained in this Agreement.

9.2     **Effect of Termination**.

(a)     In the event that this Agreement shall be terminated pursuant to Section 9.1, (a) Purchaser and its representatives shall promptly return all documents, work papers and other materials of the Sellers including any confidential information and (b) all further obligations of the parties hereto under this Agreement shall terminate without further Liability or obligation to the other parties hereto; provided, however, that, notwithstanding the foregoing, the Liabilities and obligations under (i) the Confidentiality Agreement, and (ii) Section 2.9(d), Section 6.2c), this Section 9.2, Section 9.3 and Article 11 shall continue in full force and effect.

(b)     Notwithstanding anything to the contrary in this Agreement, in the event of valid termination of this Agreement pursuant to Section 9.1, no such termination shall relieve Purchaser or the Sellers from any Liability hereunder for any and all breaches of this Agreement prior to such termination of this Agreement; provided, however, that (a) the Sellers' Liability hereunder for any and all breaches of this Agreement prior to such termination of this Agreement shall be capped at an amount equal to the (i) the Breakup Fee and the Purchaser Expense Reimbursement (to the extent payable in accordance with Section 9.3) and/or (ii) the Purchaser's right to receive the Deposit Escrow Amount (together with any dividends, interest, distributions and other income received in respect thereof) in accordance with Section 2.9(d) and (b) the Sellers shall be entitled to all remedies available at law or in equity.

9.3     **Breakup Fee; Purchaser Expense Reimbursement.** If this Agreement is terminated (i) in accordance with Section 9.1(c), Section 9.1(d), or Section 9.1(e), or (ii) by the Sellers in accordance with Section 9.1(b) or Section 9.1(h), and Purchaser is not then in breach of any of its obligations under this Agreement, then the Purchaser shall be immediately entitled to a termination fee in an amount equal to 1.5% of the Base Amount (the "**Breakup Fee**"), plus the Purchaser Expense Reimbursement (and together with the Breakup Fee, the "**Bid Protections**"); provided, however, Purchaser shall not be entitled to any Bid Protections to the extent this Agreement is terminated by Purchaser pursuant to Section 9.1(h) at a time when the condition set forth in Section 8.1(a) has not been satisfied. Such Bid Protections shall be approved by the Bankruptcy Court pursuant to Section 8.1(d), and shall be allowed as an administrative expense claim pursuant to Sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code, and (a) in the event of an Alternate Transaction, the Bid Protections shall constitute administrative expense claims under Sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code with priority over any and all

expense claims of any kind specified in Sections 503(b)(1) and 507(a) of the Bankruptcy Code and senior to all other superpriority administrative expenses in these Bankruptcy Cases, including but not limited to the superpriority administrative expense claims granted to the Senior Lender as provided in the Final Cash Collateral Order, and shall be paid promptly following the consummation of the Alternate Transaction; or (b) if the termination is not based on an Alternate Transaction, the Bid Protections shall constitute an administrative expense claim pursuant to Sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code with priority over any and all administrative expense claims of any kind specified in Sections 503(b)(1) and 507(a) of the Bankruptcy Code, but junior to the superpriority administrative expense claims granted to the Senior Lender as provided in the Final Cash Collateral Order and junior to the professional fee claims, and shall be paid promptly following the consummation of an Alternate Transaction. If Purchaser is entitled to the Bid Protections pursuant to this Section 9.3, the Sellers shall pay the Bid Protections in cash to Purchaser within three Business Days following the consummation of an Alternate Transaction; provided, that Purchaser has delivered summary documentation to the Sellers reflecting Purchaser's actual reasonable documented out-of-pocket costs, fees and expenses included in the Purchaser Expense Reimbursement as of such date. The Sellers agree and acknowledge that Purchaser's due diligence, efforts, negotiation, and execution of this Agreement have involved substantial investment of management time and have required significant commitment of financial, legal, and other resources by Purchaser and its Affiliates, and that such due diligence, efforts, negotiation, and execution have provided value to the Sellers. The Sellers acknowledge and agree that the provision of the Breakup Fee and the Purchaser Expense Reimbursement is an integral part of this Agreement, without which Purchaser would not have entered into this Agreement. The Sellers' obligation to pay the Breakup Fee and the Purchaser Expense Reimbursement in accordance with this Section 9.3 shall survive the termination of this Agreement. The Sellers shall have no obligation to pay the Bid Protections unless and until an Alternate Transaction has been consummated.

## ARTICLE 10
## SURVIVAL; INDEMNIFICATION

10.1 **Survival of Representations, Warranties and Covenants.** The representations and warranties, and the covenants or other agreements of the parties intended by their terms to be satisfied on or prior to the Closing contained in this Agreement and any Related Documents (or in any certificate delivered pursuant hereto or thereto) shall survive the Closing and terminate on the date that is 120 days following the Closing Date, and the covenants or other agreements of the parties intended to be satisfied following the Closing contained in this Agreement and any Related Documents shall survive the Closing for the respective term specified in such covenant or agreement, or if not specified, until fully performed in accordance with their respective terms (the "**Survival Period**"). Any claim for indemnification not made by the Person to be indemnified before the termination of the applicable Survival Period will be irrevocably and unconditionally released and waived, and the parties hereby agree that the statute of limitations shall be shortened to the applicable Survival Period and no claim for breach of any such representation or warranty, detrimental reliance or other right or remedy (whether in contract or in tort, or at law or in equity) may be brought after the expiration of the Survival Period applicable thereto against either party.

10.2 **Indemnification by the Seller**s.

(a)     Subject to the provisions of this Article 10, including Section 10.1, the Sellers hereby agree, from and after the Closing, to indemnify and hold Purchaser and its directors, managers, officers, employees, Affiliates, equityholders, agents, attorneys, representatives, successors and permitted assigns (collectively, the "**Purchaser Indemnified Parties**") harmless from and against, and pay to the applicable Purchaser Indemnified Parties the amount of, any Losses directly arising from:

(i)     any inaccuracy in or breach of any of the representations or warranties made by the Sellers in Article 3 in this Agreement or any Related Document (or in any certificate delivered pursuant hereto or thereto);

(ii)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by the Sellers pursuant to this Agreement or any Related Document; and

(iii)     any Excluded Liability.

(b)     No Purchaser Indemnified Party shall have any claim for any Loss to the extent that such Loss (i) is caused by any action taken by Purchaser after the Closing Date, (ii) would not have arisen but for any action expressly provided for or restricted by this Agreement or any Related Document or which is otherwise taken or not taken at the request of Purchaser or (iii) could reasonably be expected to have been avoided if Purchaser and its Affiliates had taken commercially reasonable steps to mitigate any Loss upon becoming aware of the event that gave rise to the Loss.

10.3     **Indemnification by Purchaser**.

(a)     Subject to the provisions of this Article 10, including Section 10.1, Purchaser hereby agrees, from and after the Closing, to indemnify and hold the Sellers and their directors, managers, officers, employees, Affiliates, equityholders, agents, attorneys, representatives, successors and permitted assigns (collectively, the "**Seller Indemnified Parties**") harmless from and against, and pay to the applicable Seller Indemnified Parties the amount of, any Losses directly arising from:

(i)     any inaccuracy in or breach of any of the representations or warranties made by Purchaser in Article 4 in this Agreement or any Related Document (or in any certificate delivered pursuant hereto or thereto);

(ii)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Purchaser pursuant to this Agreement or any Related Document; and

(iii)     any Assumed Liability.

(b)     No Seller Indemnified Party shall have any claim for any Loss to the extent that such Loss (i) is caused by any action taken by the Sellers after the Closing Date in breach of this Agreement or (ii) could reasonably be expected to have been avoided if the Sellers and their

Affiliates had taken commercially reasonable steps to mitigate any Loss upon becoming aware of the event that gave rise to the Loss.

      10.4   **Indemnification Procedures**.

          (a)    Subject to Section 10.1, in the event a Person has a claim for indemnification (an "**Indemnified Party**") for any matter not involving a third-party claim (a "**Direct Claim**"), the Indemnified Party shall, promptly (and in any event within ten days) after becoming aware of such claim, deliver written notice of such claim to the indemnifying party (either the Sellers or Purchaser, as applicable, and the "**Indemnifying Party**") setting forth in reasonable detail the specific claim, the basis therefor and the amount of the Loss, including copies of all material written evidence thereof; provided, that the failure to provide such notice shall not release the Indemnifying Party from any of its obligations under this Article 10 except and solely to the extent that the Indemnifying Party is actually prejudiced by such failure. The Indemnified Party shall allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim and the amount of the Loss, and the Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance as the Indemnifying Party or any of its professional advisors may reasonably request.

          (b)    Subject to Section 10.1, in order for an Indemnified Party to be entitled to indemnification under Section 10.2 or Section 10.3 (regardless of the limitations set forth in Section 10.5 (Certain Limits on Indemnification) and Section 10.6 (Calculation of Losses)) for any matter involving a third-party claim (a "**Third-Party Claim**"), the Indemnified Party shall, promptly (and in any event within five days) after receipt by such Indemnified Party of notice of such Third-Party Claim, deliver written notice setting forth in reasonable detail the specific claim, the basis therefor and the amount of the Loss; provided, that the failure to provide such notice shall not release the Indemnifying Party from any of its obligations under this Article 10 except and solely to the extent that the Indemnifying Party is actually prejudiced by such failure. Thereafter, the Indemnified Party shall deliver to the Indemnifying Party, promptly (and in any event within five days) after the Indemnified Party's receipt thereof, copies of all notices and documents (including court papers) received by the Indemnified Party relating to the Third-Party Claim.

          (i)    The Indemnifying Party shall have the right to participate in the defense of a Third-Party Claim and, at its sole option, control, defend against, negotiate, settle or otherwise deal with such Third-Party Claim and be represented by counsel selected by the Indemnifying Party. If the Indemnifying Party shall assume the defense of any Third-Party Claim, the Indemnifying Party shall not be liable for the legal expenses subsequently incurred by the Indemnified Party in connection with the defense thereof but the Indemnified Party may participate, at its own expense, in the defense of such Third-Party Claim; provided, however, that the Indemnified Party shall be entitled to participate in any such defense with separate counsel at the expense of the Indemnifying Party if (A) so requested by the Indemnifying Party to participate or (B) in the reasonable written opinion of counsel to the Indemnified Party, a conflict exists on a material issue between the Indemnified Party and the Indemnifying Party that would make such separate representation advisable; provided, further, however, that the Indemnifying Party shall not be required to pay for more than one such counsel for the Indemnified Parties in connection

with any Third-Party Claim. The attorneys' fees and other Losses incurred by the Indemnifying Party in connection with the defense, negotiation, settlement or other dealings of the Third-Party Claim shall reduce the Cap by the amount of such attorneys' fees and other Losses. All the Indemnified Parties shall cooperate in the defense, negotiation and settlement of any Third-Party Claim. Such cooperation shall include the retention and (upon the Indemnifying Party's request) the provision to the Indemnifying Party of records and information that are reasonably relevant to such Third-Party Claim, and making employees available (without charge) at such times and places as may be reasonably necessary to defend against such Third-Party Claim for the purpose of providing additional information, explanation or testimony in connection with such Third-Party Claim. If the Indemnifying Party elects not to control, defend against, negotiate, settle or otherwise deal with any Third-Party Claim that relates to any Losses indemnified against hereunder, the Indemnified Party shall defend against, negotiate, settle or otherwise deal with such Third-Party Claim.

(ii)     Notwithstanding anything in this Section 10.4 to the contrary, the Indemnified Party shall not, without the prior written consent of the Indemnifying Party, (A) admit any Liability with respect to, or settle or compromise any, Third-Party Claim or (B) permit a default or consent to entry of any Order. The Indemnifying Party may settle or compromise any Third-Party Claim (x) without the consent of the Indemnified Party if such settlement or resolution is solely for money damages which constitute an indemnifiable loss, subject to the applicable limitations of Section 10.5 (Certain Limits on Indemnification) and Section 10.6 (Calculation of Losses), and the Indemnified Party is not required to admit guilt or Liability relating to such matter and (y) with the consent of the Indemnified Party in all other cases, such consent not to be unreasonably withheld, conditioned or delayed. Notwithstanding anything in this Section 10.4 to the contrary, if a settlement offer solely for money damages is made by the applicable third-party claimant, and the Indemnifying Party notifies the Indemnified Party in writing of the Indemnifying Party's willingness to accept the settlement offer and, subject to the applicable limitations of Section 10.5 (Certain Limits on Indemnification) and Section 10.6 (Calculation of Losses), pay the amount called for by such offer, and the Indemnified Party declines to accept such offer, the Indemnified Party may continue to contest such Third-Party Claim, free of any participation by the Indemnifying Party, and the amount of any ultimate Liability with respect to such Third-Party Claim that the Indemnifying Party has an obligation to pay hereunder, subject to the applicable limitations of Section 10.5 (Certain Limits on Indemnification) and Section 10.6 (Calculation of Losses), shall be limited to the lesser of (A) the amount of the settlement offer that the Indemnified Party declined to accept plus the indemnifiable Losses of the Indemnified Party relating to such Third-Party Claim through the date of its rejection of the settlement offer or (B) the aggregate indemnifiable Losses of the Indemnified Party with respect to such Third-Party Claim.

(c)     Subject to the limitations set forth in Section 10.5 (Certain Limits on Indemnification) and Section 10.6 (Calculation of Losses), after any final decision, judgment or award shall have been rendered by a Governmental Authority of competent jurisdiction and the expiration of the time in which to appeal therefrom, or a settlement shall have been consummated, or the Indemnified Party and the Indemnifying Party shall have arrived at a mutually binding agreement with respect to a claim hereunder, the Indemnifying Party shall pay, or cause to be paid

(if applicable) from the Indemnity Escrow Account in accordance with this Agreement and the Escrow Agreement, to the Indemnified Party any sums due and owing pursuant to this Agreement with respect to such matter. If the Indemnifying Party makes any payment on any Third-Party Claim, the Indemnifying Party shall be subrogated, to the extent of such payment, to all rights and remedies of the Indemnified Party to any insurance benefits or other claims of the Indemnified Party with respect to such Third-Party Claim.

   10.5 **Certain Limits on Indemnification**.

     (a) Notwithstanding anything to the contrary, (i) the Sellers shall not have any indemnification obligations for Losses under Section 10.2(a)(i) unless the aggregate amount of all such Losses for which such Indemnifying Party would, but for this Section 10.5(a), be liable thereunder exceeds on an aggregate basis $350,000 (the "**Deductible**"), and then only to the extent of such excess; provided, however, that the Sellers shall not have any indemnification obligations under Section 10.2(a)(i) or 10.2(a)(ii) relating to Losses in the amount of $25,000 or less (a "**De Minimis Claim**") regardless of whether or not the aggregate amount of all Losses has exceeded the Deductible (it being understood that amounts below the De Minimis Claim shall be a deductible for which the Sellers shall bear no indemnification responsibility), nor shall the amount of any such De Minimis Claim be taken into account in determining whether the Deductible has been satisfied, (ii) in no event shall the aggregate amount of all payments made by the Sellers in connection with indemnification claims and other obligations under Sections 10.2(a)(i) or 10.2(a)(ii) (which shall include all payments made to Purchaser Indemnified Parties from the Indemnity Escrow Account) exceed the Indemnity Escrow Amount (the "**Cap**") other than to the extent such claims arise from Fraud by Sellers, which claims shall not exceed (and the Sellers shall have no Liability in excess of) the Base Amount, (iii) Purchaser shall not have any indemnification obligations for Losses under Section 10.3(a)(i) unless the aggregate amount of all such Losses for which such Indemnifying Party would, but for this Section 10.5(a), be liable thereunder exceeds on an aggregate basis the Deductible, and then only to the extent of such excess; provided, however, that the Purchaser shall not have any indemnification obligations under Section 10.3(a)(i) relating to a De Minimis Claim regardless of whether or not the aggregate amount of all Losses has exceeded the Deductible (it being understood that amounts below the De Minimis Claim shall be a deductible for which Purchaser shall bear no indemnification responsibility), nor shall the amount of any such De Minimis Claim be taken into account in determining whether the Deductible has been satisfied, and (iv) in no event shall the aggregate amount of all payments made by the Purchaser in connection with indemnification claims and other obligations under Sections 10.3(a)(i) or 10.3(a)(ii) exceed the Cap other than to the extent such claims arise from Fraud by Purchaser, which claims shall not exceed (and Purchaser shall have no Liability in excess of) the Base Amount.

     (b) The Sellers shall not be required to indemnify any Purchaser Indemnified Party and Purchaser shall not be required to indemnify any Seller Indemnified Party to the extent of any Losses that a court of competent jurisdiction shall have determined by final judgment to have resulted from the bad faith, gross negligence or willful misconduct of the party seeking indemnification or from the failure of the party seeking indemnification to take reasonable steps to mitigate the magnitude of such Losses.

(c)      The Seller shall not be required to indemnify any Purchaser Indemnified Party, and Purchaser shall not be required to indemnify any Seller Indemnified Party, to the extent of any Loss is contingent, unless and until such contingent Loss becomes an actual Loss of the Indemnified Party. No Person shall have the right to assert any claim for indemnification if a Loss or claim with respect to which such Person has taken (or caused action to be taken) to accelerate the time period in which such matter is asserted or payable.

(d)      Notwithstanding anything to the contrary, the Purchaser Indemnified Parties and the Seller Indemnified Parties shall be deemed not to have suffered any Loss (whether in contract, tort or otherwise) to the extent that such Loss arises out of changes after the Closing Date in accounting principles or applicable Laws, rules or regulations or interpretations thereof.

(e)      Any Loss under this Agreement shall be determined without duplication of recovery by reason of the state of facts giving rise to such Loss constituting a breach of more than one representation, warranty, covenant or agreement. The indemnification obligations of the Seller and Purchaser pursuant to Sections 10.2(a)(i) and Section 10.3(a)(i) shall only relate to Losses resulting from facts and circumstances in existence on the date of this Agreement or on the Closing Date (or such other specific date or time as to which the applicable representation or warranty was made) 10.2(a)(ii)

10.6    **Calculation of Losses**.  The amount of any Losses for which indemnification is provided under this Article 10 shall be net of any amounts actually recovered or recoverable by the Indemnified Party under other sources of indemnification, insurance policies or otherwise with respect to such Losses (net of any expenses incurred in connection with such recovery).  Each Indemnified Party shall use its commercially reasonable efforts to recover under insurance policies for any Losses prior to seeking indemnification under this Agreement. If the Indemnified Party recovers under an insurance policy or other source of indemnification with respect to any Loss that an Indemnified Party has received an indemnity payment for pursuant to this Agreement or the Escrow Agreement, then such Indemnified Party shall promptly pay over to the Indemnifying Party the amount (net of the costs of recovery) so recovered (but not in excess of the amount received by the Indemnified Party pursuant to this Agreement or the Escrow Agreement).

10.7    **Tax Treatment of Indemnity Payments**.  The Sellers and Purchaser agree to treat any indemnity payment made pursuant to this Article 10 as an adjustment to the Purchase Price for federal, state, local and foreign income Tax purposes except as otherwise required by Law after consultation with the other parties.

10.8    **Release of Escrow Funds**.

(a)      Purchaser shall notify the Escrow Agent of any claim for indemnification made by any Purchaser Indemnified Party.  Promptly following the final determination in accordance with this Article 10 of any claim for indemnification made by any Purchaser Indemnified Party in favor of such Purchaser Indemnified Party, the Parent, on behalf of itself and the other members of the Seller Group, shall execute and deliver a certificate requesting the Escrow Agent to deliver by wire transfer to an account designated by Purchaser immediately available funds in the amount of such claim as finally determined in accordance with this Article 10 (not to exceed the Indemnity Escrow Funds).  On the date that is 120 days following of the Closing Date

(the "**Release Date**"), the Escrow Agent shall immediately deliver to the Sellers all the Indemnity Escrow Funds then held by the Escrow Agent by wire transfer to one or more accounts designated by the Parent, on behalf of itself and the other members of the Seller Group; provided, however, that if prior to the Release Date, Purchaser notifies the Escrow Agent in writing that all or a portion of the Indemnity Escrow Funds are subject to claims for indemnification under this Agreement that have not been finally determined (the "**Outstanding Claims**"), the amount delivered to the Sellers upon the Release Date shall be equal to the Indemnity Escrow Funds then held by the Escrow Agent, less the sum of any amounts subject to the Outstanding Claims. If at any time after the Release Date the amount of the Indemnity Escrow Funds then held by the Escrow Agent exceeds the sum of any amounts subject to the Outstanding Claims, the Parent, on behalf of itself and the other members of the Seller Group, and Purchaser shall promptly execute and deliver a certificate requesting the Escrow Agent to deliver such excess amount to the Sellers by wire transfer to one or more accounts designated by the Parent, on behalf of itself and the other members of the Seller Group.

