SIDLEY AUSTIN LLP
Thomas R. Califano (10369867)
Charles M. Persons (24060413)
Maegan Quejada (24105999)
Jeri Leigh Miller (24102176)
Juliana L. Hoffman (24106103)
2021 McKinney Ave
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

*Counsel for the Debtors and
Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| GVS TEXAS HOLDINGS I, LLC, *et al.*, [1] | Case No. 21-31121-MVL |
| Debtors. | **(Jointly Administered)** |

## SECOND AMENDED DISCLOSURE STATEMENT
## FOR THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF
## GVS TEXAS HOLDINGS I, LLC AND ITS DEBTOR AFFILIATES

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT APPROVES A DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: GVS Texas Holdings I, LLC (7458); GVS Texas Holdings II, LLC (1225); GVS Portfolio I, LLC (6441); GVS Portfolio I B, LLC (7171); GVS Portfolio I C, LLC (3093); WC Mississippi Storage Portfolio I, LLC (0423); GVS Nevada Holdings I, LLC (4849); GVS Ohio Holdings I, LLC (6449); GVS Missouri Holdings I, LLC (5452); GVS New York Holdings I, LLC (5858); GVS Indiana Holdings I, LLC (3929); GVS Tennessee Holdings I, LLC (5909); GVS Ohio Holdings II, LLC (2376); GVS Illinois Holdings I, LLC (9944); and GVS Colorado Holdings I, LLC (0408). The location of the Debtors' service address is: 814 Lavaca Street, Austin, Texas 78701.

## IMPORTANT INFORMATION FOR YOU TO READ

GVS Texas Holdings I, LLC ("**GVS Texas**") and its affiliated debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" or the "**Company**") are providing you with the information in this *Second Amended Disclosure Statement for Debtors' Second Amended Joint Chapter 11 Plan of GVS Texas Holdings I, LLC and its Debtor Affiliates* (as may be further amended, modified, altered, revised or supplemented from time to time, the "**Disclosure Statement**") because you are a creditor whose rights are governed by the Debtors' *Second Amended Joint Chapter 11 Plan of GVS Texas Holdings I, LLC and its Debtor Affiliates* [Docket No. 588] (as may be further amended, modified, altered, revised or supplemented from time to time, the "**Plan**") or are otherwise a party in interest in the Debtors' chapter 11 cases (the "**Chapter 11 Cases**"). Nothing in this Disclosure Statement may be relied upon or used by any Person for any other purpose.

The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan. There is no assurance that the United States Bankruptcy Court for the Northern District of Texas (the "**Court**") will confirm the Plan or, if the Court does confirm the Plan, that the conditions necessary for the Plan to become effective will be satisfied or otherwise waived.

The Board of Directors and sole corporate member of each Debtor approved the transactions contemplated by the Plan and described in this Disclosure Statement. The Debtors assert that the compromises contemplated under the Plan are fair and equitable, maximize the value of the Estates[2] and provide the best recovery to Holders of Claims and Interests.

## DISCLAIMER

NO HOLDER OF A CLAIM SHOULD RELY ON ANY INFORMATION RELATING TO THE DEBTORS, THEIR PROPERTY OR THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE ATTACHED EXHIBITS.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN. THE PLAN AND THIS DISCLOSURE STATEMENT WERE EACH PREPARED BASED UPON AND IN RELIANCE ON INFORMATION TO WHICH THE DEBTORS HAVE ACCESS, INCLUDING INFORMATION PROVIDED IN THE DEBTORS' SCHEDULES OF FINANCIAL AFFAIRS, STATEMENTS OF ASSETS AND LIABILITIES, AND MONTHLY OPERATING REPORTS. ALTHOUGH THE DEBTORS HAVE MADE EVERY EFFORT TO ENSURE THAT THIS SUMMARY PROVIDES ADEQUATE INFORMATION WITH RESPECT TO THE PLAN, IT DOES NOT PURPORT TO BE COMPLETE AND IS QUALIFIED TO THE EXTENT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

**ACCORDINGLY, EACH HOLDER OF A CLAIM SHOULD REVIEW THE PLAN IN ITS ENTIRETY.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016 (BUT HAS NOT BEEN APPROVED BY THE COURT AS COMPLYING WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OF THE DEBTORS AS TO HOLDERS OF CLAIMS AGAINST THE DEBTORS.**

**IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.**

**THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN**

RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.

ALL OF THE PROJECTED RECOVERIES TO CREDITORS ARE BASED UPON THE ANALYSIS PERFORMED BY THE DEBTORS AND THEIR PROFESSIONALS. ALTHOUGH THE DEBTORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN AND IN THE EXHIBITS ATTACHED HERETO, THE DEBTORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE INFORMATION.

THE DEBTORS CANNOT ASSURE YOU THAT THE DISCLOSURE STATEMENT, INCLUDING ANY EXHIBITS THERETO, THAT IS ULTIMATELY APPROVED BY THE COURT IN THE CHAPTER 11 CASE (I) WILL CONTAIN ANY OF THE TERMS DESCRIBED IN THIS DISCLOSURE STATEMENT; OR (II) WILL NOT CONTAIN DIFFERENT, ADDITIONAL OR MATERIAL TERMS THAT DO NOT APPEAR IN THIS DISCLOSURE STATEMENT. THE DEBTORS URGE EACH HOLDER OF A CLAIM TO (I) READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT (INCLUDING THE PLAN AND THE MATTERS DESCRIBED AS "RISK FACTORS" BELOW); AND (II) TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED THE LIQUIDATION ANALYSIS DESCRIBED HEREIN. THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION IN CONNECTION WITH THE PLAN OR THIS DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE ANY CLAIMS AND CAUSES OF ACTION AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIED ANY SUCH CLAIMS OR OBJECTIONS TO SUCH CLAIMS. HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, SECURITIES, OR TAX ADVICE AND SHOULD CONSULT THEIR OWN ADVISORS.

UNLESS THE CONTEXT REQUIRES OTHERWISE, REFERENCES TO "*WE*," "*OUR*" AND "*US*" ARE TO THE DEBTORS.

THE DEBTORS RECOMMEND THAT CREDITORS AND INTEREST HOLDERS SUPPORT THE PLAN. IT IS THE OPINION OF THE DEBTORS THAT THE TREATMENT OF CREDITORS AND INTEREST HOLDERS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE

**ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTORS.  ACCORDINGLY, THE DEBTORS ASSERT THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS.**

**TABLE OF CONTENTS**

I.      EXECUTIVE SUMMARY ...................................................................................1

        A.      Introduction.............................................................................................1

        B.      Proposed Plan Transactions ....................................................................2

                1.      Overview of the Plan ...................................................................3

                2.      Sale...............................................................................................3

                3.      The Stalking Horse Bid and Transition Services Agreement ......4

                4.      Claim Estimation Procedures.......................................................5

                5.      Disputed Claims Reserve Account ...............................................5

                6.      Proposed Lender Resolutions .......................................................6

                7.      Payment in Full of Allowed Claims.............................................6

                8.      Management Agreements .............................................................6

                9.      General Settlement of Claims and Interests.................................6

                10.     Releases and Injunctions..............................................................6

        C.      Entitlement to Vote .................................................................................7

        D.      Plan Distributions....................................................................................8

        E.      Purpose of the Disclosure Statement and Notice to Creditors...............12

        F.      Amendments to the Plan .........................................................................13

II.     GENERAL INFORMATION ABOUT THE DEBTORS .................................13

        A.      Overview of the Debtors' Operations .....................................................13

        B.      Debtors' Executive Officer and Board of Directors ...............................14

        C.      The Property Manager .............................................................................15

        D.      The Cash Management System................................................................15

III.    THE DEBTORS' PREPETITION CAPITAL STRUCTURE............................16

        A.      Mortgage Loan.........................................................................................17

        B.      Mezzanine Loans .....................................................................................17

        C.      Prepetition Defaults Under the Capital Structure ..................................18

IV.     EVENTS LEADING TO THESE CHAPTER 11 CASES .................................19

        A.      The TIAA State Court Action..................................................................19

        B.      The Delaware Bankruptcy .......................................................................19

        C.      The Current Bankruptcy ..........................................................................20

                1.      Debtors' Need For Chapter 11 Relief..........................................20

                2.      Negotiations with Constituents ....................................................20

V.      CHAPTER 11 CASES .......................................................................................20

i

A. Overview of Chapter 11 ................................................................................20
B. Administration of These Chapter 11 Cases ...............................................21
  1. First Day Relief..........................................................................21
  2. Cash Collateral and the Motion to Strike....................................21
  3. Filing of Retention Applications and Related Motions ...............23
  4. Filing of the Schedules and Statements of Financial Affairs......24
  5. Creditors Committee....................................................................24
  6. Cash Management.........................................................................24
  7. Meeting of Creditors ...................................................................24
  8. Establishment of Bar Dates.........................................................25
  9. The RREF Adversary Proceeding................................................25
  10. Rule 2004 Exams .........................................................................26
  11. The Chapter 11 Trustee Motions and Governance Changes .......27
  12. Section 549 Investigation.............................................................30
  13. Other Litigation Matters..............................................................30
  14. Assumption and Rejection of Executory Contracts and Unexpired Leases ..........................................................................31
  15. Claims Estimation, Objections, and Resolutions........................31
  16. Exclusivity ..................................................................................38
VI. PLAN OF REORGANIZATION ............................................................................38
A. Administrative Expense Claims and Priority Claims ................................38
  1. Administrative Expense Claims...................................................38
  2. Professional Claims .....................................................................39
  3. Priority Tax Claims......................................................................40
B. Classification and Treatment of Claims and Interests ..............................40
  1. Classification of Claims and Interests..........................................40
  2. Treatment of Claims and Interests ..............................................41
  3. Special Provision Governing Unimpaired Claims.......................46
  4. Elimination of Vacant Classes ....................................................46
  5. Acceptance or Rejection of the Plan............................................47
  a. Presumed Acceptance of the Plan................................................47
  b. Voting Classes .............................................................................47
  6. Confirmation and 1129(b) of the Bankruptcy Code ....................47
C. Means for Implementation of the Plan.......................................................47
  1. General Settlement of Claims and Interests.................................47

ii

2. Bidding Process ........................................................................48
3. Sale...........................................................................................49
a. Cancellation of Existing Agreements ........................................49
4. Preservation of Causes of Action.............................................50
a. Maintenance of Causes of Action..............................................50
b. Preservation of All Causes of Action Not Expressly Settled or Released .50
5. Disputed Claims Reserve Account ...........................................51
6. Opt-Out Forms ..........................................................................51
7. Closing the Chapter 11 Cases ..................................................51
D. Liquidation Analysis..........................................................................52

VII. TREATMENT OF EXECUTORY CONTRACTS AND/OR UNEXPIRED LEASES....53
A. Assumption of Executory Contracts and/or Unexpired Leases ...........53
B. Claims Based on Rejection of Executory Contracts and/or Unexpired Leases .....54
C. Cure of Defaults for Assumed Executory Contracts and/or Unexpired Leases.....54
D. Preexisting Obligations to the Debtors Under Executory Contracts and/or Unexpired Leases........................................................................56
E. Insurance Policies .............................................................................56
F. Reservation of Rights........................................................................56
G. Contracts and Leases Entered Into After the Petition Date .................57

VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS .............57
A. Discharge of Claims and Termination of Interests ...........................57
B. Release of Liens................................................................................57
C. Release of Claims and Causes of Action ........................................58
1. Releases by the Debtors and Their Estates ...............................58
2. Release by Third Parties ............................................................59
D. Waiver of Statutory Limitations on Releases .....................................61
E. Exculpation ......................................................................................61
F. Injunction .........................................................................................62
G. Binding Nature of the Plan ...............................................................62
H. Protections Against Discriminatory Treatment ..................................63
I. Reimbursement or Contribution ......................................................63

IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN ...........................................................................................63
A. Conditions Precedent to the Effective Date.......................................63
B. Waiver of Conditions........................................................................65

C. Effect of Failure of Conditions ...............................................................65

D. Substantial Consummation ......................................................................65

X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN .................65

A. Modification and Amendments.................................................................65

B. Effect of Confirmation on Modifications ................................................65

C. Revocation or Withdrawal of Plan...........................................................66

XI. RETENTION OF JURISDICTION ....................................................................66

XII. MISCELLANEOUS PROVISIONS....................................................................68

A. Immediate Binding Effect........................................................................68

B. Additional Documents .............................................................................69

C. Payment of Statutory Fees.......................................................................69

D. Reservation of Rights...............................................................................69

E. Successors and Assigns............................................................................69

F. Notices .....................................................................................................69

G. Term of Injunctions or Stays....................................................................70

H. Entire Agreement.....................................................................................70

I. Exhibits and Annexes ..............................................................................70

J. Non-severability of Plan Provisions ........................................................71

K. Governing Law ........................................................................................71

L. Waiver or Estoppel ..................................................................................71

M. Closing of These Chapter 11 Cases .........................................................71

XIII. LIQUIDATION ANALYSIS.............................................................................71

XIV. FEASIBILITY AND BEST INTERESTS OF THE CREDITORS............................72

A. Feasibility of the Plan .............................................................................72

B. Best Interests of Creditors Test................................................................72

XV. PLAN CONFIRMATION AND CONSUMMATION..............................................72

A. The Confirmation Hearing .......................................................................73

B. Statutory Requirements for Confirmation ...............................................73

1. Acceptance by Impaired Classes .................................................73

2. Confirmation Without Acceptance by All Impaired Classes.....................74

XVI. RISK FACTORS IN CONNECTION WITH THE PLAN.......................................74

A. Bankruptcy Considerations......................................................................75

1. General..........................................................................................75

2. Objections to the Plan's Classification of Claims and Interests ...............75

3.  Non-Confirmation or Delay of Confirmation of the Plan..........................75

4.  Non-Occurrence of the Effective Date ......................................................76

5.  Conversion to Chapter 7 ..........................................................................76

6.  Impact of Chapter 11 Cases on the Debtors.............................................76

7.  Inability to Assume and Assign Executory Contracts and Unexpired Leases........................................................................................................77

8.  No Legal or Tax Advice is Provided to You by This Disclosure Statement ...................................................................................................................77

9.  Recoveries Subject to Contingencies.......................................................77

10. Ability to Discharge or Satisfy Prepetition Claims...................................77

11. Failure to Obtain Approval of Releases, Injunctions, and Exculpation.....78

12. Plan Based on Assumptions......................................................................78

B.  Certain Federal Tax Matters Relating to the Plan.................................................78

1.  Introduction..............................................................................................78

2.  U.S. Federal Income Tax Consequences to the Debtors...........................80

3.  U.S. Federal Income Tax Consequences to Holders of Allowed Claims ..80

4.  Information Reporting and Backup Withholding ......................................80

XVII.  RESERVATION OF RIGHTS ........................................................................81

XVIII. RECOMMENDATION AND CONCLUSION.................................................81

**EXHIBITS**

Exhibit A    *Second Amended Joint Chapter 11 Plan of GVS Texas Holdings I, LLC and its Debtors Affiliates*, dated January 26, 2022

Exhibit B    Debtors' Organizational Chart

Exhibit C    Liquidation Analysis

## I.    EXECUTIVE SUMMARY

On October 4, 2021, the Debtors in the above-captioned Chapter 11 Cases filed the original *Joint Chapter 11 Plan of Reorganization for GVS Texas Holdings I, LLC and its Debtor Affiliates* [Docket No. 207] and the original *Disclosure Statement for the Joint Plan of Reorganization for GVS Texas Holdings I, LLC and its Debtor Affiliates* [Docket No. 208]. On November 19, 2021, the Debtors filed the *Amended Joint Chapter 11 Plan of GVS Texas Holdings I, LLC and its Debtor Affiliates* [Docket No. 342] and the *Amended Disclosure Statement for the Joint Chapter 11 Plan of GVS Texas Holdings I, LLC and its Debtor Affiliates* [Docket No. 343]. On January 26, 2022, the Debtors filed the *Second Amended Joint Chapter 11 Plan of GVS Texas Holdings I, LLC and its Debtor Affiliates* [Docket No. 588] (as it may be further amended, modified or supplemented, and together with any exhibits or schedules thereto, the "Plan").

This Executive Summary is only a general overview of the Disclosure Statement and the material terms of, and transactions proposed by, the Plan. This Executive Summary is qualified in its entirety by the more detailed discussions herein and the exhibits attached hereto, including the Plan. The Debtors urge all parties to read this Executive Summary in conjunction with the Disclosure Statement and the Plan. A copy of the Plan is attached hereto as **Exhibit A**.

### A.    Introduction

The Debtors are direct and indirect owners of 64 self-storage facilities located in Colorado, Illinois, Indiana, Mississippi, Missouri, Nevada, New York, Ohio, Tennessee and Texas and are branded as Great Value Storage or "GVS." The Debtors are privately owned companies headquartered in Austin, Texas, and comprise part of a larger enterprise, known as the "GVS Portfolio." Since its founding nearly ten years ago, the GVS Portfolio has grown to, among other things, one of the largest multi-faceted self-storage brands in the country, with an aggregate of 30,811 units, totaling 4,103,764 square feet of facilities nationwide. The storage facilities offer amenities that cater to both personal and business storage needs.

The Debtors do not have employees; their day-to-day operations are conducted by an affiliate non-Debtor management company (the "Property Manager"). The Debtors' revenue is generated at the facility level from the rents collected at each of the properties. The rents are then deposited into accounts held in the name of Debtors and transferred into an account held in the name of GVS Texas and controlled by the Servicer of the Mortgage Loan (each as defined herein) on the Debtors' real property, as well as other operating fees and expenses. The 64 storage sites are located at the real property owned by one of 12 Debtor entities (each a "PropCo Debtor" and collectively, the "Propco Debtors").[3] The Propco Debtors are parties to the Mortgage Loan with an original principal amount of $110 million. The equity interests in the Propco Debtors is held by Debtor GVS Portfolio I, LLC, a Delaware limited liability company (the "Senior Mezz Debtor"). The Senior Mezz Debtor is obligated under the Senior Mezz Loan held by ESS-GV Holdings, LLC, with an original principal amount of $103 million as of the Petition Date. The

---

[3] The "PropCo Debtors" refer to the following Debtors: GVS Colorado Holdings I, LLC, GVS Illinois Holdings I, LLC, GVS Indiana Holdings I, LLC, GVS Missouri Holdings I, LLC, WC Mississippi Storage Portfolio I, LLC, GVS Nevada Holdings I, LLC, GVS New York Holdings I, LLC, GVS Ohio Holdings I, LLC GVS Ohio Holdings II, LLC, GVS Tennessee Holdings I, LLC, GVS Texas Holdings I, LLC, and GVS Texas Holdings II, LLC.

Senior Mezz Loan is secured primarily by the Senior Mezz Debtor's equity interests in the Propco Debtors. The Senior Mezz Debtor's equity interests are held, in turn, by GVS Portfolio I B, LLC, a Delaware limited liability company (the "Junior Mezz Debtor"). The Junior Mezz Debtor is obligated under the Junior Mezz Loan in the principal amount of $82 million. The Junior Mezz Loan was held as of the Petition Date by RREF III Storage, LLC ("RREF") and is secured primarily by the Junior Mezz Debtor's equity interest in the Senior Mezz Debtor.

Like most businesses, the Debtors have experienced financial and operational stress over the last 23 months due to the COVID-19 pandemic. Jurisdictional closures and government-imposed "stay-at-home" orders around the world nearly eliminated non-essential travel and reduced storage occupancies, thereby decreasing the Debtors' revenue stream at the outset of the pandemic. The effects of the pandemic and other facts, such as a non-monetary default that, as a result of the Debtors' Cash Management System and Cash Management Waterfall led to a series of defaults at the junior debt levels as a result of the Debtors' Cash Management System and Cash Management Waterfall (each as defined herein), and the threat of an imminent foreclosure, contributed to the Debtors' decision to commence these Chapter 11 Cases.

### B. Proposed Plan Transactions

The Debtors, in consultation with their advisors, have determined that a sale of substantially all of their Assets is the best path forward for the Debtors and their estates.[4] In addition, because the Debtors are self-financing the Chapter 11 Cases, the Debtors must move swiftly and not exceed their available liquidity. Recognizing the need to move expeditiously through chapter 11, on October 6, 2021, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures in Connection with the Sale of Substantially all of the Debtors' Assets; (II) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 213] (the "Bidding Procedures Motion") seeking Court approval of a timeline for a Sale process and certain bidding procedures (the "Original Bidding Procedures"), which were ultimately approved by entry of an order on November 10, 2021. *See Order (I) Approving Bidding Procedures in Connection with the Sale of Substantially all of the Debtors' Assets; (II) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Lease; and (III) Granting Related Relief* [Docket No. 318] (the "Original Bidding Procedures Order"). The Debtors moved for entry of an order (the "Revised Bidding Procedures Order") approving revised bid procedures [Docket No. 550] (the "Revised Bidding Procedures"). The Revised Bidding Procedures provide for, among other things, the Debtors' designation of a Stalking Horse Bidder and related Bid Protections (each as defined below). The Debtors intend to effectuate a Sale in accordance with the Bidding Procedures and, as may be ordered by the Court, the Revised Bidding Procedures, that will generate sufficient Sale Proceeds to fund the payment of Allowed Claims in full, with the excess if any provided to Holders of the Debtors' Interests.