(b)     Notwithstanding anything set forth herein to the contrary, if the Sellers assume the defense of a Third-Party Claim that would constitute a Loss indemnifiable by Sellers hereunder, the Sellers' costs and expenses reasonably incurred in connection with such defense shall be reimbursed to the Sellers from the Indemnity Escrow Funds. In such event, the Parent, on behalf of itself and the other members of the Seller Group, shall notify Purchaser and the Escrow Agent in writing of the Sellers' good faith calculation of their costs and expenses reasonably incurred in connection with such defense (an "**Expense Notice**"). The failure by the Sellers to promptly deliver an Expense Notice shall not adversely affect the Sellers' right to reimbursement from the Indemnity Escrow Funds, except to the extent Purchaser is actually and materially prejudiced thereby. If, by 5:00 p.m. Dallas, Texas time on the 30th day following receipt by Purchaser of an Expense Notice, the Sellers and the Escrow Agent have not received from Purchaser notice in writing that Purchaser objects to the claim set forth in the Expense Notice (an "**Expense Dispute**"), the Escrow Agent shall pay to the Sellers from the Indemnity Escrow Funds the amount set forth in the Expense Notice. If Purchaser delivers an Expense Dispute to the Parent, on behalf of itself and the other members of the Seller Group, by 5:00 p.m. Dallas, Texas time on the 30th day following receipt by Purchaser of an Expense Notice, Purchaser and the Parent, on behalf of itself and the other members of the Seller Group, shall promptly meet and use their reasonable efforts to settle the dispute as to whether and to what extent the Sellers are entitled to reimbursement from the Indemnity Escrow Funds. If Purchaser and the Sellers are able to reach agreement within 30 days after the Sellers receive the Expense Dispute, Purchaser and the Parent, on behalf of itself and the other members of the Seller Group, shall deliver a joint written instruction to the Escrow Agent, setting forth such agreement and instructing the Escrow Agent to release funds from the Indemnity Escrow Funds in the agreed amount. If Purchaser and the Sellers are unable to reach agreement within 30 days after the Sellers receive the Expense Dispute, then the dispute shall be resolved in accordance with Section 11.8.

10.9     **Exclusive Remedy**. Following the Closing, the sole and exclusive remedy for any and all claims arising under, out of or related to this Agreement and the Related Documents (including the Transactions and any representations and warranties set forth herein, made in connection herewith or made as an inducement to enter into this Agreement or the Related Documents) shall be the indemnification set forth in this Article 10 (including the Indemnity Escrow Account) and in Section 2.11 and Section 7.3 and the specific performance set forth in

Section 11.12, and no Person will have any other entitlement, remedy or recourse, whether in contract, tort or otherwise, or whether at law or in equity, it being agreed that all of such other remedies, entitlements and recourse are expressly waived and released by the parties to the fullest extent permitted by applicable Law. The provisions of this Section 10.9 and the limited remedies provided in Section 2.9, Section 2.11, Section 7.3, Section 9.2, Section 9.3, Article 10, Section 11.12 and Section 11.14, were specifically bargained for among the parties hereto and were taken into account by the parties hereto in arriving at the Base Amount and the terms and conditions of this Agreement. Each of the Purchaser and the Sellers has specifically relied upon the provisions of this Section 10.9 and the limited remedies provided in Section 2.9, Section 2.11, Section 7.3, Section 9.2, Section 9.3, Article 10, Section 11.12 and Section 11.14 in agreeing to the Base Amount and the terms and conditions of this Agreement.

## ARTICLE 11
## GENERAL PROVISIONS

11.1 **Entire Agreement**. This Agreement, including the Exhibits and Schedules hereto, the Confidentiality Agreement and the Related Documents, contain the entire understanding of the parties hereto with respect to the subject matter contained herein and therein. This Agreement supersedes all prior and contemporaneous agreements, arrangements, contracts, discussions, negotiations, undertakings and understandings (including any letters of intent or term sheets), whether written or oral, among the parties with respect to such subject matter (other than, for the avoidance of doubt, the Confidentiality Agreement and the Related Documents) or any prior course of dealings. The parties hereto have voluntarily agreed to define their rights, Liabilities and obligations respecting the Transactions exclusively in contract pursuant to the express terms and conditions of this Agreement, the Confidentiality Agreement and the Related Documents, and the parties hereto expressly disclaim that they are owed any duties or entitled to any remedies not expressly set forth in this Agreement, the Confidentiality Agreement and the Related Documents. Furthermore, the parties each hereby acknowledge that this Agreement, the Confidentiality Agreement and the Related Documents embody the justifiable expectations of sophisticated parties derived from arm's-length negotiations, and all parties to this Agreement, the Confidentiality Agreement and the Related Documents specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of an ordinary purchaser and an ordinary seller in an arm's-length transaction. The sole and exclusive remedies for any Related Claims shall be those remedies available at law or in equity for breach of contract only (as such contractual remedies have been further limited or excluded pursuant to the express terms of this Agreement); and the parties hereby agree that neither party hereto shall have any remedies or cause of action (whether in contract or in tort or otherwise) of any statements, communications, disclosures, failures to disclose, representations or warranties not set forth in this Agreement.

11.2 **Amendment; No Waiver**. This Agreement and the Related Documents may be amended, supplemented or changed, and any provision hereof or thereof can be waived, only by a written instrument making specific reference to this Agreement (and, if applicable, the Related Documents) executed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. The waiver by any party of a breach of any provision of this Agreement or the Related Documents shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on

the part of any party to exercise, and no delay in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall a single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

11.3   **Severability; Specific Versus General Provisions**. Whenever possible, each provision of this Agreement and the Related Documents shall be interpreted in such manner as to be effective and valid under applicable Law, but if any term or other provision of this Agreement or the Related Documents is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement and the Related Documents shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, in whole or in part, such term or provision is hereby deemed modified to give effect to the original written intent of the parties to the greatest extent consistent with being valid and enforceable under applicable Law. No party hereto shall assert, and each party shall cause its respective Affiliates or related parties not to assert, that this Agreement or any part hereof is invalid, illegal or unenforceable. Notwithstanding anything to the contrary, to the extent that a representation, warranty, covenant or agreement of the Sellers contained in this Agreement or the Schedules (each, a "**Provision**") addresses a particular issue with specificity (a "**Specific Provision**"), and no breach by the Sellers exists under such Specific Provision, the Sellers shall not be deemed to be in breach of any other Provision (with respect to such issue) that addresses such issue with less specificity than the Specific Provision, and if such Specific Provision is qualified or limited by the Sellers' Knowledge, or in any other manner, no other Provision shall supersede or limit such qualification in any manner.

11.4   **Expenses and Obligations**. Except as otherwise provided in this Agreement, all costs and expenses incurred by the parties hereto in connection with the Transactions, including the costs, expenses and disbursements of counsel and accountants, shall be borne solely and entirely by the party that has incurred such expenses; provided, however, that Purchaser and the Sellers shall each pay, or promptly reimburse the other party for, 50% of any filing fees which relate to any required governmental filing or notification under any Antitrust Laws, including filing fees under the HSR Act.

11.5   **Notices**. All notices, consents, waivers, and other communications under this Agreement or the Related Documents must be in writing and will be deemed to have been duly given (a) if personally delivered, on the date of delivery, (b) if delivered by express courier service of national standing for next day delivery (with charges prepaid), on the Business Day following the date of delivery to such courier service, (c) if delivered by electronic mail (unless the sender receives an automated message that the email has not been delivered) on the date of transmission if on a Business Day before 5:00 p.m. local time of the business address of the recipient party (otherwise on the next succeeding Business Day) and (d) if deposited in the United States mail, first-class postage prepaid, on the date of delivery, in each case to the appropriate addresses or email addresses set forth below (or to such other addresses or facsimile numbers as a party may designate by notice to the other parties delivered in accordance with this Section 11.5):

If to Purchaser:

c/o CBRE Investment Management Acquisitions, LLC
200 Park Avenue, Suite 2001
New York, NY 10166
Attention: Sondra C. Wenger
Email: Sondra.Wenger@cbreim.com

and a copy to:

c/o The William Warren Group Inc.
201 Wilshire Blvd., Suite 102
Santa Monica, CA 90401
Attention: Gary Sugarman
Email: gsugarman@williamwarren.com

with a copy to (which will not constitute notice):

Haynes and Boone, LLP
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Attention: Ian Peck
         Tom Harris
         Valisa Berber-Thayer
Email: ian.peck@haynesboone.com
       tom.harris@haynesboone.com
       valisa.berber-thayer@haynesboone.com

If to the Seller Group:

c/o Robert Albergotti
1085 Old Clemson Highway, Ste E
Box No. 114
Seneca, SC 29672
Attention: Robert Albergotti
Email: albergottib@gmail.com

with a copy to (which will not constitute notice):

Sidley Austin LLP
2021 McKinney Ave.
Suite 2000
Dallas, TX 75201
Attention: Thomas Califano
         Charles Persons

Sara Duran
Email: tom.califano@sidley.com
cpersons@sidley.com
sduran@sidley.com

11.6 **Counterparts**. This Agreement may be executed in two or more counterparts (any of which may be delivered by electronic transmission), each of which shall constitute an original, and all of which taken together shall constitute one and the same instrument. The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format, or other agreed format shall be sufficient to bind the parties to the terms and conditions of this Agreement. Minor variations in the form of the signature page, including footers from earlier versions of this Agreement or any Related Document, shall be disregarded in determining the party's intent or the effectiveness of such signature.

11.7 **Governing Law.** This Agreement, the Related Documents and all Related Claims shall be governed by the internal laws of the State of Texas (including its statute of limitations), without giving effect to any choice or conflict of law principles or rules that would cause the application of the Laws of any other jurisdiction.

11.8 **Submission to Jurisdiction; Consent to Service of Process**.

(a) Without limiting any party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to interpret and/or enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any Related Document, any breach or default hereunder or thereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 11.5; provided, however, that if the Bankruptcy Cases have closed, the parties agree to irrevocably submit to the exclusive jurisdiction of the Northern District of Texas, Dallas Division over all Related Claims, and each party hereto hereby irrevocably agrees that all Related Claims may be heard and determined in such courts. The parties hereto hereby irrevocably and unconditionally waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such Related Claim brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b) Each of the parties hereto hereby consents to process being served by any party to this Agreement in any Related Claim by the delivery of a copy thereof in accordance with the provisions of Section 11.5 (other than by email) along with a notification that service of process is being served in conformance with this Section 11.8(b). Nothing in this Agreement will affect the right of any party to serve process in any other manner permitted by Law.

11.9 **Waiver of Jury Trial**. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED CLAIMS IS LIKELY TO INVOLVE

COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY EXPRESSLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING OR RELATED CLAIM BROUGHT BY OR AGAINST IT, DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED CLAIMS.

11.10 **Rights Cumulative**. All rights and remedies of each of the parties under this Agreement and the Related Documents will be cumulative, and the exercise of one or more rights or remedies will not preclude the exercise of any other right or remedy available under this Agreement, the Related Documents or applicable Law.

11.11 **Assignment**. Except as otherwise provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors by operation of law and permitted assigns of the parties hereto. No assignment of this Agreement or any of the rights, interests or obligations under this Agreement may be made by any party hereto at any time, whether or not by operation of law, without the prior written consent of the Parent, on behalf of itself and the other members of the Seller Group, and Purchaser, and any attempted assignment without the required consent shall be void; provided, however, that Purchaser may assign (a) any of its rights or delegate any of its duties under this Agreement to any of its Affiliates, and (b) its rights, but not its duties, under this Agreement to any of its financing sources; provided, further, however, that, in each case, such assignment shall not release Purchaser from its obligations under this Agreement and the Sellers shall have no obligation to pursue remedies against any assignee of Purchaser before proceeding against Purchaser for any breach of Purchaser's obligations hereunder.

11.12 **Specific Enforcement; Remedies**. The parties hereto agree that irreparable damage (for which monetary relief, even if available, would not be an adequate remedy) would occur in the event that any of the provisions of this Agreement were not performed by the parties hereto in accordance with their specific terms or were otherwise breached. It is accordingly agreed that (i) Purchaser, on the one hand, and, upon entry of the Sale Order, the Sellers, on the other hand, shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of competent jurisdiction without proof of damages or otherwise and that this shall include the right of the Sellers to cause Purchaser, or Purchaser to cause Sellers, as the case may be, to fully perform the terms of this Agreement to the fullest extent permissible pursuant to this Agreement and applicable Laws and to thereafter cause this Agreement and the Transactions to be consummated on the terms and subject to the conditions thereto set forth in this Agreement, and (ii) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither the Sellers nor Purchaser would have entered into this Agreement. Remedies shall be cumulative and not exclusive and shall be in addition to any other remedies which any party may have under this Agreement. Each of the parties hereto hereby (A) waives any defenses in any action for specific performance, including the defense that a remedy at law would be adequate, (B) waives any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief and (C) agrees not to assert that a remedy of specific performance or other equitable relief is unenforceable, invalid, contrary to law or inequitable for any reason, and not to assert that a remedy of monetary damages would provide an adequate remedy or that the parties otherwise have an adequate remedy at law. Notwithstanding anything to the contrary, in no event shall this Section

to

11.12 be used, alone or together with any other provision of this Agreement, to require the Sellers to remedy any breach of any representation or warranty of the Sellers.

11.13 **Third-Party Beneficiaries**. Except as set forth in Article 2 (with respect to the Sellers), Section 9.2(b) (with respect to the released parties identified therein), Article 10 (with respect to the Purchaser Indemnified Parties and the Seller Indemnified Parties), Section 11.14 (with respect to the Nonparty Affiliates), Section 11.15 (with respect to the released parties identified therein), Section 11.16 (with respect to the Seller Group Members) and the next sentence, nothing in this Agreement, express or implied, is intended to confer upon any Person other than the parties hereto any rights or remedies of any nature whatsoever under or by reason of this Agreement. From and after the Closing, all of the Persons identified as third-party beneficiaries in the first sentence of this Section 11.13 shall be entitled to enforce such provisions and to avail themselves of the benefits of any remedy for any breach of such provisions, all to the same extent as if such Persons were parties to this Agreement. The representations and warranties in this Agreement are the product of negotiations among the parties hereto and are for the sole benefit of the parties hereto. Any inaccuracies in such representations and warranties are subject to waiver by the parties hereto in accordance with this Agreement without notice or Liability to any other Person. In some instances, the representations and warranties in this Agreement may represent an allocation among the parties hereto of risks associated with particular matters regardless of the knowledge of any party hereto. Consequently, Persons other than the parties hereto may not rely upon the representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date.

11.14 **No Personal Liability of Directors, Officers and Owners**. All Related Claims may be made only against (and are those solely of) the entities that are expressly identified as parties in the preamble to this Agreement (the "**Contracting Parties**"). No Person who is not a Contracting Party, including any current, former or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, representative or assignee of, or any financial advisor or lender to, any Contracting Party, or any current, former or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, representative or assignee of, or any financial advisor or lender to, any of the foregoing (collectively, "**Nonparty Affiliates**"), shall have any Liability pursuant to any Related Claim; and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all such Liabilities, claims, causes of action, and obligations against any such Nonparty Affiliates. Without limiting the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at Law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Nonparty Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Nonparty Affiliates with respect to the performance of this Agreement or any representation or warranty made in, in connection with, or as an inducement to enter into this Agreement or the Related Documents.

11.15 **General Release**. Effective as of the Closing, Purchaser, on behalf of itself, its Affiliates and each of their respective successors and assigns (each of the foregoing, a "**Purchaser**

**Releasing Party**"), hereby fully, irrevocably and unconditionally releases and forever discharges Robert Albergotti from and against, and covenants that it will not (directly or indirectly) assert any claim or proceeding of any kind before any Governmental Authority based upon, all claims, Actions, causes of action, suits, rights, debts, agreements, Losses and demands whatsoever and all consequences thereof, known or unknown, actual or potential, suspected or unsuspected, fixed or contingent, both in law and in equity, whether existing as of the Closing or arising thereafter, that a Purchaser Releasing Party has or may have, now or in the future, arising out of, relating to, or resulting from any act or omission, error, negligence, breach of contract, tort, violation of law, matter or cause whatsoever from the beginning of time to the Closing Date. The foregoing sentence shall not be deemed to be a release or waiver by a Purchaser Releasing Party of any Action it may have under this Agreement or any of the other Related Documents.

11.16  **Legal Representation**. Purchaser and the Sellers acknowledge and agree that the Law Firm has represented the Seller Group in connection with the negotiation, preparation, execution, delivery and performance of this Agreement and the Related Documents and the consummation of the Transactions, and that the Sellers, their Affiliates and its partners, officers, directors and representatives (the "**Seller Group Members**") have a reasonable expectation that the Law Firm will represent them in connection with any Action involving any Seller Group Member, on the one hand, and Purchaser or any of its Affiliates and representatives (the "**Purchaser Group Members**"), on the other hand, arising under this Agreement, the Related Documents or the Transactions. Purchaser hereby, on behalf of itself and the other Purchaser Group Members, irrevocably: (a) acknowledges and agrees that any attorney-client privilege, solicitor-client privilege, work product or other attorney-client or solicitor-client confidential information ("**Attorney-Client Information**") arising from communications prior to the Closing between any Seller (including any one or more officers, directors or stockholders of such Seller), on the one hand, and the Law Firm, on the other hand, are not included in the property, rights, privileges, powers, franchises and other interests that are possessed by or vested in the Business or the Transferred Assets, that any such Attorney-Client Information shall be deemed property of, and controlled solely by, such Seller for the benefit and on behalf of the Seller Group Members and, upon request, convey and transfer any Attorney-Client Information to the Sellers; (b) acknowledges and agrees that the Seller Group Members shall have the right to retain, or cause the Law Firm to retain, any such documentation or information in the possession of the Law Firm or such Seller Group Members at the Closing; (c) agrees not to access, retain or use any documentation or information constituting Attorney-Client Information and that no Purchaser Group Member shall have any right to waive any attorney-client privilege or other right to confidentiality with respect to such Attorney-Client Information; (d) disclaims the right to assert a waiver by any Seller Group Member with regard to the attorney-client privilege, solicitor-client privilege or other right to confidentiality with respect to such Attorney-Client Information solely due to the fact that such documentation or information is physically in the possession of Purchaser after the Closing; (e) consents to the Law Firm's representation after the Closing of any Seller Group Member in any Action that may relate to a Purchaser Group Member or the Transactions and consents to and waives any conflict of interest arising therefrom without the need for any future waiver or consent; and (f) consents to the disclosure by the Law Firm to any Seller Group Member of any documentation or information obtained by the Law Firm during the course of its representation of the Sellers or any Affiliate prior to the Closing, whether related to this Agreement, the Related Documents, the Transactions or otherwise, whether or not such disclosure is made prior to or after the Closing and whether or not the documentation or information disclosed

64

is subject to any attorney-client privilege, solicitor-client privilege or confidentiality obligation to any Seller, any Affiliate of such Seller or any other Person. In the event that any Action arises after the Closing between any Purchaser Group Member and a Person other than a Seller Group Member, such Purchaser Group Member shall not disclose any documentation or information that is subject to an attorney-client privilege or other rights of confidentiality referenced in this Section 11.16 without the prior written consent of the applicable Seller; provided, however, that if such Purchaser Group Member is required by judicial order or other legal process to make such disclosure, such Purchaser Group Member shall promptly notify the applicable Seller in writing of such requirement (without making disclosure) and shall provide such Seller with such cooperation and assistance as shall be necessary to enable such Seller to prevent disclosure by reason of such attorney-client privilege, solicitor-client privilege or other rights of confidentiality. This Section 11.16 is for the benefit of the Seller Group Members and such Persons are intended third-party beneficiaries of this Section 11.16.

11.17 **Parent**.