In formulating the Plan, the Debtors and their advisors considered the current assumed value of the Debtors' Assets based on available information, the respective rights of claimholders

---

[4] Unless otherwise indicated in a particular Class, the classification of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors.

and the best course to maximize value for all constituents post-emergence. The Debtors assert, based in part on the Stalking Horse Bid, that the orderly Sale process set forth in the Revised Bidding Procedures will maximize the value of the Debtors' Estates, which will benefit all stakeholders more than a forced liquidation or a contested plan.

The key components of the Plan are described below.

### 1. Overview of the Plan

To ensure the Plan transactions contemplated herein maximize value for all stakeholders, the Debtors have obtained approval of the Original Bidding Procedures for the marketing and sale of their assets. The Original Bidding Procedures and, as may be ordered by the Court, the Revised Bidding Procedures, are incorporated into the Plan and will be implemented to effectuate the Sale, with the Net Sale Proceeds used to satisfy Claims and Interests in accordance with the Distribution Waterfall. Based on the Stalking Horse Bid, the Net Sale Proceeds are expected to be sufficient to satisfy the Allowed Claims of all creditors in full.

### 2. Sale

The Debtors' Assets will be marketed pursuant to the Original Bidding Procedures and, as may be ordered by the Court, the Revised Bidding Procedures. The actions to implement the Sale may include: (1) the execution and delivery of appropriate agreements or other documents that are consistent with the terms of the Plan and that satisfy the applicable requirements of law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state law; and (4) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan. The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.

The Debtors, in conjunction with their investment banker, Houlihan Lokey Capital, Inc. ("Houlihan"), have been engaged in a robust marketing process for the sale of the Debtors' Assets. As part of the Sale process, Houlihan contacted 229 potential investors, approximately 74 of whom executed non-disclosure agreements allowing them to gain access to the Debtors' virtual data room. Several of those parties engaged with the Debtors about the possibility of serving as a stalking horse bidder, with the remainder indicating continued interest if and when the Assets went to auction. Ultimately, the Debtors selected CBRE WWG Storage Partners JV III, LLC (the "Stalking Horse Bidder") as their stalking horse bidder, determining that such bid best served the purpose of promoting a competitive sale process and maximizing the value achieved by the Sale process. The Debtors and the Stalking Horse Bidder negotiated an arms'-length baseline bid for the aggregate total cash consideration of $450 million (the "Stalking Horse Bid"), which will be sufficient to pay all Allowed Claims of the creditors in full. The Debtors approved the selection

of the Stalking Horse Bidder during a board meeting and the terms of the Stalking Horse Bid, as set forth in the Stalking Horse APA.

### 3. The Stalking Horse Bid and Transition Services Agreement

At a hearing on January 31, 2022, the Debtors will seek Court approval of the Stalking Horse Bid. In sum, the Stalking Horse Bid provides for a baseline aggregate cash consideration of $450 million (the "Base Amount") subject to certain holdbacks and/or deductions for contingency reserve and transition services. Further, certain bid protections are being sought for the Stalking Horse Bidder in the form of a 1.5% break-up fee and a $1,500,000 capped expense reimbursement (the break-up fee together with the capped expense reimbursement, the "Bid Protections"). Subject to Court approval of the Revised Bidding Procedures, the Auction will be moved from February 28, 2022 to February 21, 2022, with any overbids submitted at Auction equal to or in excess of the Stalking Horse Bid plus the Bidding Protections and $4,500,000 (*i.e.*, $462,750,000). The Debtors have also filed the *Debtors' Motion for Entry of an Order (i) Authorizing the Sale of the Assets of the Debtors Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (ii) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (iii) Granting Related Relief* [Docket No. 574] (the "Sale Motion"). Among other things, the Sale Motion seeks authority to sell the Debtors' Assets free and clear pursuant to section 363(f) of the Bankruptcy Code in accordance with the terms of the APA, approval of which remains subject to higher or otherwise better offer for the Assets at the Auction.

Additional material terms to the Stalking Horse Bid include (i) limited termination rights for the Stalking Horse Bidder; (ii) no due diligence contingency; (iii) limited conditions precedent to the Stalking Horse Bidder's obligations to close, including but not limited to Court approval of the Revised Bidding Procedures, the entry of an order approving the Sale to the Stalking Horse Bidder, the requirement that there not be total events of loss between signing and Closing to one or more facilities of 5% of the Base Amount (approximately $22 million), and the delivery of closing deliverables as required by Article 8 of the Stalking Horse APA.

The Stalking Horse Bid also contains a proposed transition services agreement (the "Transition Services Agreement"), which, upon execution, will require the Property Manager to continue to provide certain property management services to the Stalking Horse Bidder through and until two Business Days after Closing of the Sale. Pursuant to the Transition Services Agreement, upon the completion of certain milestones set forth in the contract (the "Transition Milestones"), the Stalking Horse Bidder will release an additional $20 million (the "Transition Services Amount") from escrow to the TopCo to be distributed for the benefit of Claim and Interest Holders. The Transition Services Agreement additionally provides that the Stalking Horse Bidder will be able to continue to use trademarks and selected related intellectual property for a period of up to nine months post-Closing. Successful execution and consummation of the Transition Services Agreement is not a condition to Closing nor will it directly impede the Closing of the APA. Rather, the Transition Services Agreement was designed to ensure an orderly transition of services from the Property Manager to the party that prevails at the Auction (as defined herein).

The Stalking Horse Bid and the Transition Services Agreement allow the Debtors to maximize the value of their Assets and recoveries to the Estates, and to facilitate an orderly

transition post-Sale to the Purchaser, which will allow for minimal disruption to the business. If the Stalking Horse Bid is approved, the Debtors expect that the Assets will generate Sale Proceeds sufficient to clear the secured debt and pay all of the Allowed Claims in full. To the extent an overbid is received at Auction, the excess amounts will increase the recovery to the Estates as contemplated in the Plan. Thus, the Stalking Horse Bid will facilitate a value-maximizing Auction and Sale process that inures to the benefit of the Debtors, their creditors, their interest holder, and all other parties in interest.

### 4. Claim Estimation Procedures

Pursuant to the Claim Estimation Procedures, the Debtors filed the *Amended Supplement to the Debtors' Motion for Order Determining Procedures for Estimating Claim Pursuant to 11 U.S.C. §§ 105(a) and 502(c)* [Docket No. 453] (the "Estimation Supplement"). Thereafter, the Debtors filed the *Certification of No Objection Regarding Estimation of Uncontested Claims in the Debtors' Estimation Supplement and Notice of Revised Proposed Order* [Docket No. 551] (and as may be further amended, supplemented, or revised, the "Revised Estimation Order"). Attached as Schedule 1 to the Revised Estimation Order are the proposed estimated claim amounts.

Pursuant to the Revised Estimation Order, with the exception of the claims identified below, each claim subject to the Revised Estimation Order is estimated at zero ($0.00). Claims estimated with a value greater than zero ($0.00) under the Revised Estimation Order are:

- The claim of Princeton shall be estimated at $10,000,000.

- The claim of American Builders & Contractor Supply shall be estimated at $118,918.

- The claim of Melvin Van Brookshire shall be estimated at $487,977.32.

The Court held a hearing in connection with the Claim Estimation Procedures, Estimation Supplement and Revised Estimation Order on January 20, 2022.

### 5. Disputed Claims Reserve Account

On the Effective Date, and in conjunction with making all distributions required to be made on the Effective Date, the Debtors shall establish the disputed claims reserve account ("Disputed Claims Reserve Account") in an amount equal to the amount of Disputed Claims (in addition to estimated interest due and owing, either contractually and/or under the Bankruptcy Code, to each Holder of such Disputed Claims) as of the Effective Date (the "Disputed Claim Reserve Funds"). The amount of the Disputed Claim Reserve Funds shall be reduced upon payment to Holders of Allowed Claims, with any excess Disputed Claim Reserve Funds to be distributed to the Holders of Interests. Payments of the Disputed Claim Reserve Funds shall be made to the Holder of an Allowed Claim, which was previously a Disputed Claim, upon the first Distribution Date immediately following the date upon which such Claim became an Allowed Claim.

The Disputed Claims Reserve Account shall be terminated when all Disputed Claims related to such account have either become Allowed Claims or Disallowed with excess Disputed Claim Reserve Funds to be distributed to Holders of Interests.

### 6.     Proposed Lender Resolutions

As set forth in more detail below, the Debtors have negotiated a settlement with each of the Senior Lender, Senior Mezz Lender, and Junior Mezz Lender regarding the Allowed amount of each of their respective Claims, which, subject to Court approval, could potentially result in significant savings for the Estates. Through the Proposed Lender Resolutions (as defined herein), the Debtors resolve significant issues in the Senior Mezz Lender, Senior Lender, and Junior Mezz Lender Claims and obviate the substantial risks and costs associated with potential litigation of those issues. The Claims of the Senior Lender, Senior Mezz Lender, and Junior Mezz Lender shall be estimated in the amounts reflected in their respective motions seeking approval of the Proposed Lender Resolutions.

### 7.     Payment in Full of Allowed Claims

As set forth in more detail below and in the Plan, based on estimated Net Sale Proceeds, the Plan provides for the full satisfaction of all Allowed Claims pursuant to the Distribution Waterfall.

### 8.     Management Agreements

The Debtors are parties to those certain Property Management Agreements, dated November 30, 2018, by and between Great Value Storage, LLC (the "Property Manager"), as property manager, and each of the PropCo Debtors, as owners of the property described therein (the "Management Agreements"). The Stalking Horse has indicated that it will not take assignment of the Management Agreements.

### 9.     General Settlement of Claims and Interests

As described more fully in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan will constitute a good-faith compromise and settlement of all Claims against, and Interests in, and certain controversies relating to the Debtors.

### 10.     Releases and Injunctions

The Plan contains certain releases and injunctions (as described more fully in Article VIII of the Plan), including releases between the Debtors, on the one hand, and certain Released Parties on the other hand. The Released Parties under the Plan include the Debtors, Mr. Robert D. Albergotti, the Purchaser, the Professionals, and their representatives, advisors, Affiliates, and agents. The release, exculpation, and injunction provisions in Article VIII of the Plan are integral to the Plan and the Debtors' restructuring efforts.

C.        **Entitlement to Vote**

Each Class of Claims is Unimpaired and conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and therefore not entitled to vote, as set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Senior Lender Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | PropCo Debtor Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 5 | PropCo Debtor General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 6 | Senior Mezz Lender Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 7 | Senior Mezz Debtor Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 8 | Senior Mezz Debtor General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 9 | Junior Mezz Lender Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 10 | Junior Mezz Debtor Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 11 | Junior Mezz Debtor General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 12 | Section 510(a) Subordinated Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 13 | Junior Mezz Debtor Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

275617735v.11

| Class 14 | TopCo Debtor Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
|----------|------------------------|------------|------------------------------------------|

### D. Plan Distributions

The following chart summarizes the projected distributions to Holders of Allowed Claims and Allowed Interests assuming Net Sale Proceeds in at least the amount of the Stalking Horse Bid. Although every reasonable effort was made to be accurate, the projections of estimated recoveries are only an estimate and are dependent on the results of the Auction and the availability of Net Sales Proceeds. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court. As a result of the foregoing and other uncertainties which are inherent in the estimates, the estimated recoveries in this Disclosure Statement may vary from the actual recoveries received. In addition, the ability to receive distributions under the Plan depends on the ability of the Debtors to obtain Confirmation of the Plan and meet the conditions to Confirmation and effectiveness of the Plan, as discussed in this Disclosure Statement. Reference should be made to the entire Disclosure Statement, including without limitation Section VII.B of this Disclosure Statement, and Article III.B of the Plan for a complete description of the classification and treatment of Allowed Claims and Allowed Interests.

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims** | **Projected Recovery Under the Plan** |
| N/A | Administrative Expense Claims[5] | Unless otherwise agreed to by the Holder of an Allowed General Administrative Expense Claim and the Debtors, each Holder of an Allowed General Administrative Expense Claim that is unpaid as of the Effective Date shall receive, on account and in full satisfaction of such Allowed General Administrative Expense Claim, Cash in an amount equal to the Allowed amount of such General Administrative Expense Claim, to be paid in accordance with the following: (1) if a General Administrative Expense Claim is Allowed on or prior to the Effective Date, on the Effective | $610 | 100% |

---

[5] Certain of these Administrative Expense Claims may be claims of the Senior Mezz Debtor and/or the Junior Mezz Debtor, and as such, structurally subordinate to the Administrative Expense Claims at the PropCo Debtors' level. In light of the expected Net Sale Proceeds, however, the Debtors expect all Administrative Expense Claims at all levels to be paid in full.

275617735v.11

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed General Administrative Expense Claim is due or as soon as reasonably practicable thereafter); (2) if such General Administrative Expense Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such General Administrative Expense Claim becomes a Final Order, or as soon as reasonably practicable thereafter (or if not then due, when such Allowed General Administrative Expense Claim is due or as soon as reasonably practicable thereafter); (3) at such time and upon such terms as may be agreed upon by such Holder and the Debtors; or (4) at such time and upon such terms as set forth in any other order of the Court. | | |
| N/A | Professional Claims | All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than the Administrative Expense Claims Bar Date. The Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Court. The Debtors shall pay Professional Claims in Cash in the amount the Court allows, including from the Professional Claim Reserve Account, which the Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Claim Reserve Amount on the Effective Date. | $14,500,000 | 100% |
| N/A | Priority Tax | Except as otherwise agreed by a Holder of an Allowed Priority Tax | $1,945,280 | 100% |

9

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | Claims | Claim and the Debtors, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to the Allowed amount of such Priority Tax Claim, to be paid on the Effective Date or as soon as reasonably practicable thereafter. | | |
| 1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor: (i) payment in full in cash; (ii) the return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim; or (iii) such other treatment to render such Allowed Other Secured Claim as Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $2,446,207 | 100% |
| 2 | Other Priority Claims | On the Effective Date or as soon as practicable thereafter, except to the extent that a Holder of an Allowed Other Priority Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash. | $0 | 100% |
| 3 | Senior Lender Claims | On the Effective Date, or as soon as reasonably practicable thereafter, the Allowed amount of the Senior Lender Claims shall be paid in Cash from the Net Sale Proceeds. | $127,179,913 | 100% |

10

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 4 | PropCo Debtor Priority Claims | On the Effective Date, or as soon as reasonably practicable thereafter the Allowed amount of the PropCo Debtor Priority Claims shall be paid in Cash from the available Net Sale Proceeds. | $0[6] | 100% |
| 5 | PropCo Debtor General Unsecured Claims | On the Effective Date, or as soon as reasonably practicable thereafter the Allowed amount of the PropCo Debtor General Unsecured Claims shall be paid in Cash from the available Net Sale Proceeds. | $13,018,023 | 100% |
| 6 | Senior Mezz Lender Claims | On the Effective Date, or as soon as reasonably practicable thereafter, the Allowed amount of the Senior Mezz Lender Claims shall be paid in Cash from the Net Sale Proceeds. | $125,802,476 | 100% |
| 7 | Senior Mezz Debtor Priority Claims | On the Effective Date, or as soon as reasonably practicable thereafter the Allowed amount of the Senior Mezz Debtor Priority Claims shall be paid in Cash from the Net Sale Proceeds. | $0 | 100% |
| 8 | Senior Mezz Debtor General Unsecured Claims | On the Effective Date, or as soon as reasonably practicable thereafter the Allowed amount of the Senior Mezz Debtor General Unsecured Claims shall be paid in Cash from the Net Sale Proceeds. | $7,300 | 100% |
| 9 | Junior Mezz Lender Claims | On the Effective Date, or as soon as reasonably practicable thereafter the Allowed amount of the Junior Mezz Lender Claims shall be paid in Cash from the available Net Sale Proceeds. | $124,605,736 | 100% |
| 10 | Junior Mezz Debtor Priority Claims | On the Effective Date, or as soon as reasonably practicable thereafter the Allowed amount of the Junior Mezz Debtor Priority Claims shall be paid in Cash from the available Net Sale Proceeds. | $0 | 100% |
| 11 | Junior Mezz | On the Effective Date, or as soon as reasonably practicable | $545,443 | 100% |

[6] All PropCo level Priority Claims are included in the Priority Tax Claims or the Other Priority Claims Classes above.

11

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
|---|---|---|---|---|
| | **SUMMARY OF EXPECTED RECOVERIES** | | | |
| | Debtor General Unsecured Claims | thereafter the Allowed amount of the Junior Mezz Debtor General Unsecured Claims shall be paid in Cash from the available Net Sale Proceeds. | | |
| 12 | Section 510(a) Subordinated Claims | On the Effective Date, or as soon as reasonably practicable thereafter the Allowed amount of the Section 510(a) Subordinated Claims shall be paid in Cash from the available Net Sale Proceeds. | $303,953 | 100% |
| 13 | Junior Mezz Debtor Interests | On the Effective Date, or as soon as reasonably practicable thereafter, the Junior Mezz Debtor Interests shall be paid in Cash to the extent of the available Net Sale Proceeds. The Holders of the Interests in the Junior Mezz Debtor shall thereafter be extinguished and of no further force or effect. | N/A | N/A |
| 14 | TopCo Debtor Interests | On the Effective Date, or as soon as reasonably practicable thereafter, the TopCo Debtor Interests shall be paid in Cash to the extent of the available Net Sale Proceeds. The Holders of the Interests in the TopCo Debtor shall thereafter be extinguished and of no further force or effect. | N/A | N/A |

The estimated distributions contemplated herein and in the Plan are based on projections, from the Claims filed against the Estates and the Debtors' books and records, the Revised Estimation Order and the Proposed Lender Resolutions (as defined below), but the Debtors reserve all rights to amend, supplement and/or modify their ongoing analyses and investigations. However, the following represents the Debtors' claims estimate as of the filing of this Disclosure Statement:

### E. Purpose of the Disclosure Statement and Notice to Creditors

The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code in connection with: (i) the distribution of materials related to the Plan, and (ii) the Confirmation Hearing.

Section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement that contains information of a kind, and in sufficient detail, to permit a hypothetical reasonable

12

investor to make an informed judgment regarding acceptance of a proposed chapter 11 plan of reorganization before soliciting acceptances of such proposed plan. The Debtors provide this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to certain Holders of Claims and Interests because the Debtors are asking such Holders of Claims and Interests to accept the Plan. This Disclosure Statement sets forth certain information regarding (i) the Debtors' prepetition operating and financial history; (ii) Debtors' need to file for relief under chapter 11 of the Bankruptcy Code; (iii) the terms of the Plan; (iv) the manner in which distributions will be made under the Plan; (v) certain effects of Confirmation of the Plan; (vi) certain risk factors associated with the Plan; and (vii) the Confirmation process. The Debtors believe that the Confirmation and implementation of the Plan is in the best interests of the Debtors' Estates, Creditors and all other interested parties.

This Disclosure Statement is subject to the Court's approval, as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of each of the Classes to make an informed judgment with respect to the Plan. **THE COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION WITH RESPECT TO THE MERITS OF THE PLAN. ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY.**

The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. To the extent that the information provided in this Disclosure Statement and the Plan (including any Plan Supplements) conflict, the terms of the Plan (including any Plan Supplements) will control. Terms not otherwise specifically defined herein will have the meanings attributed to them in the Plan. Each definition in this Disclosure Statement and in the Plan includes both the singular and plural. Headings are for convenience of reference and shall not affect the meaning or interpretation of this Disclosure Statement.

### F.     Amendments to the Plan

The Debtors reserve the right to make non-substantive or immaterial changes to the Disclosure Statement, the Plan, the confirmation hearing notice, the non-voting status notices, and related documents without further order of the Court, including changes to correct typographical and grammatical errors, if any, and to make conforming changes to the Disclosure Statement, the Plan, and any other related materials before distribution.

## II.     GENERAL INFORMATION ABOUT THE DEBTORS

### A.     Overview of the Debtors' Operations

The Debtors are limited liability companies with the principal business of owning a wide array of properties functioning principally as self-storage and parking facilities. The Debtors are directly or indirectly owned by Natin Paul. Mr. Paul is the founder and ultimate equity owner of the Debtors' corporate parent GVS Portfolio I C, LLC ("TopCo Debtor") – one of the Debtors in these Chapter 11 Cases.

Mr. Paul, through the TopCo Debtor, controlled and operated the Debtors, and employed the Property Manager to manage the Debtors' facilities. Although the Debtors do not directly

13

employ personnel, they are responsible for the payment of all of the Property Manager's operational expenses, including employee wage costs, maintenance and repair costs, and/or other capital expenditure expenses that are necessary to manage the business. The Debtors own approximately 64 storage locations in Texas, Colorado, Illinois, Indiana, Mississippi, Missouri, Nevada, New York, Ohio, and Tennessee.

The Debtors' current organizational chart is attached hereto as **Exhibit B**.