(a) As of the date hereof, the Parent is hereby constituted, appointed and empowered to act, with full power of substitution, as a representative by and for the benefit of the Sellers, as the exclusive agent and attorney-in-fact to act on behalf of each Seller in connection with, and to facilitate the consummation of, the Transactions, and the power and authority of the Parent shall include the power and authority (i) to consummate the Transactions on behalf of the Sellers, (ii) to pay each Seller's expenses (whether before, on or after the date hereof) incurred in connection with the negotiation and performance of this Agreement, (iii) to the extent applicable, to receive, give receipt of and disburse any funds received hereunder on behalf of or to each Seller, (iv) to hold back from disbursement to all of the Sellers collectively any such funds to the extent the Parent reasonably determines may be necessary or required under the terms and conditions of this Agreement or applicable Law or may be required for future expenses or obligations, (v) to execute and deliver on behalf of each Seller all documents contemplated herein, any amendment or waiver hereto, and any consents, in each case, with such modifications or changes as to which the Parent, in its sole discretion, determines is desirable, (vi) to make, execute, acknowledge and deliver all such other agreements, guarantees, orders, receipts, endorsements, notices, requests, instructions, certificates, letters and other writings, and, in general, to do any and all things and to take any and all action that the Parent, in its sole and absolute discretion, may consider necessary or proper or convenient in connection with or to carry out the Transactions, (vii) to enforce and protect the rights and interests of the Sellers and to enforce and protect the rights and interest of the Parent arising out of or under or in any manner relating to this Agreement and the Related Documents, (viii) to refrain from enforcing any right of the Sellers or any of them or the Parent arising out of, under or in any manner relating to this Agreement and Related Documents; provided, however, that no such failure to act on the part of the Parent, except as otherwise provided in this Agreement or in the Related Documents, shall be deemed a waiver of any such right or interest by the Parent or by such Sellers unless such waiver is in writing signed by the waiving party or by the Parent, (ix) to negotiate, settle, compromise and otherwise handle all disputes with Purchaser or any of its Affiliates or representatives under this Agreement, (x) to give and receive notices on behalf of the Sellers, including any notice or instructions to the Escrow Agent and to authorize disbursement of funds from the Indemnity Escrow Account, Transition Services Escrow Account or Deposit Escrow Account, as applicable, in accordance with this Agreement and the Escrow Agreement and (xi) to do each and every act and exercise any and all

rights which the Sellers are permitted or required to do or exercise under this Agreement; provided, however, that the Parent shall have no obligation to act on behalf of the Sellers. The Sellers, by accepting the consideration payable to them hereunder, irrevocably grant unto the Parent as said attorney-in-fact and agent full power and authority to do and perform each and every act and thing necessary or required to be done in connection with the Transactions as fully to all intents and purposes as the Sellers might or could do. Such agency and proxy are coupled with an interest, and are therefore irrevocable without the consent of the Parent, and survive the bankruptcy or liquidation of any Seller and the consummation of the Transactions. All actions, decisions and instructions of the Parent taken, made or given pursuant to the authority granted to the Parent pursuant to this Section 11.17 shall be conclusive and binding upon each Seller, and no Seller shall have the right to object to, dissent from, protest or otherwise contest the same. The terms and conditions of this Agreement are hereby made, and are hereby acknowledged to be, dependent on the determinations and actions that are contemplated or permitted to be made by the Parent pursuant to this Section 11.17, and the rights of all the Sellers shall be qualified by and dependent upon such determinations and actions, irrespective of whether the Parent is acting as an agent or power of attorney of such Seller.

(b)     All decisions, actions, consents and instructions of the Parent authorized to be made, taken or given pursuant to Section 11.17(a) shall be final and binding upon all the Sellers, and no such Person shall have any right to object, dissent, protest or otherwise contest the same. Neither the Parent nor any agent employed by the Parent shall incur any Liability to any Seller relating to the performance of its duties as authorized hereunder or the failure to act, except for actions or omissions constituting willful breach or gross negligence of the Parent in connection therewith.

(c)     The Sellers shall be bound by all actions taken and documents executed by the Parent in connection with this Agreement, the Related Documents and the Escrow Agreement, and Purchaser and its Affiliates and representatives shall be entitled to rely on any action or decision of the Parent. Notices or communications to or from the Parent shall constitute notice to or from each of the Sellers. The Sellers assign to the Parent the right to pursue claims or other causes of action that may arise in the Sellers' favor in connection with the Transactions.

(d)     In the event that the Parent becomes unable to perform the Parent's responsibilities contemplated under this Section 11.17 or resigns from such position, the Sellers shall select another representative to fill such vacancy and such substituted representative shall (i) be deemed to be the exclusive agent and attorney-in-fact to act on behalf of each Seller for all purposes of this Agreement and (ii) exercise the rights and powers of, and be entitled to, the reimbursement and other benefits of serving in such capacity.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**PURCHASER**:

**CBRE WWG STORAGE PARTNERS JV III, LLC**, a Delaware limited liability company

By: **CPUS WWG STORAGE PARTNERS, LP**, a Delaware limited partnership

By: **CPUS WWG STORAGE PARTNERS GP, LLC**, its General Partner

By: _Larissa Belova_
Name: Larissa Belova
Title: Vice President

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**SELLER GROUP:**

GVS PORTFOLIO I C, LLC

By: *Robert Albergotti*
Name: Robert Albergotti
Title: Authorized Signatory


GVS PORTFOLIO I B, LLC

By: *Robert Albergotti*
Name: Robert Albergotti
Title: Authorized Signatory


GVS PORTFOLIO I, LLC

By: *Robert Albergotti*
Name: Robert Albergotti
Title: Authorized Signatory


GVS TEXAS HOLDINGS I, LLC

By *Robert Albergotti*
Name: Robert Albergotti
Title: Authorized Signatory


GVS TEXAS HOLDINGS II, LLC

By: *Robert Albergotti*
Name: Robert Albergotti
Title: Authorized Signatory

**SELLER GROUP (CON'T):**

WC MISSISSIPPI STORAGE PORTFOLIO I, LLC

By: _Robert Albergotti_
      A27D113934AF406...
Name: Robert Albergotti
Title:  Authorized Signatory

GVS NEVADA HOLDINGS I, LLC

By: _Robert Albergotti_
      A27D113934AF406...
Name: Robert Albergotti
Title:  Authorized Signatory

GVS OHIO HOLDINGS I, LLC

By: _Robert Albergotti_
      A27D113934AF406...
Name: Robert Albergotti
Title:  Authorized Signatory

GVS OHIO HOLDINGS II, LLC

By: _Robert Albergotti_
      A27D113934AF406...
Name: Robert Albergotti
Title:  Authorized Signatory

GVS MISSOURI HOLDINGS I, LLC

By: _Robert Albergotti_
      A27D113934AF406...
Name: Robert Albergotti
Title:  Authorized Signatory

DocuSign Envelope ID: 7B2BE153-E29F-4D1C-A2DC-651FA966E65

**SELLER GROUP (CON'T):**

GVS NEW YORK HOLDINGS I, LLC

By: _Robert Albergotti_
      A27D113934AF406...
    Name: Robert Albergotti
    Title: Authorized Signatory

GVS INDIANA HOLDINGS I, LLC

By: _Robert Albergotti_
      A27D113934AF406...
    Name: Robert Albergotti
    Title: Authorized Signatory

GVS TENNESSEE HOLDINGS I, LLC

By: _Robert Albergotti_
      A27D113934AF406...
    Name: Robert Albergotti
    Title: Authorized Signatory

GVS ILLINOIS HOLDINGS I, LLC

By: _Robert Albergotti_
      A27D113934AF406...
    Name: Robert Albergotti
    Title: Authorized Signatory

GVS COLORADO HOLDINGS I, LLC

By: _Robert Albergotti_
      A27D113934AF406...
    Name: Robert Albergotti
    Title: Authorized Signatory

## SCHEDULE A

### Subsidiaries

1. GVS Portfolio I B, LLC, a Delaware limited liability company

2. GVS Portfolio I, LLC, a Delaware limited liability company

3. GVS Texas Holdings I, LLC, a Delaware limited liability company

4. GVS Texas Holdings II, LLC, a Delaware limited liability company

5. WC Mississippi Storage Portfolio I, LLC, a Delaware limited liability company

6. GVS Nevada Holdings I, LLC, a Delaware limited liability company

7. GVS Ohio Holdings I, LLC, a Delaware limited liability company

8. GVS Missouri Holdings I, LLC, a Delaware limited liability company

9. GVS New York Holdings I, LLC, a Delaware limited liability company

10. GVS Indiana Holdings I, LLC, a Delaware limited liability company

11. GVS Tennessee Holdings I, LLC, a Delaware limited liability company

12. GVS Ohio Holdings II, LLC, a Delaware limited liability company

13. GVS Illinois Holdings I, LLC, a Delaware limited liability company

14. GVS Colorado Holdings I, LLC, a Delaware limited liability company

## SCHEDULE B

### Facilities

|     | Asset | Address | City | State |
|-----|-------|---------|------|-------|
| 1.  | Aurora | 443 Laredo Street | Aurora | CO |
| 2.  | Commerce City | 7273 Kearney Street | Commerce | CO |
| 3.  | Urbana | 1710 Cunningham | Urbana | IL |
| 4.  | Champaign | 2202 N Market Street | Champaign | IL |
| 5.  | Post Road | 3380 N Post Rd | Indianapolis | IN |
| 6.  | Marion Ridge | 9600 Marion Ridge | Kansas City | MO |
| 7.  | Brandon | 1661 W Government Cove | Brandon | MS |
| 8.  | Flowood | 111 N. Layfair | Flowood | MS |
| 9.  | Hattiesburg | 2033 Oak Grove Road | Hattiesburg | MS |
| 10. | Las Vegas | 1441 Nellis Blvd | Las Vegas | NV |
| 11. | Hyde Park | 1594 Route 9G | Hyde Park | NY |
| 12. | Newburgh | 765 South St | Newburgh | NY |
| 13. | Boardman | 7986 Southern Blvd | Boardman | OH |
| 14. | Westpark | 60 Westpark Rd | Centerville | OH |
| 15. | Congress Park | 435 Congress Park Dr | Centerville | OH |
| 16. | Tamarack Circle | 5301 Tamarack Circle | Columbus | OH |
| 17. | Minerva Park | 5199 Westerville Road | Columbus | OH |
| 18. | Georgesville | 1330 Georgesville Road | Columbus | OH |
| 19. | Trotwood | 3785 Shiloh Springs Rd | Dayton | OH |
| 20. | Dayton | 426 N Smithville Rd | Dayton | OH |
| 21. | Polaris | 9984 S. Old State Road | Lewis Center | OH |
| 22. | Mansfield | 1585 Lexington Ave | Mansfield | OH |
| 23. | Mason | 4145 State Rt 741 | Mason | OH |
| 24. | Miamisburg | 8501 Springboro Pike | Miamisburg | OH |
| 25. | Taylor Road | 7821 Taylor Rd | Reynoldsburg | OH |
| 26. | Tussing Road | 7200 Tussing Road | Reynoldsburg | OH |
| 27. | Worthington | 580 E. Dublin Granville Road | Worthington | OH |
| 28. | Youngstown | 123 S Meridian Rd | Youngstown | OH |
| 29. | Lamar | 3951 Highway 78 | Memphis | TN |
| 30. | Texas Storage Park | 10013 RR 620 N | Austin | TX |
| 31. | Allsafe | 7116 S IH-35 | Austin | TX |
| 32. | Garth | 3412 Garth Rd | Baytown | TX |
| 33. | Canyon Lake | 13825 FM 306 | Canyon Lake | TX |
| 34. | Cedar Park | 16905 Indian Chief Dr | Cedar Park | TX |
| 35. | Production | 4641 Production Dr | Dallas | TX |
| 36. | Skillman | 9530 Skillman St | Dallas | TX |
| 37. | Samuell | 4311 Samuell Blvd | Dallas | TX |
| 38. | Marie | 4806 Marie Ln | Deer Park | TX |
| 39. | Fort Worth North | 613 N Fwy | Fort Worth | TX |
| 40. | Fort Worth South | 4901 S Fwy | Fort Worth | TX |
| 41. | Kuykendahl | 15300 Kuykendahl Road | Houston | TX |
| 42. | Antoine | 5550 Antoine Dr | Houston | TX |
| 43. | Westward | 6250 Westward Ln | Houston | TX |
| 44. | Boone | 8801 Boone Rd | Houston | TX |
| 45. | Cook | 8450 Cook Rd | Houston | TX |
| 46. | Harwin | 9951 Harwin Rd | Houston | TX |
| 47. | Hempstead | 10640 Hempstead Rd | Houston | TX |

| 48. | Highway 249 | 14318 Highway 249 | Houston | TX |
|---|---|---|---|---|
| 49. | Beechnut | 11702 Beechnut St | Houston | TX |
| 50. | Rosslyn | 5811 N Houston Rosslyn Rd | Houston | TX |
| 51. | Wirt Rd | 2150 Wirt Rd | Houston | TX |
| 52. | West Hardy | 16530 W Hardy St | Houston | TX |
| 53. | Alabonson | 8320 Alabonson Rd | Houston | TX |
| 54. | Fairmont I | 10601 W Fairmont Pky | La Porte | TX |
| 55. | Leander | 2407 S Hwy 183 | Leander | TX |
| 56. | Covington Pike | 1961 Covington Pike | Memphis | TN |
| 57. | Mesquite | 920 Hwy 80 East | Mesquite | TX |
| 58. | Fairmont II | 941 Fairmont Pky | Pasadena | TX |
| 59. | San Benito | 1151 E Expressway 83 | San Benito | TX |
| 60. | Lowry | 9010 E.F. Lowry Ewy | Texas City | TX |
| 61. | Gulf Freeway | 410 N IH-45 | Texas City | TX |
| 62. | Bay Street | 2502 Bay St | Texas City | TX |
| 63. | Loop 197 | 1910 25th Ave N | Texas City | TX |
| 64. | Timkin | 632 Timkin Rd | Tomball | TX |

## EXHIBIT A

**Form of Escrow Agreement**

See attached.

*Execution Version*

Escrow or Title No. <u>58349-NATL</u>
Project reference:

January 18, 2022

Fidelity National Title Insurance Company
485 Lexington Avenue, 18th Floor
New York, New York 10017
Attn: Kevin Danca

   This Escrow Agreement (the "<u>Escrow Agreement</u>") is entered into effective as of January 18, 2022 by and among Fidelity National Title Insurance Company (the "<u>Escrow Agent</u>"), CBRE WWG Storage Partners JV III, LLC, a Delaware limited liability company ("<u>Purchaser</u>") and GVS Portfolio I C, LLC, a Delaware limited liability company ("<u>Seller</u>" and together with Purchaser, sometimes referred to individually as "<u>Party</u>" and collectively as the "<u>Parties</u>"). Capitalized terms used but not defined herein shall have the meanings assigned to them in the Purchase Agreement (as defined below).

   **WHEREAS**, pursuant to that certain Asset Purchase Agreement (the "<u>Purchase Agreement</u>"), dated as of the date hereof, by and among Purchaser, Seller and each of the entities listed on Exhibit A signatory thereto, Purchaser has agreed to deposit certain funds into escrow account(s) as of the date hereof and as of the Closing by wire transfer of immediately available funds, with such funds to be held and disbursed by the Escrow Agent in accordance with the terms and conditions of this Escrow Agreement; and

   **WHEREAS**, the Parties desire to set forth their understanding with regard to the Escrow Accounts (as defined below) established by this Escrow Agreement.

   **NOW, THEREFORE**, in consideration of the premises herein, the Parties agree as follows:

## I. Terms and Conditions

  1.1. <u>Appointment of and Acceptance by Escrow Agent</u>. The Parties hereby appoint the Escrow Agent to serve as escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment and agrees to perform its duties as provided herein.

  1.2. <u>Establishment of Escrow.</u>

  a. Concurrently with the execution and delivery hereof, Purchaser will deposit (or cause to be deposited) with the Escrow Agent $45,000,000 (the "<u>Deposit Escrow Amount</u>") by wire transfer of immediately available funds into a separate and distinct deposit account maintained by the Escrow Agent (the "<u>Deposit Escrow Account</u>"), pursuant to the wire instructions set forth on <u>Exhibit C</u> hereto.

  b. On the Closing Date, Purchaser will deposit (or cause to be deposited) with the Escrow Agent $4,500,000 (the "<u>Indemnity Escrow Amount</u>") by wire transfer of immediately available funds into a separate and distinct deposit account maintained by the Escrow Agent (the "<u>Indemnity Escrow Account</u>"), pursuant to the wire instructions set forth on <u>Exhibit C</u> hereto.

c.  On the Closing Date, Purchaser will deposit (or cause to be deposited) with the Escrow Agent $20,000,000 (the "Transition Services Holdback Amount" and together with the Deposit Escrow Amount and Indemnity Escrow Amount, the "Escrow Amounts") by wire transfer of immediately available funds into a separate and distinct deposit account maintained by the Escrow Agent (the "Transition Services Holdback Account" and together with the Deposit Escrow Account and Indemnity Escrow Account, the "Escrow Accounts"), pursuant to the wire instructions set forth on Exhibit C hereto.

d.  The Escrow Agent shall hold each of the Escrow Amounts in a separate and distinct, interest-bearing demand deposit account, together with any dividends, interest, distributions and other income received in respect thereof. No investment of the Escrow Amounts will be permitted during the term of this Agreement, and the Escrow Funds (defined below) shall at all times remain available for distribution in accordance with Section 1.3 below. The Escrow Agent shall promptly acknowledge receipt of each Escrow Amount in this Section 1.2(a)-(c) by providing notice to both Purchaser and Seller at the email addresses set forth in Section 3.1 as soon as reasonably practicable following receipt thereof.

1.3.    Disbursements of the Escrow Funds.  The Escrow Agent shall only disburse from the Escrow Accounts as follows:

a.  Upon receipt of a joint written instruction substantially in the form attached hereto as Exhibit B (a "Joint Written Instruction") with respect to the Deposit Escrow Amount, Indemnity Escrow Amount or Transition Services Holdback Escrow Amount, as applicable, that shall be required to be delivered by the Parties to the Escrow Agent in accordance with the terms of the Purchase Agreement, the Escrow Agent shall promptly after receipt of a Joint Written Instruction (and in any event, within two Business Days), disburse all or part of the Deposit Escrow Amount, Indemnity Escrow Amount or Transition Services Holdback Escrow Amount (in each case, together with any dividends, interest, distributions and other income received in respect thereof (collectively with the applicable Escrow Amount, the "Escrow Funds")), as applicable, in accordance with such Joint Written Instruction by irrevocable transfer of immediately available funds to the account specified in the Joint Written Instruction.

b.  In the event that the Escrow Agent receives a copy of a final, non-appealable award or order from the Bankruptcy Court or any other court of competent jurisdiction accompanied by a certificate of either Purchaser or the Seller to the effect that such award or order is final and non-appealable and the written payment instruction to effectuate such award or order ("Final Order"), the Escrow Agent shall promptly disburse all or part of the applicable Escrow Funds in accordance with such Final Order.

c.  Any instructions setting forth, claiming, containing, objecting to, or in any way related to the transfer or distribution of any funds on deposit in the Escrow Accounts under the terms of this Agreement must be in writing, executed by Party or Parties as evidenced by the signatures of the person or persons set forth on Exhibit A-1 and Exhibit A-2 (the "Authorized Representatives") and delivered to the Escrow Agent attached to an e-mail received on a Business Day to an e-mail address set forth in Section 3.1 (and receipt by the Escrow Agent acknowledged) below. In the event a Joint Written Instruction or Final Order is delivered to the Escrow Agent, the Escrow Agent is authorized to seek confirmation of such instruction by telephone call back to the Authorized Representatives, and the Escrow Agent may rely upon the confirmations of anyone purporting to be an Authorized Representative.  If the Escrow Agent is unable to verify the instructions, or is not satisfied with the verification it receives, it will not execute the instruction

until all such issues have been resolved. The persons and telephone numbers for call backs may be changed only in writing, executed by an Authorized Representative of the applicable Party and actually received and acknowledged by the Escrow Agent.

## II. Provisions as to the Escrow Agent

2.1.   Limited Duties of Escrow Agent. Escrow Agent undertakes to perform only such duties as are expressly set forth in this Escrow Agreement. Escrow Agent is not a party to, and is not bound by, or charged with notice of any agreement out of which this escrow may arise, other than the terms and provisions of this Escrow Agreement.

2.2.   Limitations on Liability of Escrow Agent.

  a.   Escrow Agent is acting solely as a stakeholder and depository as an accommodation to Purchaser and the Seller, and is not responsible or liable for any loss arising out of Escrow Agent's conduct hereunder, except in the case of Escrow Agent's fraud, bad faith, willful misconduct or gross negligence. Escrow Agent shall not be responsible or liable for the sufficiency, correctness, genuineness, or validity of the subject matter of this Escrow Agreement, or for the identity or authority of any person executing any documents or instruments in connection herewith.

  b.   The Escrow Agent shall be entitled to act or rely upon, and the Escrow Agent shall be protected in acting or relying upon the genuineness and validity of any written notice, request, waiver, consent, certificate, receipt, authorization, power of attorney or other document the Escrow Agent shall receive from any Party hereto.

2.3.   Indemnification. Purchaser and Seller agree to jointly and severally, indemnify, defend and hold harmless the Escrow Agent from and against any loss, cost, claims, damage or expense, including, without limitation, any and all court costs and attorney's fees and expenses (collectively the "Expenses") incurred by Escrow Agent in connection with or in any way arising out of (a) Escrow Agent's performance of this Escrow Agreement, except to the extent that such Expenses are determined by a court of competent jurisdiction to have been caused by fraud, gross negligence, willful misconduct or bad faith of the Escrow Agent; and (b) Escrow Agent's following, accepting or acting upon any instructions or directions from the Parties, whether joint or singular, received in accordance with this Escrow Agreement. The Escrow Agent may, at its own expense, consult with legal counsel in the event of any dispute or questions as to the construction of any provisions hereof or its duties hereunder, and it shall be fully protected in acting in accordance with the opinion or instructions of such counsel. Notwithstanding the foregoing, neither Purchaser nor Seller shall be required to indemnify the Escrow Agent with respect to any claim against the Escrow Agent unless Purchaser and Seller are notified of the written assertion of a claim against the Escrow Agent, or of any action commenced against the Escrow Agent, promptly after the Escrow Agent shall have received any such written information as to the nature and basis of the claim; provided, however, that failure to provide such notice shall not relieve Purchaser and Seller of any indemnification obligation and/or liability hereunder if Purchaser and Seller are not actually prejudiced by such failure. In so agreeing to indemnify and hold harmless the Escrow Agent, Purchaser and Seller agree, solely as between themselves, that any indemnity obligations in respect of the Escrow Agent hereunder shall be apportioned 50% to Purchaser and 50% to Seller and that if either Purchaser or Seller pays amounts pursuant to this Section 2.3, it shall have a right of contribution against the other party for reimbursement of such other party's proportionate share thereof in accordance with the allocation set forth in this sentence. The provisions of this section shall survive the termination of this Escrow Agreement and any resignation or removal of the Escrow Agent.