Since their formation, the Debtors and the Property Manager have generated revenue and marketed their services as "Great Value Storage,"[7] and maintain approximately 30,811 units, totaling 4,103,764 square feet. The storage units offer secure storage with 24-hour security systems, both climate controlled and non-climate controlled; RV, car, and boat parking; moving and storage supplies; and moving truck rentals. In addition to conventional storage units, the GVS Portfolio includes 1,430 covered and uncovered vehicle parking units; 58 office spaces, 38 warehouse spaces, and 5 retail commercial spaces; two campsites; eight billboards; and two cell towers.

The Debtors directly or indirectly own the real property where the storage facilities are located and are responsible for the payment of all operational expenses, including, but not limited to, certain repair and maintenance, property insurance, and tax obligations. However, the Property Manager is responsible for the leasing and management of the storage facilities. The Debtors generate revenue through the regular and periodic collection of rents from the thousands of customers who lease storage space at the properties.

### B.      Debtors' Executive Officer and Board of Directors

Prior to the decision to file these Chapter 11 Cases, each of the Debtors' boards of directors (the "Board") consisted of Natin Paul, who held three seats, and two independent directors, Colleen De Vries and Richard Arthur, who were selected pursuant to section 3.1.24(o) of the Mortgage Loan. As the need for the filings became imminent, the Board determined it was in the Debtors' best interest to appoint an independent director to oversee the Debtors' restructuring. Since the Petition Date, Ms. De Vries and Mr. Arthur have stepped down from the Board, though each voted in favor of each Debtor filing for chapter 11 while on the Board. In June 2021, Mr. Paul stepped down from one of his three seats and Robert Albergotti was appointed as independent director for each of the Debtor entities.

In response to the Trustee Motions (as defined below) filed by RREF Storage III, LLC ("RREF" or the "Junior Mezz Lender") and the United States Trustee (the "U.S. Trustee"), and the oral joinder to the Trustee Motions made by the Senior Lender and Senior Mezz Lender, the Senior Lender, Senior Mezz Lender, Junior Mezz Lender, Mr. Paul, Mr. Albergotti, the Debtors, and each of their respective advisors, negotiated a consensual resolution regarding the Debtors' governance structure. The parties agreed that Mr. Albergotti would become the sole director of the Debtors with, among other things, unfettered control over, and access to, the Debtors' bank accounts and operations (the "Governance Changes"). In addition, Mr. Paul would resign from all officer positions with each of the Debtor entities and, subject to further order of the Bankruptcy

---

[7] www.greatvaluestorage.com

Court, have no role whatsoever with respect to management or operation of the Debtors except a duty to cooperate with Mr. Albergotti. The terms of the Governance Changes were read into the record at a hearing on October 13, 2021 and "so ordered" by the Court (the "Oral Governance Ruling"), which was further memorialized in the *Governance Order* [Docket No. 319] (the "Governance Order") entered November 10, 2021.

Pursuant to the terms of the Governance Order, the Debtors' current Board consists solely of Mr. Albergotti, and further actions to remove, replace, and/or appoint a director shall first be subject to Court approval. The Debtors also appointed Mr. Stephan M. Pinsly ("Pinsly") as the Debtors' Chief Accounting Officer and may determine in their business judgment that the appointment of additional officers is necessary. Such appointment will be disclosed through the Plan Supplement or other filing with the Court prior to Confirmation of the Plan.

### C. The Property Manager

The Debtors do not employ personnel directly, but rather contract with a third-party affiliate, the Property Manager, which maintains and manages the facilities. Among other things, the Property Manager employs full- and part-time storage consultants to oversee the day-to-day operations at each of the storage sites, investigates claims for damages relating to their respective property, and maintains the Debtors' books and records and accounting system. The specific terms of the Property Manager's services are governed by the Management Agreements.

### D. The Cash Management System

The Debtors maintain a centralized cash management system (the "Cash Management System") that they use in the ordinary course of business to collect funds generated by their operations and disburse those funds to satisfy obligations required to operate their business. The Cash Management System was established as a requirement under the Mortgage Loan and includes a Cash Management Agreement by and among certain of the Debtors, PNC Bank, National Association ("PNC"), as depository bank, and the Senior Lender (as may be amended, restated, or supplemented, the "Cash Management Agreement"). Pursuant to the Cash Management Agreement, PNC collects rent and other payments through a lockbox account held in the name of GVS Texas (the "Clearing Account"), which is subject to that certain Deposit Account Control Agreement, dated February 10, 2020, by and among the PropCo Debtors, PNC, and Wells Fargo Bank, National Association, as trustee, for the benefit of the Mortgage Lenders (the "DACA"). The funds in the Clearing Account in excess of the required minimum balance (*i.e.*, $5,000) are regularly swept into another bank account also held at PNC in the name of GVS Texas (the "Cash Management Account").

Outside of the Cash Management Agreement, certain of the Debtors maintain accounts at local banks where PNC does not operate (the "Local Banks"). Cash and/or check deposits are made by the Property Manager into these Local Banks throughout the month as rent and other revenues are collected. Pursuant to the Governance Changes, the Debtors perform a manual sweep of the Local Banks on a monthly basis, transferring the aggregate funds from these banks, less the required minimum balance, to the GVS Texas Operating Account (as defined below), then from the GVS Texas Operating Account to the Clearing Account. The funds are then swept from the

Clearing Account to the Cash Management Account pursuant to the regular sweeps discussed above.

Once a month, a waterfall is triggered so that the funds that had been swept into the Cash Management Account are applied into subaccounts that are held on a ledger-entry basis only in accordance with the Cash Management Agreement (the "Cash Management Waterfall"). The funds in all of the subaccounts, other than the subaccounts for operating expenses, extraordinary expenses, and excess cash flow, are either disbursed into reserve accounts, such as in the case of tax, insurance, and capital expenditures, or paid by the Servicer to the appropriate recipients, such as in the case of the cash management fees, debt service (for the Senior Lender, Senior Mezz Lender, and Junior Mezz Lender), and delinquency. The Servicer effectively controls the funds in the Cash Management Waterfall, and a late payment under a senior loan can initiate a default on the junior debt if payment is not properly remitted from the lockbox.

The amounts for operating expenses and extraordinary expenses, if any, are disbursed to the Debtors. Specifically, those funds go into a bank account held at JP Morgan Chase in the name of GVS Texas (the "GVS Texas Operating Account"). GVS Texas distributes the funds as needed for the Debtors' operations in accordance with a budget approved by the Senior Lender.

## III.    THE DEBTORS' PREPETITION CAPITAL STRUCTURE

The following is an approximate overview of the Debtors' capital structure as of the Petition Date, and includes the respective Debtor(s) principally obligated under each level of debt:

| Description | Original Principal Amount ($mm) | Interest Rate | Default Spread | Maturity |
|---|---|---|---|---|
| Mortgage Loan (PropCo Debtors) | $110.0 | 4.140% | 5.000% | Dec. 2023 |
| Senior Mezz Loan (GVS Portfolio I, LLC) | $103.0 | 5.500% | 5.000% | Dec. 2023 |
| Junior Mezz Loan (GVS Portfolio I B, LLC) | $82 | 8.715% | 5.000% | Dec. 2023 |
| **Total Funded Debt** | **$295**[8] | | | |

---

[8] The amounts set forth herein represent estimates of amounts claimed by the Lenders as of the Petition Date. Such amounts have been set pursuant to the Proposed Lender Resolutions.

In addition, ordinary-course tax, and other priority and general unsecured claims are asserted against the Debtors.

### A. Mortgage Loan

On or around November 30, 2018, the PropCo Debtors entered into that certain Loan Agreement by and between UBS AG, as original lender (the "Original Lender"), and PropCos, as borrowers, in the principal amount of $110 million (the "Mortgage Loan"). In connection with the Mortgage Loan, each of the PropCo Debtors entered into a first priority Deed of Trust, Assignment of Leases and Rents, Security Agreement, and Fixture Filing (the "Security Instrument") with the Original Lender, whereby each PropCo Debtor (a) granted the Original Lender a security interest in, among other things, (i) all real and personal property then owned or thereafter acquired, (ii) all bank accounts and deposit accounts, and (iii) all rents received in the operation of the business; and (b) assigned to the Original Lender each of the Management Agreements (the foregoing collectively being, the "Mortgage Loan Collateral").

The Original Lender perfected its security interest in the Mortgage Loan Collateral prior to the securitization of the Mortgage Loan and transfer of the right to enforce the debt from Original Lender to Wells Fargo Bank, National Association, as Trustee, for the benefit of the Registered Holders of UBS Commercial Mortgage Trust 2019-C16 Commercial Mortgage Pass-Through Certificates, Series 2019-C16 in its capacity as A-2-1 Noteholder and Lead Securitization Noteholder on behalf of the related companion noteholders Wells Fargo Bank, National Association, as Trustee, for the benefit of the Registered Holders of UBS Commercial Mortgage Trust 2018-C15 and Wilmington Trust, National Association, as Trustee, for the benefit of Wells Fargo Commercial Mortgage Trust 2019-C50 Commercial Mortgage Pass-Through Certificates, Series 2019-C50, by and through Midland Loan Services, a division of PNC Bank, N.A. as special servicer for the Lead Securitization Noteholder (the "Senior Lender"). Midland Loan Services, a division of PNC Bank, National Association, services the Mortgage Loan on behalf of the Mortgage Loan Lender (the "Servicer").[9]

### B. Mezzanine Loans

On or around November 30, 2018, the Senior Mezz Debtor and the Junior Mezz Debtor entered into the following facilities: (a) a $103 million mezzanine loan made by the Original Lender to the Senior Mezz Debtor (the "Senior Mezz Loan"), which is now held by ESS-GV Holdings LLC ("ESS-GV" or "Senior Mezz Lender," and collectively with the Senior Lender and the Junior Mezz Lender, the "Lenders"); and (b) a consolidated $82 million mezzanine facility made by the Original Lender to Junior Mezz Debtor, and successor-in-interest TIAA (as defined below), (the "Junior Mezz Loan," and collectively with the Mortgage Loan and the Senior Mezz Loan, the "Loans"), which is now held by RREF.

As security for the Senior Mezz Loan, GVS Portfolio I, LLC granted the Original Lender a security interest in (a) its membership interest in each of the PropCo Debtors, including any

---

[9] At the time this cash management system was implemented, the mortgage servicer was Wells Fargo Bank, National Association, but subsequently switched to Midland Loan Services in January 2020.

proceeds therefrom; and (b) all amounts on deposit in the Mezzanine Deposit Account or Mezzanine Loan Excess Cash Flow Account (as such terms are defined in the Senior Mezz Loan).

As security for the Junior Mezz Loan, Junior Mezz Debtor granted the Original Lender a security interest in (a) its membership interest in Senior Mezz Debtor, including any proceeds therefrom; and (b) all amounts on deposit in the Mezzanine Deposit Account or Mezzanine Loan Excess Cash Flow Account (as such terms are defined in the Junior Mezz Loan).

Upon information and belief, neither of the Mezzanine Deposit Account nor the Mezzanine Loan Excess Cash Flow Account hold any funds.

## C. Prepetition Defaults Under the Capital Structure

Each of the Loans contain a section detailing when certain events shall constitute an event of default under the applicable loan documents (the "Events of Default"). *See* Senior Loan § 10.1(a); Senior Mezz Loan § 10.1(a); Junior Mezz Loan § 10.1(a). One such Event of Default occurs if any monthly debt service is not paid when due. *See* Senior Loan § 10.1(a)(i); Senior Mezz Loan § 10.1(a)(i); Junior Mezz Loan § 10.1(a)(i). Another occurs "if any of the Taxes or Other Charges [as defined therein] are not paid when due." *See* Senior Loan § 10.1(a)(ii); Senior Mezz Loan § 10.1(a)(ii); Junior Mezz Loan § 10.1(a)(ii). Importantly, an Event of Default under the Mortgage Loan automatically triggers Events of Default under the Senior Mezz Loan and the Junior Mezz Loan, and an Event of Default under the Senior Mezz Loan automatically triggers an Event of Default under the Junior Mezz Loan. *See* Senior Mezz Loan § 10.1(a)(xviii); Junior Mezz Loan § 10.1(a)(xv). The reverse does not hold true, meaning that an Event of Default under the Junior Mezz Loan will not automatically trigger an Event of Default under the Senior Mezz Loan or the Mortgage Loan and an Event of Default under the Senior Mezz Loan will not automatically trigger an Event of Default under the Mortgage Loan.

Upon the occurrence of, and for so long as, any Event of Default has occurred and remains outstanding, the Lenders are permitted to collect interest at the "Default Rate" (as such term is defined in the applicable Loan), calculated from the date such payment was due and without regard to any grace or cure period. *See* Senior Loan § 2.2.2; Senior Mezz Loan § 2.2.2; Junior Mezz Loan § 2.2.2.

On or around August 31, 2019, the Debtors incurred a tax lien in the amount of $157.44 for unpaid sales tax amounts due to the State of Ohio. Additional *de minimis* liens were assessed in September and November of 2019 respectively for unpaid taxes owed to Ohio. Starting in March 2020, and continuing monthly thereafter, the state of Ohio, along with other states where the Debtors had operations, began to impose numerous tax liens on the Debtors for unpaid sales taxes. As of the Petition Date, the Debtors had incurred approximately 140 tax liens for unpaid sales tax from various states. In addition the Propco Debtors were subject to certain mechanics' liens and related litigation.

In addition to the tax liens, on December 6, 2019, the Junior Mezz Lender provided notice to the Debtors of certain alleged defaults under the Mortgage Loan, the Senior Mezz Loan, and the Junior Mezz Loan. As a result of these alleged defaults, the Junior Mezz Lender declared an Event of Default and purported to accelerate the Junior Mezz Loan, declaring such Junior Mezz Loan to

18

be immediately due and payable in full (the "Acceleration Notice"). Similar acceleration notices were not provided by either of the Senior Mezz Lender or the Senior Lender.

As a result of the Acceleration Notice, the Junior Mezz Lender asserts that prepetition default interest accrued under the Junior Mezz Loan from December 6, 2019 to the present. Resolution of the Junior Mezz Lender, Senior Mezz Lender and Senior Lender's right to default interest is set forth in the Proposed Lender Resolutions discussed in more detail below.

## IV. EVENTS LEADING TO THESE CHAPTER 11 CASES

### A. The TIAA State Court Action

GVS Portfolio Holdings I B, LLC initiated an action against Teachers Insurance Annuity Association of America ("TIAA"), as Junior Mezz Lender, in the New York State Supreme Court (the "NY Court") on August 27, 2020, styled as *GVS Portfolio I B, LLC v. Teachers Ins. Annuity Assoc. of Am.*, No. 654095/2020 (N.Y. Sup. Ct. Oct. 5, 2020 (the "TIAA State Court Action"). The TIAA State Court Action sought to enjoin TIAA from pursuing a UCC foreclosure sale. The NY Court initially granted the motion and enjoined TIAA from foreclosing. The NY Court ordered the parties to meet and confer as to the terms of the foreclosure auction, which resulted in the entry of a stipulation (the "Stipulation") memorializing the terms of the sale.

Approximately two days prior to the rescheduled foreclosure auction, TIAA sold the Junior Mezz Loan to RREF without prior notice to the Junior Mezz Debtor. Subsequently thereafter, the Junior Mezz Debtor obtained a temporary restraining order grounded on the argument that the sale to RREF violated the terms of the Stipulation and did not provide adequate notice as required under the Junior Mezz Loan documents. On March 30, 2021, the NY Court concluded that the sale process was presumptively reasonable, denied the Junior Mezz Debtor's request for a preliminary injunction, and ordered the foreclosure sale to go forward.

### B. The Delaware Bankruptcy

On April 12, 2021, GVS Portfolio Holdings I B, LLC filed for bankruptcy styled *In re GVS Portfolio Holdings I B, LLC*, Case No. 21-10690 (C. S.) (the "GVS Portfolio Case") in the District of Delaware Bankruptcy Court (the "Delaware Court"). Shortly thereafter, RREF commenced an action in the NY Court against the Junior Mezz Loan guarantor, Natin Paul, seeking payment in full of the outstanding principal due under the Junior Mezz Loan. The Junior Mezz Debtor was the sole debtor in the GVS Portfolio Case, making RREF the only secured creditor.

On April 26, 2021, RREF filed a motion seeking dismissal of the GVS Portfolio Case, arguing the GVS Portfolio Case was not filed in good faith, and was in reality a two-party dispute. Following a hearing on May 26, 2021, the Delaware Bankruptcy Court concluded that the Junior Mezz Debtor had failed to meet its burden to demonstrate that the bankruptcy petition served a valid bankruptcy purpose and, as a result, the case was not filed in good faith. On June 4, 2021, the case was dismissed.

C. **The Current Bankruptcy**

1. **Debtors' Need For Chapter 11 Relief**

The Debtors' circumstances changed materially since the dismissal of the GVS Portfolio Case, namely: (i) the Mortgage Loan Lender *and* the Senior Mezz Lender each declared defaults under their respective loan documents, and (ii) RREF re-noticed its UCC foreclosure sale of the Junior Mezz Debtor's interests.

Considering these circumstances, and guided by goals of preserving value and protecting the Debtors and their respective storage facilities until the disruption of the business from the pandemic can be remedied, the Debtors filed these Chapter 11 Cases to: (i) obtain time to determine whether a refinance of the capital structure or a sale of the underlying properties best preserves value for all stakeholders; (ii) explore strategic alternatives to maximize the Debtors' value on a go-forward basis; and (iii) preserve the equity value above the debt to turn the Debtors toward profitability upon emergence. Since the Petition Date, the Debtors have determined that a sale of either the Debtors' equity or of substantially all of the Debtors' assets best maximizes value for the benefit of the Estates and all stakeholders.

2. **Negotiations with Constituents**

The Debtors and their advisors have engaged in negotiations with the Lenders, Mr. Paul, and the Property Manager regarding the Bidding Procedures (including the Revised Bidding Procedures), the Sale, and the timeline for approval of the Sale through Confirmation. The results of those negotiations are incorporated into the Plan.

V. **CHAPTER 11 CASES**

A. **Overview of Chapter 11**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Chapter 11 authorizes a debtor to reorganize its business for the benefit of its creditors, equity interest holders, and other parties in interest. Commencing a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The principal objective of a chapter 11 case is to consummate a plan of reorganization. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by a bankruptcy court binds a debtor, any issuer of securities thereunder, any person acquiring property under the plan, any creditor or equity interest holder of a debtor, and any other person or entity the bankruptcy court may find to be bound by such plan. Chapter 11 requires that a plan treat similarly situated creditors and similarly situated equity interest holders equally, subject to the priority provisions of the Bankruptcy Code.

Subject to certain limited exceptions, the bankruptcy court order confirming a plan of reorganization discharges a debtor from any debt that arose prior to the date of confirmation of the

plan and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

Prior to soliciting acceptances of a proposed plan of reorganization, Bankruptcy Code section 1125 requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan of reorganization. This Disclosure Statement is submitted in accordance with Bankruptcy Code section 1125.

### B.    Administration of These Chapter 11 Cases

### 1.    First Day Relief

On the Petition Date, or soon thereafter, the Debtors filed numerous first-day motions (the "First Day Motions"), the object of which was to streamline the transition to operating under chapter 11, to stabilize operations, and to preserve their relationships with vendors, customers, royalty interest owners and employees. These first-day motions requested, among other things, authority to:

      (i)  jointly administer the Chapter 11 Cases for procedural purposes only;

      (ii) extend time to file the Debtors' Schedules and Statements (each as defined below);

      (iii) continue to operate the Debtors' existing cash management system and continue the use of existing bank accounts and business forms;

      (iv) continue prepetition insurance coverage;

      (v)  obtain authority to use cash collateral, and provide adequate protection in connection therewith; and

      (vi) continue to pay for utility services.

The First Day Motions and all orders for relief granted in the Chapter 11 Cases can be viewed free of charge at https://omniagentsolutions.com/GVS-docket.

### 2.    Cash Collateral and the Motion to Strike

On July 1, 2021, the Debtors filed the *Emergency Motion of Debtors For Entry of Interim and Final Orders Authorizing the Use Cash Collateral Use and Granting Related Relief* [Docket No. 40] (the "Cash Collateral Motion"), requesting that the Court authorize the Debtors to use the Cash Collateral of the Senior Lender under the prepetition Mortgage Loan and, despite its already significant equity cushion, providing adequate protection to the Senior Lender for any diminution in value through the Debtors' use of Cash Collateral (each as defined in the Cash Collateral Motion).

21

On July 2, 2021, the Court entered an interim order [Docket No. 59] (the "Interim Cash Collateral Order"), which authorized the Debtors to use approximately $5.34 million of the Senior Lender's Cash Collateral in accordance with the budget attached thereto. The Interim Cash Collateral Order also granted the Senior Lender adequate protection in the form of (a) replacement liens and security interests on any post-petition property acquired by the Debtors, including the post-petition rents received in the operation of the Debtors' business; (b) a monthly cash payment to Senior Lender of an amount equal to the monthly, Non-Default Interest charge, as provided in the Budget; (c) amounts necessary to reimburse Senior Lender for the fees, costs, and charges due and owing pursuant to the Mortgage Loan; (d) a Superpriority Claim equal to the aggregate diminution in the value of the Collateral resulting from the Debtors' use of the Cash Collateral during the term of the Interim Order; and (e) accrual of Default Interest in a reserve account held by the Senior Lender during the Interim Period (each as defined in the Interim Cash Collateral Order).