2.4.　　Resignation; Removal.

a.　The Escrow Agent may resign and be discharged from its duties and obligations at any time under this Escrow Agreement by providing written notice to Purchaser and Seller. Such resignation shall be effective on the date set forth in such written notice, which shall be no earlier than thirty (30) days after such written notice has been furnished. Thereafter, the Escrow Agent shall have no further obligation except to hold the Escrow Funds as depository and cooperate reasonably in the transfer of the Escrow Funds to a successor escrow agent. Purchaser and Seller shall promptly appoint a successor escrow agent. The Escrow Agent shall refrain from taking any action until it shall receive a Joint Written Instruction designating the successor escrow agent. However, in the event no successor escrow agent has been appointed on or prior to the date such resignation is to become effective, the Escrow Agent shall be entitled to tender into the custody of any court of competent jurisdiction all funds, equity and other property then held by the Escrow Agent hereunder and the Escrow Agent shall thereupon be relieved of all further duties and obligations under this Escrow Agreement.

b.　Purchaser and Seller acting together shall have the right to terminate the appointment of the Escrow Agent upon thirty (30) days' joint written notice to the Escrow Agent specifying the date upon which such termination shall take effect. Thereafter, the Escrow Agent shall have no further obligation except to hold the Escrow Funds as depository and cooperate reasonably in the transfer of the Escrow Funds to a successor escrow agent. The Escrow Agent shall refrain from taking any action until it shall receive a Joint Written Instruction designating the successor escrow agent. However, in the event no successor escrow agent has been appointed on or prior to the date such termination is to become effective, the Escrow Agent shall be entitled to tender into the custody of any court of competent jurisdiction all funds, equity and other property then held by the Escrow Agent hereunder and the Escrow Agent shall thereupon be relieved of all further duties and obligations under this Escrow Agreement.

c.　In the case of a resignation or removal of the Escrow Agent, the Escrow Agent shall have no responsibility for the appointment of a successor escrow agent hereunder. The successor escrow agent appointed by Purchaser and Seller shall execute, acknowledge and deliver to the Escrow Agent and the other parties an instrument in writing accepting its appointment hereunder, and thereafter, the Escrow Agent shall deliver all of the then-remaining balance of the Escrow Funds, less any reasonable and documented fees and expenses then incurred by and unpaid to the Escrow Agent in connection with the performance of its duties hereunder, to such successor escrow agent in accordance with the Joint Written Instruction of Purchaser and Seller and upon receipt of the Escrow Funds, the successor escrow agent shall be bound by all of the provisions of this Escrow Agreement.

## III. Miscellaneous

3.1.　　Notices.　All notices, consents, waivers, and other communications under this Escrow Agreement must be in writing and will be deemed to have been duly given (a) if personally delivered, on the date of delivery, (b) if delivered by express courier service of national standing for next day delivery (with charges prepaid), on the Business Day following the date of delivery to such courier service, (c) if delivered by electronic mail (unless the sender receives an automated message that the email has not been delivered) on the date of transmission if on a Business Day before 5:00 p.m. local time of the business address of the recipient party (otherwise on the next succeeding Business Day) and (d) if deposited in the United States mail, first-class postage prepaid, on the date of delivery, in each case to the appropriate

addresses or email addresses set forth below (or to such other addresses or facsimile numbers as a party may designate by notice to the other parties delivered in accordance with this <u>Section 3.1</u>

If to the Escrow Agent:

Fidelity National Title Insurance Company
485 Lexington Avenue, 18th Floor
New York, New York 10017
Attn: Kevin Danca
   Email: kevin.danca@fnf.com


If to Purchaser:

c/o CBRE Investment Management Acquisitions, LLC
200 Park Avenue, Suite 2001
New York, NY 10166
Attention: Sondra C. Wenger
Email: Sondra.Wenger@cbreim.com

and a copy to:

c/o The William Warren Group Inc.
201 Wilshire Blvd., Suite 102
Santa Monica, CA 90401
Attention: Gary Sugarman
Email: gsugarman@williamwarren.com

with a copy to (which will not constitute notice):

Haynes and Boone, LLP
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Attention: Ian Peck
       Tom Harris
       Valisa Berber-Thayer
Email: ian.peck@haynesboone.com
   tom.harris@haynesboone.com
   valisa.berber-thayer@haynesboone.com

If to the Seller:

c/o Robert Albergotti
1085 Old Clemson Highway, Ste E
Box No. 114
Seneca, SC 29672
Attention: Robert Albergotti
Email: albergottib@gmail.com

with a copy to (which will not constitute notice):

Sidley Austin LLP
2021 McKinney Ave.
Suite 2000
Dallas, TX 75201
Attention: Thomas Califano
   Charles Persons
    Sara Duran
Email: tom.califano@sidley.com
   cpersons@sidley.com
   sduran@sidley.com

  3.2. <u>Governing Law</u>.  This Escrow Agreement shall be governed by the internal laws of the State of Texas (including its statute of limitations), without giving effect to any choice or conflict of law principles or rules that would cause the application of the Laws of any other jurisdiction.

  3.3. <u>Submission to Jurisdiction; Consent to Service of Process</u>.
   (a) Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to interpret and/or enforce the terms of this Escrow Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Escrow Agreement, any breach or default hereunder, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 3.1</u>; <u>provided</u>, <u>however</u>, that if the Bankruptcy Cases have closed, the Parties agree to irrevocably submit to the exclusive jurisdiction of the Northern District of Texas, Dallas Division over all claims herein, and each Party hereto hereby irrevocably agrees that all such claims may be heard and determined in such courts. The Parties hereto hereby irrevocably and unconditionally waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such claim brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.
   (b) Each of the Parties hereto hereby consents to process being served by any Party to this Agreement in any claim by the delivery of a copy thereof in accordance with the provisions of <u>Section 3.1</u> (other than by email) along with a notification that service of process is being served in conformance with this <u>Section 3.3(b)</u>. Nothing in this Escrow Agreement will affect the right of any party to serve process in any other manner permitted by Law.

  3.4. <u>Waiver of Jury Trial</u>. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS ESCROW AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY EXPRESSLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING OR RELATED CLAIM BROUGHT BY OR AGAINST IT, DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS ESCROW AGREEMENT.

3.5. <u>Termination</u>. This Escrow Agreement shall terminate upon the earlier of (i) distribution by the Escrow Agent in accordance with this Escrow Agreement of all Escrow Funds held under this Escrow Agreement or (ii) delivery to the Escrow Agent of a written notice of termination jointly executed by the Purchaser and Seller. Upon delivery of all Escrow Funds in accordance with the terms hereof, Escrow Agent shall be discharged and released from any and all liability with respect to such Escrow Funds.

3.6. <u>Assignment</u>. Except as otherwise provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors by operation of law and permitted assigns of the Parties hereto. No assignment of this Escrow Agreement or any of the rights, interests or obligations under this Escrow Agreement may be made by any Party hereto at any time, whether or not by operation of law, without the prior written consent of all other Parties hereto, and any attempted assignment without the required consent shall be void.

3.7. <u>Amendment and Waiver</u>. This Escrow Agreement may be amended, supplemented or changed, and any provision hereof or thereof can be waived, only by a written instrument making specific reference to this Escrow Agreement, executed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. The waiver by any party of a breach of any provision of this Escrow Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall a single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

3.8. <u>Severability</u>. Whenever possible, each provision of this Escrow Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any term or other provision of this Escrow Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Escrow Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions in connection with this Escrow Agreement are not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, in whole or in part, such term or provision is hereby deemed modified to give effect to the original written intent of the Parties to the greatest extent consistent with being valid and enforceable under applicable Law.

3.9. <u>No Third Party Beneficiaries</u>. Nothing in this Escrow Agreement, express or implied, is intended to confer upon any Person other than the Parties hereto any rights or remedies of any nature whatsoever under or by reason of this Escrow Agreement.

3.10. <u>Titles and Headings</u>. All titles and headings in this Escrow Agreement are intended solely for convenience of reference and shall in no way limit or otherwise affect the interpretation of any of the provisions hereof.

3.11. <u>Counterparts; Electronic Execution</u>. This Escrow Agreement may be executed in two or more counterparts (any of which may be delivered by electronic transmission), each of which shall constitute an original, and all of which taken together shall constitute one and the same instrument. The exchange of a fully executed Escrow Agreement (in counterparts or otherwise) by electronic transmission in .PDF format, or other agreed format shall be sufficient to bind the parties to the terms and conditions of this Agreement. Minor variations in the form of the signature page, including footers from earlier versions of this Escrow Agreement, shall be disregarded in determining the party's intent or the effectiveness of such signature.

3.12. <u>Entire Agreement; Conflicts.</u> This Escrow Agreement, and solely as between Purchaser and Seller, the Purchaser Agreement and Related Documents, contains the entire understanding of the Parties with respect to the subject matter contained herein. Except for the Purchaser Agreement and Related Documents, this Escrow Agreement supersedes all prior and contemporaneous agreements, arrangements, contracts, discussions, negotiations, undertakings and understandings, whether written or oral, among the parties with respect to such subject matter or any prior course of dealings. As between the Purchaser and Seller, in the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms of this Escrow Agreement, the terms of the Purchase Agreement shall govern.

3.13. <u>Rights Cumulative</u>. All rights and remedies of each of the Parties under this Escrow Agreement will be cumulative, and the exercise of one or more rights or remedies will not preclude the exercise of any other right or remedy available under this Escrow Agreement or applicable Law.

3.14. <u>Further Assurances</u>. If at any time the Escrow Agent shall determine or be advised that any further agreements, assurances or other documents are reasonably necessary or desirable to carry out the provisions of this Escrow Agreement and the transactions contemplated by this Escrow Agreement, the Parties shall execute and deliver any and all such agreements or other documents and do all things reasonably necessary or appropriate to carry out fully the provisions of this Escrow Agreement.

3.15. <u>Tax Matters</u>.

(a) To the extent that any income is earned by the Escrow Amounts, such income shall be allocated to the Seller. The Seller shall be responsible for and the taxpayer on all taxes due on the income earned, if any, on the Escrow Funds for the calendar year in which such income is earned. The Escrow Agent shall report any income earned on the Escrow Funds, if any, to the IRS or other taxing authority on IRS Form 1099 in respect of U.S. residents. Prior to the date hereof, the Parties shall provide the Escrow Agent with certified tax identification numbers by furnishing appropriate forms W-9 or W-8 as applicable and such other forms and documents that the Escrow Agent may request.

(b) The Escrow Agent shall be responsible only for income reporting to the Internal Revenue Service with respect to income earned on the Escrow Funds by U.S. residents. Other than in connection with any required withholding or information reporting, the Seller and Purchaser acknowledge and agree that the Escrow Agent shall have no responsibility for the preparation and/or filing of any tax return or withholding with respect to the Escrow Amounts or any income earned by the Escrow Amounts. The Escrow Agent shall withhold any taxes required to be withheld by applicable law, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities.

(c) The Escrow Agent, its affiliates, and its employees are not in the business of providing tax or legal advice to any taxpayer. This Escrow Agreement and any amendments or attachments hereto are not intended or written to be used, and may not be used or relied upon, by any such taxpayer or for the purpose of avoiding tax penalties. Any such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

*[Signature Pages Follows]*

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date set forth above.

**PURCHASER**: CBRE WWG STORAGE PARTNERS JV III, LLC, a Delaware limited liability company
Taxpayer ID No.: 87-4491325

By: CPUS WWG STORAGE PARTNERS, LP,
    a Delaware limited partnership

    By: CPUS WWG STORAGE PARTNERS GP, LLC,
       its General Partner

      By: _____
      Name: Larissa Belova
      Title: President

*Signature Page to Escrow Agreement*

**SELLER:**

GVS PORTFOLIO I C, LLC
Taxpayer ID No.: <u>83-2583093</u>

By: Robert Albergotti
Name: Robert Albergotti
Title: Authorized Signatory

*Signature Page to Escrow Agreement*

Accepted and Agreed to:

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**

By
Name: Kevin Danca
Title: Vice President

*Signature Page to Escrow Agreement*

## EXHIBIT A-1

### Certificate as to Purchaser's Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of the Purchaser and are each authorized to initiate and approve transactions of Purchaser types for the escrow account or accounts established under this Agreement, on behalf of the Purchaser. The below listed persons (must list at least two individuals, if applicable) have also been designated call back authorized individuals and will be notified by Fidelity National Title Insurance Company upon the release of Escrow Funds from any Escrow Account.

| Name / Title / Telephone | Specimen Signature |
|---|---|
| Larissa Belova | |
| Name | Signature |
| President | |
| Title | |
| 212-824-2152 | 917-453-7440 |
| Phone | Mobile Phone |
| Jennifer Ginzberg | |
| Name | Signature |
| Vice President | |
| Title | |
| 404-812-5118 | 404-702-7574 |
| Phone | Mobile Phone |
| Justin Shanahan | |
| Name | Signature |
| Vice President | |
| Title | |
| 212-824-2157 | 516-680-8024 |
| Phone | Mobile Phone |

*Exhibit A-1 to Escrow Agreement*

DocuSign Envelope ID: 7B2BE153-E29E-4D1C-A2DC-651FA966E6F5

## EXHIBIT A-2

### Certificate as to the Seller's Authorized Signature

The specimen signature shown below is the specimen signature of the individual who has been designated as an authorized representative of the Seller and is authorized to initiate and approve transactions of all types for the escrow account or accounts established under this Agreement, on behalf of the Seller.  The below listed person has also been designated Call Back Authorized Individual and will be notified by Fidelity National Title Insurance Company upon the release of Escrowed Funds from the escrow account(s).

<u>Name / Title / Telephone</u>                    <u>Specimen Signature</u>

Robert Albergotti
Name                                                        Signature

Authorized Signatory
Title

(214) 418-4330                                        (214) 418-4330
Phone                                                       Mobile Phone


Name                                                        Signature


Title


Phone                                                       Mobile Phone


Name                                                        Signature


Title


Telephone                                                 Mobile Phone

**EXHIBIT B**
Form of Joint Written Instruction

[Date]

Fidelity National Title Insurance Company
485 Lexington Avenue, 18th Floor
New York, New York 10017
Attn: Kevin Danca

RE: GVS - CBRE WWG - Escrow Agreement, dated January 18, 2022
Escrow Account number [●]

Dear Sir/Madam:

We refer to that certain escrow agreement, dated January 18, 2022, by and among GVS Portfolio I C, LLC ("**Seller**"), CBRE WWG Storage Partners JV III, LLC ("**Purchaser**") and Fidelity National Title Insurance Company, as Escrow Agent (the "**Escrow Agreement**"). Capitalized terms in this letter that not otherwise defined shall have the same meaning given to them in the Escrow Agreement.

Pursuant to Section 1.3 of the Escrow Agreement, the parties hereto hereby instruct the Escrow Agent to release an amount equal to $            out of the [**Deposit Escrow Account / Indemnity Escrow Account / Transition Services Holdback Account**] to the specified party as instructed below.

| $ [_____] to Purchaser: | $ [_____] to Seller: |
|---|---|
| Wire Instructions: | Wire Instructions: |
| Account Name: _____ | Account Name: _____ |
| Account Number: _____ | Account Number: _____ |
| Bank Name: _____ | Bank Name: _____ |
| Bank ABA Number: _____ | Bank ABA Number: _____ |
| Bank Address: _____ | Bank Address: _____ |
| For credit to: _____ | For credit to: _____ |
| Special Instructions: _____ | Special Instructions: _____ |
| Bank Check: | Bank Check: |
| Payee Name: _____ | Payee Name: _____ |
| Mailing Address: _____ | Mailing Address: _____ |

*Exhibit B to Escrow Agreement*

**IN WITNESS WHEREOF**, the parties hereto have caused this Joint Written Direction to be executed as of the date first above written.

| PURCHASER: | SELLER: |
|---|---|

CBRE WWG STORAGE PARTNERS JV III, LLC   GVS PORTFOLIO I C, LLC
By: CPUS WWG STORAGE PARTNERS, LP,
 a Delaware limited partnership
By: CPUS WWG STORAGE PARTNERS GP, LLC,
its general partner

By:    _____        By:    _____

*Exhibit B to Escrow Agreement*

**<u>EXHIBIT C</u>**

<u>Wire Instructions</u>

See attached.

*Exhibit C to Escrow Agreement*

## EXHIBIT B

**Form of Bill of Sale and Assignment and Assumption Agreement**

See attached.

**FORM OF**
**BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

This BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Bill of Sale**") is made and entered into as of [●], 2022, by and among GVS Portfolio I C, LLC, a Delaware limited liability company, each of the entities listed on Schedule A and signatory to the Purchase Agreement (as defined below) (collectively, the "**Sellers**") and CBRE WWG Storage Partners JV III, LLC, a Delaware limited liability company ("**Purchaser**"). The Sellers and Purchaser are sometimes referred to herein individually as a "**Party**" and collectively, as the "**Parties**". Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in that certain Asset Purchase Agreement, dated as of January 18, 2022, by and among the Sellers and Purchaser (the "**Purchase Agreement**").

**WHEREAS**, the Parties have entered into the Purchase Agreement, pursuant to which, among other things, the Sellers have agreed to sell, transfer, assign, convey and deliver (or cause the sale, transfer, assignment, conveyance and delivery) to Purchaser, and Purchaser has agreed to purchase, assume and accept from the Sellers, Free and Clear, all of the Sellers' rights, title and interests in, to and under the Transferred Assets and to assume and pay, discharge and perform in accordance with their terms only the Assumed Liabilities, subject to the terms and conditions set forth in the Purchase Agreement and pursuant to a Sale Order and Sections 101(a), 363, and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure; and

**WHEREAS**, the Sellers and Purchaser desire to carry out the intent and purposes of the Purchase Agreement by the execution and delivery of this Bill of Sale as evidence of and to effectuate the foregoing.

**NOW**, **THEREFORE**, in consideration of the promises and the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.      Sale and Transfer of Transferred Assets; Acceptance and Assumption of Assumed Liabilities.  Subject to the terms and conditions contained in the Purchase Agreement, the Sellers hereby sell, transfer, assign, convey and deliver to Purchaser, and Purchaser hereby purchases, assumes and accepts from the Sellers, all of the rights, title and interests in, to and under the Transferred Assets, Free and Clear and assumes and agrees to pay, discharge and perform in accordance with their terms only the Assumed Liabilities. Notwithstanding anything to the contrary in this Bill of Sale, the Purchase Agreement or in any other document delivered in connection herewith or therewith, the Transferred Assets and Assumed Liabilities shall expressly exclude the Excluded Assets and Excluded Liabilities, and the Sellers shall retain all right, title and interest in and to such Excluded Assets and Excluded Liabilities.

2.      Terms of the Purchase Agreement.  This Bill of Sale is delivered pursuant to, and is hereby made subject to, the terms and conditions of the Purchase Agreement. The Parties acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein and in accordance with the

277173247

terms thereof. EXCEPT AS EXPRESSLY PROVIDED IN THE PURCHASE AGREEMENT AND THE RELATED DOCUMENTS, THE SELLERS ARE CONVEYING THE TRANSFERRED ASSETS AND ASSUMED LIABILITIES WITHOUT REPRESENTATION OR WARRANTY, WHETHER EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, INCLUDING, WITHOUT LIMITATION, REPRESENTATIONS AND WARRANTIES CONCERNING THE MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE TRANSFERRED ASSETS, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED.

3.     Conflicts.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms of this Bill of Sale, the terms of the Purchase Agreement shall govern.

4.     Counterparts; Electronic Signatures.  This Bill of Sale may be executed in two (2) or more counterparts (any of which may be delivered by electronic transmission), each of which shall constitute an original, and all of which taken together shall constitute one and the same instrument. The exchange of a fully executed Bill of Sale (in counterparts or otherwise) by electronic transmission in .PDF or other electronic format or other agreed format shall be sufficient to bind the Parties to the terms and conditions of this Bill of Sale.

5.     Miscellaneous.   The terms and conditions set forth in Section 1.2 (*Other Definitional and Interpretive Matters*), Section 11.2 (*Amendment; No Waiver*), Section 11.3 (*Severability; Specific Versus General Provisions*), Section 11.5 (*Notices*), Section 11.7 (*Governing Law*), Section 11.8 (*Submission to Jurisdiction; Consent to Service of Process*), Section 11.9 (*Waiver of Jury Trial*), Section 11.10 (*Rights Cumulative*), Section 11.11 (*Assignment*), and Section 11.12 (*Specific Enforcement; Remedies*) of the Purchase Agreement are hereby incorporated by reference, *mutatis mutandis*, to this Bill of Sale.