Objections to the Debtors' use of cash collateral on a final basis were filed by the Texas Taxing Authorities [Docket No. 79] and Alief Independent School District [Docket No. 89], and an unopposed response was filed by the Senior Mezz Lender [Docket No. 94]. The Junior Mezz Lender also filed an objection against the use of cash collateral and the Debtors' continued use of their Cash Management System (as defined herein) [Docket No. 95] (the "RREF Objection") on July 21, 2021. The Debtors were able to consensually resolve all objections to the Cash Collateral Motion prior to the final hearing on July 28, 2021 (the "Final Hearing"), with the exception of the RREF Objection.

On July 26, 2021, the Debtors filed their Motion to Strike and *Motion for Emergency Hearing on Debtors' Motion to Strike Objection and Reservation of Rights of RREF III Storage LLC* [Docket No. 108],[10] and filed a Reply in Support of the Cash Collateral Motion [Docket No. 111] on July 27, 2021. On July 28, 2021 the Senior Lender filed its own reply to the RREF Objection and in support of the Debtors' use of Cash Collateral [Docket No. 119]. After a contested Final Hearing, the Court denied the Motion to Strike (*see Order Denying Motion to Strike* [Docket No. 141]), but ultimately approved the use of the Cash Collateral on a final basis. *See Final Order Authorizing the Use of Cash Collateral and Granting Related Relief* [Docket No. 132] (the "Final Cash Collateral Order").

Among other things, the Final Cash Collateral Order authorizes the Debtors to (a) fund all reserve expense accounts in the ordinary course of business and as set forth in the Mortgage Loan; (b) make adequate protection payments to Senior Lender equal to the accruing interest at Non-Default Interest rate, plus reimbursement of Senior Lender's reasonable post-petition fees, costs, and charges due and owing pursuant to the Mortgage Loan; (c) satisfy other post-petition operating and reorganization expenses of the PropCo Debtors, including, but not limited to, operational costs such as utilities and tax costs, and management fees to the Property Manager. The Debtors' use of cash collateral is subject to and governed by the terms of a budget as described in the Final Cash Collateral Order. Adequate protection in the form of adequate protection liens, superpriority claims, payment of Senior Lender's expenses, accrual but not payment of Default Interest, and authorization to apply the cash reserve to the Mortgage Loan was granted to the Senior Lender.

---

[10] The Junior Mezz Lender filed a response to the Motion to Strike on July 27, 2021 [Docket No. 118].

### 3.      Filing of Retention Applications and Related Motions

Shortly after the Petition Date on June 28, 2021, the Debtors filed their application to retain Omni Agent Solutions ("Omni") as claims, noticing and solicitation agent [Docket No. 39], which the Court approved at the First Day Hearing.  *See Order Granting Application to Employ Omni Agent Solutions for GVS Texas Holdings I, LLC as Claims Agent* [Docket No. 61].  On July 16, 2021, the Debtors filed the *Debtors' Motion Pursuant to 11 U.S.C. §§ 331 and 105(a) and Fed. R. Bankr. P. 2016 for Authority to Establish Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* (the "Interim Compensation Motion") [Docket No. 83].  On July 18, 2021 and July 19, 2021, the Debtors filed applications to retain certain professionals; specifically, Sidley Austin LLP as Debtors' counsel [Docket No. 84] and Houlihan Lokey Capital, Inc. as Debtors' investment banker [Docket No. 96], respectively (collectively, the "Retention Applications").

On August 4, 2021, the Debtors filed the *Motion of the Debtors for Entry of an Order Authorizing and Approving the Debtors' Assumption of Independent Director Agreement* [Docket No. 151] (the "Albergotti Assumption Motion") seeking to assume those certain Independent Director Agreements dated as of June 16, 2021 and June 23, 2021 after the Debtors determined, in their business judgment, that Mr. Albergotti's engagement as an independent director (the "Lead Independent Director") is critical to the Debtors' restructuring and ability to emerge from these Chapter 11 Cases as a viable enterprise.

No formal objections were filed to the Interim Compensation Motion or the Retention Applications.  On August 11, 2021, the Court entered the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* [Docket No. 161]; on August 17, 2021, the Court entered an order approving Sidley's retention [Docket No. 166]; and on August 31, 2021, the Court entered an order approving Houlihan's retention [Docket No. 178].  On September 1, 2021, the Court entered an order granting the Albergotti Assumption Motion [Docket No. 181].

On November 29, 2021, the Debtors filed the *Expedited Application of the Debtors to (i) Employ Getzler Henrich & Associates LLC and (ii) Designate Stephan M. Pinsly as Chief Accounting Officer, Effective as of November 27, 2022* [Docket No. 386]; seeking to retain *Getzler Henrich & Associates( LLC* ("Getzler") as financial advisors to the Debtors and to appoint Mr. Pinsly as the Debtors' Chief Accounting Officer.

On December 8, 2021, the Getzler Retention Application was approved and Mr. Pinsly is now serving as the Debtors' Chief Accounting Officer [Docket No. 405].  Getzler and Mr. Pinsly, among other things, assist with the (i) cash management, including preparing forecasts, determining necessary operating expenditures, and developing associated recurring and ad hoc reports, (ii) investigation and analysis of pre-petition and post-petition financial activities of the Debtors, (iii) preparation of the monthly operating reports and amended Schedules and Statements (as defined below); and (iv) evaluation and general maintenance of the Debtors' books and records. Getzler and Mr. Pinsly, in the execution of their duties described above, adhere to the accrual accounting method allowed by Generally Accepted Accounting Principles (GAAP) consistent with the Debtors' historical and current accounting method.

### 4. Filing of the Schedules and Statements of Financial Affairs

On July 23, 2021, the Debtors filed their Schedules of Assets and Liabilities (the "Schedules") and Statements of Financial Affairs (the "Statements") in compliance with section 521 of the Bankruptcy Code and Rule 1007 of the Federal Rules of Bankruptcy Procedure. The Schedules and Statements set forth, among other things, the Debtors' assets and liabilities, current income and expenditures, and executory contracts and unexpired leases. The Debtors are working to collect accurate information from the Property Manager and former management to amend their Schedules and Statements, and will file such amended Schedules and Statements as soon as possible in compliance with the Governance Order.

The Debtors' existing Schedules and Statements can be downloaded free of charge at https://omniagentsolutions.com/GVS-schedules.

### 5. Creditors Committee

No statutory committee, trustee, or examiner has been appointed in these cases.

### 6. Cash Management

On June 28, 2021 the Debtors filed the *Motion of the Debtors for Entry of Order (I) Authorizing Use of Cash Management System; (II) Authorizing Applicable Banks and Other Financial Institutions to Honor and Process Related Checks and Transfers; (III) Authorizing Continuation of Intercompany Transactions; (IV) Waiving Requirements of Section 354 of the Bankruptcy Code; and (V) Granting Related Relief* [Docket No. 43] (the "Cash Management Motion"). Through the Cash Management Motion, the Debtors sought authorization to maintain their centralized Cash Management System.

On July 21, 2021, RREF filed the RREF Objection to the Debtors' Cash Management Motion. In an attempt to resolve concerns raised in the RREF Objection and informal comments from the U.S. Trustee, the Debtors agreed to the entry of an interim order [Docket No. 56] (the "Interim Cash Management Order") and subsequently agreed to continue operating on the Interim Cash Management Order until such time that a final order is entered.

On November 4, 2021, the Debtors filed proposed revisions to the Interim Cash Management Order (the "Proposed Final Cash Management Order") to reflect changes to the Cash Management System that were discovered postpetition, and on November 17, 2021, the *Final Order (i) Authorizing Use of Cash Management System; (ii) Authorizing Applicable Banks and Other Financial Institutions to Honor and Process Related Checks and Transfers; (iii) Authorizing Continuation of Intercompany Transactions; (iv) Waiving Requirements of Section 354 of the Bankruptcy Code; and (v) Granting Related Relief* [Docket No. 335] was entered.

### 7. Meeting of Creditors

On July 26, 2021, the UST held the meeting of creditors pursuant to section 341 of the Bankruptcy Code (the "341 Meeting"). The 341 Meeting was conducted and continued until August 12, 2021. The continued 341 meeting was held and concluded on August 12, 2021.

24

### 8. Establishment of Bar Dates

Pursuant to the *Notice of 341(a) Meeting of Creditors via Telephone Conference and Notice of Bar Date* [Docket No. 86] filed on July 2, 2021, the deadline for creditors other than governmental units to file a proof of claim in these Chapter 11 Cases was October 25, 2021 (the "Creditor Bar Date"). Pursuant to Bankruptcy Rule 3002(c)(1), the deadline for governmental units to file a proof of claim is January 22, 2022.

On December 20, 2021, the Debtors filed the *Emergency Motion of Debtors for Entry of an Order (I) Establishing Bar Date, (II) Approving Form and Manner of Notice, and (III) Approving Procedures for Filing Proofs of Claim of Self-Storage Customers* [Docket No. 429] (the "Customer Bar Date Motion"), seeking to establish February 28, 2022 as the date by which self-storage customers must file a proof of claim in these Chapter 11 Cases (the "Customer Bar Date"). By order entered January 7, 2022, the Court granted the relief sought in the Customer Bar Date Motion and set February 28, 2022 as the Customer Bar Date [Docket No. 497].

As of the Creditor Bar Date, a total of 195 claims had been filed totaling approximately $414,000,000. While the Debtors continue to perform a full analysis of filed claims, an initial review shows that several claims are duplicate claims and/or have no basis for recovery. Accordingly, as set forth in Section V.B.15 herein, the Debtors have filed several claim objections seeking to disallow, expunge and/or reduce certain proofs of claims filed in the Chapter 11 Cases. In addition to the filed claims, the Debtors have secured debt that was funded in the amount of $295,000,00.00. The Lenders' right to certain amounts of pre- and post-petition default interest on this funded debt, in addition to payment of a yield maintenance default premium amount, have been resolved pursuant to the Proposed Lender Resolutions.

### 9. The RREF Adversary Proceeding

Prior to the Petition Date, RREF purchased the Junior Mezz Loan from the original holder, TIAA, shortly before TIAA's scheduled UCC-1 foreclosure auction in March, 2021. After the filing of the since-dismissed GVS Portfolio case in Delaware, on April 16, 2021, RREF commenced an action against Mr. Paul (the "Guarantor Action") in the NY Court seeking enforcement of the that certain *Guaranty of Recourse Obligations (Mezzanine 2 Loan)*, dated November 30, 2018 (the "Guaranty"), executed by Mr. Paul as guarantor for the Junior Mezz Debtor, and that certain *Pledge and Security Agreement (Mezzanine 2 Loan)*, dated November 30, 2018, made by the Junior Mezz Debtor. The Guarantor Action was premised in part on the fact that the Junior Mezz Debtor's chapter 11 triggered recourse provisions in the underlying loan documents.

On June 17, 2021 and June 23, 2021, the Debtors filed these Chapter 11 Cases and thereafter RREF filed an *Order to Show Cause Regarding Plaintiff RREF III Storage LLC's Application for an Order of Attachment* the *Memorandum of Law in Support of Plaintiff's Application for an Order of Attachment of Defendant's Membership Interests in GVS-Affiliated Companies* (collectively, the "Order to Show Cause") in the Guarantor Action. The NY State Court entered the Order to Show Cause on June 23, 2021, requiring, among other things, a response to such order by July 8, 2021.

25

On July 7, 2021, the Debtors initiated an adversary proceeding against RREF in the Bankruptcy Court. *See Texas Holdings I, LLC, et al., v. RREF III Storage LLC*, Adv. No. 21-03045-MVL (*Adversary Complaint for Declaratory Relief* [Adv. No. 1] (the "Complaint")). Through the Complaint, the Debtors asserted that RREF's application for attachment was a willful violation of the automatic stay pursuant to section 362 of the Bankruptcy Code, and sought a declaratory judgment and damages for such stay violation. Alternatively, the Debtors sought an extension of the automatic stay under sections 105 and 362 of the Bankruptcy Code.

On July 15, 2021, RREF filed a motion to dismiss the Complaint [Adv. No. 6] and brief in support of such motion [Adv. No. 7] (collectively, the "RREF Motion to Dismiss"), seeking to dismiss the Complaint under rule 12(b)(6) of the Federal Rules of Civil Procedure, asserting the Complaint failed to state a claim for breach of the automatic stay. RREF asserted that the attachment application was not a violation of the automatic stay, as it sought to attach the assets of Natin Paul, who was not personally a debtor in this or any other bankruptcy proceeding. Because the Debtors had not sought, and the Court had not granted, extension of the automatic stay to cover non-Debtors like Mr. Paul, any actions taken with respect to his property could not constitute a violation of the automatic stay. The Debtors filed their opposition in response to the RREF Motion to Dismiss [Adv. No. 9] and brief in support [Adv. No. 10] on August 5, 2021, which was followed by RREF's reply in support of the RREF Motion to Dismiss [Adv. No. 12].

After discussions in an attempt to resolve the issues raised in the Complaint, the Debtors and RREF entered into a stipulation and agreed order dismissing the RREF Adversary Proceeding without prejudice [Adv. No. 13], in exchange for RREF's agreement to withdraw the state court attachment application, also without prejudice. The Court entered the order approving the stipulation and dismissing the RREF Adversary Proceeding on August 24, 2021. [Adv. No. 14].

### 10. Rule 2004 Exams

On August 6, 2021, RREF filed its *Motion for a Rule 2004 Examination* [Docket No. 156] (the "RREF 2004 Motion"), which requested the Debtors' production of certain documents and financials of which RREF asserted it was entitled. The Debtors worked with RREF to produce and respond to the requests that were applicable, but the matter remained contested. On August 27, 2021, the Debtors filed their *Response Opposed to the Motion for Rule 2004 Examination* [Docket No. 173], and RREF filed its *Reply in Support of the Motion for Rule 2004 Examination* [Docket No. 174] on August 30, 2021. After oral argument at the hearing on September 1, 2021, the RREF 2004 Motion was granted in part. *See Agreed Order Granting the Motion for Rule 2004 Examination* [Docket No. 190] (the "RREF 2004 Order"). On October 12, 2021, RREF filed its *Notice of Non-Compliance with Rule 2004 Order and Status Report in Advance of Status Conference* [Docket No. 222]. Pursuant to the RREF 2004 Order, the Debtors shall continue to produce responsive information on an ongoing basis.

On November 30, 2021, the Debtors filed the *Expedited Motion for Rule 2004 Examination of Great Value Storage, LLC and Production of Documents* [Docket No. 359] and the *Expedited Motion for Rule 2004 Examination of Barbara Lee and Production of Documents* [Docket No. 360], and each as amended on December 6, 2021 [Docket No. 376] (collectively, the "Debtors' 2004 Motions") in an effort to get information necessary to, among other things, comply with this

26

Court's order requiring the turnover of books and records, the amendment of the Debtors' Schedules and Statements, and the investigation of post-petition transactions under section 549 of the Bankruptcy Code. On December 5, 2021, World Class Holdings I, LLC ("WCH") and the Property Manager filed their own motions for Rule 2004 examinations of the Debtors [Docket No. 369] and Houlihan [Docket No. 370] and requested a hearing on an expedited basis [Docket No. 371]. The Debtors' 2004 Motions and WCH and the Property Manager's motion to expedite were set for hearing at the Debtors' December omnibus setting. As set forth in Section V.B.11 herein, in light of the Bank Account Order, Governance Order, Diligence Order and the Enforcement Order (as defined herein), the Debtors, WCH and the Property Manager agreed to continue the hearing to January 31, 2022.

On January 17, 2022, Debtors filed *Debtors' Motion for Rule 2004 Examination of Yardi Systems, Inc. and Production of Documents* [Docket No. 541] (the "Yardi 2004 Motion") as part of the continued effort to obtain access to the Debtors' financial information used to, among other things, generate the Debtors' financial statements. A hearing on the Yardi 2004 Motion is set for February 16, 2022.

## 11. The Chapter 11 Trustee Motions and Governance Changes

On September 29, 2021, RREF filed a *Motion for Appointment of Chapter 11 Trustee* [Docket No. 195] and *Memorandum of Law In Support of the Motion for Appointment of Chapter 11 Trustee* [Docket No. 196] (collectively, the "RREF Trustee Motion") on an expedited basis. In addition, on October 12, 2021, the U.S. Trustee filed the *United States Trustee's Motion for the Appointment of a Trustee in Accordance with 11 U.S.C. § 1104(a)(2) or, in the Alternative, Convert to Chapter 7 Under 11 U.S.C. § 1112(b)* [Docket No. 226] (the "UST Trustee Motion").

On October 13, 2021, the Court held a status conference on the RREF Trustee Motion. At the status conference, certain financial discrepancies and reporting issues were disclosed, causing the Senior Lender and Senior Mezz Lender to orally move for the appointment of a chapter 11 trustee as well. In response, the Court encouraged the parties to reach a consensual resolution,[11] which prompted the Debtors, the Lenders, and Mr. Paul to engage in extensive negotiations, ultimately reaching a settlement whereby the Debtors and Mr. Paul would make certain management and governance changes and, in reliance on such changes, the Lenders would withdraw their pending motions for appointment of a chapter 11 trustee. The settlement was announced in open court via a stipulation read into the record and so ordered by the Court at the hearing.

In relevant part, the stipulation provided:

> Robert D. Albergotti shall be immediately appointed as the sole director of the debtors in possession. Nate Paul immediately resigns as an officer and director of each of the debtor entities, and subject to further order of the Court shall have no role whatsoever with

---

[11] Hr'g Tr. 37:5, 37:24 (Oct. 13, 2021).

respect to management or operation of the debtors, except the duty to cooperate with Albergotti in accordance herewith.

. . .

There shall be immediate turnover by GVS, Great Value Storage LLC, the debtors, Paul, anyone under their control to Albergotti of all information, including books, records and accounts, et cetera of the debtors and/or related to the debtors and their properties.

And Mr. Albergotti shall be given full access to all employees of GVS and there shall be an ongoing obligation by GVS and Paul to cooperate with the reasonable requests of Albergotti.

Paul reserves the right upon notice and motion to petition the Court to be reinstated as an officer and/or director of the debtors. And Paul during that – prior to that time, shall have no ability to replace or remove Albergotti from his position as sole director or appoint a new director to any debtor entity without further order of the Court.[12]

As a result of the Debtors' Governance Changes and the Oral Governance Ruling, RREF withdrew the RREF Trustee Motion without prejudice. The Senior Lender and the Senior Mezz Lender also both withdrew their oral joinders and motions for appointment of a chapter 11 trustee at the same time.

Following the status conference, the Debtors filed the *Notice of Proposed Agreed Governance Order* [Docket No. 241], and amended such proposed order [Docket No. 249], and further amended such proposed order [Docket No. 303] (the "Proposed Agreed Order"), which was signed by counsel to the Debtors and the Lenders and memorialized the terms of the Oral Governance Ruling. The Proposed Agreed Order was noticed for hearing (*see Notice of Hearing* [Docket No. 245]), which set an objection period at the request of the Court to allow parties in interest an opportunity to object or otherwise respond to the Governance Changes. On October 20, 2021, the U.S. Trustee timely filed its *Objection to the Proposed Agreed Order* [Docket No. 250], and the Proposed Governance Order was set for hearing on November 3, 2021 and subsequently continued to November 5, 2021 (the "November Hearing").

In support of the Proposed Agreed Order and in response to the UST Trustee Motion, the Debtors filed their *Omnibus Opposition to the (I) Motion for the Appointment of a Trustee in Accordance with 11 U.S.C. § 1104(a)(2) or, in the Alternative, Convert to Chapter 7 Under 11 U.S.C. § 1112(b); and (II) United States Trustee's Objection to Notice of Revised Proposed Agreed Order* [Docket No. 258] and the *Emergency Motion to Enforce the Court's October 13, 2021 Order* [Docket No. 289] (the "Motion to Enforce").[13] After an evidentiary hearing and oral

---

[12] *Id.* 45:16–23, 46:4–19.

[13] RREF subsequently filed its *Response Unopposed* to the UST Trustee Motion [Docket No. 285] and WCH filed its *Joinder to the Debtors' Omnibus Opposition to the (I) Motion for the Appointment of a Trustee in Accordance with*

argument in connection with the UST Trustee Motion, the Proposed Agreed Order, and the Motion to Enforce, the Court (i) denied the UST Trustee Motion [Docket No. 323], (ii) agreed to enter the Proposed Agreed Order as revised on the record [Docket No. 319] (the "Governance Order"), and (iii) denied as moot the Debtors' Motion to Enforce [Docket No. 315]. The Court entered the Governance Order on November 10, 2021.