*[Signature pages follow]*

**IN WITNESS WHEREOF**, the Parties have caused this Bill of Sale to be executed as of the date first written above.

**SELLERS:**

GVS PORTFOLIO I C, LLC

By:_____
      Name: Robert Albergotti
      Title: Authorized Signatory

GVS PORTFOLIO I B, LLC

By:_____
      Name: Robert Albergotti
      Title: Authorized Signatory

GVS PORTFOLIO I, LLC

By:_____
      Name: Robert Albergotti
      Title: Authorized Signatory

GVS TEXAS HOLDINGS I, LLC

By:_____
      Name: Robert Albergotti
      Title: Authorized Signatory

GVS TEXAS HOLDINGS II, LLC

By:_____
      Name: Robert Albergotti
      Title: Authorized Signatory

WC MISSISSIPPI STORAGE PORTFOLIO I,
LLC

By:_____
    Name: Robert Albergotti
    Title: Authorized Signatory


GVS NEVADA HOLDINGS I, LLC

By:_____
    Name: Robert Albergotti
    Title: Authorized Signatory


GVS OHIO HOLDINGS I, LLC

By:_____
    Name: Robert Albergotti
    Title: Authorized Signatory


GVS OHIO HOLDINGS II, LLC

By:_____
    Name: Robert Albergotti
    Title: Authorized Signatory


GVS MISSOURI HOLDINGS I, LLC

By:_____
    Name: Robert Albergotti
    Title: Authorized Signatory

GVS NEW YORK HOLDINGS I, LLC

By:_____
    Name: Robert Albergotti
    Title: Authorized Signatory


GVS INDIANA HOLDINGS I, LLC

By:_____
    Name: Robert Albergotti
    Title: Authorized Signatory


GVS TENNESSEE HOLDINGS I, LLC

By:_____
    Name: Robert Albergotti
    Title: Authorized Signatory


GVS ILLINOIS HOLDINGS I, LLC

By:_____
    Name: Robert Albergotti
    Title: Authorized Signatory


GVS COLORADO HOLDINGS I, LLC

By:_____
    Name: Robert Albergotti
    Title: Authorized Signatory

**PURCHASER:**

CBRE WWG STORAGE PARTNERS JV III, LLC

By: CPUS WWG STORAGE PARTNERS, LP, a
Delaware limited partnership

    By: CPUS WWG STORAGE PARTNERS GP, LLC,
    its general partner

       By:_____
          Name: _____
          Title: _____

## EXHIBIT C

### Form of Special Warranty Deed

See attached.

*Exhibit C to Asset Purchase Agreement*

_____

Above Space for Recorder's Use Only

**FORM OF**
**SPECIAL WARRANTY DEED[1]**

THIS SPECIAL WARRANTY DEED is made this ___ day of _____, 2022, by _____, a _____, with offices located at _____ (the "**Grantor**") to and in favor of _____, a _____ (the "**Grantee**").

WITNESSETH, that Grantor, for and in consideration of the sum of Ten and 00/100 Dollars ($10.00) and other good and valuable consideration, in hand paid by Grantee, the receipt and sufficiency whereof is hereby acknowledged, by these presents does hereby, GRANT, SELL AND CONVEY unto Grantee and its successors and assigns all of Grantor's right, title and interest in and to that certain real property located in _____ County, _____ which is legally described on Exhibit A attached hereto and made a part hereof (the "**Land**"), together with all and singular, Grantor's rights, benefits, privileges, easements, tenements, hereditaments, appurtenances, interests and entitlements thereon or in anywise appertaining thereto, all improvements located thereon, including, without limitation of the foregoing, Grantor's rights (if any) in and to all minerals, any strips and gores, roads, streets, rights-of-way bounding the Land, and all remainders, rents, issues and profits of said Land (said Land, rights, benefits, privileges, easements, tenements, hereditaments, appurtenances, improvements and interests being hereinafter referred to as the "**Real Property**").

This conveyance is made and accepted subject to all validly existing easements, rights-of-way, and all presently recorded and validly existing instruments, other than conveyances of the surface fee estate, that affect the Real Property (the "**Permitted Exceptions**").

Grantee, by its acceptance hereof, does hereby assume and agree to pay any and all ad valorem taxes and special assessments pertaining to the Real Property for (i) the calendar year 2022 to the extent such ad valorem taxes and special assessments are the responsibility of Grantee according to the proration of ad valorem taxes for the current calendar year between Grantor and Grantee in the APA and (ii) subsequent years. As used herein, the term "**APA**" means that certain Asset Purchase Agreement, dated January 18, 2022, by and among Grantee, GVS Portfolio I C, LLC ("**Parent**") and all subsidiaries of Parent set forth therein.

_____

[1] **Note to Purchaser**: Title Insurance Company to review sufficiency of this deed for each state in which Owned Real Property will be conveyed and the parties agree that this form may be revised to meet statutory requirements for each state.

TO HAVE AND TO HOLD the Real Property unto Grantee and Grantee's successors and assigns FOREVER; and Grantor does hereby bind itself and its successors and assigns, to WARRANT AND FOREVER DEFEND all and singular the Real Property, subject to the Permitted Exceptions, unto Grantee, its successors and its assigns, against every person whomsoever lawfully claiming or to claim the same, or any part thereof, by, through or under Grantor but not otherwise.

IN WITNESS WHEREOF, Grantor has caused its name to be signed to this Special Warranty Deed on the day and year first above written.

                                      _____, a
                                        _____

                                        By:_____
                                        Name:_____
                                        Its:_____

STATE OF _____ )
                                   ) SS
COUNTY OF _____ )

       The undersigned, a Notary Public in and for the said County, in the State aforesaid, do hereby certify that _____, personally known to me (or proved to me on the basis of sufficient evidence) to be the _____ of _____, a _____, and personally known to me to be the same person whose name is subscribed to the within instrument, appeared before me this day in person, and acknowledged to me that as such _____, he/she executed the said instrument pursuant to authority given by the members of such entity, and that he/she executed said instrument as his/her free and voluntary act and as the free and voluntary act of said entity, for the uses and purposes set forth therein.

       Given under my hand and official seal this \_\_\_\_ day of \_\_\_\_, 2022.

                                        _____

                                        Notary Public

                                        Commission Expires _____

This Instrument Prepared By:
And When Recorded Return To:

Elizabeth K. McCloy
Sidley Austin LLP
South Dearborn Street
Chicago, IL 60603

Send Future Tax Bills to:
_____
_____
_____

**EXHIBIT A TO SPECIAL WARRANTY DEED**

**LEGAL DESCRIPTION**

Common Address:

_____

_____

Tax Parcel ID No.:

_____


[TO INSERT LEGAL DESCRIPTION]

## EXHIBIT D

**Form of Revised Bidding Procedures Order**

See attached.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| GVS TEXAS HOLDINGS I, LLC, *et al.*,[1] | Case No. 21-31121-MVL |
| Debtors. | **(Jointly Administered)** |

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: GVS Texas Holdings I, LLC (7458); GVS Texas Holdings II, LLC (1225); GVS Portfolio I, LLC (6441); GVS Portfolio I B, LLC (7171); GVS Portfolio I C, LLC (3093); WC Mississippi Storage Portfolio I, LLC (0423); GVS Nevada Holdings I, LLC (4849); GVS Ohio Holdings I, LLC (6449); GVS Missouri Holdings I, LLC (5452); GVS New York Holdings I, LLC (5858); GVS Indiana Holdings I, LLC (3929); GVS Tennessee Holdings I, LLC (5909); GVS Ohio Holdings II, LLC (2376); GVS Illinois Holdings I, LLC (9944); and GVS Colorado Holdings I, LLC (0408). The location of the Debtors' service address is: 814 Lavaca Street, Austin, Texas 78701.

1

**ORDER (I) DESIGNATING THE STALKING HORSE BIDDER; (II) APPROVING
REVISED BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (III) APPROVING REVISED
PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion") of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of an order (this "Order"), (i) designating the Stalking Horse

Bidder pursuant to the terms and conditions of that certain Asset Purchase Agreement, dated as of

January 18, 2022, by and among CBRE WWG Storage Partners JV III, LLC (the "Stalking Horse

Bidder") and the Debtors, which is attached as **Exhibit 1** hereto (the "Stalking Horse APA");

(ii) approving the revised bidding procedures attached as **Exhibit 2** hereto (the "Revised Bidding

Procedures"); (iii) approving revised procedures for the assumption and assignment of executory

contracts, attached as **Exhibit 3** hereto (the "Revised Assumption and Assignment Notice"); and

(iv) granting related relief, pursuant to sections 105(a), 363, 365, and/or 503 of title 11 of the

United States Code (the "Bankruptcy Code"), and rules 2002, 6004, 6006, and 9014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and this Court having jurisdiction to

consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and this matter being a core

proceeding within the meaning of 28 U.S.C. § 157(b)(2); and the Court being able to issue a final

order consistent with Article III of the United States Constitution; and venue of this proceeding

and the Motion in this district being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it

appearing that the relief requested in the Motion being in the best interests of the Debtors' estates,

their creditors, and other parties in interest; and the Court having determined that the legal and

factual bases set forth in the Motion establish just cause for the relief granted herein; and after due

deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**

2

1.     The relief requested in the Motion is GRANTED as set forth herein.

2.     CBRE WWG Storage Partners JV III, LLC is approved as the Stalking Horse Bidder, and the Debtors are authorized to enter into the Stalking Horse APA with the Stalking Horse Bidder, subject to the terms and conditions set forth therein and in this Order.[2]

3.     Pursuant to section 9.3 of the Stalking Horse APA, if the Stalking Horse APA is terminated (i) in accordance with section 9.1(c), section 9.1(d), or section 9.1(e), or (ii) by the Debtors in accordance with section 9.1(b) or section 9.1(h), and the Stalking Horse is not then in breach of any of its obligations under the Stalking Horse APA, then the Stalking Horse Bidder shall be immediately entitled to a termination fee in an amount equal to 1.5% of the Base Amount (the "Breakup Fee"), plus the sum of the aggregate amount of the Stalking Horse Bidder's actual reasonable documented out-of-pocket costs and expenses (including, without limitation, expenses of outside counsel, accountants and financial advisors, which shall be based on summary invoices, redacted to preserve privileged or confidential information, filing fees related to any governmental filing or notification, including filing fees under the HSR Act, fees and expenses of consultants, expenses incurred in the course of the Stalking Horse Bidder's due diligence, including research services and travel costs, and entity formation costs) incurred by the Stalking Horse Bidder in connection with or related to the Transactions prior to the date of termination of the Stalking Horse APA (i) pursuant to section 9.1(c), section 9.1(d), or section 9.1(e) or (ii) by the Debtors in accordance with section 9.1(b) or section 9.1(h) of the Stalking Horse APA, up to a maximum amount of $1,500,000 (the "Purchaser Expense Reimbursement" and together with the Breakup Fee, the "Bid Protections").

---

[2] Capitalized terms used but not otherwise defined in this Order shall have the meanings provided to them in the Motion, the Stalking Horse APA, the Revised Bidding Procedures, and the Revised Assumption and Assignment Notice, as applicable, the terms of which are fully incorporated as if set forth herein.

4. The Bid Protections shall be allowed as an administrative expense claim pursuant to sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code, and (a) in the event of an Alternate Transaction, the Bid Protections shall constitute administrative expense claims under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code with priority over any and all expense claims of any kind specified in sections 503(b)(1) and 507(a) of the Bankruptcy Code and senior to all other superpriority administrative expenses in these Bankruptcy Cases, including but not limited to the superperiority administrative expense claims granted to the Senior Lender as provided in the Final Cash Collateral Order and shall be paid promptly following the consummation of the Alternate Transaction; and (b) if the termination is not based on an Alternate Transaction, the Bid Protections shall constitute an administrative expense claim pursuant to sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code with priority over any and all administrative expense claims of any kind specified in sections 503(b)(1) and 507(a) of the Bankruptcy Code, but junior to the superpriority administrative expense claims granted to the Senior Lender as provided in the Final Cash Collateral Order and junior to the professional fee claims, and shall be paid promptly following the consummation of an Alternate Transaction.

5. If the Stalking Horse Bidder is entitled to the Bid Protections pursuant to section 9.3 of the Stalking Horse APA, the Debtors shall pay the Bid Protections in cash to the Stalking Horse Bidder within three (3) Business Days following the consummation of an Alternate Transaction and without further order of the Court; provided that the Stalking Horse Bidder has delivered summary documentation to the Debtors reflecting the Stalking Horse Bidder's actual reasonable documented out-of-pocket costs, fees and expenses included in the Purchaser Expense Reimbursement as of such date.

6.    Until paid, the Bid Protections due and owing under the terms and conditions set forth in the Stalking Horse APA and this Order shall (i) survive termination of the Stalking Horse APA; and (ii) constitute an allowed administrative expense claim pursuant to the terms of this Order.

7.    The Revised Bidding Procedures, substantially in the form attached hereto as **Exhibit 2** are hereby approved in their entirety, including all procedures and deadlines set forth therein.

8.    The Stalking Horse Bidder shall constitute a Qualified Bidder as defined in the Revised Bidding Procedures. Except for the Stalking Horse Bidder, each bidder will only constitute a Qualified Bidder if the consideration offered by such bidder equals or exceeds an amount equal to the sum of (i) the Base Amount, plus (ii) the Breakup Fee, plus (iii) the Purchaser Expense Reimbursement, plus (iv) an amount equal to 1% of the Base Amount.

9.    The Debtors will conduct an auction (the "Auction") on **February 21, 2022 at 10:00 a.m. (prevailing Central Time)** pursuant to the terms and conditions in the Revised Bidding Procedures. The Auction shall take place at the offices of Debtors' counsel, Sidley Austin LLP, 2021 McKinney Avenue, Suite 2000, Dallas, Texas, or such other location as may be announced prior to the Auction to the Qualified Bidders, at which time the Court shall be available, if needed. Contact information for the Court will be provided to counsel for the Debtors. The Debtors are authorized to hold and conduct the Auction in accordance with the Revised Bidding Procedures.

10.    To participate in the Auction, a party/bidder must submit a Qualified Bid pursuant to the terms of the Revised Bidding Procedures on or before **February 11, 2022 at 5:00 p.m. (prevailing Central Time")** (the "Bid Deadline").

11.     At the Auction, in accordance with the Revised Bidding Procedures, the Stalking Horse Bidder shall receive a credit representing the aggregate amount of the Bid Protections in each round of bidding.

12.     As soon as reasonably practicable after the conclusion of the Auction, the Debtors shall file with the Court and serve upon all Qualified Bidders and parties that have requested notice in these cases a notice identifying the Successful Bidder and the Backup Bidder (the "Notice of Successful Bidder") and post such notice on the Debtors' bankruptcy website (https://cases.omniagentsolutions.com/gvs/).

13.     A sale hearing to consider approval of the Successful Bid (as defined in the Revised Bidding Procedures), shall be held by the Court on or before **March 15, 2022** (the "Sale Hearing"). After consulting with the Stalking Horse Bidder, or such other Successful Bidder if applicable, such Sale Hearing may be continued by the Debtors by the filing of a notice with the Court.

14.     All objections to the Sale must be filed with this Court, together with proof of service, on or before 5:00 p.m. (prevailing Central Time) on the date that is at least seven (7) days prior to the Sale Hearing.

15.     All persons and entities that participate in the bidding process or the Auction shall be deemed to have knowingly and voluntarily submitted to the exclusive jurisdiction of this Court and consented to entry of a final order by this Court with respect to all matters related to the terms and conditions of the transfer of Assets, the Auction and any transaction contemplated herein.

16.     The Revised Assumption and Assignment Notice, substantially in the form attached hereto as **Exhibit 3** is hereby approved in its entirety, including all procedures and deadlines set forth therein.  The Revised Assumption and Assignment Notice and the Debtors' compliance with the procedures set forth therein shall constitute sufficient notice of the Debtors' proposed potential

6

assumption, assignment, and Cure Amount for the assumed agreements, and, except as set forth in the Sale Order, no other or further notice of the potential assumption, assignment, and Cure Amount for the Assumed Agreements shall be required to be provided by the Debtors.

17. Notwithstanding the possible applicability of Bankruptcy Rules 6004, 6006, 9014, or any provisions of the Bankruptcy Rules stating the contrary, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry and no automatic stay shall apply to this Order.

18. The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Order.

19. Proper, timely, adequate, and sufficient notice has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice shall be required except as expressly set forth in the Revised Bidding Procedures and Revised Assumption and Assignment Notice.

20. This Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

### End of Order ###

## EXHIBIT E

**Form of Transition Services Agreement**

See attached.

*Final Form*
*Exhibit E*

## TRANSITION SERVICES AGREEMENT

THIS TRANSITION SERVICES AGREEMENT (the "**Agreement**") dated [●], 2022[1], is entered into by and between Great Value Storage, LLC, a Texas limited liability company ("**Manager**"), and CBRE WWG Storage Partners JV III, LLC, a Delaware limited liability company ("**Purchaser**"). Manager and Purchaser are hereinafter collectively referred to as the "**parties**" and individually as a "**party**."

**WHEREAS**, on June 17, 2021, (the "**Subsidiaries Petition Date**") the entities listed on Schedule A to the Purchase Agreement (as defined below) (the "**Subsidiaries**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**"), and on June 23, 2021 (the "**Parent Petition Date**," and, together with the Subsidiaries Petition Date, the "**Petition Date**"), GVS Portfolio I C, LLC, a Delaware limited liability company ("**Portfolio I C**" and collectively with the Subsidiaries, the "**Sellers**"), filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (collectively, the "**Bankruptcy Cases**");

**WHEREAS**, the Sellers are debtors-in-possession under the Bankruptcy Code and manage their properties and assets pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, Purchaser, Portfolio I C, and each of the Subsidiaries have entered into that certain Asset Purchase Agreement dated as of January 18, 2022 (the "**Purchase Agreement**") pursuant to which the Sellers intend to sell to Purchaser, and Purchaser intends to purchase from the Sellers certain assets, and the Sellers intend Purchaser to assume, and Purchaser intends to assume from the Sellers, certain liabilities, in each case as more specifically described, and on the terms and subject to the conditions set forth, in the Purchase Agreement, pursuant to a Sale Order and Sections 101(a), 363 and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure;

**WHEREAS**, Manager manages and provides certain operational, maintenance, repair and similar services to certain of the Subsidiaries of Portfolio I C;

**WHEREAS**, the equity holder of Manager is also a direct or indirect equity holder of the Sellers and, pursuant to such equity interest, may be entitled to a distribution from the Sellers upon the closing of the transactions contemplated by the Purchase Agreement (the "**Closing**" and the date of such Closing being the "**Closing Date**");

**WHEREAS**, in connection with the transactions contemplated by the Purchase Agreement, Purchaser has requested the Manager to provide, or cause to be provided, certain information and services for a limited period of time following the date of the Purchase Agreement and continuing for a limited period of time following the Closing Date to provide Purchaser with information regarding, and access to, the Facilities and the other Transferred Assets and to place Purchaser in physical possession of the Transferred Assets at the Closing and enable an effective

---

[1] **Note to Draft**: To be entered into on or prior to the date that is 5 days following the date on which the Sale Order is entered.

and orderly transition of the Business following the Closing; and

**WHEREAS**, the Manager is willing to provide such services on the terms and conditions set forth herein.

**NOW**, **THEREFORE**, in consideration of the premises and the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    *Definitions.* Capitalized terms used but not otherwise defined herein shall have the respective meanings assigned to such terms in the Purchase Agreement:

"**Additional Services**" has the meaning set forth in Section 2.2.

"**Agreement**" has the meaning given such term in the Preamble.

"**Bankruptcy Cases**" has the meaning given such term in the Recitals.

"**Bankruptcy Code**" has the meaning given such term in the Recitals.

"**Bankruptcy Court**" has the meaning given such term in the Recitals.

"**Closing**" has the meaning given such term in the Recitals.

"**Closing Date**" has the meaning given such term in the Recitals.

"**Execution Date Payment**" has the meaning given such term in Section 3.1.

"**Force Majeure Event**" has the meaning given such term in Section 7.1.

"**IP Transition Period**" has the meaning given such term in Section 2.11.

"**Manager**" has the meaning given such term in the Preamble.

"**Manager Tax**" has the meaning given such term in Section 3.4.

"**Parent Petition Date**" has the meaning given such term in the Recitals.

"**Petition Date**" has the meaning given such term in the Recitals.

"**Purchase Agreement**" has the meaning given such term in the Recitals.

"**Purchaser**" has the meaning given such term in the Preamble.

"**Purchaser Indemnified Parties**" has the meaning given such term in Section 5.2.

"**Seller Marks**" has the meaning given such term in Section 2.11.