In addition to the terms of the Governance Changes, the Governance Order: (i) prohibits the appointment, removal and/or replacement of a director of the Debtors without further order of the Court;[14] (ii) requires each of the Debtors to amend their Schedules and Statements to, at a minimum, disclose all insider transactions and account for any valuations of the properties; (iii) instructs the Debtors to investigate postpetition transactions for propriety under section 549 of the Bankruptcy Code and provide a report to the U.S. Trustee and the Lenders regarding their findings; and (iv) grants Mr. Albergotti immediate access to each of the Debtor bank accounts. Governance Order ¶¶ 6-9.

In an attempt to consensually resolve ongoing issues relating to the Governance Order, prior to the hearing on the Debtors' 2004 Motions, WCH, the Property Manager, and the Debtors agreed to the terms of the (i) *Supplemental Order Regarding Bank Accounts* [Docket No. 396] (the "Bank Account Order") and (ii) *Order in Furtherance of the Governance Order Directing Access to Diligence Items* [Docket No. 410] (the "Diligence Order"), which incorporated the terms of the Bank Account Order. The Bank Account Order and Diligence Order were designed to provide Mr. Albergotti direct access to the Debtors' bank accounts, accounting software, and other critical information in possession of the Property Manager and the Debtors' former management within ten days of the entry of the orders. The Debtors have reserved the right to proceed with the Debtors' 2004 Motions if the terms of the Bank Account Order and Diligence Order were not fulfilled.

On December 31, 2021, the Debtors filed *Debtors' Emergency Motion to Enforce the Governance and Diligence Orders* [Docket No. 460]. On January 6, 2022, the Court entered the *Order Enforcing the Governance and Diligence Orders* [Docket No. 494] (the "Enforcement Order"). The Enforcement Order, among other things, ordered and directed Mr. Albergotti be provided with direct access to all information of the Debtors and/or related to the Debtors and their properties. As of the filing of this Disclosure Statement, the Debtors continue to work with WCH, the Property Manager, and Mr. Paul to resolve several of the outstanding requirements set forth the in the Governance Order, Diligence Order and Enforcement Order, and the Debtors intend to proceed as necessary to seek compliance with the same.

---

*11 U.S.C. § 1104(a)(2) or, in the Alternative, Convert to Chapter 7 Under 11 U.S.C. § 1112(b); and (II) United States Trustee's Objection to Notice of Revised Proposed Agreed Order* [Docket No. 287].

[14] Additionally, the Governance Order further provides:

> Mr. Paul reserves the right, upon notice and motion, to petition the Court to be reinstated as an officer and/or director of the Debtors and Mr. Paul shall have no ability to replace or remove Albergotti from his position as sole director or appoint a new director to any Debtor entity without further order of the Court; provided, however, Mr. Paul retains the right to bring a motion to repay all secured lenders and exit these cases.

Governance Order ¶ 5.

### 12. Section 549 Investigation

Pursuant to the terms of the Governance Order, the Debtors and their advisors began to investigate all of the Debtors' post-petition transactions for propriety under section 549 of the Bankruptcy Code. The Debtors gathered information and evaluated such transactions throughout the pendency of these Chapter 11 Cases. As the Plan provides for the payment of Allowed Claims in full, with the excess if any provided to Holders of the Debtors' Interests, the Debtors do not anticipate pursuing preferential transfers.

### 13. Other Litigation Matters

In the ordinary course of business, the Debtors are parties to a number of lawsuits, legal proceedings, and collection proceedings arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and collection proceedings.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.

The following represents a list of known litigation matters that were pending at the time of the Petition Date:

- *GVS Portfolio I B, LLC v. Teachers Insurance Annuity Association of America*, Index No. 654095/2020 (New York) – UCC-1 Foreclosure Action

- *American Builder & Contractors Supply Co. Inc. v. GVS Texas Holdings I, LLC*; Dallas County, Texas, Case No. DC-19-18776 – Construction Dispute

- *Brookshire, Melvin Van (doing business as Vision Builders) v. World Class Capital Group LLC* filed on September 5, 2019 in Harris County, Texas as Case No. 201963577 and naming GVS Texas Holdings I, LLC and GVS Texas Holdings II, LLC as defendants – Construction Dispute.

In addition, the Property Manager and World Class Capital Group, LLC are defendants in a civil case styled *Princeton Capital Corporation v. Great Value Storage, LLC, World Class Capital Group, LLC and Natin Paul*, No. 2019-18855 currently pending in the 165th District Court, Harris County (the "Princeton Case"). A judgment was entered against the Property Manager on January 29, 2021. On September 8, 2021, an order (the "Receiver Order") was entered appointing a receiver (the "Receiver") to, among other things, collect judgement from the Property Manager and World Class Capital Group, LLC.[15] The Receiver Order was appealed to the Court of Appeals for the First District of Texas, in the case styled: *Great Value Storage, LLC and World*

---

[15] The Debtors do not take a position at this time on the Princeton Case or any of the orders entered therein, but the Debtors continue to evaluate its impact on the Debtors and their Estates.

*Class Capital Group, Inc. v. Princeton Capital Corporation*, Cause No. 01-21-00284-CV (the "Princeton Appeal").

Following several orders issued by the appellate court in the Princeton Appeal, the court lifted its initial order staying the appointment of the Receiver, abated the Princeton Appeal and remanded the appeal to the trial court for a determination whether appellee and appellants' rights would be adequate protected by supersedeas or another order. Both Princeton and the Receiver have appeared in these Chapter 11 Cases and Princeton initially made a claim for $5.6 million against each Debtor, but have subsequently amended such claims in excess of $10 million, which includes post-judgment interest. The Debtors have estimated the value of Princeton's claims at $10 million and classified the claim in Class 6 (PropCo Debtor General Unsecured Claim); *provided* that Princeton shall retain the right to amend, modify, and or/supplement its claim, and the Debtors shall retain the right to object to the allowance of the claim.

### 14. Assumption and Rejection of Executory Contracts and Unexpired Leases

Prior to the Petition Date and in the ordinary course of business, the Debtors were parties to certain Executory Contracts and Unexpired Leases. The Debtors, with the assistance of their advisors, are in the process of reviewing the Executory Contracts and Unexpired Leases to either assume and assign or reject such contracts and leases pursuant to sections 365 and 1123 of the Bankruptcy Code. If any Executory Contracts or Unexpired Leases are rejected, any resulting Allowed rejection damages Claims will be treated as Allowed PropCo Debtor General Unsecured Claims, subject to the Debtors' right to object to the allowance of such Claim.

The Plan provides that except as otherwise provided in Section V.G and elsewhere herein or in the APA, all Executory Contracts and/or Unexpired Leases not otherwise assumed and assigned or rejected will be deemed rejected by the applicable Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that: (1) are identified on the Assumption Notice; (2) previously expired or terminated pursuant to their own terms; (3) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (4) are the subject of a motion to reject that is pending on the Effective Date; or (5) have an ordered or requested effective date of rejection that is after the Effective Date; provided, however, that Debtors may elect to file additional discrete motions seeking to assume or reject various of the Debtors' Executory Contracts or Unexpired Leases.

### 15. Claims Estimation, Objections, and Resolutions

On December 22, 2021, the Court entered the *Order Determining Procedures for Estimating Claims Pursuant to 11 U.S.C. §§ 105(a) and 502(c)* [Docket No. 442] (the "Estimation Procedures Order"). The Estimation Procedures Order provides for, among other things, procedures through which the Debtors' may resolve significant contingent and/or unliquidated claims arising from alleged liability asserted against the Debtors.[16] Pursuant to the Estimation Procedures Order, the Debtors filed the Estimation Supplement, which set forth the Debtors' estimates of the amounts of filed Claims that the Debtors, collectively with their advisors, have

---

[16] *See* Estimation Procedures Order ¶¶ 2A, C.

concluded to be objectionable and/or otherwise require an estimation in order to determine (a) certain credit bid rights and (b) distribution amount to each Class of Claims pursuant to the Plan. The proposed form of order estimating such Claims has been submitted to the Court concurrently upon the filing of this Disclosure Statement.

On December 23, 2021, pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3007, the Debtors filed several objections to certain proofs of claim filed in the Chapter 11 Cases. At the time of this filing, the Debtors have filed: (i) *Debtors' Objection to the Claim of Melvin Van Brookshire* [Docket No. 446]; (ii) *Debtors' Omnibus Objection to Certain Proofs of Claim (Duplicate Claims, Non-Debtor Claims, and Non-Cognizable – No Supporting Documentation Claims)* [Docket No. 450]; and (iii) *Debtors' Omnibus Objection to Certain Amended and Superseded Claims* [Docket No. 451] (collectively, the "Claim Objections"). The Debtors' have reserved all rights with respect to their rights to further object to the claims included in the Claim Objections and any other claim filed in the Chapter 11 Cases. The Claim Objections, and any responses thereto, shall be heard by the Court on February 11, 2022, subject to extensions granted by the Debtors on a case-by-case basis.

The Debtors are seeking orders of the Court, pursuant to Bankruptcy Rule 9019, approving the terms of settlements resolving the claims of the Senior Mezz Lender, Senior Lender and Junior Mezz Lender [Docket Nos. 523, 535 and 578] (collectively the "Proposed Lender Resolutions"). Through the Proposed Lender Resolutions, the Debtors seek Court approval of settlements which resolve two significant issues in the Senior Mezz Lender, Senior Lender and Junior Mezz Lender Claims against the Debtors: payment of the yield maintenance default premium and the accrual date for prepetition default interest.

The key terms of the settlement between the Debtors and the Senior Mezz Lender are summarized as follows:

| Provision | Summary Description |
|---|---|
| **Settlement/Allowance of Senior Mezz Lender Claim** | The Proposed Lender Resolution with the Senior Mezz Lender provides that the Senior Mezz Lender Claim is allowed and settled as follows:[17]<br><br>• The full outstanding funded debt (principal) amount in the amount of $103,000,000;<br><br>• Post-petition non-default interest through the Projected Closing Date in the amount of $4,752,306;<br><br>• Post-petition default interest through Projected Closing Date in the amount of $4,320,278; |

---

[17] This Settlement contemplates that the Allowed Senior Mezz Lender Claim will be paid in full on the projected closing date (the "Projected Closing Date"). In the event the Projected Closing Date is later than April 15, 2022, the calculation of the amount of default and non-default post-petition interest, post-petition late fees, yield maintenance default premium, and all fees and expenses of counsel and other professionals representing the Senior Mezz Lender to be paid will be updated to reflect the date the Senior Mezz Lender Claim is actually paid in full.

|  | • Prepetition default interest commencing March 31, 2020 through the Petition Date in the amount of $6,337,361;<br><br>• Prepetition non-default interest in the amount of $173,097;<br><br>• Late fees in the amount of $262,793.06;<br><br>• Yield maintenance default premium ("<u>YMDP</u>") in the amount of $6,104,570<br><br>• All fees and expenses of counsel and other professionals representing the Senior Mezz Lender, which is estimated to be $852,071.40 as of the Projected Closing Date |
|---|---|
| **Implementation** | The Debtors seek approval of the Senior Mezz Lender Claim settlement pursuant to Bankruptcy Rule 9019. |
| **Treatment under the Plan of Senior Mezz Lender Claim** | The Senior Mezz Lender Claim will be paid in full on the Projected Closing Date from the Net Sale Proceeds, or such later date of the closing of the sale of the properties owned by the PropCo Debtors. |
| **Application of Funds to the Senior Mezz Lender Claim** | The Senior Mezz Lender Claim shall be paid from the Net Sale Proceeds. |
| **Mutual Release** | Each of the Settlement Parties shall irrevocably and unconditionally release and forever discharge each other, their divisions, affiliates and associated companies, and their respective owners, shareholders, members, managers, officers, directors, agents, attorneys, representatives, successors, predecessors, heirs, employees, administrators, and assigns, from any and all actions, causes of action, claims, counter-claims, liens, suits, torts, debts, dues, sums of money, bills, bonds, invoices, accounts, liabilities, expenses, costs, attorneys' fees, covenants, agreements, contracts, promises, guarantees, warranties, representations, damages, judgments, obligations, charges, complaints and demands specified in the Settlement Agreement (the "<u>Mutual Release</u>"). |

The key terms of the settlement between the Debtors and the Senior Lender are summarized as follows:

| Provision | Summary Description |
|---|---|
| **Settlement/Allowance of Senior Lender Claims** | The Proposed Lender Resolution with the Senior Lender provides that the Senior Lender Claims are allowed and settled as follows:<br><br>• The full outstanding funded debt (principal) amount in the amount of $110,000,000 shall be allowed; |

33

|  | <ul><li>Postpetition non-default interest through the Closing Date shall be allowed, amounting to approximately \$63,246;[18]</li><li>Postpetition default interest through the Closing Date shall be allowed, amounting to approximately \$4,613,889;[19]</li><li>The Debtors agree that the date of the first default under the Senior Lender loan is at least as early as August 1, 2019, and that default interest is accruing under from at least that date. In consideration of payment by the Debtors to the Senior Lender in connection with the sale and plan contemplated by the Debtors, the Senior Lender agrees to accept payment for prepetition default interest commencing March 31, 2020 through the Petition Date, amounting to approximately \$6,752,778, in full settlement of its claim for prepetition default interest; and</li><li>YMDP calculated as provided for under the Loan Agreement shall be allowed. The amount of YMDP that will be due is currently estimated to be approximately \$5,500,000.[20]</li><li>All fees and expenses of counsel and other professionals representing the Senior Lender will be paid in full on the Closing Date, which is estimated to be approximately \$250,000.[21]</li></ul> |
|---|---|
| **Implementation** | The Debtors seek approval of the Senior Lender's settlement pursuant to Bankruptcy Rule 9019. |
| **Treatment under the Plan of Senior Lender Claims** | Upon the Effective Date, or as soon as reasonably practicable thereafter, the Allowed amount of the Senior Lender Claims shall be paid in full from cash in the Debtors' reserve accounts and the Net Sale Proceeds. Holders of Senior Lender Claims are Unimpaired and conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan. The Senior Lender agrees not to object to or impede confirmation of the Debtors' Plan. |
| **Payment of Professional Fees/Expenses** | All unpaid fees and expenses of counsel and other professionals representing the Senior Lender will be paid in full in cash by the Debtors on the Effective Date. |

---

[18] This amount is based on a Projected Closing Date of April 15, 2022 assumes that non-default interest continues to be paid pursuant to the Cash Collateral Order and is subject to final calculation based on the actual Closing Date.

[19] This amount is based on a Projected Closing Date of April 15, 2022 and is subject to final calculation based on the actual Closing Date.

[20] This amount is based on a Projected Closing Date of April 15, 2022 and is subject to final calculation based on the actual Closing Date and the other relevant factors provided for under the Loan Agreement.

[21] This estimate assumes that post-petition lender fees and expenses continue to be paid current on a monthly basis pursuant to the Cash Collateral Order.

275617735v.11

| | |
|---|---|
| **Application of Funds to the Senior Lender Claims** | The Senior Lender Claims shall be paid first, from available cash held in certain of the Debtors' reserve accounts, which will be netted against the Senior Lender Claims; and second, from the Net Sale Proceeds. |
| **Releases** | 1.   Release by the Debtors<br><br>Effective after full payment of the settlement amount, each of the Debtors and each of their divisions, affiliates and associated companies, and each of their respective owners, shareholders, members, managers, officers, directors, agents, attorneys, representatives, successors, predecessors, heirs, employees, administrators, and assigns (the "Debtor Releasing Parties") and Mr. Robert D. Albergotti, Mr. Stephen M. Pinsly, Getzler Henrich & Associates LLC ("Getzler") and each of Mr. Albergotti's, Mr. Pinsly's and Getzler's divisions, affiliates and associated companies, and each of their respective owners, shareholders, members, managers, officers, directors, agents, attorneys, representatives, successors, predecessors, heirs, employees, administrators, and assigns, shall irrevocably and unconditionally release and forever discharge the Senior Lender, and each of its divisions, affiliates and associated companies, and each of their respective owners, shareholders, members, managers, officers, directors, agents, attorneys, representatives, successors, predecessors, heirs, employees, administrators, and assigns (the "Senior Lender Released Parties"), from any and all actions, causes of action, claims, counter-claims, liens, suits, torts, debts, dues, sums of money, bills, bonds, invoices, accounts, liabilities, expenses, costs, attorneys' fees, covenants, agreements, contracts, promises, guarantees, warranties, representations, damages, judgments, obligations, charges, complaints and demands specified in the Settlement (the "Debtors Release").<br><br>2.   Release by the Senior Lender<br><br>Effective after full payment of the settlement amount, the Senior Lender and each of its divisions, affiliates and associated companies, and each of their respective owners, shareholders, members, managers, officers, directors, agents, attorneys, representatives, successors, predecessors, heirs, employees, administrators, and assigns (the "Senior Lender Releasing Parties") shall irrevocably and unconditionally release and forever discharge Mr. Robert D. Albergotti, Mr. Stephan M. Pinsly, Getzler Henrich & Associates LLC ("Getzler") and each of Mr. Albergotti's, Mr. Pinsly's and Getzler's divisions, affiliates and associated companies, and each of their respective owners, shareholders, members, managers, officers, directors, agents, attorneys, representatives, successors, predecessors, heirs, employees, administrators, and assigns, and the Debtors and their successors and assigns (the "Debtors Released Parties") from any and all actions, causes of action, claims, counter-claims, liens, suits, torts, debts, dues, sums of money, bills, bonds, invoices, accounts, liabilities, expenses, costs, attorneys' fees, covenants, agreements, contracts, promises, guarantees, warranties, representations, damages, judgments, obligations, charges, complaints and demands specified in the Settlement (the "Senior Lender Release" and together with the Debtors Release, the "Releases"). |

The key terms of the settlement between the Debtors and the Junior Mezz Lender are summarized as follows:

| Provision | Summary Description |
|---|---|
| **Settlement/Allowance of Junior Mezz Lender Claims** | The Proposed Lender Resolution with the Junior Mezz Lender provides that the Junior Mezz Lender Claim is allowed and settled as follows:<br><br>• The full outstanding funded debt (principal) amount in the amount of $82,000,000 shall be allowed;<br><br>• Postpetition non-default interest through the Closing Date shall be allowed, amounting to approximately $5,994,952;[22]<br><br>• Postpetition default interest through the Closing Date shall be allowed, amounting to approximately $3,439,444;[23]<br><br>• Prepetition default interest commencing December 6, 2019 through the Petition Date shall be allowed in the amount of $4,884,834;<br><br>• Prepetition non-default interest shall be allowed in the amount of $11,672,290;<br><br>• 70% shall be allowed of the amount of YMDP calculated as provided for under the Loan Agreement. The amount of YMDP that will be due is currently estimated to be 70% of approximately $7,913,721;[24]<br><br>• $2,034,687 on account of protective advances shall be allowed; and<br><br>• All fees and expenses of counsel and other professionals representing the Junior Mezz Lender ("<u>Costs and Expenses</u>") will be paid in full on the Closing Date, which amount is estimated to be $9,039,923 as of the Closing Date. |
| **Implementation** | The Debtors seek approval of the Junior Mezz Lender settlement pursuant to Bankruptcy Rule 9019. |
| **Treatment under the Plan of Junior Mezz Lender Claims** | Upon the Effective Date, or as soon as reasonably practicable thereafter, the Allowed amount of the Junior Mezz Lender Claims shall be paid in full from the Net Sale Proceeds. |
| **Payment of Professional Fees/Expenses** | All unpaid fees and expenses of counsel and other professionals representing the Junior Mezz Lender will be paid in full in cash by the Debtors on the Effective Date. |

---

[22] This amount is based on a projected Closing Date of April 15, 2022, and is subject to final calculation based on the actual Closing Date.

[23] This amount is based on a projected Closing Date of April 15, 2022, and is subject to final calculation based on the actual Closing Date.