"**Service Coordinator**" has the meaning given such term in Section 2.4.

"**Services**" has the meaning given such term in Section 2.1.

"**Schedules**" means the schedules initially attached hereto and any subsequent schedules that may become a part of this Agreement.

"**Subsidiaries**" has the meaning given such term in the Recitals.

"**Subsidiaries Petition Date**" has the meaning given such term in the Recitals.

"**Transition Period**" means the period between the date of this Agreement and the Transition Period End Date.

"**Transition Period End Date**" means the date that is five (5) Business Days following the Closing Date, as such date may be modified by written agreement of the parties from time to time.

## ARTICLE II
## SERVICES

Section 2.1 *Services.* Upon the terms and subject to the conditions of this Agreement, Manager, acting directly or through its Affiliates or its or their respective employees, agents, contractors or independent third parties designated by them, agrees to use best efforts to provide or cause to be provided during the Transition Period the transition services to Purchaser as set forth in Schedule A hereto (such services, together with any Additional Services to be provided by Manager or its Affiliates in accordance with Section 2.3, are collectively referred to herein as the "**Services**"). The parties acknowledge that the descriptions of the Services in Schedule A are general only and do not purport to contain an exhaustive description of the Services to be provided. The parties further acknowledge and agree that it may not be practicable to describe each and every aspect of a particular Service in detail; therefore, each Service that is generally agreed upon by the parties and included in Schedule A will be provided in accordance with the applicable terms of this Agreement, even where all aspects regarding the provision of a particular Service are not described in detail.

Section 2.2 *Additional Services.* Purchaser may from time to time during the term of this Agreement request Manager to provide additional services not listed in Schedule A, as applicable (the "**Additional Services**") by providing written notice to Manager. Manager shall notify Purchaser within five (5) Business Days of receipt of such request whether Manager, in its commercially reasonable discretion, is able to provide such Additional Services. In the event Manager agrees to provide such Additional Services upon the mutual agreement of the parties as to the nature, duration and scope of such Additional Services, the parties shall supplement in writing Schedule A hereto, as applicable, to include such Additional Services.

Section 2.3 *Service Coordinators.* Manager and Purchaser will each nominate in writing a representative to act as the primary contact with respect to the provision of the Services and the

resolution of disputes under this Agreement (each such person, a "**Service Coordinator**"). The initial Service Coordinators shall be [●] and [●][2] (or their designated delegates) for Manager and Purchaser, respectively. Unless Manager and Purchaser otherwise agree in writing, Manager and Purchaser agree that all notices and communications relating to this Agreement other than those day-to-day communications and billings relating to the actual provision of the Services shall be delivered to the Service Coordinators in accordance with Section 8.3 hereof. The Service Coordinators shall communicate as expeditiously as possible to resolve any dispute hereunder.

Section 2.4 *Third Party Services.* Manager shall have the right to hire third party subcontractors to provide all or part of any Service hereunder; *provided* that Manager shall give notice to Purchaser of its intent to subcontract such Service and shall be responsible for such subcontractors' performance of the Service and compliance with the terms of this Agreement to the same extent as Manager.

Section 2.5 *Standard of Performance; Disclaimer of Warranty; Limitation of Liability.*

(a) Except as otherwise provided in Schedule A for a specific Service, the Services shall be in scope and nature substantially consistent with services similar the Services provided by a prudent management services provider providing services in respect of self-storage facilities. In addition, the Services to be provided hereunder shall be performed in a manner (including as to volume, amount, level or frequency, as applicable) and at a level of care and diligence consistent with the level of care and diligence utilized by a prudent management services provider. Manager shall be entitled to rely upon all directions provided by Purchaser's Service Coordinator or other third parties designated by Purchaser's Service Coordinator. In addition, Manager shall be entitled to rely on the accuracy and completeness of all data provided by Purchaser to Manager as necessary for the performance of the Services and Manager shall have no liability for inaccuracies or omissions in such data and no duty to verify such information. It is understood and agreed that Manager's personnel performing Services hereunder have other responsibilities and will not be dedicated full-time to performing Services hereunder.

(b) In the event Manager fails to provide, or cause to be provided, the Services in accordance herewith, Purchaser shall promptly notify Manager thereof and, in the event Manager does not provide, or cause to be provided, such Services by the date such Service is intended to be performed as set forth in Schedule A, as determined by Purchaser in its sole discretion, Purchaser shall have no obligation to pay all or any portion of the Transition Services Amount under Section 2.10 of the Purchase Agreement and shall be entitled to such other remedies as provided herein, including without limitation, that in the event the Manager defaults in the manner described in Section 4.2(b), the Purchaser shall have the further right of termination as set forth in Section 4.2.

(c) Unless agreed to as part of an Additional Service, Manager will not have any obligation hereunder to alter the Services or to perform any other services not specifically set forth herein, including to accommodate any post-Closing changes (i) of Purchaser, or the Business, including any acquisitions or divestitures, and/or (ii) in applicable Laws or GAAP.

---

[2] **Note to Draft**: Manager to provide.

(d)     Except as specifically provided in Schedule A for a specific Service, Manager shall not be obligated to provide records, financial information, or other information which is not kept or reported in the ordinary course of business by Manager.

Section 2.6     *Service Boundaries and Scope.*

(a)     Except as provided in Schedule A for a specific Service: (i) Manager shall be required to provide, or cause to be provided, the Services only at the Facilities; and (ii) the Services shall be available only for purposes of conducting the Business substantially in the manner it was conducted immediately prior to the Petition Date. Except as provided in Schedule A for a specific Service, in providing, or causing to be provided, the Services, in no event shall Manager be obligated to: (A) maintain the employment of any specific employee or hire additional employees; (B) purchase, lease or license any additional equipment (including computer equipment, furniture, furnishings, fixtures, machinery, vehicles, tools and other tangible personal property), software or other assets, rights or properties; (C) make modifications to its existing systems or software; (D) provide Purchaser with access to any systems or software (other than as set forth on Schedule A); or (E) pay any costs related to the transfer or conversion of data of Purchaser. The provision of the Services, including certain information technology and data processing services as more particularly described in Schedule A, may require consents, waivers or approvals from third parties under licenses and contracts to which Manager or one or more of its Affiliates is a party. Manager shall use commercially reasonable efforts to obtain any such consents, waivers or approvals necessary for the provision of the Services, with any cost incurred in obtaining the consent, waiver or approval to be paid directly by the Purchaser. Manager shall not be required to perform Services hereunder that conflict with any applicable Law, contract, rule, regulation, order, license, authorization, certification or permit or Manager's Code of Business Conduct and Ethics.

(b)     At all times during the performance of the Services, Manager shall be considered an independent contractor as to Purchaser. All persons performing Services (including agents, temporary employees, independent third parties and consultants) shall be construed as being independent from Purchaser and shall not be considered or deemed to be an employee of Purchaser. The responsibility of such persons is to perform the Services in accordance with this Agreement and, as necessary, to advise Purchaser in connection therewith, and such persons shall not be responsible for decision-making on behalf of Purchaser. Such persons performing Services shall not be required to report to management of Purchaser nor be deemed to be under the management or direction of Purchaser, but shall at all times be under the direct and sole supervision and control of Manager or its Affiliates, as applicable.

(c)     It is not the intent of Manager to render to the Purchaser any professional advice or opinions, whether with regard to tax, legal, treasury, finance, employment or other business and financial matters, technical advice, whether with regard to information technology or other matters, or the handling of or addressing environmental matters. Purchaser shall not rely on, or construe, any Service rendered by or on behalf of Manager as such professional advice or opinions or technical. Purchaser shall seek third-party professional advice and opinions or technical advice as it may desire or need.

Section 2.7   *Cooperation.*  Manager and Purchaser shall cooperate with one another and provide such further assistance as the other party may reasonably request in connection with the provision of Services hereunder.

Section 2.8   *Transitional Nature of Services; Changes.*  The parties acknowledge the transitional nature of the Services and that Manager may make changes from time to time in the manner of performing the Services if Manager is making similar changes in performing similar services within its organization and, to the extent such changes are material, if Manager furnishes to Purchaser prompt notice respecting such changes.

Section 2.9   *Access.*  During the term of this Agreement and for so long as any Services are being provided to Purchaser by Manager, access to the Facilities will be provided to Purchaser in accordance with Section 6.2 of the Purchase Agreement.

Section 2.10   *No Breach.*  Notwithstanding anything to the contrary herein, Manager shall not be deemed to be in breach of its obligations hereunder by reason of any of the following:  (i) the failure of Purchaser or any third party to grant its consent to any matter requiring such consent prior to Manager's performance of its obligations with respect to such matter; (ii) the failure of Purchaser to enter into a contract or agreement with a third party which is necessary for Manager to perform its obligations with respect to such matters; or (iii) any acts of Manager done at the request or direction of Purchaser or its representatives.

Section 2.11   *Use of Seller Marks.*  Subject to the terms of this Section 2.11, Manager, on behalf of itself and its Affiliates and subsidiaries, hereby grants to Purchaser a non-exclusive, non-transferable license to use the Trademarks owned by Manager or any of its Affiliates or subsidiaries that, prior to the Petition Date, were used in connection with the Business or any Facility or Transferred Asset (the "**Seller Marks**") solely during the period beginning on the Closing Date and ending on the nine-month anniversary of the Closing Date (the "**IP Transition Period**") that have been, prior to the Closing Date, used by the Sellers with, affixed to or otherwise associated with the Facilities and Transferred Assets, in each case solely for purposes of transitioning ownership of the Facilities and Transferred Assets and in a manner that is not intended to or reasonably likely to harm or disparage any Seller or Manager or their respective businesses, reputation or goodwill. In connection with such limited use of the Seller Marks, as permitted by this Section 2.11, Purchaser acknowledges that use thereof shall inure to the Manager's or Sellers' benefit, as applicable, and shall not create in the Purchaser's favor any right, title or interest in or to the Seller Marks. Purchaser shall use the Seller Marks in compliance with all applicable Law and shall not (i) use the Seller Marks in combination with any other Trademark in a manner that creates a combination mark, (ii) context Manager's, Sellers' (or their Affiliates') ownership of the Seller Marks, (iii) take any action that a reasonable person would believe would diminish or dilute the distinctiveness or validity of the Seller Marks, or (iv) attempt to registerer any of the Seller Marks or any mark confusingly similar thereto, alone or in combination with other words or designs, as a trademark, service mark or trade name. Upon the expiration of the IP Transition Period, Purchaser shall promptly cease and discontinue all use of the Seller Marks. Purchaser shall re-label, destroy, delete or exhaust all materials in its possession bearing any of the Seller Marks, including signage, advertising, promotional materials, packaging, inventory, electronic materials, collateral goods, stationery, business cards, websites and other materials. For the avoidance of doubt, this paragraph will not require Purchaser to alter any historical or archival

6

materials owned or held by Purchaser as part of the Transferred Assets acquired by Purchaser in the Transactions which include the Seller Marks.

## ARTICLE III
## SERVICE CHARGES AND PAYMENTS

Section 3.1 *Consideration.* In consideration for the provision of the Services hereunder, (i) on the date of this Agreement, subject to execution and delivery of this Agreement by the parties, Purchaser shall pay to Manager an amount in cash equal to $1,000 (the "**Execution Date Payment**") and (ii) if Manager successfully completes all of the Transition Milestones (as defined in the Purchase Agreement) on or before the Transition Period End Date, and *provided* that Manager does not breach any term or provision of this Agreement, does not object to the entry of the Sale Order and does not otherwise obstruct entry of the Sale Order or consummation of the Closing, Purchaser shall pay to Portfolio I C (on behalf of the Sellers) the Transition Services Amount pursuant to the terms of Section 2.10 of the Purchase Agreement.

Section 3.2 *Payment.* On the date of this Agreement, the Execution Date Payment shall be paid by wire transfer of immediately available funds to the account designated in writing by Manager. Within three (3) Business Days following the Transition Period End Date, *provided* that each of the Transition Milestones has been satisfied, and *provided further* that Manager does not breach any term or provision of this Agreement, does not object to the entry of the Sale Order and does not otherwise obstruct entry of the Sale Order or consummation of the Closing, the Transition Services Amount shall be paid in accordance with the terms and conditions of Section 2.10 of the Purchase Agreement.

Section 3.3 *Taxes.* All taxes, excises, fees, interest, penalties or other charges (including sales, use or receipts taxes, or taxes on or measured by the income, net or gross revenues, business activity or capital of Manager or any of its Affiliates), or any increase therein, now or hereafter imposed directly or indirectly by Law upon any fees paid hereunder for Services, which Manager or any of its Affiliates is required to pay or incur in connection with the provision of Services hereunder ("**Manager Tax**"), shall be the sole responsibility of Manager or its applicable Affiliate, and the Purchaser shall not have any obligation for any Manager Tax.

## ARTICLE IV
## TERM AND TERMINATION

Section 4.1 *Term.* Subject to Section 4.2, during the Transition Period, the Manager shall provide the Services to Purchaser pursuant to this Agreement for the time period set forth on Schedule A relating to the specific Service; provided, that Manager shall undertake to provide as soon as reasonably practicable, each of the Services. This Agreement shall be effective as of the date first set forth above and shall continue in effect until the Transition Period End Date, or with respect to Section 2.11, until the end of the IP Transition Period, unless the Agreement is terminated prior thereto at any time in accordance with this Article IV.

Section 4.2 *Termination.* Notwithstanding anything herein or elsewhere to the contrary, this Agreement may be terminated at any time upon the happening of any of the following events or conditions:

(a)  by the written consent of each of the parties; and

(b)  by Purchaser, upon Manager's breach of a material obligation under this Agreement and, after having been given written notice specifying such breach, Manager does not correct such breach within five (5) Business Days of receipt of said notice.

Section 4.3  *Effect of Termination of Services.*  Upon the termination of a Service hereunder, this Agreement shall be of no further force and effect with respect to such Service, except as to obligations accrued prior to the date of termination and except as provided in Section 8.12 hereof. Upon the termination of the Services to be provided hereunder, Manager will promptly deliver to Purchaser, upon request, copies of any books and records, contracts, and all other papers or documents in its possession to the extent related to the Services provided thereunder; *provided*, that Manager shall be allowed to retain copies of any such materials.

ARTICLE V
INDEMNIFICATION, WAIVER AND RELEASE

Section 5.1  *Waiver of Damages.*  EXCEPT TO THE EXTENT SUCH DAMAGES ARE ACTUALLY INCURRED BY A PARTY AND PAYABLE TO A THIRD PARTY IN CONNECTION WITH A THIRD PARTY CLAIM, NEITHER PARTY SHALL BE LIABLE UNDER THIS AGREEMENT FOR ANY CONSEQUENTIAL, INDIRECT, REMOTE, SPECULATIVE, SPECIAL, INCIDENTAL, PUNITIVE OR EXEMPLARY DAMAGES OR ANY LOST PROFITS OR REVENUES, HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY, ARISING OUT OF ACTIVITIES OR OBLIGATIONS UNDER OR RELATED TO THIS AGREEMENT, REGARDLESS OF THE ACTS, OMISSIONS, NEGLIGENCE OR GROSS NEGLIGENCE (WHETHER SOLE, JOINT, CONCURRENT, ACTIVE OR PASSIVE) OR FAULT OF ANY PERSON.

Section 5.2  *Manager's Agreement to Indemnify.*  MANAGER SHALL BE RESPONSIBLE FOR, AND SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS THE PURCHASER, ITS AFFILIATES AND THEIR RESPECTIVE EMPLOYEES, OFFICERS, DIRECTORS, MANAGERS AND AGENTS (TOGETHER, THE "**PURCHASER INDEMNIFIED PARTIES**") FOR, ANY DAMAGES CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF MANAGER, OR ITS AFFILIATES OR ANY OF THEIR SUBCONTRACTORS.

Section 5.3  *Express Negligence.*  THE INDEMNITY AND RELEASES IN THIS AGREEMENT ARE INTENDED TO BE ENFORCEABLE AGAINST THE PARTIES IN ACCORDANCE WITH THE EXPRESS TERMS AND SCOPE THEREOF, NOTWITHSTANDING ANY EXPRESS NEGLIGENCE RULE OR ANY SIMILAR DIRECTIVE THAT WOULD PROHIBIT OR OTHERWISE LIMIT INDEMNITIES BECAUSE OF THE NEGLIGENCE OR GROSS NEGLIGENCE (WHETHER SOLE, JOINT, CONCURRENT, ACTIVE OR PASSIVE) OR OTHER FAULT OR STRICT LIABILITY OF ANY OF THE INDEMNIFIED PARTIES.

Section 5.4  *Release.*  Effective as of the Closing under the Purchase Agreement, Manager, on behalf of itself, its Affiliates and each of their respective successors and assigns (each

of the foregoing, a "**Releasing Party**"), hereby fully, irrevocably and unconditionally releases and forever discharges Purchaser and its respective past and present directors, managers, officers, employees, agents, stockholders, members, representatives and Affiliates from and against, and covenants that it will not (directly or indirectly) assert any claim or proceeding of any kind before any Governmental Authority based upon, any and all claims, Actions, causes of action, suits, rights, debts, agreements, Losses and demands whatsoever and all consequences thereof, known or unknown, actual or potential, suspected or unsuspected, fixed or contingent, both in law and in equity, whether existing as of the Closing or arising thereafter, that a Releasing Party has or may have, now or in the future, arising out of, relating to, or resulting from any act or omission, error, negligence, breach of contract, tort, violation of law, matter or cause whatsoever from the beginning of time to the Closing Date. The foregoing sentence shall not be deemed to be a release or waiver by a Releasing Party of any Action it may have under this Agreement.

## ARTICLE VI
## CONFIDENTIALITY

Section 6.1    *Confidentiality.*

(a)    Purchaser and Manager each acknowledge and agree that prior to the Closing, the terms of Section 6.2(c) of the Purchase Agreement shall apply to information, documents, plans and other data made available or disclosed by one party to the other in connection with this Agreement.

(b)    From and after the Closing Date, Manager shall, and shall cause its Affiliates and subsidiaries to hold in confidence and not disclose any confidential information, whether written or oral, concerning the Business, the Facilities, or the Transferred Assets, except to the extent such information is generally available to and known by the public through no fault of Manager or any of its Affiliates or subsidiaries. If Manager or any of its Affiliates or subsidiaries are compelled to disclose any information by judicial or administrative process or by other requirements of Law, Manager shall promptly notify Purchaser in writing and shall cause the disclosing Person to disclose only that portion of such information which such Person is advised by its counsel is legally required to be disclosed, provided that such Person shall (and Manager shall cause such Person to) use commercially reasonable efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

## ARTICLE VII
## FORCE MAJEURE

Section 7.1    *Performance Excused.*  Performance of a Service shall be excused to the extent caused by any event or condition beyond the reasonable control of the Manager (or its applicable Affiliate) obliged to perform such Service, including acts of God, labor or trade disturbance, war, terrorism, civil commotion, compliance in good faith with any Law (whether or not it later proves to be invalid), disruption in general economic, commercial or social conditions relating to a pandemic (which, for the avoidance of doubt will not include the COVID-19 pandemic), or other event or condition whether similar or dissimilar to the foregoing (a "**Force Majeure Event**").

Section 7.2 *Notice.* If Manager's (or its Affiliates') performance is affected by a Force Majeure Event, Manager will give prompt notice to Purchaser of the occurrence of the Force Majeure Event and of its nature and anticipated duration. If such Force Majeure Event occurs and is continuing for a period of time in excess of seven (7) days, Purchaser shall be entitled to terminate this Agreement in full or solely as to the affected Service upon written notice to Manager.

Section 7.3 *Cooperation.* Upon the occurrence of a Force Majeure Event, if requested by Purchaser, the parties shall cooperate with each other to find alternative means and methods for the provision of the affected Service to Purchaser, at the sole cost of Manager.

## ARTICLE VIII
## MISCELLANEOUS

Section 8.1 *Relationship of the Parties.* This Agreement is not intended to and shall not be construed as creating a fiduciary relationship, joint venture, partnership, relationship of trust or agency or other association within the meaning of the common law or under the laws of the state in which any party is incorporated, organized, or conducting business. It is the intent of the parties that with respect to performing the Services hereunder, Manager and its Affiliates are independent contractors, and shall provide the Services in accordance with the reasonable instructions provided by authorized representatives of Purchaser, subject to the provisions of this Agreement.

Section 8.2 *Construction Rules.* The article and section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. As used in this Agreement, unless otherwise provided to the contrary, (i) all references to days or months shall be deemed references to calendar days or months and (ii) any reference to a "Section," "Article," "Exhibit" or "Schedule" shall be deemed to refer to a section or article of this Agreement or an exhibit or schedule to this Agreement. The words "hereof," "herein" and "hereunder" and words of similar import referring to this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." Unless otherwise specifically provided for herein, the term "or" shall not be deemed to be exclusive.