[24] This amount is based on a projected Closing Date of April 15, 2022 and is subject to final calculation based on the actual Closing Date and the other relevant factors provided for under the Loan Agreement.

| | |
|---|---|
| **Application of Funds to the Junior Mezz Lender Claims** | The Junior Mezz Lender Claim shall be paid from the Net Sale Proceeds. |
| **Releases** | 3.   Release by the Debtors<br><br>Effective after full payment of the settlement amount, each of the Debtors and each of their divisions, affiliates and associated companies, and each of their respective owners, shareholders, members, managers, officers, directors, agents, attorneys, representatives, successors, predecessors, heirs, employees, administrators, and assigns (the "Debtor Releasing Parties") and Mr. Robert D. Albergotti, Mr. Stephen M. Pinsly, Getzler Henrich & Associates LLC ("Getzler") and each of Mr. Albergotti's, Mr. Pinsly's and Getzler's divisions, affiliates and associated companies, and each of their respective owners, shareholders, members, managers, officers, directors, agents, attorneys, representatives, successors, predecessors, heirs, employees, administrators, and assigns, shall irrevocably and unconditionally release and forever discharge the Junior Mezz Lender, and each of its divisions, affiliates and associated companies, and each of their respective owners, shareholders, members, managers, officers, directors, agents, attorneys, representatives, successors, predecessors, heirs, employees, administrators, and assigns (the "Junior Mezz Lender Released Parties"), from any and all actions, causes of action, claims, counter-claims, liens, suits, torts, debts, dues, sums of money, bills, bonds, invoices, liabilities, expenses, costs, attorneys' fees, covenants, agreements, contracts, promises, guarantees, warranties, representations, damages, judgments, obligations, charges, complaints and demands specified in the Settlement (the "Debtors Release").<br><br>4.   Release by the Junior Mezz Lender<br><br>Effective after full payment of the settlement amount, the Junior Mezz Lender and each of its divisions, affiliates and associated companies, and each of their respective owners, shareholders, members, managers, officers, directors, agents, attorneys, representatives, successors, predecessors, heirs, employees, administrators, and assigns (the "Junior Mezz Lender Releasing Parties") shall irrevocably and unconditionally release and forever discharge Mr. Robert D. Albergotti, Mr. Stephan M. Pinsly, Getzler Henrich & Associates LLC ("Getzler") and each of Mr. Albergotti's, Mr. Pinsly's and Getzler's divisions, affiliates and associated companies, and each of their respective owners, shareholders, members, managers, officers, directors, agents, attorneys, representatives, successors, predecessors, heirs, employees, administrators, and assigns, and the Debtors and their successors and assigns (the "Debtors Released Parties") from any and all actions, causes of action, claims, counter-claims, liens, suits, torts, debts, dues, sums of money, bills, bonds, invoices, accounts, liabilities, expenses, costs, attorneys' fees, covenants, agreements, contracts, promises, guarantees, warranties, representations, damages, judgments, obligations, charges, complaints and demands specified in the Settlement (the "Junior Mezz Lender Release" and together with the Debtors Release, the "Releases"). |

The Debtors and their advisors have determined that the Proposed Lender Resolutions are fair and reasonable and represent the settling parties' good faith negotiations that efficiently

resolve the Senior Mezz Lender, Senior Lender and Junior Mezz Lender Claims and that will maximize recoveries and provide more certainty to all parties in respect of the Sale and the Debtors' emergence from the Chapter 11 Cases.

### 16. Exclusivity

Pursuant to sections 1121(b) and 1121(c)(3) of the Bankruptcy Code, the Debtors had the exclusive right to file a plan (the "Exclusive Filing Period") until October 15, 2021, and the exclusive right to solicit acceptances for its plan until December 14, 2021 (the "Exclusive Solicitation Period" and together with the Exclusive Filing Period, the "Exclusive Periods"). The Debtors filed their original Plan within the Exclusive Filing Period, but sought an extension of the Exclusive Solicitation Period to solicit acceptances of the Plan. Accordingly, on November 15, 2021, the Debtors filed the *Motion Pursuant to 11 U.S.C. § 1121(d) to Extend the Exclusive Solicitation Period* [Docket No. 326], seeking an extension of the Exclusive Solicitation Period until February 12, 2022. On December 22, 2021, the Court entered an order extending the Exclusive Solicitation Period to February 12, 2022 [Docket No. 441].

The Debtors reserve the right to seek extensions of the Exclusive Filing Period and further extensions of the Exclusive Solicitation Period pursuant to section 1121(d) of the Bankruptcy Code.

## VI. PLAN OF REORGANIZATION

### A. Administrative Expense Claims and Priority Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

### 1. Administrative Expense Claims

Unless otherwise agreed to by the Holder of an Allowed General Administrative Expense Claim and the Debtors, each Holder of an Allowed General Administrative Expense Claim that is unpaid as of the Effective Date shall receive, on account and in full satisfaction of such Allowed General Administrative Expense Claim, Cash in an amount equal to the Allowed amount of such General Administrative Expense Claim, to be paid in accordance with the following: (1) if a General Administrative Expense Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed General Administrative Expense Claim is due or as soon as reasonably practicable thereafter); (2) if such General Administrative Expense Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such General Administrative Expense Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) at such time and upon such terms as may be agreed upon by such Holder and the Debtors; or (4) at such time and upon such terms as set forth in any other order of the Court.

Each Holder of a General Administrative Expense Claim that was not accrued in the ordinary course of business must File and serve a request for payment of such General Administrative Expense Claim on the Debtors no later than the Administrative Expense Claims

38

Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of the Effective Date. Holders of General Administrative Expense Claims that are required to File and serve a request for payment of such General Administrative Expense Claims by the Administrative Expense Claims Bar Date that do not File and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such General Administrative Expense Claims against the Debtors or their respective property, and such General Administrative Expense Claims shall be deemed forever discharged and released as of the Effective Date. Any requests for payment of General Administrative Expense Claims that are not properly Filed and served by the Administrative Expense Claims Bar Date shall not appear on the Claims Register and shall be Disallowed automatically without the need for further action by the Debtors, or further order of the Court.

The Debtors may settle General Administrative Expense Claims without further Court approval. The Debtors may also choose to object to any General Administrative Expense Claim no later than sixty (60) days from the Administrative Expense Claims Bar Date, subject to extensions by the Court, agreement in writing of the parties, or on motion of a party in interest approved by the Court. Unless the Debtors or other party with standing, as applicable, object to a timely Filed and properly served General Administrative Expense Claim, such General Administrative Expense Claim will be deemed Allowed in the amount requested. In the event that the Debtors object to a General Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing that, the Court will determine whether such General Administrative Expense Claim should be Allowed and, if so, in what amount.

### 2. Professional Claims

#### (a) Final Fee Applications and Payment of Professional Claims

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than the Administrative Expense Claims Bar Date. The Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Court. The Debtors shall pay Professional Claims in Cash in the amount the Court allows, including from the Professional Claim Reserve Account, which the Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Claim Reserve Amount on the Effective Date.

#### (a) Professional Claim Reserve Account

On the Effective Date, the Debtors shall fund the Professional Claim Reserve Account with Cash equal to the aggregate Professional Claim Reserve Amount for all Professionals. The Professional Claim Reserve Account shall be maintained in trust for the Professionals. Such funds in the Professional Claim Reserve Account shall not constitute property of the Debtors' Estates, except as otherwise expressly set forth in the last sentence of this paragraph. The amount of Professional Claims owing to the Professionals on and after the Effective Date shall be paid in Cash to such Professionals from funds held in the Professional Claim Reserve Account, without interest or other earnings therefrom, as soon as reasonably practicable after such Claims are Allowed by a Court order. When all Allowed Professional Claims have been paid in full, amounts

remaining in the Professional Claim Reserve Account, if any, shall revert to the Debtors to be distributed pursuant to the terms of the Plan without any further action or order of the Court.

Professionals shall reasonably estimate their unpaid Professional Claims Reserve Amount and shall deliver such estimate to the Debtors no later than five (5) days before the Effective Date; provided, however, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in these Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional for purposes of determining the Professional Claims Reserve Amount.

**(b)      Post-Effective Date Fees and Expenses**

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Debtors. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Court.

**3.      Priority Tax Claims**

Except as otherwise agreed by a Holder of an Allowed Priority Tax Claim and the Debtors, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to the Allowed amount of such Priority Tax Claim, to be paid on the Effective Date or as soon as reasonably practicable thereafter.

**B.      Classification and Treatment of Claims and Interests**

**1.      Classification of Claims and Interests**

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation, and distribution pursuant thereto and pursuant to sections 1122 and 1123(a) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class for purposes of distribution only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code and as described in Article III of the Plan, the Debtors have not classified Administrative Expense Claims (including Professional Claims) and Priority Tax Claims.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

40

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Senior Lender Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | PropCo Debtor Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 5 | PropCo Debtor General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 6 | Senior Mezz Lender Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 7 | Senior Mezz Debtor Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 8 | Senior Mezz Debtor General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 9 | Junior Mezz Lender Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 10 | Junior Mezz Debtor Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 11 | Junior Mezz Debtor General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 12 | Section 510(a) Subordinated Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 13 | Junior Mezz Debtor Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 14 | TopCo Debtor Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

## 2. Treatment of Claims and Interests

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

41

      **(a)**    **Class 1 – Other Secured Claims**

    i.    *Classification.*  Class 1 consists of Other Secured Claims.

    ii.    *Treatment*.  Each Holder of an Allowed Other Secured Claim shall receive at the option of the Debtors:

        (i)  payment in full in Cash;

        (ii) the return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim; or

        (iii) such other treatment sufficient to render such Allowed Other Secured Claim as Unimpaired.

    iii.    *Voting.*  Class 1 is Unimpaired under the Plan.  Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

      **(b)**    **Class 2 – Other Priority Claims**

    i.    *Classification*.  Class 2 consists of Other Priority Claims.

    ii.    *Treatment*.  On the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash.

    iii.    *Voting*.  Class 2 is Unimpaired under the Plan.  Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

      **(c)**    **Class 3 – Senior Lender Claims**

    i.    *Classification*.  Class 3 consists of Senior Lender Claims.

    ii.    *Treatment*.  Upon the Effective Date, or as soon as reasonably practicable thereafter, the Allowed amount of the Senior Lender Claims shall be paid in Cash from the Net Sale Proceeds.

    iii.    *Voting*.  Class 3 is Unimpaired under the Plan.  Holders of Claims in Class 3 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**(d)**      **Class 4 – PropCo Debtor Priority Claims**

     i.     *Classification*. Class 4 consists of PropCo Debtor Priority Claims.

     ii.     *Treatment*. On the Effective Date, or as soon as reasonably practicable thereafter the Allowed amount of the PropCo Debtor Priority Claims shall be paid in Cash from the available Net Sale Proceeds.

     iii.     *Voting*. Class 4 is Unimpaired under the Plan. Holders of Claims in Class 4 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**(e)**      **Class 5 – PropCo Debtor General Unsecured Claims**

     i.     *Classification*. Class 5 consists of PropCo Debtor General Unsecured Claims.[25]

     ii.     *Treatment*. On the Effective Date, or as soon as reasonably practicable thereafter the Allowed amount of the PropCo Debtor General Unsecured Claims shall be paid in Cash from the available Net Sale Proceeds.

     iii.     *Voting*. Class 5 is Unimpaired under the Plan. Holders of Claims in Class 5 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**(f)**      **Class 6 – Senior Mezz Lender Claims**

     i.     *Classification*. Class 6 consists of Senior Mezz Lender Claims.

     ii.     *Treatment*. On the Effective Date, or as soon as reasonably practicable thereafter, the Allowed amount of the Senior Mezz Lender Claims shall be paid in Cash from the Net Sale Proceeds.

     iii.     *Voting*. Class 6 is Unimpaired under the Plan. Holders of Claims in Class 6 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

---

[25] To the extent that Class 5 includes General Unsecured Claims against multiple Debtors, the treatment of Class 5 described herein potentially constitutes a partial substantive consolidation of the applicable Debtors.

43

Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**(g)**     **Class 7 – Senior Mezz Debtor Priority Claims**

    i.     *Classification*. Class 7 consists of Senior Mezz Debtor Priority Claims.

    ii.     *Treatment*. On the Effective Date, or as soon as reasonably practicable thereafter the Allowed amount of the Senior Mezz Debtor Priority Claims shall be paid in Cash from the Net Sale Proceeds.

    iii.     *Voting*. Class 7 is Unimpaired under the Plan. Holders of Claims in Class 7 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**(h)**     **Class 8 – Senior Mezz Debtor General Unsecured Claims**

    i.     *Classification*. Class 8 consists of Senior Mezz Debtor General Unsecured Claims.

    ii.     *Treatment*. On the Effective Date, or as soon as reasonably practicable thereafter the Allowed amount of the Senior Mezz Debtor General Unsecured Claims shall be paid in Cash from the Net Sale Proceeds.

    iii.     *Voting*. Class 8 is Unimpaired under the Plan. Holders of Claims in Class 8 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**(i)**     **Class 9 – Junior Mezz Lender Claims**

    i.     *Classification*. Class 9 consists of Junior Mezz Lender Claims.

    ii.     *Treatment*. On the Effective Date, or as soon as reasonably practicable thereafter the Allowed amount of the Junior Mezz Lender Claims shall be paid in Cash from the available Net Sale Proceeds.

    iii.     *Voting*. Class 9 is Unimpaired under the Plan. Holders of Claims in Class 9 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

44

Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**(j)     Class 10 – Junior Mezz Debtor Priority Claims**

    i.    *Classification*.  Class 10 consists of Junior Mezz Debtor Priority Claims.

    ii.    *Treatment*.  On the Effective Date, or as soon as reasonably practicable thereafter the Allowed amount of the Junior Mezz Debtor Priority Claims shall be paid in Cash from the available Net Sale Proceeds.

    iii.    *Voting*.  Class 10 is Unimpaired under the Plan.  Holders of Claims in Class 10 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**(k)     Class 11 – Junior Mezz Debtor General Unsecured Claims**

    i.    *Classification*.  Class 11 consists of Junior Mezz Debtor General Unsecured Claims.

    ii.    *Treatment*.  On the Effective Date, or as soon as reasonably practicable thereafter the Allowed amount of the Junior Mezz Debtor General Unsecured Claims shall be paid in Cash from the available Net Sale Proceeds.

    iii.    *Voting*.  Class 11 is Unimpaired under the Plan.  Holders of Claims in Class 11 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**(l)     Class 12 – Section 510(a) Subordinated Claims**

    i.    *Classification*.  Class 12 consists of Section 510(a) Subordinated Claims.

    ii.    *Treatment*.  On the Effective Date, or as soon as reasonably practicable thereafter the Allowed amount of the Section 510(a) Subordinated Claims shall be paid in Cash from the available Net Sale Proceeds.

    iii.    *Voting*.  Class 12 is Unimpaired under the Plan.  Holders of Claims in Class 12 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

45

275617735v.11

Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**(m)** **Class 13 – Junior Mezz Debtor Interests**

    i.    *Classification*. Class 13 consists of Junior Mezz Debtor Interests.

    ii.    *Treatment*. On the Effective Date, or as soon as reasonably practicable thereafter, the Junior Mezz Debtor Interests shall be paid in Cash to the extent of the available Net Sale Proceeds. Interests in the Junior Mezz Debtor shall thereafter be extinguished and of no further force or effect.

    iii.    *Voting*. Class 13 is Unimpaired under the Plan. Holders of Interests in Class 13 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**(n)** **Class 14 – TopCo Debtor Interests**

    i.    *Classification*. Class 14 consists of TopCo Debtor Interests.

    ii.    *Treatment*. On the Effective Date, or as soon as reasonably practicable thereafter, the TopCo Debtor Interests shall be paid in Cash to the extent of the available Net Sale Proceeds. Interests in the TopCo Debtor shall thereafter be extinguished and of no further force or effect.

    iii.    *Voting*. Class 14 is Unimpaired under the Plan. Holders of Interests in Class 14 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**3.** **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights regarding any Unimpaired or reinstated Claim, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired or reinstated Claim.

**4.** **Elimination of Vacant Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting

to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 5. Acceptance or Rejection of the Plan

#### a. Presumed Acceptance of the Plan

No Classes of Claims or Interests are Impaired under the Plan. Accordingly, each Class is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code; provided, however, that, to the extent there are insufficient Net Sale Proceeds to satisfy Holders of Claims or Interests in any Class (other than Class 13 Junior Mezz Debtor Interests and Class 14 TopCo Debtor Interests), such Class or Classes shall be deemed Impaired and eligible to vote to accept or reject the Plan during the Exclusive Solicitation Period.

#### b. Voting Classes

No Classes of Claims or Interests are Impaired under the Plan. Accordingly, no Classes of Claims or Interests are entitled to vote to accept or reject the Plan.

### 6. Confirmation and 1129(b) of the Bankruptcy Code

As no Classes of Claims or Interests are Impaired under the Plan, Section 1129(a)(10) of the Bankruptcy Code is inapplicable for purposes of Confirmation. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules. If a controversy arises as to whether any Claims or Interests, or any class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### C. Means for Implementation of the Plan

### 1. General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority, or extent of the Senior Lender Claims; (2) any challenge to the amount, validity, perfection, enforceability, priority, or extent of the Senior Mezz Claims; and (3) any challenge to the amount, validity, perfection, enforceability, priority, or extent of the Junior Mezz Claims. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their

47

Estates.  Subject to Article VI.K of the Plan, all Plan Distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

## 2. Bidding Process

As stated herein, the Debtors filed the Original Bidding Procedures, which were subsequently approved by the Court's entry of the Original Bidding Procedures Order.

In accordance with the Original Bidding Procedures, the Debtors and their advisors engaged in negotiations with several parties interested in serving as the stalking horse bidder and determined that the Stalking Horse Bid from the Stalking Horse Bidder best served the purpose of promoting a competitive Sale process.  Accordingly, the Debtors entered into an Asset Purchase Agreement (the "APA") with the Stalking Horse Bidder that, subject to Court approval, will serve as a baseline from which all prospective bidders will negotiate.

On January 18, 2022, in accordance with the Original Bidding Procedures Order, the Debtors filed the Revised Bidding Procedures. The Revised Bidding Procedures provide for, among other things, the Debtors' designation of a stalking horse bidder and related bid protections. Substantive provisions of the Revised Bidding Procedures include, but are not limited to:

a) Submission of Asset Purchase Agreement.  Bidders shall submit a form asset agreement, which shall (i) identify the Assets the bidder seeks to purchase; (ii) contain the form and total consideration to be paid by such bidder, (iii) be subject to all of the terms, conditions, and contingencies in the Stalking Horse APA; and (iv) include cash consideration equal to or greater than the Topping Bid (as defined below);

b) Bid Protections.  Stalking Horse Bidder, but no other bidders, shall be entitled to shall be immediately entitled to a termination fee in an amount equal to 1.5% of the Base Amount (the "Break-Up Fee") *plus* the sum of the aggregate amount of Purchaser's actual reasonable documented out-of-pocket costs and expenses incurred by the Stalking Horse Bidder in connection with or related to the Transactions prior to the date of termination of the Stalking Horse APA.  The Bid Protections shall constitute administrative expense claims under Sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code; and

c) Topping Bid.  Bidders shall be required to submit a bid equal to or in excess of the sum of (i) the Base Amount, plus (ii) the Breakup Fee, plus (iii) the Purchaser Expense Reimbursement, plus (iv) an amount equal to 1% of the purchase price (a "Topping Bid")

The Debtors intend to conduct an auction (the "Auction") on February 21, 2022, in accordance with the Original Bidding Procedures and, as may be ordered by the Court, the Revised Bidding Procedures, in furtherance of the Sale that will generate sufficient Sale Proceeds to fund the payment of Allowed Claims in full.

48

3. **Sale**

The Debtors' Assets will be marketed pursuant to the Original Bidding Procedures and, as appropriate, the Revised Bidding Procedures, to effectuate the Sale and to generate Sale Proceeds to be distributed in accordance with the Plan. The actions to implement the Sale may include: (1) the execution and delivery of appropriate agreements or other documents that are consistent with the terms of the Plan and that satisfy the applicable requirements of law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan. The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.

a. **Cancellation of Existing Agreements**

On the Effective Date, except to the extent otherwise provided in the Plan, the Sale Order, or the Confirmation Order, all notes, instruments, certificates, credit agreements, indentures, and other similar documents evidencing Claims or Interests, shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect. Holders of or parties to such canceled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan.

b. **Section 1146 Exemption**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; (b) the Sale; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the grant of collateral as security for the Debtors' obligations under and in connection with the Mortgage Loan, Senior Mezz Loan, or Junior Mezz Loan, as applicable; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan or the Sale Order, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan or the Sale Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and

49

accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Entity with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### c. Effectuating Documents; Further Transactions

On and after the Effective Date, the Debtors, or Liquidating Debtors, as applicable, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan or the Sale Order, as applicable.

### 4. Preservation of Causes of Action

### a. Maintenance of Causes of Action

Except as otherwise provided in this Article IV or elsewhere in the Plan or the Confirmation Order, after the Effective Date, the Liquidating Debtors shall retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in these Chapter 11 Cases; provided, however, that the foregoing shall not be deemed to include any claims or Causes of Action (i) released under Section VIII.C.1 hereof or (ii) exculpated under Article VIII.E of the Plan to the extent of any such exculpation. The Debtors, Liquidating Debtors, and the Estates, may, and shall have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of such Causes of Action, in each case solely to the extent of the Debtors', Liquidating Debtors', or their Estates' interest therein, without notice to or approval from the Bankruptcy Court. Notwithstanding the foregoing, the Debtors or Liquidating Debtors, as applicable, shall retain all claims and defenses to any Allowed Claims that are Unimpaired pursuant to the Plan. A further description of the retained causes of action shall be filed with the Plan Supplement.

### b. Preservation of All Causes of Action Not Expressly Settled or Released

The Debtors expressly reserve all Causes of Action for later adjudication by the Debtors or Liquidating Debtors, as applicable, (including, without limitation, Causes of Action not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or

50

otherwise) or laches shall apply to such Causes of Action upon or after the Confirmation or Consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except in each case where such Causes of Action have been expressly waived, relinquished, released, compromised or settled in the Plan, the Confirmation Order or any other Final Order, including, without limitation or any other claims or Causes of Action (i) released under Article VIII.C.1 of the Plan or (ii) exculpated under Article VIII.E of the Plan to the extent of any such exculpation. In addition, the Debtors and Liquidating Debtors, as applicable, expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any of the Debtors are a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

### 5. Disputed Claims Reserve Account

On the Effective Date, and in conjunction with making all distributions required to be made on the Effective Date, the Debtors shall establish the disputed claims reserve account ("Disputed Claims Reserve Account") in an amount equal to the amount of Disputed Claims (in addition to estimated interest due and owing, either contractually and/or under the Bankruptcy Code, to each Holder of such Disputed Claims) as of the Effective Date (the "Disputed Claim Reserve Funds"). The amount of the Disputed Claim Reserve Funds shall be reduced upon payment to Holders of Allowed Claims, with any excess Cash to be distributed to the Holders of Interests. Payments from the Disputed Claim Reserve Funds shall be made to the Holder of an Allowed Claim, which was previously a Disputed Claim, upon the first Distribution Date immediately following the date upon which such Claim became an Allowed Claim.