Section 8.3 *Notices.* All notices and other communications to be given to any party hereunder shall be sufficiently given for all purposes hereunder if in writing and delivered by hand, courier or overnight delivery service or three days after being mailed by certified or registered mail, return receipt requested, with appropriate postage prepaid, or when received in the form of an email and shall be directed to the address set forth below (or at such other address or email address as such party shall designate by like notice):

(a)    if to Manager, to:

**[Name]**
**[Address Line 1]**
**[Address Line 2]**
**Attention: [●]**
**Email: [●]**

with a copy (which will not constitute notice) to each of:

c/o Robert Albergotti
1085 Old Clemson Highway, Ste E
Box No. 114
Seneca, SC 29672
Attention: Robert Albergotti
Email: albergottib@gmail.com

and

**[Name]**
**[Address Line 1]**
**[Address Line 2]**
**Attention: [●]**
**Email: [●]**

and

Sidley Austin LLP
2021 McKinney Ave.
Suite 2000
Dallas, TX 75201
Attention: Thomas Califano
          Charles Persons
          Sara Duran
Email: tom.califano@sidley.com
        cpersons@sidley.com
        sduran@sidley.com

(b)     if to Purchaser, to:

> c/o CBRE Investment Management Acquisitions, LLC
> 200 Park Avenue, Suite 2001
> New York, NY 10166
> Attention: Sondra C. Wenger
> Email: Sondra.Wenger@cbreim.com

and a copy to:

c/o The William Warren Group Inc.
201 Wilshire Blvd., Suite 102
Santa Monica, CA 90401
Attention: Gary Sugarman
Email: gsugarman@williamwarren.com

with a copy to (which will not constitute notice):

> Haynes and Boone, LLP
> 2323 Victory Avenue, Suite 700
> Dallas, TX 75219
> Attention: Ian Peck
>         Tom Harris
>         Valisa Berber-Thayer
> Email: ian.peck@haynesboone.com
>        tom.harris@haynesboone.com
>        valisa.berber-thayer@haynesboone.com

Section 8.4    *Assignment, Binding Effect.*   Neither this Agreement nor any of the rights, benefits or obligations hereunder may be assigned or delegated by Purchaser or Manager (whether by operation of law or otherwise) without the prior written consent of the other party; *provided, however*, that the foregoing shall in no way restrict the performance of a Service by an Affiliate of Manager or a third party as otherwise allowed hereunder; and *provided*, further, that nothing in this Section 8.4 shall prohibit Purchaser from assigning its rights to receive the Services to any of its Affiliates.

Section 8.5 *No Third-Party Beneficiaries.* Nothing in this Agreement, express or implied, is intended to or shall confer upon any Person (other than Purchaser, Manager, any Affiliate of Manager providing Services hereunder, and the Purchaser Indemnified Parties described in Section 5.2, or their respective successors or permitted assigns) any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, and no Person (except as so specified) shall be deemed a third-party beneficiary under or by reason of this Agreement.

Section 8.6 *Amendment.* No amendments, additions to, alterations, modifications or waivers of all or any part of this Agreement shall be of any effect, whether by course of dealing or otherwise, unless explicitly set forth in writing and executed by the parties hereto.

Section 8.7 *Waiver.* The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach. The failure of any party to require performance of any provision of this Agreement shall not affect any party's right to full performance thereof at any time thereafter. Unless otherwise specified herein, the rights and remedies provided in this Agreement are cumulative and the exercise of any one right or remedy by any party shall not preclude or waive its right to exercise any or all other rights or remedies.

Section 8.8 *Severability.* If any provision of this Agreement or the application of any such provision to any Person or circumstance shall be declared judicially to be invalid, unenforceable or void, such decision shall not have the effect of invalidating or voiding the remainder of this Agreement, it being the intent and agreement of Purchaser and Manager that this Agreement shall be deemed amended by modifying such provision to the extent necessary to render it valid, legal and enforceable while preserving the original intent and economic balance of the parties as reflected in the severed provision or, if such modification is not possible, by substituting therefor another provision that is legal and enforceable and that achieves the same economic objective.

Section 8.9 *Counterparts.* This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement binding on the parties. An executed counterpart signature page to this Agreement delivered by facsimile or other means of electronic transmission shall be deemed an original and shall be effective for all purposes as delivery of a manually executed counterpart.

Section 8.10 *Governing Law.* This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas without giving effect to the conflicts of law principles thereof.

Section 8.11 *Further Assurances.* From time to time, each party agrees to execute and deliver such additional documents, and will provide such additional information and assistance, as any party may reasonably require to carry out the terms of this Agreement.

Section 8.12 *Survival.* The parties agree that ARTICLE I, ARTICLE V, ARTICLE VI, and ARTICLE VIII, and Section 4.3 will survive the termination of this Agreement.

Section 8.13 *Entire Agreement.* This Agreement, the Exhibits and Schedules hereto (which Exhibits and Schedules shall be deemed to be part of this Agreement), the Purchase Agreement and the other agreements, documents and instruments to be delivered pursuant hereto and thereto set forth the entire understanding and agreement between the parties as to the matters covered herein and therein and supersede and replace any prior understanding, agreement or statement of intent, in each case, written or oral, of any and every nature with respect to the subject matter hereof and thereof.

*Signature page follows*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**CBRE WWG STORAGE PARTNERS JV III, LLC**

By: **CPUS WWG STORAGE PARTNERS, LP**, a Delaware limited partnership

By: **CPUS WWG STORAGE PARTNERS GP, LLC**, its general partner

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

GREAT VALUE STORAGE, LLC

By:_____

Name: _____

Title: _____

## SCHEDULE A
Services

- During the Transition Period, the Manager and/or its applicable Affiliates shall provide the following services and shall not in any way impede or delay Purchaser's taking physical possession of the Transferred Assets, including without limitation, the Facilities:

  - Place Purchaser in physical possession of all Transferred Assets (except to the extent such Transferred Assets exist only in electronic copy or intangible form), including the Assigned Contracts, Customer Data and Tangible Personal Property (including without limitation, all computers included in the Tangible Personal Property, which shall be located at a Facility), on the Closing Date.

  - As soon as possible following the date of this Agreement, but in any event prior to the filing of the Assumption Notice, provide access to electronic copies of all Assignable Contracts, including without limitation, all tenant leases, and deliver hard copies of such Assigned Contracts as Purchaser may request in writing (to the extent such hard copies are in existence) at Closing.

  - From time to time, promptly upon written request by Purchaser, provide an updated rent roll report, management summary report and occupancy statistics report, as well as financial reports, including accounts payable, accounts receivable, revenues and expenses, in each case, for each Facility.

  - Provide Purchaser with copies of or access to all Customer Data as soon as practicable following the date of this Agreement.

  - From time to time as requested by Purchaser, provide access to the Manager's and/or its Affiliate's SiteLink management system files in order to integrate Business data into the Purchaser's Yardi property management system, and provide any additional documentation that may be required by either SiteLink or Yardi to effectuate the transfer and integration.

  - As soon as possible following the date of this Agreement, but in any event prior to the filing of the Assumption Notice, provide copies of or access to all customer property protection plan agreements and related data to Purchaser.

  - As soon as possible following the date of this Agreement, but in any event no fewer than 15 Business Days prior to the Closing Date, provide access to all store personnel, district and regional management (collectively, "**Facility Workers**") for employment interviews and such employment information related to or regarding such personnel and their employment as Purchaser may reasonably request.

  - Promptly following the date of this Agreement, provide a list of each Facility Worker (including name of employing or engaging entity, title, position, start date, whether active or on a leave of absence) and (ii) compensation (listing annual

salary, hourly rate, or consulting fee) and bonus opportunity (if applicable) of each Facility Worker.

o On the Closing Date, provide keys and access codes for each Facility.

o Promptly following the date of this Agreement provide such information on gate and security systems for each Facility as Purchaser may reasonably request, plus on the Closing Date, provide alarm codes for each Facility and any related information needed to access and operate the Facility.

o Promptly following the date of this Agreement, a schedule of all utility providers at each facility, plus on the Closing Date, provide account information for utility providers at each Facility.

o As soon as possible following the date of this Agreement, provide a list of vendors and copies of vendor contracts for each Facility, including but not limited to, elevator service, landscaping, snow removal, HVAC service, pest control, fire monitoring, waste management/trash, etc.

o As soon as possible following the date of this Agreement, provide a schedule of all Tangible Personal Property included in the Transferred Assets, including the location of each item of Tangible Personal Property and indicate whether such item of Tangible Personal Property is owned or leased.

o On the Closing Date, deliver to Purchaser a certificate of title, duly endorsed by the applicable member of the Seller Group, and if applicable, keys and registration, for each applicable item of Tangible Personal Property included in the Transferred Assets, and provide any such documentation as may be required by the applicable Department of Transportation or other authority to effectuate a transfer of ownership and title.

o As soon as possible following the date of this Agreement, copies of all roof warranties, HVAC warranties and any other warranties relating to the Business, the Facilities or the Transferred Assets.

o Promptly following the date of this Agreement, any cell tower / antenna lessee contact information and any documentation relating thereto.

o Promptly following the date of this Agreement, any billboard agreements/lease information and any documentation relating thereto.

o Promptly following the date of this Agreement, copies of any commercial retail space leases, with originals to be delivered on the Closing Date.

o No fewer than three (3) Business Days prior to Closing, passwords for fire and burglary alarms, and dates of last inspections.

- o Promptly following the date of this Agreement, copies of all apartment or residential leases, with originals to be delivered on the Closing Date.

- o Promptly following the date of this Agreement, any outstanding invoices for open maintenance, repairs or capital expenditures.

- o On the Closing Date, all login passwords for onsite computers.

- o Promptly following the date of this Agreement, copies of business licenses required by all state and local authorities or other Governmental Authority for each Facility.

- o Promptly following the date of this Agreement, copies of all elevator and building permits, with originals to be delivered on the Closing Date.

- o No later than the evening prior to Closing, transfer any bank deposits or structure automatic payments such that any rent payments received on the day of Closing will belong to Purchaser.

- o Credit card terminals, auto-charge, and online payments should be disengaged at the close of business the day before Closing.

- o On the Closing Date, remove all Facilities from the Great Value Storage website.

- o Effective as of the Closing, cancel any existing advertising agreements for any medium, whether online, printed or otherwise that apply to the Facilities.

- o Effective as of the Closing Date, transfer ownership of any listings on the following (or similar) services/directories/feeds: Google My Business Listings, Yahoo! Local, Bing Business Center, Facebook, Yext, Axciom, Foursquare, Infogroup, CityGrid/CitySearch, Localeze, Sparefoot.

- o On or prior to the Closing Date, provide access to pending insurance claims and/or facilitate the transfer of such claims to Purchaser by Closing.

- o As soon as possible following the date of this Agreement, a legal description of each parcel of Owned Real Property.

- o As soon as possible following the date of this Agreement, a list of all Assignable Contracts.

A-3

*Final Form*

**PURCHASER SCHEDULES**

**to the**

**ASSET PURCHASE AGREEMENT**

**by and between**

**CBRE WWG STORAGE PARTNERS JV III, LLC, as Purchaser,**

**and**

**GVS PORTFOLIO I C, LLC, as Parent**

**and**

**each of the entities listed on Exhibit A signatory thereto, collectively with Parent, as Sellers,**

**Dated as of January 18, 2022**

These Purchaser Schedules dated January 18, 2022, (the "**Schedules**") are delivered in connection with that that certain Asset Purchase Agreement (the "**Agreement**"), dated as of January 18, 2022, by and among CBRE WWG Storage Partners JV III, LLC, a Delaware limited liability company ("**Purchaser**"), GVS Portfolio I C, LLC, a Delaware limited liability company (the **"Parent"**), and each of the entities listed on Schedule A and signatory thereto (the "**Subsidiaries**" and, collectively with Parent, the "**Seller Group**" or the "**Sellers**").

These Schedules are qualified in their entirety by reference to the provisions of the Agreement. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent such exception to such other representation or warranty is readily apparent on its face. Disclosure of any item on any Schedule shall not constitute an admission or indication that any such item is required to be disclosed, or that such item or matter is material or has resulted in or will result in a material adverse effect on the ability of Purchaser to perform its obligations under the Agreement or otherwise prevent, hinder or delay the consummation of the Transactions or that the included items or actions are not in the ordinary course of business. No disclosure on a Schedule relating to a possible breach or violation of any Contract, Law or Order shall be construed as an admission or indication that a breach or violation exists or has actually occurred.

The disclosures in these Schedules expressly refer to a section or subsection of the Agreement; provided, however, that disclosures in a portion of these Schedules expressly referring to a section or subsection of the Agreement may incorporate by specific reference the disclosures in these Schedules with respect to any other section or subsection of the Agreement; provided, further, that any fact or circumstance disclosed with respect to a particular section or subsection of theses Schedules will be deemed adequately disclosed in another part of these Schedules as an exception to another representation, warranty, covenant or agreement to the extent that it is

reasonably apparent on the face of such disclosure that such disclosure is also an exception of such other representation, warranty, covenant or agreement.

Any capitalized terms used but not defined herein shall be defined as set forth in the Agreement.

## Schedule 4.3

### No Conflict: Required Filings and Consents

(i)

      None.

(ii)

      None.

(iii)

      None.

(iv)

      None.

(v)

      None.

## Schedule 4.6

## Litigation

(a)

      None.

(b)

      None.

## Schedule 4.7

### Brokers and Finders

None.

*Final Form*

# SELLER DISCLOSURE SCHEDULES
## TO THE
## ASSET PURCHASE AGREEMENT

THESE DISCLOSURE SCHEDULES (these "Disclosure Schedules") have been prepared in connection with and are delivered pursuant to the Asset Purchase Agreement (the "Agreement"), dated as of January 18, 2022, by and among CBRE WWG Storage Partners JV III, LLC, a Delaware limited liability company ("Purchaser"), GVS Portfolio I C, LLC, a Delaware limited liability company and each of the entities listed on Schedule A and signatory to the Agreement (collectively, the "Sellers"). Capitalized terms used but not otherwise defined in these Disclosure Schedules shall have the meanings specified in the Agreement. These Disclosure Schedules are delivered pursuant to, and subject to the terms and conditions of the Agreement. Headings have been inserted in these Disclosure Schedules for the convenience of reference only and shall not affect the construction or interpretation of any of the provisions of the Agreement or these Disclosure Schedules.

Any matter or item disclosed on one Disclosure Schedule shall be deemed to have been disclosed on each other Disclosure Schedule to the extent such exception to such other representation or warranty is readily apparent on its face. Disclosure of any item on any Disclosure Schedule shall not constitute an admission or indication that any such item is required to be disclosed, or that such item or matter is material or has resulted in or will result in a Material Adverse Effect or that the included items or actions are not in the ordinary course of business. No disclosure on a Disclosure Schedule relating to a possible breach or violation of any Contract, Law or Order shall be construed as an admission or indication that a breach or violation exists or has actually occurred.

The inclusion of any reference to $ shall mean U.S. dollars, which is the currency used for all purposes in these Disclosure Schedules. The specification of any dollar amount in these Disclosure Schedules is not intended and shall not be deemed to be an admission or acknowledgement of the materiality of such amounts or items, nor shall the same be used in any dispute or controversy between the parties hereto to determine whether any obligation, item or matter (whether or not described herein or included in any schedule) is or is not material for purposes of these Disclosure Schedules.

## Section 2.1(h)

**Transferred Assets – Vehicles**

1. None.

**Section 2.2(b)**

**Excluded Assets - Excluded IP**

Trademarks, service marks, trade names (including fictitious, assumed and d/b/a names), slogans, or logos, as well as all abbreviations, variations or derivations thereof:
- Great Value Storage
- Value Is Our Middle Name
- 
- 
- 
- 
- GVS
- GVS Portfolio
- WC Mississippi
- GVS Nevada
- GVS Ohio
- GVS Missouri
- GVS New York
- GVS Texas
- GVS Indiana
- GVS Tennessee
- GVS Illinois
- GVS Colorado

Domain Names, and applicable web pages:
- www.greatvaluestorage.com

Social Media Accounts, including all rights in such social media accounts and applicable social media pages:

- Facebook.com/GreatValueStorage/
- youtube.com/channel/UCRN8lyU0zlgxx7pFPNKbMww
- Twitter.com/gvs_storage
- Twitter.com/storagegvs
- Pinterest.com/followgvs

## Schedule 2.2(k)

### Excluded Assets - Avoidance Actions

1. Claims that may arise under section 549 of the Bankruptcy Code, except any claims against Purchaser or any Affiliate of Purchaser

2. Claims against third parties necessary to obtain compliance with the Sellers' obligations as debtors in possession, to deliver the Transferred Assets under the Agreement, to effectuate its plan of reorganization or which may be used as offsets or counterclaims to any claim, in each case, other than any claims against Purchaser or any Affiliate of Purchaser

## Schedule 2.2(l)

### Excluded Asset - Rights; Claims; Causes of Action

1. Claims that may arise under section 549 of the Bankruptcy Code, except any claims against Purchaser or any Affiliate of Purchaser

2. Claims against third parties necessary to obtain compliance with the Sellers' obligations as debtors in possession, to deliver the Transferred Assets under the Agreement, to effectuate its plan of reorganization or which may be used as offsets or counterclaims to any claim, in each case, other than any claims against Purchaser or any Affiliate of Purchaser

## Schedule 3.3

### No Conflict; Required Filings and Consents

1. None.

## Schedule 3.4

### Compliance with Laws; Permits

(a)

    (i)  None.

    (ii) The items listed on Schedule 3.8 are incorporated herein by reference.

(b)

    (i)     None.

    (ii)    None.

## Schedule 3.6(a)

## Real Property

| | Asset | Address | City | State | Owner |
|---|---|---|---|---|---|
| 1. | Aurora | 443 Laredo Street | Aurora | CO | GVS Colorado Holdings I, LLC |
| 2. | Commerce City | 7273 Kearney Street | Commerce | CO | GVS Colorado Holdings I, LLC |
| 3. | Urbana | 1710 Cunningham | Urbana | IL | GVS Illinois Holdings I, LLC |
| 4. | Champaign | 2202 N Market Street | Champaign | IL | GVS Illinois Holdings I, LLC |
| 5. | Post Road | 3380 N Post Rd | Indianapolis | IN | GVS Indiana Holdings I, LLC |
| 6. | Marion Ridge | 9600 Marion Ridge | Kansas City | MO | GVS Missouri Holdings I, LLC |
| 7. | Brandon | 1661 W Government Cove | Brandon | MS | WC Mississippi Storage Portfolio I, LLC |
| 8. | Flowood | 111 N. Layfair | Flowood | MS | WC Mississippi Storage Portfolio I, LLC |
| 9. | Hattiesburg | 2033 Oak Grove Road | Hattiesburg | MS | WC Mississippi Storage Portfolio I, LLC |
| 10. | Las Vegas | 1441 Nellis Blvd | Las Vegas | NV | GVS Nevada Holdings I, LLC |
| 11. | Hyde Park | 1594 Route 9G | Hyde Park | NY | GVS New York Holdings I, LLC |
| 12. | Newburgh | 765 South St | Newburgh | NY | GVS New York Holdings I, LLC |
| 13. | Boardman | 7986 Southern Blvd | Boardman | OH | GVS Ohio Holdings I, LLC |
| 14. | Westpark | 60 Westpark Rd | Centerville | OH | GVS Ohio Holdings I, LLC |
| 15. | Congress Park | 435 Congress Park Dr | Centerville | OH | GVS Ohio Holdings I, LLC |
| 16. | Tamarack Circle | 5301 Tamarack Circle | Columbus | OH | GVS Ohio Holdings II, LLC |
| 17. | Minerva Park | 5199 Westerville Road | Columbus | OH | GVS Ohio Holdings II, LLC |
| 18. | Georgesville | 1330 Georgesville Road | Columbus | OH | GVS Ohio Holdings II, LLC |
| 19. | Trotwood | 3785 Shiloh Springs Rd | Dayton | OH | GVS Ohio Holdings I, LLC |
| 20. | Dayton | 426 N Smithville Rd | Dayton | OH | GVS Ohio Holdings I, LLC |
| 21. | Polaris | 9984 S. Old State Road | Lewis Center | OH | GVS Ohio Holdings II, LLC |
| 22. | Mansfield | 1585 Lexington Ave | Mansfield | OH | GVS Ohio Holdings II, LLC |
| 23. | Mason | 4145 State Rt 741 | Mason | OH | GVS Ohio Holdings I, LLC |
| 24. | Miamisburg | 8501 Springboro Pike | Miamisburg | OH | GVS Ohio Holdings I, LLC |
| 25. | Taylor Road | 7821 Taylor Rd | Reynoldsburg | OH | GVS Ohio Holdings I, LLC |
| 26. | Tussing Road | 7200 Tussing Road | Reynoldsburg | OH | GVS Ohio Holdings II, LLC |
| 27. | Worthington | 580 E. Dublin Granville Road | Worthington | OH | GVS Ohio Holdings II, LLC |
| 28. | Youngstown | 123 S Meridian Rd | Youngstown | OH | GVS Ohio Holdings I, LLC |
| 29. | Lamar | 3951 Highway 78 | Memphis | TN | GVS Tennessee Holdings I, LLC |
| 30. | Covington Pike | 1961 Covington Pike | Memphis | TN | GVS Tennessee Holdings I, LLC |
| 31. | Texas Storage Park | 10013 RR 620 N | Austin | TX | GVS Texas Holdings II, LLC |
| 32. | Allsafe | 7116 S IH-35 | Austin | TX | GVS Texas Holdings I, LLC |
| 33. | Garth | 3412 Garth Rd | Baytown | TX | GVS Texas Holdings I, LLC |
| 34. | Canyon Lake | 13825 FM 306 | Canyon Lake | TX | GVS Texas Holdings I, LLC |
| 35. | Cedar Park | 16905 Indian Chief Dr | Cedar Park | TX | GVS Texas Holdings I, LLC |
| 36. | Production | 4641 Production Dr | Dallas | TX | GVS Texas Holdings I, LLC |
| 37. | Skillman | 9530 Skillman St | Dallas | TX | GVS Texas Holdings II, LLC |
| 38. | Samuell | 4311 Samuell Blvd | Dallas | TX | GVS Texas Holdings II, LLC |
| 39. | Marie | 4806 Marie Ln | Deer Park | TX | GVS Texas Holdings I, LLC |
| 40. | Fort Worth North | 613 N Fwy | Fort Worth | TX | GVS Texas Holdings I, LLC |