The Disputed Claims Reserve Account shall be terminated when all Disputed Claims related to such account have either become Allowed Claims or Disallowed with excess Disputed Claim Reserve Funds to be distributed to Holders of Interests.

### 6. Opt-Out Forms

**All Holders of Claims or Interests will receive a form ("Opt-Out Forms") to complete and return if such Holder elects to opt-out of the consensual third-party releases set forth herein and in Section VIII.D of the Plan. The Opt-Out Forms must be properly executed, completed, and delivered (the "Opt-Out Deadline") so as to be actually received by Omni on or before 4:00 p.m. CT on a date that is no earlier than 28 days after the Solicitation Agent distributes the notices of the Confirmation Hearing (the "Confirmation Hearing Notices") to applicable Holders of Claims and Interests.**

### 7. Closing the Chapter 11 Cases

The Liquidating Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Court to close the Chapter 11 Cases; provided that, as of the Effective Date, the Debtors or Liquidating Debtors, as applicable, may submit separate orders to the Court under certification of counsel previously provided to the U.S. Trustee closing certain individual Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly. Nothing in the Plan shall authorize the closing of any case effective as of a date that precedes the date any such order is

entered. Any request for such relief shall be made on motion served on the U.S. Trustee, and the Court shall rule on such request after notice and a hearing. Upon the filing of a motion to close the last Chapter 11 Case remaining open, the Liquidating Debtors shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

## D.    Liquidation Analysis

The Plan is a liquidating Plan, so no liquidation analysis is required. However, in the opinion of the Debtors' professionals, the additional costs of a chapter 7 trustee and distressed sale if the Debtors' facilities immediately shut down would bring in far less than the liquidation pursuant to the Plan. The Debtors assert that the Plan provides a greater recovery for Holders of Allowed Claims, and no less recovery for Holders of Interests, than would be achieved in a liquidation under chapter 7 of the Bankruptcy Code. This assertion is based on a number of considerations, including (1) the likely erosion in value of the Debtors' assets in a chapter 7 case in the context of an expeditious liquidation and the "forced sale" atmosphere; (2) the additional Administrative Expense Claim and Professional Claims generated by conversion to a chapter 7 case and any related costs, including costs of chapter 7 trustee; (3) the absence of a robust market in which the Debtors' assets could be marketed and sold pursuant to a liquidation sale; and (4) the additional Claims that would arise by reason of the breach or rejection in a chapter 7 case of obligations under leases and executory contracts that would otherwise be assumed under the Plan.

A more comprehensive Liquidation Analysis is attached hereto as **Exhibit C**.

## Note about Forward-Looking Statements

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under federal securities laws. Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made and involve known and unknown risks, uncertainties, and other unknown factors that could impact the Debtors' restructuring plans or cause the actual results of the Debtors to be materially different from any future results expressed or implied by such forward-looking statements. In addition to statement which explicitly describe such risks and uncertainties, readers are urged to consider statements labeled with the terms "believes," "belief," "expects," "intends," "anticipates," "plans," "estimates," "potential," or "probable" or similar terms to be uncertain and forward looking. There can be no assurance that the Sale as described in this Disclosure Statement will be consummated. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- The Chapter 11 Cases, including the Debtors' ability to obtain Confirmation;
- The Debtors' ability to obtain the approval of the Bankruptcy Court with respect to motions or other requests made to the Bankruptcy Court, including maintaining strategic control as debtor in possession;

- the effects of these Chapter 11 Cases on the Debtors and on the interests of the various constituents, including holders of our common stock and indebtedness;
- the length of time that the Debtors will operate under Chapter 11 protection and the continued availability of capital during the pendency of the proceedings;

- any future effects as a result of the pendency of or emergence from the Chapter 11 Cases or ability to emerge from Chapter 11;

- the Debtors' level of operating expenses, general and administrative costs;
- budgets;
- results of litigation;
- disruption of operations.

## VII. TREATMENT OF EXECUTORY CONTRACTS AND/OR UNEXPIRED LEASES

### A. Assumption of Executory Contracts and/or Unexpired Leases

On the Effective Date, except as otherwise provided in <u>Section V.G</u> and elsewhere of the Plan or in the APA, all Executory Contracts and/or Unexpired Leases not otherwise assumed and assigned or rejected will be deemed rejected by the applicable Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that: (1) are identified on the Assumption Notice; (2) previously expired or terminated pursuant to their own terms; (3) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (4) are the subject of a motion to reject that is pending on the Effective Date; or (5) have an ordered or requested effective date of rejection that is after the Effective Date.

Such automatic assumption, assumption and assignment, or rejection, as applicable, shall be effective without the need for any further notice to or action, order, or approval of the Court, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than any Executory Contracts and/or Unexpired Leases that: (1) have been previously assumed, assumed and assigned, or rejected pursuant to a Court order; (2) are the subject of a motion to assume, assume and assign, or reject such Executory Contract or Unexpired Leases (or of a Filed objection with respect to the proposed assumption, assumption and assignment, or rejection of such Executory Contract or Unexpired Leases) that is pending on the Effective Date; or (3) are a contract, release, or other agreement or document entered into in connection with the Plan or Sale, if applicable. The assumption and assignment or rejection of Executory Contracts and/or Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates. Entry of the Confirmation Order shall constitute an order of the Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts and/or Unexpired Leases as set forth in the Plan or the Assumption Notice, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein or in the Plan, assumptions and assignments or rejections of Executory Contracts and/or Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Any motions to assume Executory Contracts and/or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Debtors.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract and/or Unexpired Leases assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption and assignment of such Executory Contract and/or Unexpired Leases (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory

53

Contract and/or Unexpired Leases or to exercise any other default-related rights with respect thereto.

**Notwithstanding anything to the contrary in the Plan, the Debtors or the Purchaser, as applicable, reserve the right to alter, amend, modify, or supplement the Assumption Notice at any time up to the Designation Deadline and any Assignable Contract that would otherwise be automatically rejected pursuant to the terms of the Plan may be added to the Assumption Notice and assumed and assigned at any time prior to the Designation Deadline consistent with the terms of the APA, Sale Order, and the Plan.**

### B. Claims Based on Rejection of Executory Contracts and/or Unexpired Leases

Unless otherwise provided by a Final Order of the Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and/or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Court by the applicable counterparty within thirty (30) days after the later of (1) the date of entry of an order of the Court (including the Confirmation Order) approving such rejection; (2) the effective date of such rejection; or (3) the Effective Date. Notwithstanding anything to the contrary herein or in the Plan, the Debtors or Liquidating Debtors, as applicable, shall have thirty (30) days following the Filing of the Proof of Claim for rejection damages to object to such Claim. If such objection is timely filed by the Debtors or Liquidating Debtors, the Proof of Claim shall be adjudicated in accordance with the procedures set forth in <u>Section VII</u> hereof.

**Any Claims arising from the rejection of an Executory Contract and/or Unexpired Lease not Filed with the Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Estates, or their property without the need for any objection by the Debtors or further notice to, or action, order, or approval of the Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract and/or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts and/or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with the appropriate Class herein or in the Plan.

### C. Cure of Defaults for Assumed Executory Contracts and/or Unexpired Leases

The Debtors shall file the Assumption Notice on or before the date that is five (5) Business Days following the date on which the Sale Order is entered by the Court, identifying all Assignable Contracts that the Debtors and Purchaser believe may be assumed and assigned in connection with the Sale and all Cure amounts relating thereto. The Debtors may amend the list of Assignable Contracts in the Assumption Notice to add or remove certain Assignable Contracts at any point up until the Designation Deadline.[26]

---

[26] Notwithstanding anything herein to the contrary, in the event that any Executory Contract or Unexpired Lease is added to the Assumption Notice and thereby assumed and assigned after the filing of the Plan Supplement, a notice of Cure amount with respect to such Executory Contracts and/or Unexpired Lease will be sent promptly to the counterparty thereof and such counterparty shall have seven (7) days to object to such notice.

The Assumption Notice shall include a description of the procedures for objecting to the proposed Cure amounts or the Purchaser's ability to provide "adequate assurance of future performance thereunder" (within the meaning of section 365 of the Bankruptcy Code). Unless otherwise agreed in writing by the parties in the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption and assignment or related Cure must be Filed and served on counsel to the Debtors no later than seven (7) days after the Filing of the Assumption Notice.

Any unresolved objection to a proposed Cure that cannot be consensually resolved or settled prior to Confirmation may be adjudicated by the Court at the Debtors' first omnibus setting following the Filing of the objection, or at such other time as such matters are brought before the Court, including at the Confirmation Hearing. Once any such dispute is adjudicated, the Debtors shall retain the right to modify, amend, or supplement the Assumption Notice up until the Designation Deadline.

Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption and assignment or Cure will be deemed to have assented to such assumption and assignment and Cure, and any untimely objection shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Purchaser without the need for any objection by the Debtors, Purchaser, or any other party in interest or any further notice to or action, order, or approval of the Court.

Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Purchaser, as applicable, of the Cure; *provided* that nothing herein or in the Plan shall prevent the Debtors or Purchaser from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure amount. The Debtors or Purchaser, as applicable may also settle any Cure without any further notice to or action, order, or approval of the Court.

The Debtors or the Purchaser, as applicable, shall pay undisputed Cures, if any, on the Closing of the Sale or as soon as reasonably practicable thereafter, or on such other terms as the parties to such Executory Contracts and/or Unexpired Leases may agree. If there is any dispute regarding any Cure, the ability of the Purchaser or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the applicable Cure amount shall occur at the later of (1) Closing, and (2) fourteen (14) days after entry of a Final Order resolving such dispute, or as may be agreed upon by the Debtors or the Purchaser, as applicable, and the counterparty to the Executory Contract and/or Unexpired Lease.

Assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts and/or Unexpired Leases that have been assumed and assigned in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged as of the latest of (1) the date of entry of an order of the Court (including the**

**Confirmation Order) approving such assumption and assignment; (2) the effective date of such assumption and assignment; and (3) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Court.**

### D. Preexisting Obligations to the Debtors Under Executory Contracts and/or Unexpired Leases

Rejection of any Executory Contract and/or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such Executory Contracts and/or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts and/or Unexpired Leases.

### E. Insurance Policies

Notwithstanding anything to the contrary herein, in the Plan, the Plan Supplement, the Confirmation Order, any other document related to any of the foregoing, or any other order of the Court, each of the Debtors' Insurance Contracts shall be treated as Executory Contracts under the Plan.

Unless otherwise provided in the Plan, on and after the Effective Date (1) the Debtors or Liquidating Debtors, as applicable, shall be deemed to have assumed and assigned the Insurance Contracts pursuant to sections 105 and 365 of the Bankruptcy Code; (2) nothing shall alter, amend or otherwise modify the terms and conditions of the Insurance Contracts except that, on and after the Effective Date, the Purchaser shall become and remain jointly and severally liable in full for all of their and the Debtors' obligations under the Insurance Contracts, regardless of whether such obligations arise before or after the Effective Date, without the requirement or need for any Insurer to file a Proof of Claim or an Administrative Expense Claim, or to object to any Cure; and (3) the automatic stay of Bankruptcy Code section 362(a) and the injunction set forth in <u>Section VIII.F</u> of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Court, solely to permit: (a) claimants with valid direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; (b) Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Court: (i) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, (ii) claims where an order has been entered by this Court granting a claimant relief from the automatic stay or the injunction set forth in <u>Section VIII.F</u> of the Plan to proceed with its claim; and (iii) all costs in relation to each of the foregoing; and (c) the Insurers to cancel any Insurance Contracts, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Insurance Contracts.

### F. Reservation of Rights

Nothing contained herein, in the Plan, or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract is in fact an Executory Contract or Unexpired Lease or that any Debtors have any liability thereunder. If there is a dispute regarding whether a

contract or lease is or was executory at the time of assumption and assignment or rejection, the Debtors shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

### G. Contracts and Leases Entered Into After the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or Purchaser in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order; provided, that nothing in Section V.G of the Plan shall apply to contracts and leases identified as part of the Debtors' investigation that are subject to avoidance pursuant to section 549 of the Bankruptcy Code.

## VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

### A. Discharge of Claims and Termination of Interests

Except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created pursuant to the Plan, (including with respect to Reinstated Claims) and pursuant to section 1141(d) of the Bankruptcy Code, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

### B. Release of Liens

**Except as otherwise provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens,**

pledges, or other security interests shall revert to the Debtors and their successors and assigns, including the Purchaser. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Debtors to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Debtors or Purchaser, as applicable, to evidence the release of such Lien, including the execution, delivery, and Filing or recording of such releases. The presentation or Filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps reasonably requested by the Debtors or the Purchaser, as applicable, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Debtors or Purchaser shall be entitled to make any such filings or recordings on such Holder's behalf.

## C. Release of Claims and Causes of Action

### 1. Releases by the Debtors and Their Estates

Under section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in the Plan and the Sale Order, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Liquidating Debtors, in their respective individual capacities and as debtors in possession, and on behalf of themselves and their respective Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected under section 1123(b)(3) of the Bankruptcy Code (collectively, the "<u>Debtor Releasing Parties</u>") and their respective assets and properties will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Debtor Releasing Parties) (the "<u>Debtor Release</u>") from any and all Claims, Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of (i) the Debtors, the Chapter 11 Cases, the marketing of any of the Debtors' assets, the Disclosure Statement, the Plan, and the Sale Order, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or

58

Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Sale Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Claim or Interest of the Debtors or the Liquidating Debtors, and/or (vii) the Confirmation or Consummation of the Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Liquidating Debtor (whether directly or derivatively) against any of the Released Parties; provided, however, that the foregoing provisions of this Debtor Release shall not operate to waive, release or otherwise impair: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction and/or (ii) the rights of such Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan or assumed under the Plan or assumed under Final Order of the Bankruptcy Court.

The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released under this Debtor Release. Notwithstanding the foregoing, nothing in Article VIII.C of the Plan shall or shall be deemed to prohibit the Debtors or the Liquidating Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Liquidating Debtors, unless otherwise expressly provided for in the Plan.

Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release set forth in Article VIII.C of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing.

2.      Release by Third Parties

Except as otherwise expressly provided in the Plan, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release

provided by the Debtor Releasing Parties above, each of (i) the Holders of Unimpaired Claims or Interests, to the extent such Holder has not opted out of the voluntary release by completing and returning the Opt-Out Form on or before the Opt-Out Deadline (each a "<u>Non-Debtor Releasing Party</u>" and, together with the Debtor Releasing Parties, the "<u>Releasing Parties</u>") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Non-Debtor Releasing Parties) (the "<u>Third Party Release</u>") from any and all Claims, Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of (i) the Debtors, the Chapter 11 Cases, the marketing of any of the Debtors' assets, the Disclosure Statement, the Plan, and the Sale Order, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Sale Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Claim or Interest of the Debtors or the Liquidating Debtors, and/or (vii) the Confirmation or Consummation of the Plan that such Non- Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; <u>provided</u>, <u>however</u>, that the foregoing provisions of this Third Party Release shall not operate to waive, release or otherwise impair: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (ii) any of the indebtedness and obligations of the Debtors and/or the Liquidating Debtors incurred under the Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan or assumed under the Plan or assumed under Final Order of the Bankruptcy Court; (iii) the rights of such Non-Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan or assumed under the Plan or assumed under Final Order of the Bankruptcy Court; and/or (iv) any objections with respect to any Retained Professional's final fee application or Accrued Professional Compensation Claims in these Chapter 11 Cases.

The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released under this Third Party Release.

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein and in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Third Party Release; (iii) in the best interest of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.**

### D. Waiver of Statutory Limitations on Releases

Each of the Releasing Parties in each of the releases contained above expressly acknowledges that although ordinarily a general release may not extend to Claims which the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims. Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the release, which if known by it may have materially affected its settlement with the Released Party. The releases contained in the Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

### E. Exculpation

**Effective as of the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any Entity for any claims or Causes of Action arising prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of the Plan, the Disclosure Statement, the Sale Documents or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other post-petition act taken or omitted to be taken in connection with the restructuring of the Debtors, the approval of the Sale, the Disclosure Statement or Confirmation or Consummation of the Plan; provided, however, that the foregoing provisions of this exculpation shall not operate to waive, release or otherwise impair: (i) any Causes of Action expressly set forth in and preserved by the Plan or the Plan Supplement; (ii) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (iii) any of the indebtedness or obligations of the Debtors and/or the Liquidating Debtors incurred under the Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan or assumed under the Plan or assumed under Final Order of the Bankruptcy Court, (iv) the rights of any Entity to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan or assumed under the Plan or assumed under Final Order of the Bankruptcy Court; and/or (v) any objections**

with respect to any Retained Professional's final fee application or Accrued Professional Compensation Claims in these Chapter 11 Cases; **provided** **further** that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties under, or in connection with, the above-referenced documents, actions, or inactions.

The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person. Notwithstanding the foregoing, nothing in Article VIII.E of the Plan shall or shall be deemed to prohibit the Debtors or the Liquidating Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Liquidating Debtors, in each case unless otherwise expressly provided for in the Plan.

## F. Injunction

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED UNDER THE PLAN OR THE CONFIRMATION ORDER AGAINST ANY PERSON OR ENTITY SO RELEASED OR DISCHARGED (OR THE PROPERTY OR ESTATE OF ANY PERSON OR ENTITY SO RELEASED, DISCHARGED). ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.

## G. Binding Nature of the Plan

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, THE DEBTORS, THE LIQUIDATING DEBTORS, ANY AND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, ALL PERSONS AND ENTITIES THAT ARE PARTIES TO OR ARE SUBJECT TO THE SETTLEMENTS, COMPROMISES,

**RELEASES, DISCHARGES, AND INJUNCTIONS DESCRIBED IN THE PLAN, EACH PERSON ACQUIRING PROPERTY UNDER THE PLAN, ANY AND ALL NON-DEBTOR PARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH THE DEBTORS AND THE RESPECTIVE SUCCESSORS AND ASSIGNS OF EACH OF THE FOREGOING, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING WHETHER OR NOT SUCH PERSON ORENTITY (I) WILL RECEIVE OR RETAIN ANY PROPERTY, OR INTEREST IN PROPERTY, UNDER THE PLAN OR (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES.**

### H.     Protections Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Debtors or Purchaser, as applicable, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Debtors, the Purchaser, or another Entity with whom the Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

### I.     Reimbursement or Contribution

If the Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## IX.     CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.     Conditions Precedent to the Effective Date

The following shall be Conditions Precedent to the Effective Date:

1.     The Court shall have entered the Confirmation Order, which shall be a Final Order or not subject to a stay pending appeal, and shall:

> (a)     implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

> (b)     decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

    (c)    authorize the Debtors, as applicable/necessary, to: (i) implement the Sale; (ii) make all distributions and issuances as required under the Plan; and (iii) enter into any agreements, transactions, and sales of property as set forth in the Plan and Plan Supplement;

    (d)    authorize the implementation of the Plan in accordance with its terms;

    (e)    provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

    (f)    authorize the payment into the Professional Claim Reserve Account, on or prior to the Effective Date, of the Professional Claim Reserve Amount, all in accordance with the terms of each Professional's engagement letter and subject to a hearing on final fee applications as necessary.

2.    The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan.

3.    The final versions of the Plan Supplement and all of the schedules, documents, annexes, and exhibits contained therein shall have been Filed in a manner consistent in all material respects with the Plan in form and substance reasonably acceptable to the Debtors.

4.    The Plan Supplement documents shall have been executed by the applicable parties thereto and all conditions precedent to the effectiveness of the applicable Plan Supplement documents shall have been satisfied or waived in accordance with the terms of such Plan Supplement documents.

5.    All conditions to Closing of the Purchase and Sale Agreement shall have been satisfied; provided that Closing shall not occur until a date to be determined following Confirmation.

6.    The Purchase and Sale Agreement shall have been executed and remain in full force and effect.

7.    All reasonable and documented Allowed Professional Fee Claims shall have been paid in full in Cash.

8.     The Debtors shall have implemented the Sale in a manner consistent with the Plan.

### B.     Waiver of Conditions

The Debtors may waive any one or more of the Conditions Precedent to the Effective Date, without notice, leave, or order of the Court or any formal action other than proceeding to confirm or consummate the Plan.

### C.     Effect of Failure of Conditions

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the Debtors, or Claims against, or Interests in, the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

### D.     Substantial Consummation

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

## X.     MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

### A.     Modification and Amendments

Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code. Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

### B.     Effect of Confirmation on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or solicitation under Bankruptcy Rule 3019.