| | | | | | |
|---|---|---|---|---|---|
| 41. | Fort Worth South | 4901 S Fwy | Fort Worth | TX | GVS Texas Holdings I, LLC |
| 42. | Kuykendahl | 15300 Kuykendahl Road | Houston | TX | GVS Texas Holdings II, LLC |
| 43. | Antoine | 5550 Antoine Dr | Houston | TX | GVS Texas Holdings II, LLC |
| 44. | Westward | 6250 Westward Ln | Houston | TX | GVS Texas Holdings II, LLC |
| 45. | Boone | 8801 Boone Rd | Houston | TX | GVS Texas Holdings II, LLC |
| 46. | Cook | 8450 Cook Rd | Houston | TX | GVS Texas Holdings II, LLC |
| 47. | Harwin | 9951 Harwin Rd | Houston | TX | GVS Texas Holdings II, LLC |
| 48. | Hempstead | 10640 Hempstead Rd | Houston | TX | GVS Texas Holdings II, LLC |
| 49. | Highway 249 | 14318 Highway 249 | Houston | TX | GVS Texas Holdings II, LLC |
| 50. | Beechnut | 11702 Beechnut St | Houston | TX | GVS Texas Holdings I, LLC |
| 51. | Rosslyn | 5811 N Houston Rosslyn Rd | Houston | TX | GVS Texas Holdings I, LLC |
| 52. | Wirt Rd | 2150 Wirt Rd | Houston | TX | GVS Texas Holdings I, LLC |
| 53. | West Hardy | 16530 W Hardy St | Houston | TX | GVS Texas Holdings I, LLC |
| 54. | Alabonson | 8320 Alabonson Rd | Houston | TX | GVS Texas Holdings I, LLC |
| 55. | Fairmont I | 10601 W Fairmont Pky | La Porte | TX | GVS Texas Holdings I, LLC |
| 56. | Leander | 2407 S Hwy 183 | Leander | TX | GVS Texas Holdings I, LLC |
| 57. | Mesquite | 920 Hwy 80 East | Mesquite | TX | GVS Texas Holdings II, LLC |
| 58. | Fairmont II | 941 Fairmont Pky | Pasadena | TX | GVS Texas Holdings I, LLC |
| 59. | San Benito | 1151 E Expressway 83 | San Benito | TX | GVS Texas Holdings I, LLC |
| 60. | Lowry | 9010 E.F. Lowry Ewy | Texas City | TX | GVS Texas Holdings II, LLC |
| 61. | Gulf Freeway | 410 N IH-45 | Texas City | TX | GVS Texas Holdings I, LLC |
| 62. | Bay Street | 2502 Bay St | Texas City | TX | GVS Texas Holdings I, LLC |
| 63. | Loop 197 | 1910 25th Ave N | Texas City | TX | GVS Texas Holdings I, LLC |
| 64. | Timkin | 632 Timkin Rd | Tomball | TX | GVS Texas Holdings I, LLC |

**Schedule 3.8**

**Taxes**

1.  Judgment Lien, filed September 6, 2019 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $158.45 (2019 SCJ 159579).

2.  Judgment Lien, filed November 22, 2019 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $7,160.89 (2019 SCJ 162717).

3.  Judgment Lien, filed March 27, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the Sate of Ohio in the amount of $1,166.45 (2020 SCJ 172479).

4.  Judgment Lien, filed March 27, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $1,321.11 (2020 SCJ 172480).

5.  Judgment Lien, filed March 27, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $2,294.53 (2020 SCJ 172481).

6.  Judgment Lien, filed March 27, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $1,044.49 (2020 SCJ 172482).

7.  Judgment Lien, filed March 27, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $924.99 (2020 SCJ 172483).

8.  Judgment Lien, filed April 20, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $11,716.41 (2020 SCJ 173194).

9.  Judgment Lien, filed April 3, 2020 in the Delaware County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio Department of Taxation in the amount of $2,235.83 (2020 TL 22352).

10. Judgment Lien, filed April 20, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $7,476.75 (2020 SCJ 173195).

11. Judgment Lien, filed April 20, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $5,671.85 (2020 SCJ 173196).

12. Judgment Lien, filed May 13, 2020 in the Delaware County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio Department of Taxation in the amount of $15,108.04 (2020 TL 22930).

13. Judgment Lien, filed May 15, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $16,546.41 (2020 SCJ 175774).

14. Judgment Lien, filed April 20, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $7,476.75 (2020 SCJ 173195).

15. Judgment Lien, filed May 19, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $8,593.87 (2020 SCJ 175825).

16. Judgment Lien, filed May 19, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $6,026.94 (2020 SCJ 175826).

17. Judgment Lien, filed May 19, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $13,461.26 (2020 SCJ 175827).

18. Judgment Lien, filed May 19, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $6,540.01 (2020 SCJ 175828).

19. Judgment Lien, filed May 19, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $7,503.34 (2020 SCJ 175829).

20. Judgment Lien, filed June 3, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $14,638.73 (2020 SCJ 176344).

21. Judgment Lien, filed June 15, 2020 in the Delaware County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio Department of Taxation in the amount of $19,337.08 (2020 TL 23977).

22. Judgment Lien, filed June 15, 2020 in the Delaware County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio Department of Taxation in the amount of $15,336.90 (2020 TL 23978).

23. Judgment Lien, filed June 16, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $8,679.37 (2020 SCJ 180201).

24. Judgment Lien, filed June 16, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $6,615.50 (2020 SCJ 180244).

25. Judgment Lien, filed June 16, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $13,600.76 (2020 SCJ 180245).

26. Judgment Lien, filed June 23, 2020 in the Delaware County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio Department of Taxation in the amount of $13,129.13 (2020 TL 24086).

27. Judgment Lien, filed July 13, 2020 in the Delaware County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio Department of Taxation in the amount of $16,548.59 (2020 TL 24168).

28. Judgment Lien, filed July 22, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $7,122.28 (2020 SCJ 181059).

29. Judgment Lien, filed August 18, 2020 in the Delaware County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio Department of Taxation in the amount of $16,735.93 (2020 TL 24504).

30. Judgment Lien, filed September 16, 2020 in the Delaware County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio Department of Taxation in the amount of $18,001.95 (2020 TL 25098).

31. Judgment Lien, filed October 9, 2020 in the Delaware County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio Department of Taxation in the amount of $6,906.84 (2020 TL 25247).

32. Judgment Lien, filed May 8, 2020 at the Richland County Recorder, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio Department of Taxation in the amount of $6,424.59 (2020 CJS 1924).

33. Judgment Lien, filed June 12, 2020 at the Richland County Recorder, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio Department of Taxation in the amount of $6,521.92 (2020 CJS 1925).

34. Judgment Lien, filed June 22, 2020 at the Richland County Recorder, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio Department of Taxation in the amount of $5,583.05 (2020 CJS 2803).

35. Judgment Lien, filed July 10, 2020 at the Richland County Recorder, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio Department of Taxation in the amount of $7,037.15 (2020 CJS 2883).

36. Judgment Lien, filed July 13, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $9,291.89 (2020 SCJ 180962).

37. Judgment Lien, filed August 14, 2020 at the Richland County Recorder, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio Department of Taxation in the amount of $7,116.83 (2020 CJS 3163).

38. Judgment Lien, filed September 11, 2020 at the Richland County Recorder, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio Department of Taxation in the amount of $7,654.83 (2020 CJS 3652).

39. Judgment Lien, filed October 9, 2020 at the Richland County Recorder, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio Department of Taxation in the amount of $3,826.37 (2020 CJS 3764).

40. Judgment Lien, filed November 13, 2020 at the Richland County Recorder, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio Department of Taxation in the amount of $380.47 (2020 CJS 4157).

41. State Tax Lien, filed October 20, 2020 in the Shelby County Register of Deeds, Tennessee against GVS Tennessee Holdings I, LLC in favor of the State of Tennessee Department of Revenue (20115067).

42. State Tax Lien, filed September 10, 2019 in the Court of Common Pleas of Mahoning County against GVS Ohio Holdings I LLC in favor of the Ohio Department of Taxation in the amount of $157.44 (2019 TL 02488).

43. State Tax Lien, filed March 30, 2020 in the Court of Common Pleas of Mahoning County against GVS Ohio Holdings I LLC in favor of the Ohio Department of Taxation in the amount of $1,536.87 (2020 TL 03121).

44. State Tax Lien, filed April 20, 2020 in the Court of Common Pleas of Mahoning County against GVS Ohio Holdings I LLC in favor of the Ohio Department of Taxation in the amount of $8,026.47 (2020 TL 03363).

45. State Tax Lien, filed May 18, 2020 in the Court of Common Pleas of Mahoning County against GVS Ohio Holdings I LLC in favor of the Ohio Department of Taxation in the amount of $9,264.67 (2020 TL 04309).

46. State Tax Lien, filed June 15, 2020 in the Court of Common Pleas of Mahoning County against GVS Ohio Holdings I LLC in favor of the Ohio Department of Taxation in the amount of $11,798.94 (2020 TL 06389).

47. State Tax Lien, filed June 15, 2020 in the Court of Common Pleas of Mahoning County against GVS Ohio Holdings I LLC in favor of the Ohio Department of Taxation in the amount of $9,405.20 (2020 TL 06390).

48. State Tax Lien, filed July 13, 2020 in the Court of Common Pleas of Mahoning County against GVS Ohio Holdings I LLC in favor of the Ohio Department of Taxation in the amount of $10,201.63 (2020 TL 06642).

49. State Tax Lien, filed August 31, 2020 in the Court of Common Pleas of Mahoning County against GVS Ohio Holdings I LLC in favor of the Ohio Department of Taxation in the amount of $4,803.46 (2020 TL 07341).

50. State Tax Lien, filed September 11, 2020 in the Court of Common Pleas of Mahoning County against GVS Ohio Holdings I LLC in favor of the Ohio Department of Taxation in the amount of $5,321.20 (2020 TL 08267).

51. State Tax Lien, filed October 13, 2020 in the Court of Common Pleas of Mahoning County against GVS Ohio Holdings I LLC in favor of the Ohio Department of Taxation in the amount of $5,012.80 (2020 TL 08555).

52. Judgment Lien, filed September 14, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $3,097.40 (2020 SCJ 182311).

53. Judgment Lien, filed September 14, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $3,455.20 (2020 SCJ 182959).

54. Judgment Lien, filed September 14, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $3,751.04 (2020 SCJ 182960).

55. Judgment Lien, filed September 14, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $3,408.67 (2020 SCJ 182989).

56. Judgment Lien, filed September 14, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $3,408.67 (2020 SCJ 183009).

57. Judgment Lien, filed September 16, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $4,555.52 (2020 SCJ 185014).

58. Judgment Lien, filed September 16, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $7,512.52 (2020 SCJ 185040).

59. Judgment Lien, filed September 16, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $3,417.43 (2020 SCJ 185041).

60. Judgment Lien, filed September 18, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $3,316.09 (2020 SCJ 185328).

61. Judgment Lien, filed September 18, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $6,952.51 (2020 SCJ 185347).

62. Judgment Lien, filed October 9, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $4,340.97 (2020 SCJ 185878).

63. Judgment Lien, filed October 9, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $3,529.43 (2020 SCJ 185879).

64. Judgment Lien, filed October 9, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $3,350.73 (2020 SCJ 185880).

65. Judgment Lien, issued May 9, 2020 in the Court of Common Pleas of Warren County against GVS Ohio Holdings I LLC in favor of the Ohio Department of Taxation in the amount of $6,854.75 (20CJ003045).

66. Judgment Lien, issued June 13, 2020 in the Court of Common Pleas of Warren County against GVS Ohio Holdings I LLC in favor of the Ohio Department of Taxation in the amount of $5,996.95 (20CJ004434).

67. Judgment Lien, issued July 4, 2020 in the Court of Common Pleas of Warren County against GVS Ohio Holdings I LLC in favor of the Ohio Department of Taxation in the amount of $7,483.09 (20CJ004701).

68. Judgment Lien, issued August 15, 2020 in the Court of Common Pleas of Warren County against GVS Ohio Holdings I LLC in favor of the Ohio Department of Taxation in the amount of $3,117.21 (20CJ005225).

69. Judgment Lien, issued September 5, 2020 in the Court of Common Pleas of Warren County against GVS Ohio Holdings I LLC in favor of the Ohio Department of Taxation in the amount of $3,611.85 (20CJ005782).

70. Judgment Lien, issued October 3, 2020 in the Court of Common Pleas of Warren County against GVS Ohio Holdings I LLC in favor of the Ohio Department of Taxation in the amount of $3,282.16 (20CJ005927).

71. Judgment Lien, issued August 31, 2019 in the Court of Common Pleas of Warren County against GVS Ohio Holdings I LLC in favor of the Ohio Department of Taxation in the amount of $154.89 (20CJ008275).

72. Judgment Lien, issued November 7, 2020 in the Court of Common Pleas of Warren County against GVS Ohio Holdings I LLC in favor of the Ohio Department of Taxation in the amount of $2,921.07 (20CJ009633).

73. Judgment Lien, filed March 13, 2020

74. Judgment, filed May 8, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $8,884.62 (20JG-05-052801).

75. Judgment, filed May 8, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $9,537.35 (20JG-05-052802).

76. Judgment, filed May 8, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $9,791.03 (20JG-05-052803).

77. Judgment, filed May 8, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $11,438.64 (20JG-05-053022).

78. Judgment, filed May 8, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $11,797.18 (20JG-05-053023).

79. Judgment, filed June 12, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $11,977.45 (20JG-05-077674).

80. Judgment, filed June 12, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $9,939.39 (20JG-06-077676).

81. Judgment, filed June 12, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $11,613.42 (20JG-06-077677).

82. Judgment, filed June 12, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $9,019.20 (20JG-06-077679).

83. Judgment Lien, filed June 15, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $10,641.87 (2020 SCJ 179954).

84. Judgment Lien, filed June 15, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in

the amount of $16,877.38 (2020 SCJ 179955).

85. Judgment Lien, filed June 15, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $8,134.23 (2020 SCJ 179956).

86. Judgment, filed June 19, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $8,288.09 (20JG-06-080105).

87. Judgment, filed June 19, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $8,508.56 (20JG-06-080106).

88. Judgment, filed June 19, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $10,253.25 (20JG-06-080107).

89. Judgment, filed June 19, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $7,720.90 (20JG-06-080108).

90. Judgment, filed June 19, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $9,941.62 (20JG-06-080109).

91. Judgment Lien, filed June 22, 2020 in the Court of Common Pleas, Montgomery County Ohio Civil Division against GVS Ohio Holdings I LLC in favor of the State of Ohio in the amount of $5,279.84 (2020 SCJ 180525).

92. Judgment, filed July 10, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $12,530.91 (20JG-06-083039).

93. Judgment, filed July 10, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $9,731.75 (20JG-06-083040).

94. Judgment, filed July 10, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $12,923.66 (20JG-05-083041).

95. Judgment, filed July 10, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $10,724.58 (20JG-05-083042).

96. Judgment, filed August 24, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation

in the amount of $9,736.63 (20JG-05-088569).

97. Judgment, filed August 24, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $10,846.05 (20JG-05-088716).

98. Judgment, filed June 19, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $8,508.56 (20JG-06-080106).

99. Judgment, filed June 19, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $10,253.25 (20JG-06-080107).

100. Judgment, filed June 19, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $7,720.99 (20JG-06-080108).

101. Judgment, filed June 19, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $9,941.62 (20JG-06-080109).

102. Judgment, filed July 10, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $12,530.91 (20JG-06-083039).

103. State Tax Lien, filed August 24, 2020 against GVS Ohio Holdings II LLC in favor of the Ohio State Department of Taxation in the amount of $10,564.53 (20 JG 088782).

104. Warrant for Collection of Tax, filed September 21, 2020 against GVS Indiana Holdings I LLC by the State of Indiana Department of Revenue in the amount of $1,317.30 (Warrant Number 30071417).

105. Judgment, filed August 24, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $12,672.18 (20JG-05-088783).

106. Judgment, filed September 11, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $10,586.02 (20JG-09-099433).

107. Judgment, filed September 11, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $11,665.98 (20JG-09-099434).

108. Judgment, filed September 11, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $13,630.82 (20JG-09-099435).

109. Judgment, filed September 11, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $11,363.68 (20JG-09-099436).

110. Judgment, filed September 11, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $14,054.51 (20JG-09-099436).

111. Judgment, filed September 18, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $10,515.20 (20JG-09-100187).

112. Judgment, filed October 9, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $4,765.11 (20JG-10-102186).

113. Judgment, filed October 9, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $5,352.17 (20JG-10-102187).

114. Judgment, filed October 9, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $4,542.21 (20JG-10-102189).

115. Judgment, filed October 9, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $6,038.73 (20JG-10-102190).

116. Judgment, filed October 16, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $5,709.39 (20JG-10-103364).

117. Judgment, filed October 16, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $4,198.40 (20JG-10-103365).

118. Judgment, filed November 13, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $5,783.79 (20JG-11-115389).

119. Judgment, filed November 13, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $4,791.61 (20JG-11-115390).

120. Judgment, filed November 13, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $4,134.42 (20JG-11-115391).

121. Judgment, filed November 13, 2020 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $4,183.18 (20JG-11-115392).

122. Judgment, filed March 5, 2021 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $5,384.06 (21JG-03-023224).

123. Judgment, filed March 5, 2021 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $5,366.91 (21JG-03-023243).

124. Judgment, filed March 5, 2021 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $4,962.28 (21JG-03-023293).

125. Judgment, filed March 5, 2021 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $4,338.35 (21JG-03-023294).

126. Judgment, filed March 5, 2021 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $4,169.91 (21JG-03-023295).

127. Judgment, filed March 5, 2021 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $6,390.27 (21JG-03-023297).

128. Judgment, filed March 5, 2021 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $5,214.90 (21JG-03-023298).

129. Judgment, filed March 5, 2021 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $303.23 (21JG-03-023299).

130. Judgment, filed March 5, 2021 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $5,847.65 (21JG-03-023300).

131. Judgment, filed March 5, 2021 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $4,889.07 (21JG-03-023339).

132. Judgment, filed March 5, 2021 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $129.47 (21JG-03-023340).

133. Judgment, filed March 5, 2021 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $4,004.96 (21JG-03-023341).

134. Judgment, filed March 5, 2021 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $5,658.28 (21JG-03-023342).

135. Judgment, filed March 5, 2021 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $4,685.33 (21JG-03-023343).

136. Judgment, filed March 5, 2021 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $5,963.73 (21JG-03-023344).

137. Judgment, filed March 5, 2021 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $4,087.13 (21JG-03-023345).

138. Judgment, filed March 5, 2021 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $4,938.14 (21JG-03-023378).

139. Judgment, filed March 5, 2021 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $5,812.59 (21JG-03-023379).

140. Judgment, filed March 5, 2021 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $5,074.35 (21JG-03-023380).

141. Judgment, filed March 5, 2021 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $4,159.41 (21JG-03-023381).

142. Judgment, filed March 5, 2021 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $5,950.02 (21JG-03-023382).

143. Judgment, filed March 5, 2021 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $301.45 (21JG-03-023383).

144. Judgment, filed March 5, 2021 in the Franklin County Court of Common Pleas, Ohio against GVS Ohio Holdings II, LLC in favor of the Ohio State Department of Taxation in the amount of $3,994.41 (21JG-03-023384).

## Schedule 3.10

### Brokers and Finders

1. Letter Agreement, by and between Sidley Austin LLP in its capacity as counsel to GVS Portfolio I C, LLC, along with its direct and indirect subsidiaries, and Houlihan Lokey Capital, Inc., dated June 12, 2021.

## Schedule 6.4

### Third Party Notices and Consents

1.  None.