### C.      Revocation or Withdrawal of Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts and/or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## XI.      RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.   allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.   decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.   resolve any matters related to: (1) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to section 365 of the Bankruptcy Code; (2) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed and assigned; (3) the Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V of the Plan, any Executory Contracts to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (4) any dispute regarding whether a contract is or was executory or expired;

4.   ensure that distributions to Holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of

the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6. adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7. enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement, except to the extent that a Plan Supplement document provides for exclusive jurisdiction and venue in another forum;

8. enter and enforce any order for the sale of property pursuant to sections 1123 or 1146(a) of the Bankruptcy Code;

9. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10. issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

11. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.L of the Plan;

13. enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14. determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Sale Order, if applicable, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, except to the

extent that any Plan Supplement document provide for exclusive jurisdiction and venue in another forum;

15. enter an order concluding or closing the Chapter 11 Cases;

16. adjudicate any and all disputes arising from or relating to distributions under the Plan;

17. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Court order, including the Confirmation Order;

18. determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19. hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, except to the extent that any Plan Supplement document provide for exclusive jurisdiction and venue in another forum;

20. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21. hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII of the Plan;

22. enforce all orders previously entered by the Court; and

23. hear any other matter not inconsistent with the Bankruptcy Code.

**As of the Effective Date and notwithstanding anything in Article XI of the Plan to the contrary, the Purchase and Sale Agreement, and any other documents related thereto, shall be governed by the jurisdictional provisions therein, and the Court shall not retain jurisdiction with respect thereto.**

## XII.    MISCELLANEOUS PROVISIONS

### A.    Immediate Binding Effect

Subject to Article IX.A of the Plan, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges,

and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts or Unexpired Leases with the Debtors.

### B. Additional Documents

On or before the Effective Date, the Debtors may File with the Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan. The Debtors and all Holders of Claims or Interests receiving Plan Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### C. Payment of Statutory Fees

All fees payable to the U.S. Trustee under 28 U.S.C. § 1930(a)(6) (including interest under 31 U.S.C. § 3717) as of the Confirmation Date will be paid on the Effective Date or as soon as reasonably practicable thereafter. Notwithstanding anything to the contrary in the Plan, such fees are not subject to an allowance procedure under 11 U.S.C. § 503(b), nor is the U.S. Trustee required to file a request for payment of such fees.

Following confirmation, the Debtors shall pay quarterly fees to the U.S. Trustee to the extent, and in the amounts, required by 28 U.S.C. § 1930(a)(6) (including interest under 31 U.S.C. § 3717). Quarterly fees shall be payable for any case that is reopened. So long as the Debtors are required to make these payments, the Debtors shall file with the Court quarterly reports in the form specified by the U.S. Trustee for that purpose.

### D. Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

### E. Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

### F. Notices

All notices , requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein or in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of

notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| GVS Texas Holdings I, LLC<br>1085 Old Clemson Hwy, Ste. E-205 Seneca, SC 29672-8028<br>Attention: Robert D. Albergotti | Sidley Austin LLP<br>2021 McKinney Avenue, Ste. 2000<br>Dallas, TX 75201<br>Attention: Thomas R. Califano and Charles Persons |
| **U.S. Trustee** | |
| Office of the United States Trustee<br>Earle Cabell Federal Building<br>1100 Commerce Street, Rm. 976<br>Dallas, TX 75242<br>Attention: Lisa Lambert, Elizabeth Young, and Asher Bublick | |

After the Effective Date, the Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

G.      **Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in these Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

H.      **Entire Agreement**

Except as otherwise indicated, the Plan (including, the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.      **Exhibits and Annexes**

All exhibits, annexes, and documents attached hereto or included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits, annexes, and documents are Filed, copies of such exhibits, annexes, and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits, annexes, and documents from the Debtors' restructuring website at https://omniagentsolutions.com/gvs or the Court's website at www.txnb.uscourts.gov. To the

extent any exhibit, annex, or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Court or otherwise specifically provided for in such exhibit, annex, or document, the non-exhibit, non-annex, or non-document portion of the Plan shall control.

### J.     Non-severability of Plan Provisions

If prior to Confirmation, any term or provision of the Plan is held by the Court to be invalid, void, or unenforceable, the Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

### K.     Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Texas, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided, however, that corporate governance matters relating to the Debtors not incorporated in Texas shall be governed by the laws of the state of incorporation or formation of the relevant Debtor.

### L.     Waiver or Estoppel

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Court prior to the Confirmation Date.

### M.     Closing of These Chapter 11 Cases

The Debtors shall, promptly after the full administration of these Chapter 11 Cases, File with the Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Court to close the Chapter 11 Cases

## XIII.  LIQUIDATION ANALYSIS

The Plan is a liquidating Plan, so no liquidation analysis is required. However, in the opinion of the Debtors' professionals, the additional costs of a chapter 7 trustee and distressed sale if the Debtors' facilities immediately shut down would bring in far less than the liquidation pursuant to the Plan. The Debtors assert that the Plan provides a greater recovery for Holders of Allowed Claims, and no less recovery for Holders of Interests, than would be achieved in a liquidation under chapter 7 of the Bankruptcy Code. This assertion is based on a number of considerations, including (1) the likely erosion in value of the Debtors' assets in a chapter 7 case in the context of an expeditious liquidation and the "forced sale" atmosphere; (2) the additional Administrative Expense Claim and Professional Claims generated by conversion to a chapter 7 case and any related costs, including costs of chapter 7 trustee; (3) the absence of a robust market in which the Debtors' assets could be marketed and sold pursuant to a liquidation sale; and (4) the additional Claims that would arise by reason of the breach or rejection in a chapter 7 case of obligations under leases and executory contracts that would otherwise be assumed under the Plan.

**Creditors and other interested parties should read <u>Section XVI</u> of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the ability of the Debtors to consummate the Plan.**

## XIV. FEASIBILITY AND BEST INTERESTS OF THE CREDITORS

### A. Feasibility of the Plan

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the chapter 11 plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of, the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan). Here the Debtors have proposed to liquidate either their equity or substantially all of their assets pursuant to the Sale set forth in the Plan. The Debtors believe that from these Sale Proceeds they will be able to make all payments required under the Plan.

### B. Best Interests of Creditors Test

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a Bankruptcy Court find, as a condition to confirmation, that a chapter 11 plan of reorganization provides, with respect to each class of claims and interests, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7, as set forth more fully in <u>Article XIII</u> herein.

Since the Plan is a liquidating Plan, no liquidation analysis is required. However, in the opinion of the Debtors' professionals, the additional costs of a chapter 7 trustee and distressed sale if the Debtors' facilities immediately shut down would bring in far less than the liquidation pursuant to the Plan. However, in order to satisfy the "best interests" test, the Debtors assert that the distributions to all Classes of Claims and Interests under the Plan are not less than the amount that Holders in such Classes are likely to receive if the Debtors were liquidated under chapter 7.

## XV. PLAN CONFIRMATION AND CONSUMMATION

## A.     The Confirmation Hearing

Section 1129(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to hold a hearing on confirmation of a chapter 11 plan.  The Bankruptcy Code further provides that any party in interest may object to the confirmation of a chapter 11 plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for [●] **p.m./a.m.** (prevailing Central Time), before the Honorable Micelle V. Larson, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Northern District of Texas.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before [●] p.m. (prevailing Central Time).  **THE BANKRUPTCY COURT MAY NOT CONSIDER OBJECTIONS TO CONFIRMATION OF THE PLAN IF ANY SUCH OBJECTIONS HAVE NOT BEEN TIMELY SERVED AND FILED IN COMPLIANCE WITH THE ORDER APPROVING THE DISCLOSURE STATEMENT.**

## B.     Statutory Requirements for Confirmation

Among the requirements for the confirmation of a chapter 11 plan of reorganization are that such plan (i) is accepted by all impaired classes of claims and interests, or if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class; (ii) is feasible; and (iii) is in the "best interests" of holders of claims and interests that are impaired under the plan.

In these Chapter 11 Cases, at the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (i) the Plan satisfies all of the necessary statutory requirements of chapter 11, (ii) they have complied or will have complied with all of the necessary requirements of chapter 11, and (iii) the Plan has been proposed in good faith.

### 1.     Acceptance by Impaired Classes

The Bankruptcy Code requires that, as a condition to confirmation, except as described in Section XVI.B.2 of this Disclosure Statement, each class of claims or interests that is impaired under a chapter 11 plan of reorganization, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.[27]

---

[27] As described in section 1124 of the Bankruptcy Code, a class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

No Holders of Claims are deemed Impaired under the Plan. Therefore, solicitation of acceptances with respect to each Class of Claims and Interests is not required.

### 2. Confirmation Without Acceptance by All Impaired Classes

Bankruptcy Code section 1129(b) allows a bankruptcy court to confirm a plan, even if an impaired class has not accepted it, provided that the plan has been accepted by at least one impaired class. The Debtors cannot guarantee confirmation of the Plan, but will seek confirmation pursuant to Bankruptcy Code section 1129(b) as necessary. Bankruptcy Code section 1129(b) states that, notwithstanding an impaired class's failure to accept a plan of reorganization, the plan may still be confirmed, so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of allowed Claims in that Class. The Debtors assert that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan, any Exhibit thereto and any Plan Supplement, including to amend or modify it to satisfy Bankruptcy Code section 1129(b), if necessary.

## XVI. RISK FACTORS IN CONNECTION WITH THE PLAN

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive. There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project and the Debtors undertake no obligation to update any such statement.

### A. Bankruptcy Considerations

### 1. General

While the Debtors expect that these Chapter 11 Cases will be of short duration and will not be materially disruptive to their business, the Debtors cannot be certain that this will be the case. Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Debtors' business. Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their customers and vendors. The proceedings will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

### 2. Objections to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors assert that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that parties in interest will not object to the classification of Claims and Interests under the Plan, or that the Bankruptcy Court will approve such classification.

### 3. Non-Confirmation or Delay of Confirmation of the Plan

The Debtors intend to seek Confirmation of the existing Plan as promptly as practicable, but may, in limited instances, seek to confirm an alternative chapter 11 plan. The Debtors can give no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

Alternatively, the Debtors may nevertheless seek Confirmation of the Plan notwithstanding the dissent of certain Classes of Claims or Interests. Nevertheless, the Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code if the Bankruptcy Court determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. To confirm a plan over the objection of a dissenting class, the Bankruptcy Court also must find that at least one Impaired Class (which cannot be an "insider" class) has accepted the Plan.

For the Debtors to emerge from the Chapter 11 Cases, the Debtors, like any other chapter 11 debtor, must obtain approval from their creditors and confirmation of the Plan by the Bankruptcy Court, and then successfully implement the Plan. The foregoing process requires the Debtors to (i) meet certain statutory requirements with respect to the adequacy of this Disclosure Statement, and (ii) fulfill other statutory conditions with respect to the confirmation of the Plan.

Although the Debtors assert that the Plan satisfies all of the requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will

reach the same conclusion. Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation, or that such modifications would not necessitate the solicitation, as applicable, of votes to accept the Plan, as modified. If the Plan is not confirmed by the Bankruptcy Court, (a) the Debtors may not be able to sell their business; (b) the distributions that Holders of Claims and Interests ultimately would receive, if any, with respect to their Claims or Interests is uncertain; and (c) there is no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that will be acceptable to the Bankruptcy Court and the Holders of Claims and Interests. It is also possible that third parties may seek and obtain approval from the Bankruptcy Court to terminate the exclusivity period during which only the Debtors may propose and seek to confirm a plan of reorganization.

### 4. Non-Occurrence of the Effective Date

As more fully set forth in Article IX of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place.

### 5. Conversion to Chapter 7

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. See Section XIII of this Disclosure Statement for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Interests.

### 6. Impact of Chapter 11 Cases on the Debtors

The Plan affects both the Debtors' capital structure and the ownership, structure, and operation of its business and reflects assumptions and analyses based on the Debtors' experience and perception of historical trends, current conditions, and expected future developments, as well as other factors that the Debtors consider appropriate under the circumstances. Whether actual future results and developments will be consistent with the Debtors' expectations and assumptions depends on a number of factors, including, but not limited to, the Debtors' (i) ability to obtain adequate liquidity and financing sources; (ii) ability to maintain customers' confidence in the Debtors' viability as a continuing entity and to attract and retain sufficient business from them; and (iii) ability of a Property Manager to retain  employees, as well as the overall strength and stability of general economic conditions in light of the global COVID-19 pandemic. The failure of any of these factors could materially adversely affect the successful liquidation of the Debtors' business.

Finally, the pursuit of these Chapter 11 Cases have consumed and will continue to consume a substantial portion of the time and attention of management, which may have an adverse effect on the Debtors' business and results of operations. The Debtors may also face increased levels of employee attrition from the Property Manager.

### 7. Inability to Assume and Assign Executory Contracts and Unexpired Leases

An executory contract is a contract on which performance remains due to some extent by both parties to the contract. The Plan provides for the assumption and assignment of all Executory Contracts that are not specifically rejected as set forth in the Plan. The Debtors intend to preserve as much of the benefit of their existing Executory Contracts as possible. However, with respect to some limited classes of Executory Contracts, including licenses with respect to patents or trademarks, the Debtors may need to obtain the consent of the counterparty to maintain the benefit of the contract. There is no guarantee that such consent either would be forthcoming or that conditions would not be attached to any such consent that makes assuming the contracts unattractive. The Debtors then would be required to either forego the benefits offered by such contracts or to find alternative arrangements to replace them.

### 8. No Legal or Tax Advice is Provided to You by This Disclosure Statement

**This Disclosure Statement is not legal or tax advice to you.** The contents of this Disclosure Statement should not be construed as legal, business or tax advice, and are not personal to any person or entity. Each Holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than as a disclosure of certain information regarding the Debtors and the Plan and to determine whether to complete an Opt-Out Form or object to confirmation of the Plan.

### 9. Recoveries Subject to Contingencies

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The estimated Claims and creditor recoveries that will be forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 10. Ability to Discharge or Satisfy Prepetition Claims

The Bar Dates for filing Proofs of Claim has been established as described in Article V.B.8 hereof. However, the Debtors may be subject to Claims in various legal proceedings and may become subject to other legal proceedings in the future. Although any such Claims will generally be stayed while the Chapter 11 Cases are pending, the Debtors may not be successful in ultimately discharging or satisfying such Claims. The ultimate outcome of each of these matters, including the Debtors' ability to have these matters satisfied and discharged in the bankruptcy proceeding, cannot presently be determined, nor can the liability that may potentially result from a negative

outcome be reasonably estimated presently for every case. The liability the Debtors may ultimately incur with respect to any one of these matters in the event of a negative outcome may be in excess of amounts currently accrued with respect to such matters and, as a result, these matters may potentially be material to the Debtors' business, financial condition, and/or results of operations.

### 11. Failure to Obtain Approval of Releases, Injunctions, and Exculpation

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases of claims and causes of action that may otherwise be asserted against the Debtors or other Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. Any party in interest, including the U.S. Trustee, could object to the Plan on the grounds that the third-party release contained in Article VIII.D of the Plan is not given consensually or in a permissible nonconsensual manner. In response to such an objection, the Bankruptcy Court could determine that the third party release is not valid under the Bankruptcy Code. If the Bankruptcy Court makes such a determination, the Plan could not be confirmed without modifying the Plan to alter or remove the third-party release, in which case the Released Parties may withdraw their support for the Plan. This could result in substantial delay in Confirmation of the Plan or the Plan not being confirmed at all.

### 12. Plan Based on Assumptions

The Plan affects both the Debtors' capital structure and the ownership, structure, and operation of its business and reflects assumptions and analyses based on the Debtors' experience and perception of historical trends, current conditions, and expected future developments, as well as other factors that the Debtors consider appropriate under the circumstances. Whether actual future results and developments will be consistent with the Debtors' expectations and assumptions depends on a number of factors, including but not limited to the Debtors' (i) ability to obtain adequate liquidity and financing sources; (ii) ability to maintain customers' confidence in the Debtors' viability as a continuing entity and to attract and retain sufficient business from them; and (iii) ability of a Property Manager to retain employees, as well as the overall strength and stability of general economic conditions in light of the global COVID-19 pandemic.

The failure of any of these factors could materially adversely affect the successful reorganization of the Debtors' business.

### B. Certain Federal Tax Matters Relating to the Plan

### 1. Introduction

It is possible that implementation of the Plan will have federal, state, local or foreign tax consequences to the Debtors and Holders of Interests as well as Holders of Claims. No tax opinion or ruling has been sought or will be obtained with respect to any tax consequences of the Plan, and the following discussion does not constitute and is not intended to constitute either a tax opinion or tax advice to any person.

The following discussion summarizes certain U.S. federal income tax consequences of the Plan to the Debtors and to Holders of Claims. This discussion assumes that each Holder of Claims is for United States federal income tax purposes:

- An individual who is a citizen or resident of the United States for federal income tax purposes;

- a corporation (or other entity treated as a corporation for United States federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- any other person that is subject to U.S. federal income taxation on a net income basis;

- an estate the income of which is subject to United States federal income tax without regard to its source; or

- a trust (1) that is subject to the primary supervision of a United States court and the control of one or more United States persons, or (2) that has a valid election in effect under applicable treasury regulations to be treated as a United States person.

This discussion also assumes that each Holder holds the Claims as capital assets under section 1221 of the Internal Revenue Code.

The summary provides general information only and does not purport to address all of the federal income tax consequences that may be applicable to the Debtors or to any particular Holder of Claims in light of such Holder's own individual circumstances. In particular, the summary does not address the federal income tax consequences of the Plan to Holders of Claims that may be subject to special rules, such as non-U.S. persons, insurance companies, financial institutions, regulated investment companies, broker-dealers, persons who acquired Claims as part of a straddle, hedge, conversion transaction or other integrated transaction, or persons who acquired Claims in connection with the performance of services; persons who hold Claims through a partnership or other pass-through entity and tax-exempt organizations. The summary does not address foreign, state, local, estate or gift tax consequences of the Plan, nor does it address the federal income tax consequences to Holders of Interests.

This summary is based on the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), the final, temporary and proposed Treasury regulations promulgated thereunder, judicial decisions and administrative rulings and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof and all of which are subject to change (possibly with retroactive effect) by legislation, judicial decision or administrative action. Moreover, due to a lack of definitive authority, substantial uncertainties exist with respect to various tax consequences of the Plan.

**THE TAX CONSEQUENCES TO THE HOLDERS OF CLAIMS OR INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF**

**THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE APPLICABLE TAX LAW. THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST SHOULD CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FOREIGN, FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN**.

### 2. U.S. Federal Income Tax Consequences to the Debtors

The Debtors are limited liability companies and are treated as disregarded entities for federal income tax purposes and therefore not subject to federal income tax. Instead, Holders of Interests are required to report the Debtors income, gain, loss, deduction or credit for the taxable year as if such items were incurred directly by such Holder.

Certain of the Debtors' transactions contemplated herein and in the Plan could constitute a taxable disposition of assets, and the Holders will recognize gain or loss based on the difference between the fair market value and the tax basis of the assets sold, transferred, or disposed, as applicable. The Debtors anticipate that the disposition of their assets will create a loss for federal income tax purposes. Holders of Interests will be required to report this loss on such Holder's tax return for the year of such disposition.

### 3. U.S. Federal Income Tax Consequences to Holders of Allowed Claims

The U.S. federal income tax consequences of the Plan to Holders of Claims, including the character and amount of income, gain or loss recognized as a consequence of the Plan, will depend upon, among other things, (a) the manner in which a Holder acquired a Claim; (b) the length of time the Claim has been held; (c) whether the Claim is a capital asset in the hands of the Holder; (d) the method of tax accounting of the Holder; and (e) with respect to any Claim, (i) whether the Claim was acquired at a discount, (ii) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years, (iii) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim, and (iv) whether the Claim is an installment obligation for U.S. federal income tax purposes.

**EACH HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISORS REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.**

### 4. Information Reporting and Backup Withholding

The Debtors will withhold all amounts required by law to be withheld from payments of interest. The Debtors will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim. Additionally, backup withholding, currently at a rate of 24 percent, will generally apply to such payments if a Holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding

rules. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a credit against such Holder's U.S. federal income tax liability and may entitle such Holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

## XVII. RESERVATION OF RIGHTS

The foregoing discussion is subject to change (possibly substantially) based on, among other things, subsequent changes to the Plan and events that may subsequently occur that may impact the timeline for the transactions contemplated by the Plan. The Debtors and the Debtors' advisors reserve the right to modify, revise, or supplement this discussion and other tax related sections of the Plan and Disclosure Statement in accordance with the terms of the Plan and the Bankruptcy Code.

## XVIII. RECOMMENDATION AND CONCLUSION

In the opinion of each of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. In addition, any alternative to confirmation of the Plan could result in extensive delays and increased administrative expense.

Accordingly, the Debtors submit the Plan is in the best interests of all Holders of Claims and Interests and should be confirmed on an uncontested basis.

*[Remainder of the Page Intentionally Left Blank]*

Dated: January 26, 2022          Respectfully submitted,
      Dallas, Texas


*/s/ Robert D. Albergotti*
Robert D. Albergotti
Director

82